# INDEX OF EXHIBITS

Exhibit 1   Declaration of Dr. Farshad Raissi, MD, MPH, FACC, FHRS

Exhibit 2   Toxicology report

Exhibit 3   Declaration of Dr. Gary Lee Sisler, DDO

Exhibit 4   September 23, 2004 Statement of Laketha Allen

Exhibit 5   September 4, 2004 Statement of Laketha Allen

Exhibit 6   Amendment to Death certificate of James Tomlin

Exhibit 7   Declaration of Dr. Charles Minor Harvey, MD

Exhibit 8   September 22, 2004 Statement of Tilon Carter

Exhibit 9   September 27, 2004 Statement of Tilon Carter

Exhibit 10 Chain of custody (release to Wade Funeral Home)

Exhibit 11 Detective C.D. Johnson affidavit

Exhibit 12 Donna Lacy affidavit

Exhibit 13 PULSAR MAX II manual excerpts

Exhibit 14 Declaration of Santiago Salinas
Exhibit 15 Forensic pathology consultation report by Dr. Charles M. Harvey

Exhibit 16 Email from Thea Posel to Dr. Peerwani

Exhibit 17 Death certificate of James Tomlin

Exhibit 18 PIA

Exhibit 19 Handwritten notes and Provisional Autopsy Form

Exhibit 20 Declaration of Patrick Garner

Exhibit 21 Internal TCME emails in response to PIA

Exhibit 22 Tomlin autopsy report

Exhibit 23 Declaration of Dr. Michael Baden

Proposed Second or Successive Petition

# EXHIBIT 1

# UNIVERSITY OF CALIFORNIA SAN DIEGO



BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO      SANTA BARBARA • SANTA CRUZ

**Farhad Raissi, MD MPH FACC, FHRS**
Division Of Cardiovascular Medicine
Ph 858-657-5310 | Fx 858-657-5314
email: fraissi@health.ucsd.edu

9452 Medical Center Dr
La Jolla, CA 92037

## Professional Qualifications

**Farshad Raissi, MD, MPH, FACC, FHRS**
Associate Professor of Medicine, University of California, San Diego
Board Certified in Cardiology, Cardiac Electrophysiology, and Advanced Heart Failure &
Transplantation

1. I am a physician specializing in Cardiology, Cardiac Electrophysiology, and Advanced Heart Failure and Transplantation, with board certification in all three disciplines. I currently serve as an Associate Professor of Medicine at the University of California, San Diego (UCSD), where I direct and participate in advanced cardiac electrophysiology and heart-failure device programs at the UC San Diego Medical Center. My clinical and research practice focuses on the management of complex arrhythmias, conduction-system disease, cardiac resynchronization, and advanced heart-failure therapies, including mechanical circulatory support and heart transplantation. I am also actively involved in the training and mentorship of the next generation of cardiologists and cardiac electrophysiologists.

2. Over the course of my academic and clinical career, I have personally performed and supervised thousands of device implantations, interrogations, and electrophysiologic studies, including pacemaker and defibrillator systems. I routinely collaborate with cardiac pathology, imaging, and surgical teams to correlate electrophysiologic findings with structural and histopathologic cardiac disease. I have published and lectured nationally and internationally on cardiac physiologic pacing, conduction-system disease, and arrhythmia mechanisms in heart failure, and have served as a principal investigator or co-investigator on multiple multicenter trials evaluating device therapy and sudden cardiac death prevention.

Ex. 1  001

3. In the context of this case, my qualifications include specialized expertise in the **electrophysiologic and structural mechanisms of sudden cardiac death**, interpretation of **device interrogation and autopsy data**, and correlation of **heart-failure pathophysiology with conduction and pacing abnormalities**. This enables me to provide an informed and objective expert assessment of the decedent's cardiac condition, pacemaker function, and mechanism of death.

4. I have generated this document independently, and the medical findings and conclusions contained in the document are my own. Portions of this report were proofread and edited with the assistance of secure, AI-based analytical tools. All source materials were handled in a confidential, restricted manner, and the analysis was conducted solely under my direction and professional supervision, consistent with accepted standards for expert medical review and reporting.

## Scope of Review

5. In preparation of this report, I have reviewed all available medical, autopsy, and evidentiary materials related to the death of Mr. James Tomlin. These materials include:

- The original autopsy report (Case #0403742) prepared by Dr. Nizam Peerwani, Medical Examiner, Tarrant County, Texas.
- The JPS Health Network hospital records (April 2002) documenting the admission for complete heart block and subsequent dual-chamber pacemaker implantation along with VA medical system health records.
- The pacemaker implant and interrogation records, including device specifications, programming parameters, and lead performance data.
- The expert testimonies of Drs. Nizam Peerwani, Amy Gruszecki, Jack Daniel, and Michael Baden.
- Supplemental medical and investigative materials, including relevant witness statements and scene descriptions, as provided by the retaining legal team.

6. My review was conducted with focus on the decedent's cardiac and pulmonary history, device function and dependence, and the forensic pathology findings that relate to the cause and mechanism of death. The opinions expressed herein are based on these materials, my training and experience in cardiac electrophysiology and advanced heart-failure medicine, and accepted standards in cardiovascular pathology and device interpretation.

7. I have approached this case with complete independence and objectivity, without bias toward either party. My analysis and conclusions are derived solely from the medical and forensic evidence, interpreted within the scope of my professional expertise and current scientific standards.

2

## Medical History and Pacemaker Implantation

8.  Mr. Tomlin had a long-standing history of essential hypertension, documented over years and likely suboptimally controlled. Hypertension (abnormal elevated blood pressure) is the most probable cause of his significant left-ventricular hypertrophy (severe increased wall thickness of main pumping chamber of heart with 2.1 cm thickness and heart weight of 455 g), consistent with hypertensive heart disease. Less common causes, such as hypertrophic cardiomyopathy (genetic heart disease in which the heart muscle becomes abnormally thickened) or infiltrative cardiomyopathies e.g., transthyretin amyloidosis (when abnormal proteins or substances build up inside the heart muscle), are possible but less likely in the absence of tissue or imaging confirmation. Over time, this chronic pressure overload would have resulted in diastolic dysfunction (when heart becomes too stiff to relax and fill normally), meeting modern criteria for heart failure with preserved ejection fraction (HFpEF) where the heart pumps well but is too stiff to fill properly, leading to heart failure symptoms like fatigue or shortness of breath.

9.  In April 2002, Mr. Tomlin was admitted to John Peter Smith Hospital in Fort Worth, Texas with symptomatic bradycardia (slow heart beats) and multiple falls likely due to sudden loss of consciousness due to high-grade AV block. Electrocardiography demonstrated high-grade atrioventricular block, a rhythm disturbance in which electrical impulses from the atria (top chambers of heart) fail to conduct to the ventricles (lower and main pumping chambers of heart), causing the upper and lower chambers of the heart to beat independently. Without conduction between the atria and ventricles, the intrinsic ventricular rate typically slows to 20–40 beats per minute—often insufficient to maintain adequate cardiac output—placing patients at risk for syncope, sudden cardiac arrest, or death.

10. To restore physiologic heart rate and maintain synchrony, Mr. Tomlin underwent implantation of a permanent dual-chamber pacemaker on April 29, 2002. This procedure is the standard of care of this condition of complete heart block/high grade AV block. The implanted device was a Guidant (now Boston Scientific) Pulsar MAX II DR (Model 1280) which regulated his rhythm with 100% pacing of lower chambers of the heart. The atrial lead (Model 4087) and ventricular lead (Model 4088) were both bipolar and demonstrated adequate sensing and capture thresholds at implantation.

Ex. 1  003

11. Although follow-up data do not specify the exact percentage of pacing, the underlying rhythm of complete heart block and initial 100% pacing implies that Mr. Tomlin was effectively 100 percent ventricularly paced—his heartbeat entirely dependent on pacemaker output for ventricular activation. Over time, this pattern of chronic right-ventricular pacing can contribute to ventricular dyssynchrony (where right and left ventricles do not synchronously pump) and progressive remodeling, particularly in the setting of existing hypertensive left-ventricular hypertrophy.

12. In addition, The Guidant Pulsar MAX II pacemaker family, including Model 1280 (the device implanted in Mr. Tomlin), was issued a Class I FDA recall/advisory in 2005 for a hermetic sealing defect that could lead to pacemaker malfunction and serious clinical consequences. This recall was classified as Class I — indicating a reasonable probability that the malfunctioning device could cause serious adverse health consequences or death. Regulatory advisories and health authorities (including Health Canada) also confirmed that certain PULSAR MAX II and related models were associated with a sealing-component issue and advised clinicians to consider device replacement, especially in pacemaker-dependent patients.

## Cardiac and Pulmonary Pathologic Findings

13. The autopsy performed in March 2004 by Dr. Nizam Peerwani, Medical Examiner of Tarrant County, Texas, described a heart weight of 455.5 grams with marked concentric left-ventricular hypertrophy. The left-ventricular wall measured 2.1 cm in thickness, and the right-ventricular free wall measured 0.5 cm. The coronary arteries demonstrated multivessel atherosclerosis with approximately 70–80% narrowing of artery diameter, consistent with advanced hypertensive and ischemic (where the blood supply to heart muscle is deficient) heart disease. The endocardium (inner lining of heart chamber) was smooth and intact, and no gross myocardial scar or infarction was identified. The cardiac valves were anatomically unremarkable.

14. These anatomic findings represent long-standing pressure overload from chronic hypertension, leading to compensatory myocardial thickening. Such hypertrophy increases myocardial oxygen demand and diastolic stiffness, impairs ventricular relaxation, and results in heart failure with preserved ejection fraction (HFpEF). Mr. Tomlin's absence of prior hospitalization for "heart failure" is therefore unsurprising; however, by modern criteria, his structural findings meet those typical of chronic hypertensive heart disease with diastolic dysfunction.

4

15. The lungs were described as heavy (combined weight 1,451 g) and congested and edematous, with microscopic evidence of emphysema and pulmonary vascular congestion. These findings are consistent with chronic pulmonary disease (emphysema) complicated by acute pulmonary edema secondary to elevated left-atrial and pulmonary venous pressures resulting from diastolic heart failure.

16. From an electrophysiologic standpoint, a myocardium with marked hypertrophy and diastolic dysfunction is electrically unstable. Increased wall thickness prolongs intramyocardial conduction time, promotes dispersion of repolarization, and heightens vulnerability to ventricular and atrial abnormal rhythms. Chronic right-ventricular pacing in this setting can exacerbate mechanical dyssynchrony and further elevate arrhythmic risk. Together, these features create a substrate in which sudden cardiac death or acute decompensated heart failure may occur spontaneously, without an external trigger or airway obstruction.

17. In addition to the hypertensive and structural findings, Mr. Tomlin had significant coronary artery disease, as clearly documented in the autopsy report, showing multivessel atherosclerosis with up to 70–80% arterial lumen narrowing (stenosis). Although the exact location of these stenoses—such as potential involvement of the left main or proximal left anterior descending (LAD) artery—was not specified in the report, the degree of disease is not unusual in an older individual with long-standing hypertension and other vascular risk factors; however, it carried major prognostic implications.

18. There was a documented diagnosis of chronic ischemic heart disease in Mr. Tomlin's VA records. My review of Mr. Tomlin's VA medical records showed no documentation of prior stress testing, echocardiographic ischemia evaluation, or coronary imaging to assess for coronary artery disease. These tests could be used to better delineate the extent of coronary disease and tailor an optimized medical management of ischemic heart disease. Furthermore, his medication profile indicates that he was not receiving optimal medical therapy for coronary disease or secondary prevention. Specifically, he was not treated with a statin, ACE inhibitor or ARB, a beta-blocker, or aspirin—agents known to reduce ischemic burden, stabilize atherosclerotic plaque, improve vascular function, and lower arrhythmic and mortality risk in patients with coronary atherosclerosis.

19. The combination of structural heart disease (left-ventricular hypertrophy and diastolic dysfunction) and untreated or suboptimally treated coronary atherosclerosis placed Mr. Tomlin at high risk for ischemia-induced ventricular arrhythmias, particularly under conditions of emotional stress, acute

5

heart-failure exacerbation, or transient surges in blood pressure. In such patients, even brief ischemia (lack of adequate blood supply to heart muscle) or adrenergic stimulation (a surge of stress hormones like adrenaline that make the heart race and work harder) can trigger malignant ventricular tachyarrhythmias or acute decompensated heart failure, either of which may result in sudden cardiac death without preceding symptoms.

## Autopsy Report Review and Comparison of Expert Testimonies

20. The autopsy performed by Dr. Nizam Peerwani in March 2004 documented an enlarged heart weighing 455.5 grams with concentric left-ventricular hypertrophy and multivessel coronary atherosclerosis (70–80 % luminal narrowing), consistent with advanced hypertensive and ischemic heart disease. The report also described pulmonary congestion and edema and moderate emphysema, findings compatible with acute cardiac decompensation in the setting of chronic cardiopulmonary disease.

21. However, the autopsy report was incomplete and deficient in several key respects. Most notably, it failed to mention the presence of Mr. Tomlin's dual-chamber cardiac pacemaker. A dual-chamber pacing system necessarily includes two intracardiac leads—one in the right atrium and the other in the right ventricle—which would be readily visible during routine cardiac dissection. Their complete omission indicates that the pacemaker was not examined, photographed, described, or interrogated.

22. The dual-chamber pacemaker system, had it been interrogated, could have provided objective electronic data on rhythm disturbances, capture failure, or terminal arrhythmia, materially informing both medical and legal conclusions.

6

## The Central Role of Stored Pacemaker Information

23. Given the structural and electrophysiologic substrate present in Mr. Tomlin's heart, several plausible natural mechanisms of sudden death exist independent of external asphyxia. One possibility is an electrical storm, consisting of recurrent or incessant ventricular tachycardia or ventricular fibrillation (VF) triggered by transient ischemia or adrenergic surge. In a patient with severe left-ventricular hypertrophy, diastolic dysfunction, and multivessel coronary atherosclerosis, even a brief episode of subendocardial ischemia could provoke VF or pulseless ventricular tachycardia, leading to sudden collapse. Alternatively, an acute ischemic event—such as plaque rupture or coronary vasospasm— could have precipitated electromechanical dissociation or acute heart-failure decompensation, particularly under conditions of stress and heightened adrenergic stimulation. These mechanisms are consistent with his pre-existing disease and would not necessarily produce distinct gross or microscopic evidence of infarction at autopsy, especially if death occurred within minutes of onset.

24. Mr. Tomlin's Guidant Pulsar MAX II DR (Model 1280) pacemaker had the capability to record such tachyarrhythmias, and post-mortem interrogation of the device could have clarified this plausible mechanism of death. The failure to document, extract, or interrogate the pacemaker represents a significant deficiency in the autopsy process, one that diminishes both the diagnostic accuracy and probative value of its conclusions.

25. The Guidant Pulsar MAX II DR was a dual-chamber, rate-responsive pacemaker capable of storing detailed electrocardiographic event data. The early-2000s devices of this model could record and retain intracardiac electrogram (EGM) tracings and diagnostic logs documenting episodes of tachycardia, loss of capture, and trends in battery voltage, lead impedance, and pacing thresholds. When properly interrogated post-mortem, such a device could reveal the heart's rhythm in the minutes or hours preceding death, including transitions from normal paced rhythm to ventricular tachycardia (VT), ventricular fibrillation (VF), or asystole (loss of capture).

Ex. 1  007

26. Removal of the device post-mortem is straightforward and standard in modern forensic protocol. After incising the skin over the left upper chest pocket, the pacemaker generator is gently dissected free from its fibrous capsule and disconnected from the atrial and ventricular leads. The leads are typically left in situ or trimmed near their insertion points to preserve cardiac anatomy. The pulse generator is then labeled, photographed, and sealed in a sterile container for electronic interrogation using the manufacturer's programmer.

27. Interrogation produces a readout and printout of device data, including stored electrograms, time-stamped rhythm strips, event markers, and trend graphs of heart rate and pacing activity. In pacemaker-dependent patients such as Mr. Tomlin, interrogation could demonstrate sustained ventricular arrhythmia (VT/VF), failure of ventricular capture, or a terminal decline in rate variability—findings that provide critical insight into both the mechanism and timing of death.

## Conclusion and Summary of Findings

28. Based on my review of the clinical records, autopsy findings, pacemaker data, and expert testimonies, it is my opinion that Mr. James Tomlin's death was in all likelihood most consistent with a cardiac event arising from his advanced structural and ischemic heart disease. His long-standing hypertension led to severe left-ventricular hypertrophy and diastolic dysfunction, while multivessel coronary atherosclerosis further compromised myocardial perfusion and electrical stability. These conditions created a substrate highly vulnerable to acute cardiac decompensation or malignant ventricular arrhythmia, particularly under conditions of emotional stress he was subjected to.

Ex. 1  008

29. The autopsy findings of pulmonary congestion and edema are compatible with acute left-sided heart failure which can occur without external obstruction. In addition, a post-mortem interrogation of his pacemaker device could have clarified whether a terminal arrhythmia or pacing failure occurred. The absence of this analysis represents a significant limitation in determining the precise sequence of events. Nevertheless, the totality of the medical and forensic evidence supports that Mr. Tomlin's death most likely resulted from a cardiac cause—either acute heart failure with pulmonary edema or a fatal arrhythmia (ventricular fibrillation)—precipitated by stress and underlying heart disease rather than direct asphyxia.

Respectfully submitted,


Farshad Raissi, MD, MPH, FACC, FHRS
Associate Professor of Medicine
Division of Cardiology, Section of Cardiac Electrophysiology
University of California, San Diego

Board Certified in:

- ABIM Cardiovascular Disease
- ABIM Clinical Cardiac Electrophysiology
- ABIM Advanced Heart Failure & Transplant Cardiology
- IBHRE Certified Cardiac Device Specialist

My name is Farshad Raissi Shabari, my date of birth is 2/11/1973, and my address is 9452 Medical

Center Dr, La Jolla, California, 92037 and United States. I declare under penalty of perjury that the

foregoing is true and correct.


Executed in San Diego County, State of California, on the 22nd day of December, two thousand twenty

five.


_FRaissi_
_____
Farshad Raissi Shabari

9

# EXHIBIT 2

# Toxicology Test Results

Office of Chief Medical Examiner
Toxicology Laboratory Service
200 Feliks Gwozdz Place
Fort Worth, Texas 76104
**Name: James Eldon Tomlin**

Case Number: **0403742**
Toxicology Work Number: **0601503**

Nizam Peerwani, M.D., DABFP
Chief Medical Examiner
Angela Springfield, PH.D., DABFT
Chief Toxicologist
Priority: **1**

Service Request Number: **014**

| Specimen | Drug | Result | Drug Amount | Performed By |
|---|---|---|---|---|
| AORTA BLOOD | ETHANOL | NEGATIVE | | S. HOWE |
| URINE | CANNABINOIDS TDX | NEGATIVE | | J. HO |
| URINE | COCAINE TDX | NEGATIVE | | J. HO |
| URINE | OPIATES TDX | NEGATIVE | | J. HO |
| URINE | AMPHETAMINE TDX | NEGATIVE | | J. HO |
| URINE | BENZODIAZEPINE TDX | POSITIVE | | J. HO |
| FEMORAL BLOOD | CHLORDIAZEPOXIDE | POSITIVE | 18.6 NG/ML | C. WHEELER |
| URINE | CHLORDIAZEPOXIDE | NEGATIVE | | C. WHEELER |
| FEMORAL BLOOD | NORDIAZEPAM | POSITIVE | 112.0 NG/ML | C. WHEELER |
| URINE | NORDIAZEPAM | POSITIVE | | C. WHEELER |

Report Prepared By: _Beryl Landry_

Approved By: _AC Springfield_

Approved Date: _10/19/06_

# EXHIBIT 3

# DECLARATION OF GARY LEE SISLER, ~~M.D.~~ D.O. *[handwritten initials]*

1. I am retired from working as a Deputy Medical Examiner with the Tarrant County Medical Examiner's Office. I worked in that office for approximately twenty years. I retired in 2012. Dr. Nizam Peerwani wanted me to keep working but I had to retire due to my physical health.

2. Before working with the Tarrant County Medical Examiner's Office, I was enlisted in the United States Army. I enlisted when I was 17 years old and I served in both the Korean and Vietnam Wars. I served in the Army for about 30 years.

3. I attended medical school at the Kansas City University of Medicine and Biosciences. I graduated in 1966. I was still in the Army at that time. I obtained my Texas medical license in 1975 after I retired from the Army.

4. I performed autopsies both in the Army and when I worked in Tarrant County. Over the years I have conducted over 2,000 autopsies. At the time I worked at the Tarrant County Medical Examiner's Office, Dr. Peerwani was the Chief Medical Examiner.

1

*[signature]*

5. During an autopsy, the autopsy technicians were responsible for removing the organs from the body. The medical examiner's job was to then weigh and examine the individual organs.

6. At autopsy, we recorded our observations in two ways. We made notes during the autopsy. We also audio-recorded our findings. This was important because sometimes the handwritten notes became covered in blood or fluid. The audio-recording then served as a back up in case the notes became unreadable. After completing the autopsy, we created the report from the handwritten notes as long as they were still readable. We kept the audio tapes in case they were needed later.

7. We also took photographs at autopsy. We photographed the person's face to make sure that we had identified the correct person in the autopsy report and death certificate. We also took other photographs of the body. We took photographs of organs when they were unusual, particularly in homicide cases.

8. When someone had a pacemaker, the Tarrant County Medical Examiner's Office practice was to remove that device at autopsy. The pacemaker would then be sent to the manufacturer of the

2

device as a matter of course. This was important so they could test the device and make sure it worked correctly.

9. At the Tarrant County Medical Examiner's Office, we developed a practice of signing off on reports of autopsies conducted by other examiners. This did not mean we agreed with the other examiner's cause of death determination. This meant that we had reviewed that examiner's findings and understood how they had arrived at the conclusion. This was particularly important in cases where the examiner determined the cause of death was homicide.

10. There are five causes of death that can be listed in an autopsy. They are homicide, accidental, suicide, natural, or undetermined. The homicide cause of death just means that the individual's death occurred at the hands of another. A medical examiner cannot determine whether a death is a murder from the autopsy.

11. I remember that Dr. Peerwani once testified that the cause of death was a murder. This testimony helped the District Attorney advance their case, but it was not testimony that was supported by the autopsy. I remember that Dr. Peerwani tended to be partial to the D.A.

12. The death certificate lists the final cause of death. Sometimes we listed the cause of death on a preliminary death certificate as "pending." We typically did this because we were awaiting some further testing that was important to the cause of death determination. This included testing like x-rays or toxicology. After the testing came back, the examiner was then able to consider the results.

My name is Gary Lee Sisler my date of birth is _____, and my address is _____ (street, city, state, zip code).

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Bell County, Texas, United States (county, state, country) on __10 / 13 / 25__ (date).

_Gary L Sisler_

Gary Lee Sisler
Declarant

4

# EXHIBIT 4

PARTICIPANTS:

DETECTIVE C. D. JOHNSON ID 2455
LEKETHA ALLEN
THURSDAY SEPTEMBER 23, 2004

---

STARTING TIME  05:19 P.M.

JOHNSON:   Detective C. D. Johnson ID 2455, It is Thursday, September 23rd 2004, at 05:19 p.m. We're at the Mansfield Jail. I'll be interviewing Leketha Allen. Leketha, before we start I have to read your rights and warnings, okay.

ALLEN:   Uh-umm.

JOHNSON:   You have the right to remain silent and not make any statement at all; any statement you make may be used against you at your trial; any statement you make may be used as evidence against you in court; you have the right to have a lawyer present to advise you prior to and during any questioning; if your are unable to employ a lawyer, you have the right to have a lawyer appointed to advise you prior to and during any questioning; and you have the right to terminate the interview at any time. Do you understand those rights?

ALLEN:   Uh-hum.

JOHNSON:   All right, do you wish to speak with me?

ALLEN:   Yes.

JOHNSON:   I need you to sign right there. Do you voluntarily waive these rights and agree that you wish to speak with me?

ALLEN:   Uh-hum.

JOHNSON:   Okay. You talked to Detective Carroll the other night—

ALLEN:   Uh-hum.

JOHNSON:   --right?

JOHNSON: Alright, so everybody's talking about that they need money and what specifically does your mom say, as best as you can remember?

ALLEN: About?

JOHNSON: About how to get money?

ALLEN: She was just telling us I know him. He'll have money and all this kind of stuff and stuff like that. There was just a whole bunch of talking because I didn't know him like that. You know what I'm saying. I knew him a long time ago when I was smaller and younger and he use to deliver fruit I guess or whatever. She was just saying that I know how is money be and he has such and such and such and such. See they got my step daddy's license plate of the cr. You know that white car. Because my little brother has been over there with my mother before.

JOHNSON: Okay. So y'all are talking, she says she knows how he has his money so tell me how did she describe his money how his money is kept?

ALLEN: One's on top and as you flip there are going to be 20's in the middle

JOHNSON: Okay. So it's you, Tilon, and your mother at this point. Is there any body else there talking?

ALLEN: No.

JOHNSON: Okay. So all three of y'all get in your car- -

ALLEN: Uh-hum.

JOHNSON: --and she?

ALLEN: points the way.

JOHNSON: Okay. Now you already told me that you didn't really know him except he use to deliver vegetables. Now did Tilon know him at all?

ALLEN: I'm not sure, I'm thinking, but I'm not sure.

JOHNSON: Okay, what do you think?

ALLEN: I mean I think he do and he might not of, you know, I just, you know, I asked him, he said no.

JOHNSON: Okay. So she's takes y'all over there and points it out?

ALLEN: ok and we leave.

JOHNSON: -okay and then you said- -

ALLEN: (inaudible)

JOHNSON: --and then after that who went back and scoped it out.

ALLEN: Another day me and Tilon

JOHNSON: Okay. And when you say scoped it out you go by and see

ALLEN: Just look that's it just look and go back home.

JOHNSON: Alright. So then when did y'all actually go over there?

ALLEN: I'm not sure, but I'm not sure, whenever the day, I mean, when was he found dead anyway,- -

JOHNSON: the 28th of April.

ALLEN: Probably about 2 days before or 3 days before.

JOHNSON: Was it morning or night?

ALLEN: Morning.

JOHNSON: Do you remember about what time?

ALLEN: No.

JOHNSON: Okay. So when ya'll go back over there how do you get in the house?

ALLEN: He let's us in.

JOHNSON: Okay, but tell me. Do you go knock on the door? Do you both go knock on the door?

ALLEN: I go to knock on the door and he let's us in he let me in. I guess he thought I was going to have sex with him or something.

FWPD000276
Ex. 4 003

ALLEN: some change

JOHNSON: some change

ALLEN: In some coffee plastic jars.

JOHNSON: Alright. And then Tilon gets on gloves and puts tape on him and you go start the car and he comes out with the gun.

ALLEN: No, as he was putting tape on him I was like I'm scared I'm ready to go. He was like hold on, like hold on, you know, he's like, he's like stand right here like this and I stood over him, you know what I'm saying, to making sure he didn't move or anything. And then he was like go crank up the car and I left out. As he was coming out the room with the gun I left out to go crank up the car. When he heard the car crank he came right out.

JOHNSON: Okay so you were with Tilon while he was taping him and then Tilon goes in the room to get the gun while you are going out to the car?

ALLEN: um hum

JOHNSON: At some point Mr. Tomlin is hit and smothered.

ALLEN: okay

JOHNSON: When is that?

ALLEN: Okay when he got in the car he was like okay I put some tape over his mouth.

JOHNSON: Okay let me tell you I'm reading this straight out of the autopsy report. Evidence of smothering, patterned mucosal contusions of upper lip with edema. He had laceration to his upper lip from his teeth from pressure being put on his face. There was evidence from his eyelids to his brain and generalized visceral congestion. So there was obviously somebody either put something over his face or held his face down.

ALLEN: I didn't see Tilon put anything over his face. Like I said anything could have happened while I was off in the next room. I didn't see or hear anything. All I heard and seen him do was put the tape on that's it and when he got in the car he was like I put tape over his mouth as well. You know. Seriously I'm already in jail why would I keep lying.

JOHNSON: I don't know, I don't know

ALLEN: Can I take a polygraph test then?

JOHNSON: Yeah we can do that. The confusion is that all three of ya'll are saying three different things.

ALLEN: Okay like what?

JOHNSON: Okay. He is saying that you went up to the door, then you came back to the car and he went in on his own. Then you came in later and found stuff. Of course he is denying even putting tape on him.

ALLEN: Okay.

JOHNSON: Your mom is saying that y'all told her that you went up and knocked on the door and asked if your mom was there and then Tilon came in and that his head was bleeding. Mr. Tomlin's head was bleeding and you held the gun while Tilon taped him.

ALLEN: No, this is my mother's plan, I mean, she's just asked what happened afterwards and the same thing I told you I was telling her. And she was like just don't worry about it. She was saying I wish I had went because I could have found more money and stuff like that she was just talking. But I'm just saying that's not the truth. If I can take a polygraph test I will. Seriously.

JOHNSON: Alright. So you are saying you never touched?

ALLEN: No, no not at all.

JOHNSON: And ya'll went over in your car?

ALLEN: My car. Yes

JOHNSON: About what time of the morning?

ALLEN: I can't remember. I know it was in the morning time.

JOHNSON: So, gun and the money?

ALLEN: Ah- -

JOHNSON: --you said Tilon came out with some cash in his hand?

ALLEN: um hum.

JOHNSON: Do you know how much money?

ALLEN: I don't know, all I know is he paid my car note. $140 he kept the rest of it I don't know how much it was. I don't ask I didn't try to count it.

JOHNSON: Okay. But you're saying you never saw any injuries to Mr. Tomlin?

ALLEN: No.

JOHNSON: And you never touched him?

ALLEN: No.

JOHNSON: Did you ever sit on him, push his face down?

ALLEN: No.

JOHNSON: put anything over his face?

ALLEN: No.

JOHNSON: Hit him in the head?

ALLEN: No.

JOHNSON: anyhting?

ALLEN: No, I will take a polygraph very seriously.

JOHNSON: Huh-huh.

ALLEN: I'm already in jail I have no reason to lie. I don't want to be here why would I continue to lie. I'm not lying. Test me, do a polygraph test.

JOHNSON: When ya'll leave and go back to your moms- -

ALLEN: Huh-hum.

JOHNSON: She gets the change- -

ALLEN: Yeah, the two coffee jars or whatever.

JOHNSON: --and Tilon pays $140 car note for you.

ALLEN: um hum.

JOHNSON: And he keeps the guns and the rest of the cash.

ALLEN: um hum.

JOHNSON: Did you know what happened to the guns?

ALLEN: He told me a friend stole it. Stole it from him

JOHNSON: All right Okay, and you don't know what he did with the cash.?

ALLEN: No ma'am I don't.

JOHNSON: Did y'all take the duct tape with you?

ALLEN: No.

JOHNSON: No. That was left there.

ALLEN: It was already there.

JOHNSON: But you didn't take it when ya'll left?

ALLEN: I don't remember seeing him get it no.

JOHNSON: Is there anything else that you're not telling me?

ALLEN: No. Can I take the polygraph test?

JOHNSON: Yeah, I'll get it scheduled. This will conclude the interview at 5:31 p.m.

# EXHIBIT 5

## FORT WORTH POLICE DEPARTMENT HOMICIDE UNIT

### LOCATION OF INTERVIEW:
### ERIC HOLDEN'S OFFICE, REGAL ROW
### DALLAS, TEXAS

### SERVICE NUMBER 04049162

**DATE:**      **FRIDAY, SEPTEMBE 4, 2004**
**TIME:**      **2:32 P.M.**

**PARTICIPANTS:**    **DETECTIVE C. D. JOHNSON, I.D. 2455**
**FORT WORTH POLICE DEPARTMENT HOMICIDE UNIT**

                 **LEKETHA NICOLE ALLEN**
                 **DOB:**
                 **ADDRESS:**

                 **PHONE:**

---

**DET JOHNSON:** THIS IS DETECTIVE C. D. JOHNSON, I.D. 2455. IT IS FRIDAY, SEPTEMBER 24, 2004, AT 2:32 P.M. I'LL BE INTERVIEWING LEKETHA ALLEN. WE ARE AT ERIC HOLDEN'S OFFICE ON REGAL ROW, IN DALLAS.

OKAY, ONCE AGAIN I'M GOING TO READ YOU YOUR MIRANDA WARNING.

"YOU HAVE THE RIGHT TO REMAIN SILENT AND NOT MAKE ANY STATEMENT AT ALL. ANY STATEMENT YOU MAKE MAY BE USED AGAINST YOU AT YOUR TRIAL. ANY STATEMENT YOU MAKE MAY BE USED AS EVIDENCE AGAINST YOU IN COURT. YOU HAVE THE RIGHT TO HAVE A LAWYER PRESENT TO ADVISE YOU PRIOR TO AND DURING ANY QUESTIONING. IF YOU ARE UNABLE TO EMPLOY A LAWYER, YOU HAVE THE RIGHT TO HAVE A LAWYER APPOINTED TO ADVISE YOU PRIOR TO AND DURING ANY QUESTIONING. YOU HAVE THE RIGHT TO TERMINATE THE INTERVIEW AT ANY TIME."

DO YOU UNDERSTAND THOSE RIGHTS?

**MS ALLEN:** YES.

**DET JOHNSON:** IF YOU'LL SIGN RIGHT THERE.

AND, YOU VOLUNTARILY WAIVE THOSE RIGHTS AND WISH TO TALK TO ME TODAY?

MS ALLEN: YES.

DET JOHNSON: I WANT YOU TO START, I GUESS, A LITTLE FURTHER BACK THAN THE ROBBERY. WHEN DID YOU ACTUALLY FIRST MEET OR GO TO MR. TOMLIN'S HOUSE?

MS ALLEN: WITH MY MOTHER, LIKE, MMM, IT WOULD HAVE TO BE BEFORE I MET TILON.

DET JOHNSON: OKAY. SO, ALMOST A YEAR AGO?

MS ALLEN: NO, NOT THAT LONG AGO, BUT, LIKE A MONTH OR SO BEFORE I MET HIM.

DET JOHNSON: OKAY. AND, WHY DID YOU GO OVER THERE TO MR. TOMLIN'S HOUSE?

MS ALLEN: I WENT OVER THERE WITH MY MOTHER, BECAUSE SHE TRIED TO GET SOME MONEY OUT OF HIM, AND SO DID I, BUT WE IT DIDN'T HAPPEN THAT WAY.

DET JOHNSON: OKAY. WHAT WERE YA'LL GOING TO DO FOR THE MONEY?

MS ALLEN: IF YOU WANT TO CALL IT TRICKING YOU CAN, BUT, YEAH.

DET JOHNSON: OKAY. WERE YA'LL GOING TO HAVE SEX WITH HIM, OR YOU WERE JUST GOING TO TALK?

MS ALLEN: TALK, BASICALLY.

DET JOHNSON: OKAY. UH, NOW HOW DID THAT NOT WORK OUT? WHAT HAPPENED?

MS ALLEN: I MEAN, I GUESS HE WAS ABOUT TO HAVE COMPANY OR SOMETHING LIKE THAT, BUT I JUST DIDN'T HAPPEN THAT DAY.

DET JOHNSON: OKAY. UH, SO DID YA'LL BOTH LEAVE?

MS ALLEN: MM HMM.

DET JOHNSON: ALL RIGHT. AND THEN, UH, DID YA'LL GO BACK?

MS ALLEN: NO, SHE WENT BACK.

DET JOHNSON: OKAY. THAT SAME DAY OR A DIFFERENT DAY?

MS ALLEN: IT WOULD HAVE TO BE THE SAME DAY.

**DET JOHNSON:** AND WHEN SHE WENT BACK, WHAT HAPPENED?

**MS ALLEN:** I WAS AT MY GRANDMOTHER'S HOUSE. SHE CALLED ME AND SAID, "I WANT YOU TO DO ME A FAVOR. CALL THIS NUMBER BACK. DISTRACT HIM FOR LIKE TWO MINUTES OR A MINUTE OR SO SO THAT I CAN GET SOME MONEY OUT OF HIM, AND I'LL PAY YOU." AND I SAID "OKAY."

**DET JOHNSON:** OKAY. SO, WHEN YOU CALLED BACK, WHAT DID YOU SAY?

**MS ALLEN:** I WAS JUST LIKE....I JUST MADE A WHOLE BUNCH OF STUFF. "WOULD YOU LIKE TO GIVE A DONATION TO SUCH AND SUCH?" HE WAS LIKE, "NO, I DON'T HAVE ANY MONEY RIGHT NOW. I'VE GOT COMPANY, SO I'VE GOTTA GO." MR. TOMLIN GOT OFF THE PHONE. SHE CALLED ME BACK WHEN SHE GOT BACK TO THE HOUSE AND SAID, "COME GET YOUR MONEY. I DID IT."

**DET JOHNSON:** AND HOW MUCH MONEY DID YOU GET?

**MS ALLEN:** LIKE FORTY OR FIFTY DOLLARS.

**DET JOHNSON:** OKAY. NOW, FROM THE TIME THAT YOU WENT OVER THERE WITH YOUR MOM UNTIL THE ROBBERY, DID YOU EVER GO BACK OVER TO HIS HOUSE?

**MS ALLEN:** NO.

**DET JOHNSON:** OKAY. AND, WHEN WAS THE FIRST TIME THAT YA'LL STARTED TALKING ABOUT NEEDING MONEY AND SOMETHING LIKE THAT GOING ON?

**MS ALLEN:** LIKE A WEEK BEFORE THE INCIDENT HAPPENED.

**DET JOHNSON:** OKAY. SO, ABOUT A WEEK BEFORE?

**MS ALLEN:** MM HMM.

**DET JOHNSON:** AND WHAT DID YA'LL DISCUSS?

**MS ALLEN:** HOW WE ALL NEEDED MONEY—HOW TIMES WERE HARD, ETC, ETC.

**DET JOHNSON:** AND, WHAT DID YA'LL NEED MONEY FOR?

**MS ALLEN:** I NEEDED MY CAR NOTE PAID, AND SHE NEEDED SOME THINGS DONE AROUND THE HOUSE, BECAUSE MY STEPDADDY WASN'T GIVING HER ANY MONEY, AND TILON, HE JUST NEEDED MONEY. HE DIDN'T NEVER SAY WHAT FOR.

FWPD000285
Ex. 5 003

**DET JOHNSON:** OKAY. AND SO, TELL ME HOW THE CONVERSATION WENT IN AS MUCH DETAIL AS YOU CAN REMEMBER.

**MS ALLEN:** ABOUT?

**DET JOHNSON:** ABOUT NEEDING MONEY AND HOW ALL THIS CAME...?

**MS ALLEN:** SHE WAS JUST LIKE....WE WERE ALL TALKING ABOUT WE NEEDED MONEY, AND SHE WOULD LIKE SAY "I GOT THIS LICK." SHE WAS LIKE, "THERE'S A OLD WHITE DUDE THAT I'VE TRICKED WITH BEFORE. HE GOT A LOT OF MONEY. SOMETIMES IT BE IN THE OVEN. SOMETIMES IT BE IN THE ICEBOX." SHE WAS LIKE, "ALL HIS BIG BILLS WAS IN THE MIDDLE. IT'S LIKE, YOU START FROM ONES AND KEEP FLIPPING, IT'S GOING TO TURN TO BIG BILLS, 'CAUSE HE NEVER PUT HIS BIG BILLS ON TOP."

**DET JOHNSON:** OKAY. AND SO, WHAT DID YA'LL DECIDE TO DO? DID YA'LL TALK ABOUT WHAT YA'LL WERE GONNA DO?

**MS ALLEN:** NOT AT THAT POINT, BUT SOMETIME LIKE THE NEXT DAY OR SOMETHING LIKE THAT. THAT DAY WE JUST...SHE JUST WAS TELLING US ABOUT IT AND DESCRIBING IT AND ALL OF THAT KIND OF STUFF.

**DET JOHNSON:** OKAY. SO, ALL YA'LL DID THAT FIRST DAY IS JUST TALK ABOUT THE FACT HE HAD MONEY?

**MS ALLEN:** YEAH.

**DET JOHNSON:** AND....THAT DAY, DID YA'LL TALK ABOUT THE FACT THAT YA'LL WERE GOING TO ROB HIM OR JUST THAT HE HAD MONEY.

**MS ALLEN:** THAT HE HAD MONEY. IT WAS MORE SO HER TALKING THAN US THAT DAY.

**DET JOHNSON:** OKAY. SO, THE VERY NEXT DAY YA'LL HAD ANOTHER CONVERSATION?

**MS ALLEN:** MM HMM.

**DET JOHNSON:** AND WHAT DID YA'LL TALK ABOUT THAT DAY?

**MS ALLEN:** ABOUT LIKE GOING TO GO AHEAD AND PROCEED WITH IT—GO AHEAD AND GO THROUGH WITH IT.

**DET JOHNSON:** OKAY. TELL ME SPECIFCALLY THE CONVERSATION AS YOU REMEMBER IT.

**MS ALLEN:** WE WENT UP TO MY MOTHER'S HOUSE, AND SHE WAS LIKE, "SO, WHAT'S UP? HAVE YA'LL THOUGHT ABOUT IT?" OR SOMETHING LIKE THAT, AND WAS

| | |
|---|---|
| MS ALLEN: | UH HUH. |
| DET JOHNSON: | ...TO HIS HOUSE? |
| MS ALLEN: | UH HUH. |
| DET JOHNSON: | AND WHERE DO YOU PARK? |
| MS ALLEN: | IN THE YARD. |
| DET JOHNSON: | OKAY. AND, THEN TELL ME IN DETAIL WHAT HAPPENED ONCE YA'LL GET THERE. |
| MS ALLEN: | OKAY. WE PARK IN THE YARD; HE DON'T LOCK THE DOOR, SO I GET OUT, GO KNOCK ON THE DOOR; HE COMES TO THE DOOR. I SAY, "HAVE YOU SEEN MY MOTHER?" HE SAID, "WHO'S YOUR MOTHER?" I SAID, "DONNA." HE'S LIKE, "NOT TODAY." DURING THAT TIME TILON COMES, YOU KNOW, GO IN. "GET YO' BITCH ASS ON THE GROUND." YOU KNOW WHAT I'M SAYING? HE...THE MAN GETS ON THE GROUND BY HIMSELF TILON'S NOT PUSHIN' OR KICKIN' OR NOTHIN'. I'M SEEING THIS WITH MY OWN EYES. SO, HE'S LIKE, "GO SEE WHAT YOU CAN FIND." SO, I WENT DIRECTLY TO THE KITCHEN, BECAUSE IT WAS THE CLOSEST THING TO ME AND GET TWO COFFEE CREAM MAKERS, SOME KIND OF JARS OF CHANGE, TWO OF THEM, AND TAKE THEM BACK IN THE LIVING ROOM WHERE HE IS. HE WAS LIKE, "HERE, HOLD THIS GUN. DON'T LET HIM MOVE." AND I WAS LIKE, "OKAY" BUT NOT AT NO TIME DID WE POINT THE GUN AT HIM OR ANYTHING, SO, YOU KNOW, I'M JUST HAVING THE GUN, AND THE MAN WAS LIKE, "I WISH YA'LL WOULDN'T DO ME LIKE THIS." AND ALL I SAID, WAS, "CHILL." AND HE DID. HE'D STAY QUIET. SO, TILON CAME OUT THE ROOM, HE HAD A LONG GUN...I GUESS IT WAS RIFLE PER SE, AND HE WAS LIKE, "HOW THE HELL YOU GONNA BYPASS A GUN?" I SAID, "I WASN'T LOOKING FOR THE GUN. I WAS LOOKING FOR MONEY." YOU KNOW WHAT I'M SAYING? AND, UH, I WAS LIKE, "HURRY UP, BECAUSE I'M READY TO GO." OR WHATEVER, SO HE GETS THE GUN BACK AND TUCK IT IN HIS PANTS OR WHATEVER, AND THE TAPE WAS ALREADY IN THERE, AND WHEN WE FIRST WALKED IN, THERE WAS GLOVES ALREADY IN THERE. SO, YOU KNOW WHAT I'M SAYING, JUST TO PUT THE GLOVES ON OR WHATEVER. I DIDN'T HAVE NO GLOVES. I REALLY DIDN'T JUST MOVE AROUND LIKE THAT. |
| DET JOHNSON: | MM HMM. |
| MS ALLEN: | SO, HE TELLS THE MAN TO CROSS HIS LEGS; HE TAPES HIS LEGS AND HIS ARMS, AND THE MAN IS...HE'S COOPERATING. HE'S NOT DOING NOTHING. HE'S NOT SAYING ANYTHING, SO, AT THAT POINT, HE WAS LIKE, OKAY, YOU GOT THE MONEY. IT WAS A HUNDRED DOLLAR BILL IN HIS WALLET, AND I GUESS IN HIS OTHER POCKET THERE WAS SOME MONEY. AS HE FLIPPED |

FWPD000287
Ex. 5 005

THROUGH, HE HANDED ME A $140, AND HE SAID, "THIS IS YOUR CAR NOTE." AND I PUT IT IN MY BRA, AND HE WAS LIKE, "GO CRANK UP THE CAR OR WHATEVER. SO, I LEAVE TO CRANK UP THE CAR BECAUSE MY IGNITION IS MESSED UP. SO, THE CAR CRANKED, AND WITHIN LIKE TEN SECONDS HE COME OUT, YOU KNOW, STUFF LIKE THAT'S, GETS IN MY CAR AND WE LEAVE AND WE LEAVE FOR MY MOTHER'S—GO STRAIGHT TO MY MOTHER'S HOUSE.

DET JOHNSON: OKAY. AND ONCE YOU GET TO YOUR MOTHER'S WHAT HAPPENS?

MS ALLEN: I GO OUT AND GO GET HER, AND I WAS LIKE, "MAMA, WE DID IT." I'M SCARED." I MEAN, "WHAT SHOULD I DO NOW?" YOU KNOW WHAT I'M SAYING, BECAUSE I'VE NEVER BEEN IN TROUBLE BEFORE. I MEAN, I DON'T, YOU KNOW WHAT I'M SAYING. SHE WAS JUST LIKE, "JUST CHILL. WHERE'S TILON?" I'M LIKE, "HE'S IN THE CAR." DURING THAT TIME, THE UH RIFLE WAS IN MY TRUNK OR WHATEVER; I GUESS IT'S A RIFLE, AND SO.....SHE...TILON WAS LIKE, "COME ON. LET'S GO." OR WHATEVER, LIKE THAT. I WAS STILL PACING BACK AND FORTH, 'CAUSE WE ALL NERVOUS, YOU KNOW. SO, HE WAS LIKE, "GIVE YOUR MAMA THOSE CHANGE JARS." AND I KINDA HESITATED LIKE, "NO." YOU KNOW, LIKE THAT. AND, HE WAS LIKE, "GIRL, GO ON GIVE HER THAT MONEY." SO, I GAVE HER BOTH OF THEM, OR WHATEVER, SO....

DET JOHNSON: MM HMM

MS ALLEN: SO, WE LEAVE TO GO TO HIS GRANDMOTHER'S HOUSE SO HE CAN PUT THE RIFLE, OR WHATEVER, AND THEN ME AND HIM JUST GO TO THE PARK TALK ABOUT WHAT HAPPENED AND HOW WE WISH HAD NEVER WENT DOWN LIKE THAT.

DET JOHNSON: OKAY. I WANT TO GO BACK TO WHEN YA'LL FIRST SHOW UP AT HIS HOUSE. YOU GO KNOCK ON THE DOOR, AND YOU ASK IF YOUR MOM'S THERE.

MS ALLEN: MM HMM.

DET JOHNSON: WHERE IS TILON WHEN YOU KNOCK ON THE DOOR?

MS ALLEN: IN THE CAR.

DET JOHNSON: OKAY. SO, ONCE HE SEES THAT YOU'RE TALKING....

MS ALLEN: YEAH. HE GETS OUT AND COMES AND I SCOOT OUT OF THE WAY, AND HE JUST GOES IN.

ET JOHNSON: OKAY. IS HE HOLDING THE GUN IN HIS HAND?

MS ALLEN:       UH HUH.

DET JOHNSON:    OKAY.

MS ALLEN:       BUT HE DIDN'T NEVER POINT IT. I GUESS THE OLD MAN JUST AUTOMATICALLY SEEN THE GUN, OR WHATEVER, AND JUST, YOU KNOW, AFTER HE SAID, "GET YOUR BITCH ASS ON THE GROUND," HE GOT ON THE GROUND.

DET JOHNSON:    UH, HOW DID HE GET ON THE GROUND?

MS ALLEN:       VOLUNTARILY.

DET JOHNSON:    OKAY.

MS ALLEN:       SLOWLY, BUT VOLUNTARILY.

DET JOHNSON:    OKAY. DID HE JUST SIT DOWN ON THE GROUND? DID HE KNEEL ON THE GROUND?

MS ALLEN:       HE KNEELED. HE KNEELED FIRST, AND THEN LAID FLAT, YOU KNOW, LIKE THAT.

DET JOHNSON:    ON HIS BACK OR ON HIS STOMACH?

MS ALLEN:       ON HIS STOMACH.

DET JOHNSON:    OKAY. SO, AS SOON AS HE'S ON THE GROUND....ARE BOTH OF YA'LL INSIDE AT THIS TIME?

MS ALLEN:       MM HMM. I CAME IN AFTER HIM.

DET JOHNSON:    OKAY. WHERE IS TILON?

MS ALLEN:       STILL OVER THE MAN.

DET JOHNSON:    OKAY. DOES HE HAVE THE GLOVES ON YET?

MS ALLEN:       MMM, YES.

DET JOHNSON:    AND WHILE TILON IS THERE, WHAT ARE YOU DOING?

MS ALLEN:       IN THE KITCHEN GETTING THE COFFEE THINGS.

DET JOHNSON:    OKAY. SO, WHERE ALL IN THE HOUSE DO YOU GO LOOKING FOR MONEY?

FWPD000289
Ex. 5 007

MS ALLEN: JUST IN THE KITCHEN AND THE BEDROOM.

DET JOHNSON: BUT, THE ONLY MONEY YOU FOUND WERE THE CREAMERS?

MS ALLEN: YES.

DET JOHNSON: OKAY. SO, WHILE YOU'RE LOOKING FOR MONEY, IS TILON STILL THERE WITH HIM THE WHOLE TIME?

MS ALLEN: MM HMM.

DET JOHNSON: SO, YOU COME BACK WITH THE COFFEE CREAMERS?

MS ALLEN: MM HMM.

DET JOHNSON: AND THEN, AT THAT POINT HE HANDS YOU THE GUN?

MS ALLEN: MM HMM. AND SAID, HOLD THIS, AND THEN MY EYES GOT BIG, LIKE, "OKAY, BUT HURRY UP." YOU KNOW. I DIDN'T POINT IT AT HIM OR NOTHING. HE SAID, "I WISH YOU WOULDN'T DO ME LIKE THIS." I JUST SAID, "CHILL." JUST LIKE THAT. HE DIDN'T SAY ANYTHING ELSE.

DET JOHNSON: OKAY. IS HE TAPED UP AT THIS TIME?

MS ALLEN: NO.

DET JOHNSON: OKAY. SO THEN TILON GOES AND LOOKS AND COMES WITH A BIG, LONG GUN, RIFLE, WHATEVER IT IS?

MS ALLEN: MM HMM.

DET JOHNSON: ALRIGHT AND ONCE HE COMES BACK HE IMMEDIATELY TAKES THE GUN BACK FROM YOU?

MS ALLEN: UH HUH. AND PUTS IT IN HIS PANTS.

DET JOHNSON: OKAY. SO THEN, HE TAKES THE DUCT TAPE?

MS ALLEN: UH HUH.

DET JOHNSON: AND THEN WHAT DOES HE DO?

MS ALLEN: THE DUCT TAPE WAS ALREADY IN THE HOUSE, LIKE RIGHT WITH THE GLOVES AND TAPES HIS LEGS AND HIS ARMS.

DET JOHNSON: OKAY.

MS ALLEN: HE GETS THE MONEY; GIVE ME A HUNDRED AND FORTY AND SAYS "GO PAY YOUR CAR NOTE." I'M LIKE, "YOU DIDN'T HAVE TO DO THIS IN THE HOUSE YOU COULD WAIT TIL WE GOT OUT YOU KNOW, LIKE THAT, OR WHATEVER, AND THEN HE'S LIKE, "GO CRANK UP THE CAR." YOU KNOW. SO, I DID WHAT HE SAID.

DET JOHNSON: ALL RIGHT. DID YOU SEE HIM PUT TAPE OVER HIS MOUTH?

MS ALLEN: NO, I DIDN'T, BUT WHEN HE GOT IN THE CAR, HE TOLD ME HE DID, AND I ASKED HIM WHY. HE WAS LIKE, "SOMEBODY WILL THERE TO CHECK LATER JUST CHILL —YOU KNOW, JUST IN CASE. IN FACT, I THINK I KNOW HIM FROM SOMEWHERE." AND I'M LIKE, "DID YOU DO ANYTHING TO HIM?" HE WAS LIKE, "NO." I DIDN'T SEE HIM DO ANYTHING. I DIDN'T HEAR HIM DO ANYTHING. LIKE, IF HE PUNCHED SOMEBODY, YOU COULD HEAR IT. I DIDN'T HEAR HIM DO ANYTHING OR SEE HIM DO ANYTHING.

DET JOHNSON: OKAY. SO, YOU WENT OUT AND STARTED THE CAR, AND WHEN HE CAME AND GOT IN THE CAR, UH, HE JUST IMMEDIATELY TOLD PUT DUCT TAPE.

MS ALLEN: YEAH. HE'S LIKE, "BABY, I PUT TAPE OVER HIS MOUTH, JUST IN CASE." I SAID, "WHY'D YOU DO THAT?" YOU KNOW WHAT I'M SAYING. HE'S LIKE, "JUST CHILL. SOMEBODY WILL BE HERE AND THEY'LL CHECK ON HIM."

DET JOHNSON: SO THEN YA'LL GO TAKE....

MS ALLEN: MY MOTHER'S HOUSE

DET JOHNSON: ....THE CREAMERS TO YOUR MOM, AND THEN UH....

MS ALLEN: WE STAYED THERE FOR A WHILE AND TALKED TO HER, BECAUSE I'M NERVOUS; I'M PACING; I'M LIKE, YOU KNOW, LIKE THAT.

DET JOHNSON: OKAY. AND THEN YA'LL GO PUT...

MS ALLEN: THE RIFLE...

DET JOHNSON: THE RIFLE AT....HIS GRANDMOTHER'S HOUSE?

MS ALLEN: MM HMM.

DET JOHNSON: WHERE DO YA'LL PUT THAT?

| | |
|---|---|
| MS ALLEN: | I DON'T KNOW. I DIDN'T GET OUT. I NEVER GET OUT. EVERY TIME I GO OVER THERE, I NEVER GET OUT. HE JUST GOT OUT. |
| DET JOHNSON: | DID HE TAKE IT IN THE HOUSE? |
| MS ALLEN: | UH HUH. |
| DET JOHNSON: | DID HE LEAVE THE OTHER GUN IN THE HOUSE ALSO? |
| MS ALLEN: | UH HUH. |
| DET JOHNSON: | OR, WHERE IS THAT AT? |
| MS ALLEN: | IN THE HOUSE ALSO. UH HUH. |
| DET JOHNSON: | ALL RIGHT. AND THEN YA'LL GO TO THE PARK? |
| MS ALLEN: | MM HMM. |
| DET JOHNSON: | AND WHAT DO YA'LL TALK ABOUT AT THE PARK? |
| MS ALLEN: | JUST HOW SCARY IT WAS; HOW I'VE NEVER BEEN THROUGH NOTHING LIKE THAT. HE WAS MORE SO TRYING TO CALM ME DOWN. AND HE WAS LIKE, YOU KNOW WHAT I'M SAYING, "I KNOW HOW YOUR MAMA IS. MAYBE WE SHOULDN'T HAVE DONE IT." YOU KNOW WHAT I'M SAYING? AND I'M LIKE, "WE IN THIS TOGETHER." I SAID "I LOVE YOU". AND HE'S LIKE, "WELL, I LOVE YOU, TOO." YOU KNOW WHAT I'M SAYING, AND THEN THE WHOLE TIME WE WAS LIKE, "WELL, MY MAMA SAID "JUST CHILL." AND STUFF LIKE THAT, AND WE TRIED TO BE AS CALM AS POSSIBLE. |
| DET JOHNSON: | OKAY. SO, THEN, WHEN IS THE FIRST TIME THAT YOU KNOW THAT HE DIED? |
| MS ALLEN: | ON THE NEWS, WHEN I SEEN IT ON THE NEWS. |
| DET JOHNSON: | AND UH.... |
| MS ALLEN: | I'M HALFWAY ASLEEP, AND I SEEN IT ON THE NEWS. MY EYES GOT AS BIG AS THEY COULD GET, LITERALLY. SO, I IMMEDIATELY CALLED HIM TO COME OVER AND, YOU KNOW WHAT I'M SAYING. IT'S LIKE "DAMN" YOU KNOW. WE JUST AMAZED THAT SOMETHING LIKE THAT COULD JUST HAPPEN OVERNIGHT OR OUT OF SOMETHING LIKE THAT, YOU KNOW. THEN, THE NEWS WAS LIKE, "IT WASN'T A FORCED ENTRY." AND HE WASN'T LIKE MURDERED BRUTALLY; IT WAS LIKE MORE OF A SUFFOCATION, BECAUSE OF THE TAPE OR WHATEVER. SO, I'M LIKE, O-OWIE, I HOPE WE DON'T GET IN TROUBLE. AND WOOPTY WOOP THIS AND ALL THAT, AND HE'S LIKE, "BABY, JUST CHILL, YOU |

FWPD000292
Ex. 5 010

KNOW WHAT I'M SAYING. DON'T, YOU KNOW, DON'T REACT DIFFERENTLY, OR YOU'LL PANIC AND SOMETHING HAPPEN IF YOU DON'T WANT IT TO HAPPEN."

DET JOHNSON: OKAY. SO, DID YOU EVER TELL ANYBODY?

MS ALLEN: NO.

DET JOHNSON: UH, DID YOU EVER TALK TO YOUR MOM AFTER YOU KNEW THAT HE HAD DIED?

MS ALLEN: YEAH. SHE WAS JUST LIKE....ACTUALLY, SHE BROUGHT IT TO MY ATTENTION WHEN I WENT UP THERE, BECAUSE I DIDN'T WANT TO JUST BRING IT UP LIKE THAT. AND SHE'S LIKE, "KIKI, YOU KNOW THAT OLD MAN DIED?" I WAS LIKE, "OOOH, MAMA, WE DIDN'T DO IT. IT WAS AN ACCIDENT, AND ALL OF THAT KIND OF STUFF LIKE THAT." SHE WAS LIKE, "I KNOW. MAYBE HE DIED OF OLD AGE." YOU KNOW WHAT I'M SAYING? AND STUFF LIKE THAT. SHE WAS JUST LIKE, "CHILL." YOU KNOW WHAT I' SAYING? I ADOPT YOU. YOU KNOW WHAT I'M SAYING? THIS IS MY MAMA SAYING THIS. WE WERE ALL IN THIS TOGETHER. YOU DOWN DOWN, AND I'LL GO DOWN AND ALL THIS KIND OF STUFF LIKE THIS. SHE WAS LIKE, "REALLY." YOU KNOW WHAT I'M SAYING. IT WASN'T PLAYING, SO, YOU KNOW WHAT SAYING, SO JUST PRAY ABOUT IT.

DET JOHNSON: OKAY. IS THERE ANYTHING ELSE THAT YOU'VE LEFT OUT?

MS ALLEN: NO.

DET JOHNSON: HAVE YOU TOLD ME EVERYTHING?

MS ALLEN: MM HMM.

DET JOHNSON: THIS COMPLETES THE INTERVIEW AT 2:49 P.M.

TRANSCRIBED BY D. SIMONDS, L308.

FWPD000293
Ex. 5 011

# EXHIBIT 6

# AMENDMENT TO MEDICAL CERTIFICATION OF CERTIFICATE OF DEATH

**STATE OF TEXAS**

STATE FILE NUMBER CV03742

ENTER NAME OF DECEASED AND PLACE OF DEATH <u>EXACTLY</u> AS SHOWN ON ORIGINAL DEATH CERTIFICATE

| NAME OF DECEASED | DATE OF DEATH Found |
|---|---|
| JAMES ELDON TOMLIN | APRIL 28, 2004 |

| PLACE OF DEATH (CITY OR TOWN AND COUNTY) | IS THE DATE OF DEATH BEING CORRECTED? |
|---|---|
| FORT WORTH, TARRANT COUNTY, TEXAS | ☐ YES ☒ NO |

30. CERTIFIER

☐ CERTIFYING PHYSICIAN — TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE TIME, DATE, AND PLACE, AND DUE TO THE CAUSE(S) AND MANNER AS STATED.

☒ MEDICAL EXAMINER } ON THE BASIS OF EXAMINATION AND/OR INVESTIGATION, IN MY OPINION, DEATH OCCURRED AT THE TIME, DATE, PLACE, AND DUE TO THE
☐ JUSTICE OF THE PEACE } CAUSE(S) AND MANNER AS STATED.

| 31. SIGNATURE & TITLE OF CERTIFIER | 32. DATE SIGNED | | | 33. TIME OF DEATH Found |
|---|---|---|---|---|
| NIZAM PEERWANI, M.D. Chief Medical Examiner, Tarrant County | MO 06 | DAY 08 | YEAR 04 | Dead 2:11 P M. |

34. PRINTED NAME & ADDRESS OF CERTIFIER
TARRANT COUNTY MEDICAL EXAMINER, 200 FELIKS GWOZDZ PLACE, FORT WORTH, TEXAS 76104-4919

| 35. PART 1 ENTER THE DISEASES, INJURIES OR COMPLICATIONS THAT CAUSED THE DEATH. DO NOT ENTER THE MODE OF DYING SUCH AS CARDIAC OR RESPIRATORY ARREST, SHOCK, OR HEART FAILURE. LIST ONLY ONE CAUSE ON EACH LINE. | Approximate Interval Between Onset and Death |
|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) a. SMOTHERING WITH POSITIONAL ASPHYXIATION | UNKNOWN |
| Sequentially list conditions, if any, leading to immediate cause. Enter UNDERLYING CAUSE (disease or injury that initiated events resulting in death) LAST b. | |
| c. | |
| d. | |

| 36. PART 2 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART 1 (i.e., substance abuse, diabetes, smoking, etc.) | 36a. AUTOPSY? ☒ YES ☐ NO | 36b. AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH? ☒ YES ☐ NO |
|---|---|---|

| 37. DID TOBACCO USE CONTRIBUTE TO DEATH | 38. DID ALCOHOL USE CONTRIBUTE TO DEATH | 39. WAS DECEDENT PREGNANT |
|---|---|---|
| ☐ YES ☐ PROBABLY ☐ NO ☒ UNKNOWN | ☐ YES ☐ PROBABLY ☐ NO ☒ UNKNOWN | AT TIME OF DEATH ☐ YES ☒ NO ☐ UNK — WITHIN LAST 12 MO ☐ YES ☒ NO ☐ UNK |

| 40. MANNER OF DEATH | 41a. DATE OF INJURY Found | 41b. TIME OF INJURY | 41c. INJURY AT WORK | 41d. PLACE OF INJURY — AT HOME, FARM, STREET, FACTORY, OFFICE, ETC. (SPECIFY) |
|---|---|---|---|---|
| ☐ NATURAL | 4-28-04 | prior to 2:11 P M. | ☐ YES ☒ NO | RESIDENCE |
| ☐ ACCIDENT | 41e. LOCATION (STREET AND NUMBER, CITY OR TOWN, STATE) | | | |
| ☐ SUICIDE | 3008 MIMS FORT WORTH, TEXAS | | | |
| ☒ HOMICIDE | 41f. DESCRIBE HOW INJURY OCCURRED | | | |
| ☐ PENDING INVESTIGATION | SMOTHERED BY ANOTHER PERSON | | | |
| ☐ COULD NOT BE DETERMINED | | | | |

| 42a. REGISTRAR FILE NO. | 42b. DATE RECEIVED BY LOCAL REGISTRAR. | 42c. SIGNATURE OF LOCAL REGISTRAR. |
|---|---|---|

WARNING
The penalty for knowingly making a false statement in this form can be 2-10 years in prison and a fine of up to $10,000. (Health and Safety Code, Section 195.003, 1989)

VS-174, REV. 7/98

Ex. 5 001

# EXHIBIT 7

# DECLARATION OF CHARLES MINOR HARVEY, M.D.

1. My name is Charles Minor Harvey, M.D. I am a retired forensic pathologist. In 2006, before I retired, I was retained to serve as a defense expert in *State of Texas v. Tilon Carter*. The case was a capital trial proceeding out of Tarrant County, Texas.

2. I received my medical degree from the Joe R. and Teresa Lozano Long School of Medicine at the University of Texas Health Science Center at San Antonio in 1975. I then completed residencies in Anatomical and Clinical Pathology first at Baptist Memorial Hospital in San Antonio (1975-77) and then at St. Paul Hospital in Dallas (1977-79). I was a fellow with the National Association of Medical Examiners since, and in 2005, I served as a member of that organization's Standards Committee.

3. I was teaching Pathology at the Texas College of Osteopathic Medicine in Fort Worth, Texas when Dr. Nizam Peerwani, the Chief Medical Examiner of Tarrant County, approached me about working for him as a Deputy Medical Examiner. I had talked previously with Nizam about some of the problems I was having with my department head at the University. I joined the Tarrant County Medical Examiner's Office as a Deputy Medical Examiner in 1985 and stayed there until 1994.

4. After leaving the Tarrant County Medical Examiner's Office, I worked as a Consulting Forensic Pathologist in Jefferson County, Texas (1994-96), before becoming a Deputy Medical Examiner in Lubbock County, Texas(1996-97). I then was a Deputy Medical Examiner with the Maricopa County Medical Examiner's Office in Phoenix, Arizona (1997-98) before working in private practice (1998-99). In 1999 I became an Associate Professor of Pathology in the University of Texas Medical Branch (UTMB) in Galveston, Texas (1999-2004). In that capacity, I served as a Deputy Medical Examiner before serving

1

for two years as the Chief Medical Examiner in Galveston County, Texas. I continued to work as an Adjunct Professor with the UTMB Department of Pathology until my retirement.

5. I was retained by attorney Richard Alley to work on Mr. Carter's case. I had worked with Mr. Alley before on other cases. He and attorney Santiago Salinas represented Mr. Carter at his trial. Mr. Alley retained me to review the autopsy of the victim in the case, James Eldon Tomlin. Dr. Peerwani, MD had conducted the autopsy of Mr. Tomlin at the Tarrant County Medical Examiner's Office.

6. The function of a medical examiner's office is to investigate unexpected, unexplained, or suspicious deaths, such as accidents, homicides, or sudden natural deaths. A medical examiner determines the cause and manner of death through investigation, which may include external examination, an autopsy, and laboratory tests. The official cause and manner of death are then documented on the death certificate. Official manners of death are homicide, suicide, natural, accident, or undetermined. The cause is more specific and includes information about how that person died.

7. When I worked at the Tarrant County Medical Examiner's Office, the office had a process to review cause of death determinations. Pursuant to this process, a committee of medical examiners was assigned to review the autopsy findings and cause of death determination made by a fellow medical examiner in the office.

8. This review process was particularly important in cases where the manner of death was determined to be a homicide. The committee reviewed all homicide cases. Dr. Peerwani was a member of the committee on any homicide case where another examiner had conducted the autopsy. When other examiners reviewed the autopsy report as part of this

2

review process, their signatures appeared at the bottom of the report. I do not see signatures other than Dr. Peerwani's on the Tomlin autopsy report. Had the report been reviewed, the signatures of other medical examiners would appear in the report. As the Chief Medical Examiner for Tarrant County, Dr. Peerwani reviewed every case performed in the office.

9. As part of my work consulting on Mr. Carter's case, I reviewed the autopsy materials defense counsel provided. I listed those materials at the top of my report. They included photographs, a cover letter from Mr. Alley, the autopsy report and various police reports. The autopsy report included the typed report, as well as two body diagrams, a trace evidence report, the forensic investigator's report, and the forensic investigator's narrative, and toxicology report This is a comprehensive list of the autopsy materials that defense counsel provided to me.

10. I have recently been provided with a copy of the handwritten Provisional Autopsy Form from Mr. Tomlin's autopsy. It includes several notations detailing that Mr. Tomlin had a pacemaker in place at the time of autopsy. I did not have a copy of this form at the time I worked as a defense expert on Mr. Carter's case in 2006. If I had reviewed this form at that time, I would have included it in the list of materials reviewed at the top of my report.

11. The fact that Mr. Tomlin had a pacemaker at the time of his death is significant. From Dr. Peerwani's notes, it appears that he was only able to see one lead on the dual-lead pacemaker. This is a possibility that suggests it may not have been functioning properly.

12. Mr. Tomlin had significant cardiac issues at the time of his death. These issues were so serious that he was prone to heart attacks. Any type of stress could have triggered a heart attack in Mr. Tomlin. The pacemaker was implanted to deliver pulses and correct his heart

3

rhythm. If it was not functioning properly, it would be unable to correct Mr. Tomlin's heart rhythm in the event of a heart attack or other cardiac event.

13. The autopsy materials that I received in 2006 did not mention that Nizam observed a pacemaker in Mr. Tomlin's body at the time of autopsy. This is a significant omission. When an implanted pacemaker was observed at autopsy, standard practice when I was at the Tarrant County Medical Examiner's Office was to list the pacemaker in the description of the heart in the autopsy report. To my knowledge, this practice remained in place and is similar to the practice of other medical examiner offices I worked in. While there was a notation of a scar on Mr. Tomlin's chest on the body diagram and a reported past pacemaker history, I understood this to suggest only that Mr. Tomlin had previously had a pacemaker. It is my understanding that pacemakers are sometimes removed from a person for various medical reasons. Because the autopsy report did not mention that Nizam observed a pacemaker at autopsy, I believed that Mr. Tomlin no longer had an implanted pacemaker at the time of his death.

14. Standard practice at the time I worked at the Tarrant County Medical Examiner's Office also included removal of the pacemaker, bagging it, and marking it as evidence. At that point, a log was created to document the pacemaker chain of custody. The pacemaker would then be sent to the manufacturer for auditing and examination. This practice of bagging and marking the pacemaker as evidence and sending it to the manufacturer is a practice shared by other medical examiner offices I worked in. The pacemaker manufacturer would complete an assessment of the device and its data. This assessment could reveal whether the pacemaker was still functioning properly. This could be helpful information in determining the cause and time of death.

4

15. I don't know why Dr. Peerwani did not include the pacemaker in his autopsy report. Information about the presence of a pacemaker is something I was taught to include in autopsy reports. I learned the importance of including this information from Nizam when I worked for him. If there was a reason for not removing the pacemaker, I would have expected Nizam to include that information in his report.

My name is Charles Minor Harvey, M.D., my date of birth is                    , and my address is

                    .

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Kendall County, Texas on _08 Oct 2025_ (date).

Charles Minor Harvey, M.D.
Declarant

5

# EXHIBIT 8

I, TILON LASHON CARTER PRIOR TO MAKING ANY STATEMENT, HAVING BEEN DULY WARNED BY **DET. C. D. JOHNSON I.D. 2455**, THE PERSON TO WHOM; THIS STATEMENT IS MADE; THAT I HAVE THE RIGHT TO REMAIN SILENT AND NOT MAKE ANY STATEMENT AT ALL AND THAT ANY STATEMENT I MAKE MAY BE USED AGAINST ME AT MY TRIAL; THAT ANY STATEMENT I MAKE MAY BE USED AS EVIDENCE AGAINST ME IN COURT; THAT I HAVE THE RIGHT TO HAVE A LAWYER PRESENT TO ADVISE ME PRIOR TO AND DURING ANY QUESTIONING; THAT IF I AM UNABLE TO EMPLOY A LAWYER, I HAVE THE RIGHT TO HAVE A LAWYER APPOINTED TO ADVISE ME PRIOR TO AND DURING ANY QUESTIONING: AND THAT I HAVE THE RIGHT TO TERMINATE THE INTERVIEW AT ANY TIME. HAVING BEEN INFORMED OF THESE, MY RIGHTS, AND UNDERSTANDING SAME. I HEREBY FREELY, INTELLIGENTLY, VOLUNTARILY AND KNOWINGLY WAIVE THESE RIGHTS AND NOT DESIRING A LAWYER, VOLUNTARILY CHOOSE TO MAKE THE FOLLOWING STATEMENT:

MY FULL NAME IS TILON LASHON CARTER. I AM 24 YEARS OF AGE. MY DATE OF BIRTH IS 12-07-79. I LIVE AT 4828 GARDEN STREET, FORT WORTH, TX 76119. I HAVE CO MPLETED 11 YEARS OF SCHOOL.

**STARTING TIME:** 1024hrs.
**TYPED BY:** Beronica Bribiesca
**DATE:** September 22, 2004
350 WEST BELKNAP STREET
FORT WORTH POLICE DEPARTMENT

STATE'S
EXHIBIT
95
GR 10-30-06
PENGAD 800-631-6989

Earlier this year Laketha and I started dating. We actually lived together for about a month. Laketha wanted me to meet her mom Donna so we went to their apartment in the Stop Six projects. Laketha's step-dad was also there. The third time I went to Laketha's mom's house and Laketha was talking about needing money and Laketha's step-dad was there also. They call Laketha's step-dad "Wolf". Donna said, "Oh I know where you can get it, my home girl got him for 20 thousand dollars." Then she said she could show us where's he's at. She got in the car and we went over to 3008 Mims and pointed out a house with a white fence. She said that's where it's at but that old bastard is not there. We went back to Donna's apartment. Me and Laketha went back to her granny's. I think it was the next day Laketha and I went back to the house on Mims. We were in Laketha's car and we parked in the drive way. I stayed in the car and Laketha went and knocked on the door. The man opened the door and Laketha's eyes got big, I got out of the car and told Laketha to get back in the car. I walked up to the door and saw the man standing in the door way. He had opened the door and screen door. The man had a hammer in his hand. I opened the door and he swung it at me and I dodged back and I told the man to get back and I told the man to lay down on the floor. He told me, "I wish you wouldn't do this to me!" I acted like I was searching the house and Laketha came in and I told her, "I thought I told you to stay in the car." And then she came in and she was standing around. I started searching for real and Laketha went into the kitchen and got two jars of coins. I think I tripped over a gun and I took the gun. It was an old long gun. Laketha said the man is going to get up and move and so I put duck tape on his hands. Laketha went out to the car and I came out last. We went over to Donna's house and her step-dad was there also. Donna took both of the jars of coins. Laketha and I went back to her granny's house. I kept the gun in my car but it was stolen in July.

Nina and I had a sexual relationship, but Nina took it a lot more seriously. During this time I told Nina I had been in some mess in the past. I just said stuff that happened on

**EXHIBIT 3**
Ex. 8-001

Mims. Nina star[ ]hreatening me and sending people t[ ]y house. She's threaten Laketha also. Nina and Laketha saw each other and ended up getting into it. After this Nina called me and told me, "You're going to die today!" Nina was on her way to my house flying up the street. I saw her so I fired one shot in the air. I used a 12 gauge. That was B.I's gun. B. I. heard about this and he came by and took the gun. B. I.'s name is Brandon but I don't' know his last name. I don't know where he stays. I don't have a phone number he just comes by.


**ENDING TIME: 1048 hrs.**

_Tilon Carter_
**Tilon Lashon Carter**

This statement is true that I have told to Det. Johnson.

_Beronica Fulvesce_
**Witness**

2

Ex. 8 002

# EXHIBIT 9

THE STATE OF TEXAS )(
                    )(
COUNTY OF TARRANT   )(

I, Tilon Lashon Carter, prior to making any statement, having been duly warned by Detective C. D. Johnson 2455, the person to whom this statement is made; that I have the right to remain silent and not make any statement at all and that any statement I make may be used against me at my trial; that any statement I make may be used as evidence against me in court; that I have the right to have a lawyer present to advise me prior to and during any questioning; that if I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning; and that I have the right to terminate the interview at any time. Having been informed of these, my rights, and understand same, I hereby freely, intelligently, voluntarily, and knowingly choose to make the following statement:

Starting time: 11:55    a.m.

My name is Tilon Lashon Carter. I am 24 years of age. My date of birth is 12/07/79. I live at 4828 Garden Ln., Fort Worth, Texas, 76119. I have completed 11 years of schooling. I can read, write, and understand the English language.

On the day Donna Ke-Ke and I were talking about the robbery I was scared so I decided to get a gun. I saw Butch driving in his Cutlass and I flagged him down. I asked if I could borrow a gun from him. Butch said all right just make sure you give it back. I stayed at Weber Garden and Butch left. Butch was gone for about 30 minutes and then he returned. Butch gave me a small black gun. I think it was a .380. The gun had a little red light on the side. Butch's real name is Brent, but I don't know his last name. He lives on Reed Street and is a FHB gang member.

The day we went to the house it was just Ke-Ke and I. Ke-Ke went to the door and I stayed in the car. Ke-Ke knocked on the door and then she looked at me. I assumed that he was at the door. I walked up with the gun in my hand. The man tried to hit me with the hammer. I dodged it I went in and told him to sit down. I told Ke-Ke to go back to the car. The man didn't sit down so I grabbed his arm and sat him down on the floor. As he went down I hurt him say "oh". He was sitting on the floor and said, "I wish ya'll wouldn't do this to me." I was standing in one place. The door opened back up which startled me. That is when I just started looking. She went in and got the coins. After she got the coins, the gun kept falling so I said here and handed the gun to Ke-Ke. She was just holding it. I came out of the back room with the long gun. After that I used a sock to hold the tape and I used my teeth to tear it. I wrapped his hands up with tape and I think I wrapped his feet up. After that I told Ke-Ke to go back to the car.

EXHIBIT 4

Ex. 9 001

PENGAD 800-631-6989

STATE'S
EXHIBIT
97
bh 10-30-06

There wasn't anything else to do.  I watched him for a minute to make sure he was ok.  When I left out of the house he was still talking.  I said we are fixing to go.  He said ok.  I just walked out the door.  I looked back through the screen door and he was sitting up with his legs out on the ground and his hands behind him.

We drove off and went to Donna's house.  Donna took both of the jars from her.  We left Donna's and went to Ke-Ke's grandmothers house.  We just kicked it for a couple of hours.  I went home and then came back.  When I went home I took Butch his gun back to Weber Garden.  The Cutlass is red outside and inside.  It is an 87 I think the front lights are straight.

I know Ke-Ke's mom has been in an old square red car before.  It is either a Shadow or a Datsun.

The following statement is true and correct to the best of my knowledge as I have told Detective C. D. Johnson 2455.

_Tilon Carter_ _____  Tilon Lashon Carter
_M. M. Hardy 2151_ _____  Witness

Time ended: 12:15 p.m. p.m.
Date:      09/27/04
Place:     350 W. Belknap
Typed by C. D. Johnson 2455

# EXHIBIT 10

## Case Management: Chain of Custody

| Home | Search | Case #: [_____] | Goto |

## Case #0403742

| | | | | | |
|---|---|---|---|---|---|
| **Case Sensitivity:** | Routine High Profile | **Case Type:** | Jurisdiction | **County Name:** | Tarrant |
| **Created Date:** | 04/28/2004 19:22 | **Created By:** | John Briggs | **Status:** | Laboratory Service |
| **Agency:** | Fort Worth PD ▼ | **Service #:** | 04049162 | **Agent:** | Det. S. Johnson |
| **Deceased Name:** | James Tomlin | **Date/Time of Death:** | 04/28/2004 14:11 | **Race, Sex, Age:** | WM89 |
| **Investigator:** | John Briggs | **Medical Examiner:** | Nizam Peerwani | **Autopsy Date/Time:** | 04/29/2004 10:00 |
| **Tox Work Number:** | | **Next-of-Kin Notification:** | Pat Wilson | **Release Body:** | No |

### Chain of Custody for This Case

[ Print/Preview All ]

▼ **Exhibit# 1**        Tracking # 040428115        **Description:** body        [ Print This Exhibit ]

| Date/Time | From Agency | Relinquisher | To Agency | Receiver | Disposition |
|---|---|---|---|---|---|
| 04/28/2004 18:52 | NRST | Steve Mathews | Morgue Services | Morgue Incoming Fridge | Morgue |
| 04/30/2004 09:30 | Morgue Services | Morgue Incoming Fridge | Morgue Services | Patricia El Rashid | Morgue |
| 04/30/2004 09:30 | Morgue Services | Patricia El Rashid | Wade Funeral Home | J COBB | Morgue |

▼ **Exhibit# 2**        Tracking # 040428116        **Description:** Briggs Card 3        [ Print This Exhibit ]

| Date/Time | From Agency | Relinquisher | To Agency | Receiver | Disposition |
|---|---|---|---|---|---|
| 04/28/2004 20:56 | Forensic Death Investigation | John Briggs | Photography Lab | Larry Reynolds | Long-term Storage |

▼ **Exhibit# 3**        Tracking # 040429015        **Description:** Trace material from posterior pants        [ Print This Exhibit ]

| Date/Time | From Agency | Relinquisher | To Agency | Receiver | Disposition |
|---|---|---|---|---|---|
| 04/29/2004 10:50 | Medical Examiners | Nizam Peerwani | Trace Lab | Kelly Belcher | In Lab |
| 04/29/2004 14:21 | Trace Lab | Kelly Belcher | Evidence | Patricia El Rashid | In Lab |
| 05/03/2004 16:26 | Evidence | Patricia El Rashid | Fort Worth Crime Lab | LAURA MARTINEZ | In Lab |

▼ **Exhibit# 4**        Tracking # 040429016        **Description:** Trace material from posterior shirt        [ Print This Exhibit ]

| Date/Time | From Agency | Relinquisher | To Agency | Receiver | Disposition |
|---|---|---|---|---|---|
| 04/29/2004 10:50 | Medical Examiners | Nizam Peerwani | Trace Lab | Kelly Belcher | In Lab |
| 04/29/2004 14:21 | Trace Lab | Kelly Belcher | Evidence | Patricia El Rashid | In Lab |
| 05/03/2004 16:26 | Evidence | Patricia El Rashid | Fort Worth Crime Lab | LAURA MARTINEZ | In Lab |

▼ **Exhibit# 5**        Tracking # 040429017        **Description:** Trace material from socks        [ Print This Exhibit ]

| Date/Time | From Agency | Relinquisher | To Agency | Receiver | Disposition |
|---|---|---|---|---|---|
| 04/29/2004 10:50 | Medical Examiners | Nizam Peerwani | Trace Lab | Kelly Belcher | In Lab |
| 04/29/2004 14:21 | Trace Lab | Kelly Belcher | Evidence | Patricia El Rashid | In Lab |

Ex. 10 001

# EXHIBIT 11

# WARRANT TO SEARCH A PARTICULAR PERSON FOR EVIDENCE

STATE OF TEXAS        ) (

COUNTY OF TARRANT        ) (

THE UNDERSIGNED AFFIDAVIT (S), BEING (A) PEACE OFFICER (S) UNDER THE LAWS OF TEXAS, BEING DULY SWORN ON OATH, MAKE THE FOLLOWING STATEMENTS AND ACCUSATIONS:

I, Fort Worth Police Detective C. D. JOHNSON, I. D. 2455, do solemnly swear that heretofore on or about the 28th day of APRIL 2004, in the city of Fort Worth, County of Tarrant, State of Texas, DONNA ALLEN LACY, BLACK FEMALE ███████ did then and there commit the offense of CAPITAL MURDER,

My belief and personal knowledge is based on the following facts and circumstance:

1.  On April 28, 2004 at approximately 2:11 p.m., Debra Wilson came to 3008 Mims to check on her father James Eldon Tomlin because she could not reach him by phone. When Debra arrived at the house she went to the side door and observed the glass door closed but the interior door open. As Debra reached the top step she could see her father, James Eldon Tomlin, face down inside the door with his hands and feet bound. A neighbor contacted the police for Mrs. Wilson.

2.  On April 28, 2004 at approximately 2:32 p.m. your affiant was notified by police communications. Your affiant arrived at 3008 Mims at approximately 3:04 p.m. Your affiant observed the victim inside the door with his hands and feet bound with duct tape. Your affiant also observed several cigarette butts along the front yard and another cigarette butt in the driveway next to the victim's vehicle.

3.  Through interviews with Debra Wilson your affiant learned that James Eldon Tomlin had been a victim of several thefts in the past year. Mrs. Wilson stated that in the first few months of 2004 James Eldon Tomlin related the following. A black female came over and took a gun from his house. Later a female called and told Mr. Tomlin that she knew who took the guns. The female told Mr. Tomlin that she could get them back for him for $75. After the crime scene had been processed Ms. Wilson walked through the residence and determined that a gun was missing from under Mr. Tomlin's bed.

4.  Dr. Peerwani performed an autopsy on Mr. Tomlin. Dr. Peerwani determined the death to be a homicide due to smothering from positional asphyxia.

5. On May 5, 2004, Detective Hernandez met with Luis Mota who lives across the street from Mr. Tomlin. Luis stated that he went to Mr. Tomlin's house almost daily to help him with household chores. Luis said approximately one to two weeks before Mr. Tomlin's death he was at Mr. Tomlin's house. While he was there someone knocked on the door. Luis looked through the peephole and observed 2 black females on the front porch. Luis told Mr. Tomlin. Mr. Tomlin grabbed a knife and went to the door. Mr. Tomlin opened the door and one of the females asked Mr. Tomlin for some money. Mr. Tomlin told them to leave. Luis saw the females get into a vehicle with a black male and leave. Luis stated that on approximately April 21, 2004 he saw the same two females at Mr. Tomlin's house.

6. From numerous interviews your affiant was able to identify 7 black females who were known to associate with Mr. Tomlin. On May 18, 2004 your affiant and Detective Hernandez met with Luis Mota and showed him photographs of the 7 black females. Luis positively identified Donna Allen Lacy black female ▮▮▮▮▮ as one of the black females who had come to Mr. Tomlin's house asking for money.

7. On July 27, 2004, your affiant received a phone call from Angela Mitchell. Ms. Mitchell advised that she had gone to Donna Lacy's house on July 25, 2004. When Ms. Mitchell knocked on the door, Donna came out onto the porch. Donna told Ms. Mitchell the following. Donna said she had gone to Mr. Tomlin's house to have sex with him. Donna beat Mr. Tomlin and took his money and guns. Donna then called Mr. Tomlin and told him she knew the girl who had taken the guns and could get hem back to him for $80. Donna's husband, John Lacy, drove Donna over to get the $80.

8. Based on the above affidavit the Buccal swab, hair sample and fingerprints are needed for comparison with the evidence collected during autopsy and from the crime scene.

WHEREFORE your affiant Fort Worth Police DETECTIVE C. D. JOHNSON, I. D. 2455, requests this court order, DONNA ALLEN LACY, To submit to the buccal swab samples and that this item be examined and compared to the evidence by qualified personnel.

DETECTIVE C. D. JOHNSON, I. D. 2455 further requests that this court order the Tarrant County Sheriff or any Peace Officer of the City of Fort Worth, County of Tarrant, State of Texas to transport, DONNA ALLEN LACY, BLACK FEMALE ███ to an appropriate facility to attain a buccal swab sample from, DONNA ALLEN LACY. In accordance with accepted medical practices.

WITNESS MY SIGANTURE, this the 28th day of July, 2004.

AFFIANT

Subscribed and sworn to before me on this the 28 day of July, 2004.

JUDGE

TARRANT COUNTY, TEXAS

# EXHIBIT 12

BEFORE ME, THE UNDERSIGNED PARTY NOTARY PUBLIC IN AND FOR THE STATE AND COUNTY AFORESAID, ON THIS DAY PERSONALLY APPEARED WHO, AFTER BEING DULY SWORN DEPOSES AND SAYS:

| | |
|---|---|
| STARTING TIME: | 1158hrs. |
| TYPED BY: | Beronica Bribiesca |
| DATE: | September 23, 2004 |
| LOCATION: | 350 W. BELKNAP STREET |
| | FORT WORTH POLICE DEPARTMENT |

MY FULL NAME IS DONNA MARIA LACY. I AM 37 YEARS OF AGE. MY DATE OF BIRTH IS ▮▮▮▮ I LIVE AT
. MY CONTACT TELEPHONE NUMBER IS . I HAVE
COMPLETED 12 YEARS OF SCHOOL. I CAN READ, WRITE, AND UNDERSTAND THE ENGLISH LANGUAGE.

I knew Mr. Tomlin for about 19 years. A friend of mine Trina Hart introduced me to Mr. Tomlin. I began having occasional sex with him. Mr. Tomlin would give me money. The last time I had sex with him was in March of 2004. About a year ago I took a gun from Mr. Tomlin's house. And I called him later and told him for $80 I could get the gun back. I got the money from Mr. Tomlin but I didn't get the gun back. After this Mr. Tomlin said he didn't want me to come back to the house but I would use different names and still go over to see Mr. Tomlin.

Laketha Allen is my daughter. Her boyfriend is Tolin Carter. Towards the end March or the first part of April Laketha and Tolin came to my house. We were standing in the front yard when a white male drove by in a pickup truck. Tolin said the man in the truck was a good trick, I said I had never talked to him but I also knew another old man that was a good trick who lived in Meadowbrook. Tilon asked me how did he look so I described him to Tilon. And Tilon said that it sound like a guy he used to fix cars for and take girls over to his house. Sometime in April Laketha brought me a plastic coffee creamer container with change in it. She told me, "Here mom I got something for you." I asked her what is was for and she just said for me to go buy some cigarettes.

On Monday September 20, I talked to Laketha after Detective Johnson came by. Laketha told me she had nothing to worry about. Laketha said she was looking around the house for money and when she came back in the room where Mr. Tomlin and Tolin were Mr. Tomlin was bleeding.

1

FWPD000413
Ex. 12 001

Q. Were you there when Mr. Tomlin was killed?
A. No.
Q. Did you drive Tilon and Laketha over to Mr. Tomlin's house and pointed it out?
A. No.
Q. Did you help planned the robbery of Mr. Tomlin?
A. No.

ENDING TIME: 1214hours _____

*Subscribed and sworn to before me this _____ day of _____, 2004.*

_____

**Notary Public in and for Tarrant County, Texas**
**My commission expires:** _____

Beronica Bubreso
9/23/04

FWPD000414
Ex. 12 002

# EXHIBIT 13

## ABOUT THIS MANUAL

This Pacemaker System Guide can be used with all models of PULSAR® MAX II pacemakers and the Model 2920 Programmer/Recorder/Monitor (PRM) equipped with Model 2891 CONSULT software.

This manual is organized into four sections. Refer to the Table of Contents for an outline of the sections.

- **Part One—The PULSAR MAX II Pacemaker**
  Part One includes descriptions of all models including lead connections, implant and post-implant information as well as indications, contraindications, warnings, precautions, and adverse events associated with the pacemakers.

- **Part Two—Programming and Interrogation**
  Part Two includes instructions on using the PRM to program the pacemaker, and includes an explanation of programmer functions and instructions for programming and interrogating the pacemakers.

- **Part Three—Therapy and Diagnostics**
  Part Three includes a description of each PRM screen and a discussion of the programmable parameters and diagnostic features, and instructions for performing efficient follow-up procedures and printing electrograms, event markers, and reports. All of the programmable parameters are discussed in this section.

- **Part Four—Appendices**
  The Appendices include additional reference information about the pacemaker and its use. Topics include a features summary, mode indications and contraindications, external cable connections, and electromagnetic interference sources. Quick reference tables are also found in this section.

## NOMINAL SPECIFICATIONS OF PULSAR MAX II PACEMAKERS

| Model | Type | Dimensions W x H x D (mm) | Mass (g) | Density (g/cc) | Volume (cc) | Usable Battery Capacity (Ah) |
|-------|------|---------------------------|----------|----------------|-------------|------------------------------|
| 1180  | SR   | 47 x 41 x 7               | 23.2     | 2.3            | 10.3        | 1.02                         |
| 1181  | SR   | 52 x 42 x 7               | 27.0     | 2.4            | 11.4        | 1.32                         |
| 1280  | DR   | 52 x 44 x 7               | 28.7     | 2.3            | 12.4        | 1.36                         |

Ex. 13 001

Ex. 13 002

# CONTENTS

## PART ONE—THE PULSAR MAX II PACEMAKER

The PULSAR MAX II Pacing System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i
    PULSAR MAX II Pacemakers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i
    Model 2891 CONSULT Software Application . . . . . . . . . . . . . . . . . . . . . . . i
    Programmer/Recorder/Monitor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i
Manual Conventions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii
    Other Related Manuals and Information Tools . . . . . . . . . . . . . . . . . . . . . . iii

## CHAPTER 1—INFORMATION FOR USE . . . . . . . . . . . . . . . . . . . . . . . . . . 1–1

Indications and Usage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–2
Contraindications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–2
Warnings and Precautions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–3
    Minute Ventilation Sensor Calibration at Implant . . . . . . . . . . . . . . . . . . 1–3
    Clinical Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–3
    Sterilization, Storage, and Handling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–4
    Lead Evaluation and Connection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–4
    Implantation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–5
    Programming and Pacemaker Operation . . . . . . . . . . . . . . . . . . . . . . . . . 1–5
    MV Initialization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–6
    Environmental and Medical Therapy Hazards . . . . . . . . . . . . . . . . . . . . . 1–6
        Hospital and Medical Environments . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–6
        Home and Occupational Environments . . . . . . . . . . . . . . . . . . . . . . . . 1–8
            Cellular Phones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–8
    Explanted Pacemakers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–9
Adverse Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–9
Clinical Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–11
Patient Counseling Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–14
    Patient Manual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–14
    Patient ID Card . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1–14

## CHAPTER 2—PRE-IMPLANT AND IMPLANT INFORMATION . . . . . . . 2–1

Storage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2–2
Opening Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2–2
Items Included . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2–2
Sterilization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2–2

Ex. 13 003

Lead Connections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2–3
    Lead Adapters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2–4
    Lead to Pacemaker Connection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2–4
Pacemaker Insertion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2–5
    Automatic Lead Implant Detection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2–5
    Pacemaker Insertion Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2–6

**CHAPTER 3—TECHNICAL INFORMATION** . . . . . . . . . . . . . . . . . . . . . . . . 3–1
Power Source . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3–2
Adaptive-Rate Sensors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3–2
    Accelerometer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3–2
    Minute Ventilation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3–2
X-ray Identifier . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3–4
Minimizing Pacemaker/ICD Interaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3–5
External Defibrillation Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3–6
Reset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3–7
Output Circuit Recharge Cycle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3–8
Runaway Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3–8

**CHAPTER 4—POST-IMPLANT INFORMATION** . . . . . . . . . . . . . . . . . . . . 4–1
Pacemaker Longevity Projections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4–2
Battery Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4–2
    Magnet Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4–3
Elective Replacement Time (ERT) Operation . . . . . . . . . . . . . . . . . . . . . . . . 4–3
    End of Life (EOL) Operation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4–4
Explant Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4–5
Warranty Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4–5

**PART TWO—PROGRAMMING AND INTERROGATION**

**CHAPTER 5—USING THE PROGRAMMER/RECORDER/MONITOR
  (PRM)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–1
Starting Up the Programmer and Software . . . . . . . . . . . . . . . . . . . . . . . . . . 5–2
    ECG Display . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–3
    Quick Start . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–4
    The Utilities Menu on the Startup Screen . . . . . . . . . . . . . . . . . . . . . . . . 5–5
        The About Utility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–5

Ex. 13 004

The Set Programmer Clock Utility . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–6
The Copy Disk Utility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–6
The Format Disk Utility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–7
The Select PG Option on the Startup Screen . . . . . . . . . . . . . . . . . . . . 5–7

Introduction to Software Terminology and How to Move Around . . . . . . . . 5–8
Standard Buttons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–8
Utilities Menu . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–8
Arrows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–9
Printer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–9
ECG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–9
Snapshot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–9
Assist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–9
Demo Mode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–9
Pacemaker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–10
Rate Indicator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–10
Parameter Interactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–10
Stop Sign . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–10
Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–10
Screen Buttons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–10
Stop Sign (Clinical Event) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–10
Shortcut . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–11
Magnifying Glass . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–11
ECG/EGM Display . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–11
Toolbox and Toolbox Buttons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–11
General Windows Functions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–11
Moving Windows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–11
Message Windows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–12
Assist Windows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–12
PRM Keys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–12
STAT PACE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–12
Divert Therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–13
STAT Shock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–13

Programming and Interrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–13
Establishing Telemetry Communication . . . . . . . . . . . . . . . . . . . . . . . . . 5–13
Interrogating the Pacemaker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–14
Changing Parameter Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–15
Programming the Pacemaker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–16

The Utilities Menu on the Main Application Screen . . . . . . . . . . . . . . . . . . 5–17
Patient Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–17

Ex. 13 005

Save All to Disk  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–17
Copy Disk/Format Disk/Set Programmer Clock  . . . . . . . . . . . . . . . . . . 5–18
About  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–18
New Patient  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–18
Quit  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5–19

## PART THREE—THERAPY AND DIAGNOSTICS

**CHAPTER 6—THERAPY**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–1

Brady Parameters Screen  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–2
Brady Parameters Submenus  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–2
Modifying Parameter Values  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–3
The Cancel Changes Button  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–3
The Load Nominals Button  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–3
The Load Initial Values Button  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–3

**CHAPTER 6.1—BASIC BRADY PARAMETERS**  . . . . . . . . . . . . . . . . . . . 6–5

Mode  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–6

A-Tachy Response  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–7

Lower Rate Limit  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–7

Maximum Tracking Rate  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–8
Conventional DDD Behavior  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–8

Maximum Sensor Rate  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–9

AV Delay (Paced)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–10

Pulse Width  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–11

Pulse Amplitude  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–11

Sensitivity  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–12
Auto Sense  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–12

Refractory Periods  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–14
Atrial Refractory Period  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–14
Post-Ventricular Atrial Refractory Period  . . . . . . . . . . . . . . . . . . . . . . 6–14
Ventricular Refractory Period  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–15

Pace/Sense  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–15

**CHAPTER 6.2—SENSOR SUBMENU**  . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–16

Adaptive-Rate Pacing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–16

Accelerometer  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–16
Response Factor (Accelerometer)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–17

Ex. 13 006

Advanced Accelerometer Parameters . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–18
   Activity Threshold . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–18
   Reaction Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–20
   Recovery Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–21

Minute Ventilation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–22
   Response Factor (MV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–24
   Advanced Minute Ventilation Parameters . . . . . . . . . . . . . . . . . . . . . . . 6–25
      High Rate Response Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–25
      High Rate Break Point . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–27
      Fix Baseline During Exercise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–27
Dual-Sensor Blending . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–27
   Time Dependent Blend . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–30
Automatic Response Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–31
   Sensor Rate Target . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–32
   Initial Response Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–32
Expert Ease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–32
   Age . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–33
   Gender . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–33
   Exercise Frequency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–33
   Target Heart Rate During Exercise . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–33
**CHAPTER 6.3—A-TACHY RESPONSE SUBMENU** . . . . . . . . . . . . . . . 6–34
A-Tachy Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–34
   Trigger Rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–34
   Entry Count . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–35
   Exit Count . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–35
   Fallback Mode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–35
   Duration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–36
   Fallback Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–36
   ATR Lower Rate Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–38
      End of ATR Episode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–38
      ATR Diagnostic Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–38
Ventricular Rate Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–39
   VRR Maximum Rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–39
Atrial Flutter Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–39
PMT Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–40
**CHAPTER 6.4—RATE ENHANCEMENTS SUBMENU** . . . . . . . . . . . . . 6–42
Rate Hysteresis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–42

Ex. 13 007

Hysteresis Offset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–42
Rate Hysteresis in Nonadaptive-Rate Modes . . . . . . . . . . . . . . . . . . . . 6–43
Rate Hysteresis in Adaptive-Rate Modes . . . . . . . . . . . . . . . . . . . . . . . 6–43
Search Hysteresis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–44

Rate Smoothing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–45
Rate Smoothing Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–46
Rate Smoothing Down . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–47
Maximum Pacing Rate (DDI and SSI) . . . . . . . . . . . . . . . . . . . . . . . . . 6–47
Rate Smoothing Example . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–47

Sudden Bradycardia Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–48
SBR Detect Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–48
SBR Number of Beats . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–49
SBR Therapy Duration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–49
SBR Therapy Rate Offset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–49
SBR MV Offset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–50

**CHAPTER 6.5—LEAD CONFIGURATION SUBMENU** . . . . . . . . . . . . . 6–52

Bipolar Configuration Lock-out . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–52

Lead Configuration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–52
Pacing Configuration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–53
Sensing Configuration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–53

Safety Switch (Automatic Lead Configuration) . . . . . . . . . . . . . . . . . . . . 6–53

**CHAPTER 6.6—AV DELAY SUBMENU** . . . . . . . . . . . . . . . . . . . . . . . . 6–55

Dynamic AV Delay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–55
Maximum AV Delay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–56
Minimum AV Delay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–56

Sensed AV Offset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–57
Sensed AV Offset to Fixed AV Delay . . . . . . . . . . . . . . . . . . . . . . . . . . 6–57
Sensed AV Offset to Dynamic AV Delay . . . . . . . . . . . . . . . . . . . . . . . 6–57

AV Search Hysteresis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–58
AV Search Interval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–58
AV Increase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–59

**CHAPTER 6.7—REFRACTORY SUBMENU** . . . . . . . . . . . . . . . . . . . . . 6–60

Dynamic PVARP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–60
Maximum PVARP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–61
Minimum PVARP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–61

PVARP after PVC/PAC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6–61

Ex. 13 008

Blanking and Noise Rejection .................................... 6–62
    V-Blanking after A-Pace (Ventricular Blanking) ................... 6–63
    A-Blanking after V-Pace (Atrial Blanking) ....................... 6–63
    Noise Rejection .............................................. 6–64
        Atrial or Ventricular Pacing ................................ 6–64
        Atrial Depolarization Sensing .............................. 6–64
        Ventricular Depolarization Sensing ......................... 6–64
**CHAPTER 6.8—MAGNET SUBMENU** ........................... 6–65
    Magnet Response ............................................ 6–65

**CHAPTER 7—DIAGNOSTICS AND FOLLOW-UP** ................. 7–1
System Summary ................................................ 7–2
Quick Check Screen ............................................. 7–3
    Intrinsic Amplitude Measurement ............................... 7–4
    Lead Impedance Measurement .................................. 7–4
    Atrial and Ventricular Amplitude Thresholds ...................... 7–5
    Print Quick Notes ............................................. 7–5
    Full Report .................................................. 7–6
    Save All to Disk .............................................. 7–6
Brady Parameters Screen ........................................ 7–6
Temporary Parameters Screen .................................... 7–6
    Implementing Temporary Values ................................ 7–7
Setup ......................................................... 7–8
    Magnet ..................................................... 7–8
    Arrhythmia Logbook .......................................... 7–8
        EGM Selections ........................................... 7–10
        Clearing Stored EGMs ..................................... 7–11
    Trending .................................................... 7–11
    Daily Measurement .......................................... 7–13
Therapy History ................................................ 7–13
    Arrhythmia Logbook .......................................... 7–13
        Stored Electrograms ....................................... 7–15
    Counters .................................................... 7–16
    Histograms .................................................. 7–18
Diagnostic Evaluation ........................................... 7–19
    Battery Status ............................................... 7–19
    Intrinsic Tests ............................................... 7–20
    Impedance Tests ............................................. 7–22

Ex. 13 009

Threshold Tests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–24
Using the Automatic Threshold Testing Functions . . . . . . . . . . . . . . . 7–25
Daily Measurements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–26
    Intrinsic Amplitude Measurements . . . . . . . . . . . . . . . . . . . . . . . . . 7–26
    Lead Impedance Measurement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–27
    Displaying Daily Measurement Data . . . . . . . . . . . . . . . . . . . . . . . . 7–27
Trending . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–29
    Retrieving Trending and Beat to Beat Data . . . . . . . . . . . . . . . . . . 7–30
    Working with Rate/Sensor Trending Data . . . . . . . . . . . . . . . . . . . 7–30
    Working with Beat to Beat Data . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–31
    Working with Sensitivity Trending Data . . . . . . . . . . . . . . . . . . . . . 7–31
Snapshot Viewer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–31

EP Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–33
Atrial Stimulation and Backup VVI Pacing During EP Testing . . . . . . 7–34
Programmed Electrical Stimulation . . . . . . . . . . . . . . . . . . . . . . . . . . 7–34
    Performing PES Induction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–35
Manual Burst Pacing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–35
    Performing Manual Burst Pacing . . . . . . . . . . . . . . . . . . . . . . . . . . 7–35

**CHAPTER 8—ELECTROGRAMS/EVENT MARKERS/REPORTS** . . . . . 8–1

Viewing and Printing Traces and Markers . . . . . . . . . . . . . . . . . . . . . . . . . 8–2
    Displaying Surface ECGs, Electrograms, and Event Markers . . . . . . . 8–3
    Printing to the Internal PRM Printer/Recorder . . . . . . . . . . . . . . . . . . . 8–5
    Printing to an External Recorder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8–6
    Printing to an External Printer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8–6
Obtaining a Printed Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8–6

**PART FOUR—APPENDICES**

**APPENDIX A—FEATURES SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . A–1
Diagnostic Features . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A–1
Therapy Features . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A–2

**APPENDIX B—PACEMAKER MODES OF OPERATION** . . . . . . . . . . . . B–1
Pacemaker Identification Codes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B–1
Optimal Pacing Mode Decision Tree . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B–2
Available Modes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B–2
DDD(R) Mode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B–3

DDI(R) Mode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B–3

DOO(R) Mode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B–4

VDD Mode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B–4

AAI(R) Mode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B–5

VVI(R) Mode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B–5

AOO(R) Mode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B–6

VOO(R) Mode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B–6

AAT Mode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B–7

VVT Mode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B–7

**APPENDIX C—EXTERNAL CABLE CONNECTIONS** . . . . . . . . . . . . . . . C–1

Surface ECG Connections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C–2

    Patient–Recorder–PRM Connection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C–3

    Patient–PRM–Recorder Connection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C–4

    Parallel Connection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C–5

Troubleshooting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C–6

Optimizing the Quality of ECGs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C–6

External Printer Connection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C–7

**APPENDIX D—ELECTROMAGNETIC INTERFERENCE** . . . . . . . . . . . D–1

Hospital and Medical Environments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D–1

Home and Occupational Environments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D–3

    Cellular Phones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D–3

**APPENDIX E—REFERENCE TABLES** . . . . . . . . . . . . . . . . . . . . . . . . . . . E–1

Programmable Pacing Parameters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E–2

Nominal Mechanical Specifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E–7

STAT, Reset, and SHIP Parameter Values . . . . . . . . . . . . . . . . . . . . . . . . . . E–7

Telemetry Data Tolerances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E–8

Parameter Values During Magnet Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E–8

**INDEX**

Ex. 13 011

Ex. 13 012

# THE PULSAR MAX II PACING SYSTEM

## PULSAR MAX II PACEMAKERS

The PULSAR MAX II pacemakers are multiprogrammable. The family consists of both dual-chamber and single-chamber models, offering adaptive-rate therapy and providing various levels of therapeutic and diagnostic functionality. The pacemakers feature IS-1[1] connectors. Refer to Appendix A for a list of features.

Two sensors are available with the PULSAR MAX II adaptive-rate models: minute ventilation detection and an accelerometer (motion sensor). These sensors adapt the pacing rate to the patient's changing metabolic demand. Minute ventilation responds to changes in respiration, and the accelerometer responds to patient activity (motion). PULSAR MAX II models can use either the accelerometer or minute ventilation sensor, or a blend of both accelerometer and minute ventilation. Refer to Chapter 3—Technical Information for a detailed description of the sensors.

## MODEL 2891 CONSULT SOFTWARE APPLICATION

The PULSAR MAX II pacemaker family can be interrogated and programmed using the Model 2920 Programmer/Recorder/Monitor (PRM) equipped with the Model 2891 CONSULT software. This software allows the user to view and change all programmable parameters to optimize the therapy, and to access the diagnostic information stored in the pacemaker.

## PROGRAMMER/RECORDER/MONITOR

The PRM communicates with the pacemakers by means of radio frequency telemetry. The PRM provides simultaneous real-time ECG and telemetered signals and generates reports that detail pacemaker function, patient data, and test results. For more information, refer to the Operator's Manual for the Model 2920 PRM.

---

1. IS-1 refers to the international standard ISO 5841.3:1992.

## MANUAL CONVENTIONS

Throughout this manual, the following text conventions will be used:

| | |
|---|---|
| PRM KEYS | The names of the PRM keys will appear in capital letters (eg, PROGRAM, INTERROGATE). |
| Screen Text | When text appearing on the PRM screen is referred to in the manual, it will appear with the first letter of each word capitalized. |
| 1., 2., 3. | Numbered lists indicate a series of instructions that should be followed in the order given. |
| • | Bullets precede items in a list, or a series that is not sequential. |
| **DR** | A pacemaker profile appears in the margin if the feature being discussed applies only to a specific type of pacemaker (eg, DR). If the feature applies to both models, there will be no profile. |

This manual uses several graphic representations to help the reader locate features on the PRM. In the following example, the graphic shows that the Rate Smoothing parameter is found by accessing the Rate Enhancements submenu from the Brady Parameters screen.

### Rate Smoothing

 

As each PRM screen is introduced, a graphic of the PRM toolbox button bar indicates the button to be selected. In the following example, the Temporary Parameters button on the toolbox button bar is shaded, indicating the PRM screen being discussed in that section.

### TEMPORARY PARAMETERS SCREEN

| System Summary | Quick Check | Brady Parameters | Temporary Parameters | Setup | Therapy History | Diagnostic Evaluation | EP Test |
|---|---|---|---|---|---|---|---|

All screen illustrations in this manual show typical screens from a PULSAR MAX II Model 1280 pacemaker. The screens you see when

Ex. 13.014

interrogating or programming other pacemaker models will be similar but may not include any dual-chamber fields, depending on the model.

In this manual, the word "select" means to touch the desired item on the screen with the stylus, then lift the stylus from the screen. Menu buttons and parameter selection buttons will activate when touched; the buttons in the parameter value palettes will activate when the stylus is lifted from the screen.

## Other Related Manuals and Information Tools

The **Physician's Technical Manual** is packaged with the pacemaker and provides the information needed to implant the pacemaker at nominal parameter settings. All information in the Physician's Technical Manual is also included in this manual.

The **ZOOM Programming System Operator's Manual** provides information specific to the Model 2920 PRM, such as setting up the system, maintenance, and handling.

The **PRM Assist Window feature** available on the PRM provides a convenient tool for obtaining information about selected parameters.

The **Lead Manuals** provide specific information and instructions regarding the implanted lead(s).

Ex. 13.016

INTRODUCTION

# INFORMATION FOR USE

## CHAPTER 1

This chapter includes the following information associated with the PULSAR MAX II pacemakers.

- Indications and Usage
- Contraindications
- Warnings and Precautions
- Adverse Events
- Patient Counseling Information

## INDICATIONS AND USAGE

Guidant PULSAR MAX II series pacemakers are indicated for treatment of the following:

- Symptomatic paroxysmal or permanent second- or third-degree AV block

- Symptomatic bilateral bundle branch block

- Symptomatic paroxysmal or transient sinus node dysfunction with or without associated AV conduction disorders (eg, sinus bradycardia, sinus arrest, sinoatrial [SA] block)

- Bradycardia–tachycardia syndrome, to prevent symptomatic bradycardia or some forms of symptomatic tachyarrhythmias

- Neurovascular (vaso-vagal) syndromes or hypersensitive carotid sinus syndromes

Adaptive-rate pacing is indicated for patients who may benefit from increased pacing rates concurrent with increases in minute ventilation and/or level of physical activity.

The PULSAR MAX II series pacemakers' dual-chamber and atrial tracking modes are also indicated for patients who may benefit from maintenance of AV synchrony. Dual-chamber modes are specifically indicated for treatment of the following:

- Conduction disorders that require restoration of AV synchrony, including varying degrees of AV block

- VVI intolerance (eg, pacemaker syndrome) in the presence of persistent sinus rhythm

## CONTRAINDICATIONS

The PULSAR MAX II series pacemakers are contraindicated for the following applications:

- Patients with unipolar pacing leads or in MV mode with an implanted cardioverter-defibrillator (ICD), because it may cause unwanted delivery or inhibition of ICD therapy

- MV mode in patients with unipolar ventricular leads

- Single-chamber atrial pacing in patients with impaired AV nodal conduction

- Atrial tracking modes for patients with chronic refractory atrial tachyarrhythmias (atrial fibrillation or flutter), which might trigger ventricular pacing

- Dual-chamber and single-chamber atrial pacing in patients with chronic refractory atrial tachyarrhythmias

Ex. 13.018

- Asynchronous pacing in the presence (or likelihood) of competition between paced and intrinsic rhythms

## WARNINGS AND PRECAUTIONS

### Minute Ventilation Sensor Calibration at Implant

**WARNING:** Inappropriate sustained high-rate pacing occurred in the PULSAR MAX clinical study in 5 out of 130 patients with Minute Ventilation ON, 4 to 14 days after implant. If sustained high-rate pacing could be of concern, consider programming

- a reduced maximum sensor rate, or
- MV to Passive.

These programming recommendations are intended to assure that MV calibration is evaluated, and, if necessary, recalibrated (4→ON) when the patient and pacing system have stabilized post-implant. Continued monitoring of the MV sensor performance should be performed at all follow-up visits until implant stabilization has occurred. (See "MV Initialization" in this section for details of evaluation and correction of inappropriate high-rate pacing.)

### Clinical Considerations

- In devices with the Safety Switch programmed to ON, the lead polarity will revert to unipolar in the presence of a lead impedance of < 100 Ω or > 2500 Ω. Unipolar pacing is contraindicated for patients with an ICD.

- STAT Pace will initiate unipolar pacing, which is contraindicated for patients with an ICD.

- Adaptive-rate pacing should be used with care in patients unable to tolerate increased pacing rates.

- Adaptive-rate modes based completely or in part on minute ventilation might be inappropriate for patients who can achieve respiratory cycles shorter than one second (greater than 60 breaths per minute). Higher respiratory rates attenuate the impedance signal, which diminishes the MV rate response (ie, the pacing rate will drop toward the programmed lower rate limit).

- Slow retrograde conduction combined with a short PVARP might induce pacemaker-mediated tachycardia.

- The safety and efficacy of the minute ventilation sensor modes have not been clinically established in patients with abdominal implant sites.

- Performance of the minute ventilation sensor may be adversely affected under transient conditions such as pneumothorax, pericardial effusion, or

pleural effusion. Consider programming the MV sensor OFF until these conditions are resolved.

Adaptive-rate modes based completely or in part on minute ventilation should not be used for the following patients:

- those implanted with an ICD.

- those with unipolar ventricular leads, because a bipolar lead is required for minute ventilation detection.

- those with epicardial ventricular leads, because minute ventilation measurement has only been tested with a bipolar transvenous lead.

- those using a mechanical ventilator, because use of the ventilator might result in an inappropriate MV sensor-driven rate.

## Sterilization, Storage, and Handling

- **Do not freeze.** The recommended storage temperature range is 0 to 50°C (32–122°F). Exposure to temperatures outside this range may adversely affect pacemaker operation. **Extremely** low temperatures (below –20°C) could result in permanent memory loss. If this occurs, as indicated by a programmer error message, return the device to Guidant for inspection.

- FOR SINGLE USE ONLY—DO NOT RESTERILIZE DEVICES. Return the unimplanted device to Guidant.

Do not implant a pacemaker if any of the following conditions apply:

- If a Guidant pacemaker is dropped onto a hard surface. Return the device to Guidant for inspection.

- If the "USE BEFORE" date that is printed on the packaging has passed, because this can adversely affect pacemaker longevity or sterility. If a pacemaker with an expired "USE BEFORE" date is implanted, the pacemaker warranty is void.

- If the storage package has been pierced or altered, because this could have rendered it nonsterile.

## Lead Evaluation and Connection

- **Pacing and sensing safety margins.** Consider lead maturation in choice of pacing amplitudes, pacing pulse widths, and sensing levels.

- Acute pacing thresholds greater than 1.5 V or chronic pacing thresholds greater than 3 V can result in loss of capture because thresholds increase after implantation.

- R-wave amplitude less than 5 mV or P-wave amplitude less than 2 mV can result in undersensing because sensed amplitude decreases after implantation.

Ex. 13.020

- **Line-powered equipment.** Exercise extreme caution if testing leads using line-powered equipment, because leakage current exceeding 10 µA can induce ventricular fibrillation.

- **Setscrew position.** Do not insert a lead into the pacemaker connector without first visually verifying that the setscrews are sufficiently retracted to allow insertion.

- **Pacemaker/lead compatibility.** Prior to implanting this pacemaker, verify lead/pacemaker compatibility with Guidant technical services.

- **Proper programming of the lead configuration**. If the lead configuration is programmed to bipolar when a unipolar lead is implanted, pacing will not occur.

## Implantation

- **Implanting a replacement pacemaker in a subcutaneous pocket that previously housed a larger device** may result in pocket air entrapment, migration, erosion, or insufficient grounding between the device and tissue. Flooding the pocket with sterile saline solution decreases the possibility of pocket air entrapment and insufficient grounding. Suturing the device in place reduces the possibility of migration and erosion.

- **Defibrillation causing a power surge exceeding 360 watt-seconds** can damage the pacemaker system.

## Programming and Pacemaker Operation

- **Use only a Guidant Model 2920 ZOOM Programmer/Recorder/Monitor (PRM) and the Model 2891 CONSULT software application** to communicate with the PULSAR MAX II pacemaker.

- **Telemetry communication can be interrupted by electrical noise, thus preventing improper interrogation or programming.** If the message window appears indicating that the wand is out of range or there is telemetry noise, move the programmer away from such electrical devices as electrosurgical and monitoring equipment and ensure that the wand cord and cables are not crossing one another. Telemetry communication will resume when the noise source is removed. The message window also has a Cancel button that, when selected, will stop the interrogation.

- **A pacemaker programmed to STAT pacing, if not reprogrammed, will continue to pace in SSI mode at the high-energy STAT values.** Reprogram the pacemaker to other parameter settings for alternative patient therapies or to extend pacemaker longevity.

- **Adaptive-rate pacing is not limited by refractory periods.** A long refractory period programmed in combination with a high MSR can result in asynchronous pacing during refractory periods, since the combination can cause a very small sensing window or none at all. Use Dynamic AV Delay or Dynamic PVARP to optimize sensing windows.
- **If the Amplitude is OFF during temporary programming, the pacemaker will not pace.** Pacing with the permanently programmed parameters can be restored by breaking the telemetry link or by selecting the Cancel button on the "Temporary Parameters now in use" dialogue window.

## MV Initialization

- In some patients MV Initialization will need to be repeated by performing the 4→ON initialization procedure. Factors affecting the MV baseline included lead maturation effects, air entrapment in the pocket, pacemaker motion due to inadequate suturing, and other patient complications (eg, pneumothorax).
- A 4→ON initialization should be performed if the pacemaker is removed from the pocket following implant, such as during a lead repositioning procedure.
- A 4→ON initialization should be performed to establish a new MV baseline if one of the following conditions is noted during MV sensor evaluation:
  - Failure to achieve a significant sensor-indicated response with the MV Response Factor set to level 16
  - Observed maximum or elevated sensor-indicated rates with the MV response factor set to level 2

## Environmental and Medical Therapy Hazards

Patients should be directed to avoid devices that generate strong electric or magnetic interference (EMI). If the pacemaker inhibits or reverts to asynchronous operation at the programmed pacing rate or at the magnet rate while in the presence of the EMI, moving away from the source or turning it off will usually allow the pulse generator to return to its normal mode of operation.

### Hospital and Medical Environments

Confirm pacemaker operation after any of the following medical procedures.

- **Mechanical ventilators** might result in an inappropriate MV sensor-driven rate when MV is programmed ON. Program the MV sensor OFF during mechanical ventilation.
- **Electrosurgical cautery** could induce ventricular arrhythmias and/or fibrillation, may cause asynchronous or inhibited pacemaker operation, or

may trigger the EOL indicator. If electrocautery cannot be avoided, observe the following precautions to minimize complications:

- Program the device to the VOO/AOO/DOO mode and avoid direct contact with the pacemaker or leads.
- Position the ground plate so that the current pathway does not pass through or near the pacemaker system.
- Use short, intermittent, and irregular bursts at the lowest feasible energy levels.
- Use a bipolar electrocautery system where possible.
- Have temporary pacing and defibrillation equipment available.

- **RF ablation** may cause asynchronous or inhibited pacemaker operation, and possible reset of the pacemaker. During RF Ablation, the current path (electrode tip to ground plate) should be kept as far away from the pacemaker and leads as possible, and the output amplitude of the pacemaker should be programmed to the 5-V setting, or greater. Avoid direct contact between the ablation catheter and the implanted lead and pacemaker.

- **Magnetic Resonance Imaging** (MRI) for pacemaker patients has been contraindicated by MRI manufacturers. Clinicians should carefully weigh the decision to use MRI with pacemaker patients.

  - Magnetic and radio-frequency fields produced by MRI may increase ventricular pacing beyond the rate limit, result in total inhibition of pacing output, result in pacing at random rates, or result in asynchronous pacing.
  - Magnetic fields may activate magnet mode operation and cause asynchronous pacing.
  - MRI can irreversibly damage the pacemaker.
  - Pacemaker patients treated with MRI should be closely monitored and programmed parameters should be verified upon cessation of MRI.

- **Lithotripsy** can damage the pacemaker. If lithotripsy must be used, do not focus near the pacemaker site.

- **Therapeutic ultrasound energy** may damage the pulse generator. If therapeutic ultrasound energy must be used, avoid focusing near the pulse generator site.

- **Therapeutic diathermy** may cause fibrillation, burning of the myocardium, and irreversible damage to the pacemaker because of induced currents.

- **External defibrillation** may damage the pacemaker. Attempt to minimize the current flowing through the pacemaker and lead system by following these precautions:

  - Position defibrillation paddles as far from the pacemaker as possible and perpendicular to the implanted pacemaker/lead system.

- Use the lowest clinically appropriate energy output (watt-seconds). Protective thyristors help shield pacemaker circuitry from electrical damage during external defibrillation procedures up to 360 watt-seconds. However, the precautionary measures listed in Chapter 3, External Defibrillation Protection section, should be implemented.

- **Transcutaneous Electrical Nerve Stimulation** (TENS) may interfere with pacemaker function. If necessary, the following measures may reduce interference:
  - Place the TENS electrodes as close to each other as possible.
  - Place the TENS electrodes as far from the pacemaker/lead system as possible.
  - Monitor cardiac activity during TENS use.

- **Diagnostic x-ray and fluoroscopic radiation** should not affect the pacemaker. However, high radiation sources such as cobalt 60 or gamma rays should not be directed at the pacemaker. If a patient requires radiation therapy in the vicinity of the implanted pacemaker, place lead shielding over the implant site as a precaution against radiation damage.

## Home and Occupational Environments

Patients should be advised of the following potential sources of EMI:

- **High-voltage power transmission lines** might generate enough EMI to interfere with pacemaker operation if approached too closely.

- **Communication equipment** such as microwave transmitters, linear-power-er amplifiers, or high-powered amateur transmitting systems might generate enough EMI to interfere with pacemaker operation if approached too closely.

- **Commercial electrical equipment** such as arc welders, induction furnaces, or resistance welders might generate enough EMI to interfere with pacemaker operation if approached too closely.

- **Electronic Article Surveillance (EAS) equipment** such as retail theft prevention systems might interact with pulse generators. Patients should be advised to walk directly through and not to remain near an EAS system longer than is necessary.

- **Home appliances** that are in good working order and properly grounded do not usually produce enough EMI to interfere with pulse generator operation. There are reports of pulse generator disturbances caused by electric hand tools or electric razors used directly over the pulse generator implant site.

### *Cellular Phones*
- Patients having an implanted pacemaker who operate a cellular phone should observe the following precautions:

- Maintain a minimum separation of 6 inches (15 cm) between a handheld personal cellular phone and the implanted device. Portable and mobile cellular phones generally transmit at higher power levels compared to handheld models. For phones transmitting above 3 watts, maintain a minimum separation of 12 inches (30 cm) between the antenna and the implanted device.

- Hold the phone to the ear opposite the side of the implanted device. Patients should not carry the phone in a breast pocket or on a belt over or within 6 inches (15 cm) of the implanted device as some phones emit signals when they are turned ON but not in use (ie, in the listen or standby mode). Store the phone in a location opposite the side of the implant site.

## Explanted Pacemakers

- Do not incinerate pacemakers, because they can explode if subjected to incineration or cremation temperatures; be sure that the pacemaker is explanted before a deceased patient is cremated.

- Return all explanted pacemakers and leads to Guidant for analysis and disposal. Examination of explanted devices can provide information for continued improvement in device reliability and will permit calculation of any warranty replacement credit due.

- Do not implant an explanted pacemaker in another patient as sterility, functionality, and reliability cannot be insured.

## ADVERSE EVENTS

A total of 105 patients were enrolled in the PULSAR MAX II clinical investigation of which 103 were successfully implanted with a PULSAR MAX II pacemaker. The patient population included 65 males and 38 females with a mean age of 70.2 years. Total cumulative implant duration was 608.1 device-months, with a mean implant duration of 5.9 months (ranging from 4.1 to 7.9 months).

During the clinical study, there was one patient death, which was reviewed and determined to be non-device related. The death was classified as cardiac/arrhythmic.

## Observed Adverse Events

Table 1 reports the number of adverse events, percentage of patients who experienced at least one adverse event, and the number of events per device-year basis in descending order of frequency.

**Table 1. Adverse Events Reported—All Patients (N = 103 devices in 103 patients)**

| Adverse Events Reported | # of Events | % of Patients | Events per Device–Year |
|---|---|---|---|
| Palpitations | 10 | 16.7 | 0.330 |
| Arrhythmia logbook counter | 5 | 8.3 | 0.164 |
| Programmer observations | 4 | 6.7 | 0.132 |
| Arrhythmia – atrial fibrillation | 3 | 5.0 | 0.099 |
| Congestive heart failure | 3 | 5.0 | 0.099 |
| Fatigue | 3 | 5.0 | 0.099 |
| Lead dislodgment – right ventricle | 3 | 5.0 | 0.099 |
| Oversensing – atrium | 3 | 5.0 | 0.099 |
| Undersensing – atrium | 3 | 5.0 | 0.099 |
| Angina | 2 | 3.3 | 0.066 |
| Lead dislodgment – right atrium | 2 | 3.3 | 0.066 |
| Lightheadedness | 2 | 3.3 | 0.066 |
| PMT | 2 | 3.3 | 0.066 |
| Brady capture – intermittent atrium | 1 | 1.7 | 0.033 |
| Chest pain | 1 | 1.7 | 0.033 |
| Dehydration | 1 | 1.7 | 0.033 |
| Hypotension | 1 | 1.7 | 0.033 |
| Infection | 1 | 1.7 | 0.033 |
| Oversensing – ventricle | 1 | 1.7 | 0.033 |
| Perforation, cardiac | 1 | 1.7 | 0.033 |
| Phrenic nerve/diaphragm stimulation | 1 | 1.7 | 0.033 |
| Placement diff., dislodg/migrat/displace | 1 | 1.7 | 0.033 |
| Stroke syndrome or CVA | 1 | 1.7 | 0.033 |
| Syncope | 1 | 1.7 | 0.033 |
| Threshold diff,. pacing, elevated, acute | 1 | 1.7 | 0.033 |
| Vagal hypotensive event | 1 | 1.7 | 0.033 |
| Valve replacement and CABG | 1 | 1.7 | 0.033 |
| Ventricular fibrillation | 1 | 1.7 | 0.033 |
| Any adverse event | 60 | | |

## Potential Adverse Events

Historically reported potential physical effects from implantation of a pacemaker are listed below in alphabetical order:

- Cardiac perforation
- Cardiac tamponade
- Death
- Elevated thresholds
- Erosion through the skin
- Fibrotic tissue formation
- Foreign body rejection phenomena
- Hematoma/seroma
- Infection
- Lead Abrasion
- Lead fracture, insulation break
- Local tissue reaction
- Myopotential sensing
- Nerve and muscle stimulation
- Pacemaker-mediated tachycardia (PMT)
- Pacemaker migration
- Transvenous lead-related thrombosis

In addition, electronic devices such as pacemakers are subject to random component failures that cannot be predicted and can lead to failure to pace.

## CLINICAL STUDIES

The Auto Sense feature of the PULSAR MAX II pacemaker was evaluated in a multi-center (17 US centers) prospective study. Patients were evaluated during two 24-hour periods via consecutive Holter monitors at the one-month and three-month visits.

## Methods

Manual sensitivity was programmed for one 24-hour period at the one-month and three-month visits. Auto Sense was programmed ON at the day following each of those visits and remained ON between visits. To compare performance of manually programmed sensitivity with Auto Sense, two consecutive 24-hour Holter monitors were performed. Each 24-hour period consisted of the following: a deep breathing and myopotential exercise, postural and Valsalva manuever(s), an exercise evaluation, and daily activities. The 24-hour Holter monitoring data were evaluated by an independent lab to assess over- and under-sensing episodes. (An episode was defined as two or more consecutive events.)

## Description of Patients and Implant Duration

Table 2 provides a summary of patient characteristics. Table 3 lists the patient arrhythmia history.

**Table 2. Patient Population Characteristics**

| Characteristic | Model (N = 103) |
|---|---|
| Age at Implant (years) | |
|   Minimum | 36.1 |
|   Maximum | 94.1 |
|   Mean | 70.2 |
|   Standard Deviation | 10.8 |
| Gender (# of patients, %) | |
|   Male | 65 (63.1%) |
|   Female | 38 (36.9%) |

**Table 3. Patient Arrhythmia History**

| Arrhythmias* | Number of Subjects |
|---|---|
| Sinus bradycardia | 32 |
| Sinus arrhythmia | 2 |
| Paroxysmal atrial fibrillation | 42 |
| Atrial fibrillation (AF) (chronic) | 1 |
| Atrial flutter | 8 |
| PSVT | 1 |
| PAT | 4 |
| Sinus arrest | 12 |
| Sinus node dysfunction (brady-tachy synchrony) | 38 |
| 1st-degree AV heart block | 6 |
| 2nd-degree AV block (Mobitz I) | 10 |
| 2nd-degree AV block (Mobitz II) | 4 |
| 3rd-degree AV block | 19 |
| Left bundle branch block | 8 |
| Right bundle branch block | 5 |
| Arrhythmia resulting from ablation | 1 |
| Intraventricular conduction delay | 1 |
| Other | 27 |

\*   Numbers may not be summed as some patients may be reported in more than one category.

## Results

Results of the one-month Auto Sense feature evaluation are presented in Table 4 and Table 5. There were more malsensed episodes in the atrium ver-

Ex. 13.028

sus the ventricle for both Auto Sense OFF (manually programmed sensitivity) and Auto Sense ON.

**Table 4. One-Month Auto Sense Atrial Performance**

|  | Under–sensing | | Over–sensing | | Total Malsensing | |
|---|---|---|---|---|---|---|
|  | n | mean ± std | n | mean ± std | n | mean ± std |
| Auto Sense ON | 63 | 0.00 ± 0.00 | 63 | 0.00 ± 0.00 | 63 | 0.00 ± 0.00 |
| Auto Sense OFF | 68 | 0.26 ± 2.18 | 68 | 0.19 ± 0.74 | 68 | 0.46 ± 2.28 |
| Difference (ON – OFF) | 63 | −0.29 ± 2.27 | 63 | −0.21 ± 0.77 | 63 | −0.49 ± 2.37 |
| Comparison on paired differences | | | | | P-value: <.0001 | |

**Table 5. One-Month Auto Sense Ventricular Performance**

|  | Under–sensing | | Over–sensing | | Total Malsensing | |
|---|---|---|---|---|---|---|
|  | n | mean ± std | n | mean ± std | n | mean ± std |
| Auto Sense ON | 60 | 0.00± 0.00 | 60 | 0.03± 0.26 | 60 | 0.03± 0.26 |
| Auto Sense OFF | 66 | 0.00± 0.00 | 66 | 0.08± 0.36 | 66 | 0.08± 0.36 |
| Difference (ON – OFF) | 60 | 0.00± 0.00 | 60 | −0.05± 0.47 | 60 | −0.05± 0.47 |
| Comparison on paired differences | | | | | P-value: <.0001 | |

Results of the three-month Auto Sense feature evaluation are presented in Table 6 and Table 7. There were more malsensed episodes in the atrium versus the ventricle for both Auto Sense OFF (manually programmed sensitivity) and Auto Sense ON.

**Table 6. Three-Month Auto Sense Atrial Performance**

|  | Under–sensing | | Over–sensing | | Total Malsensing | |
|---|---|---|---|---|---|---|
|  | n | mean ± std | n | mean ± std | n | mean ± std |
| Auto Sense ON | 58 | 0.21 ± 1.21 | 58 | 0.05 ± 0.39 | 58 | 0.26 ± 1.26 |
| Auto Sense OFF | 62 | 0.15 ± 1.14 | 62 | 0.00 ± 0.00 | 62 | 0.15 ± 1.14 |
| Difference (ON – OFF) | 57 | 0.05 ± 1.73 | 57 | 0.05 ± 0.40 | 57 | 0.11 ± 1.77 |
| Comparison on paired differences | | | | | P-value: <.0001 | |

**Table 7. Three-Month Auto Sense Ventricular Performance**

|  | Under–sensing | | Over–sensing | | Total Malsensing | |
|---|---|---|---|---|---|---|
|  | n | mean ± std | n | mean ± std | n | mean ± std |
| Auto Sense ON | 59 | 0.00 ± 0.00 | 59 | 0.00 ± 0.00 | 59 | 0.00 ± 0.00 |
| Auto Sense OFF | 62 | 0.00 ± 0.00 | 62 | 0.03 ± 0.25 | 62 | 0.03 ± 0.25 |
| Difference (ON – OFF) | 58 | 0.00 ± 0.00 | 58 | −0.03 ± 0.26 | 58 | −0.03 ± 0.26 |
| Comparison on paired differences | | | | | P-value: <.0001 | |

In addition, an analysis was conducted between one month and three months both with Auto Sense ON, to demonstrate the consistent performance of the Auto Sense feature over time. Comparisons between the mean differences determined for Auto Sense ON at the one-month and three-

month follow-ups were evaluated and no significant differences in the atrium (P-value: 0.1188) or ventricle (P-value: 0.3177) were observed, indicating that the Auto Sense feature's performance does not change over time.

## Conclusion

The results of the PULSAR MAX II Auto Sense feature demonstrate that Auto Sense and manual programming of sensitivity are equivalent. There were more malsensed episodes in the atrium versus the ventricle for both Auto Sense OFF and Auto Sense ON. The Auto Sense feature's performance does not change over time.

# PATIENT COUNSELING INFORMATION

The following are topics that the clinician might want to discuss with the patient prior to discharge:

- Signs and symptoms of infection
- Symptoms that should be reported (eg, sustained high-rate pacing requiring reprogramming)
- Activity restrictions (if applicable)
- Minimum heart rate (lower rate limit of the pacemaker)
- Frequency of follow-up
- MV sensor adaptation process and symptoms of high-rate pacing

## Patient Manual

A copy of the patient manual is packaged with each device. It contains information for the patient, patient's relatives, and other interested people. Discuss the information in the manual with concerned individuals both before and after pacemaker implantation so they are fully familiar with operation of the device. For additional copies of the patient manual, contact the nearest Guidant sales representative or contact Guidant at the address on the back cover of this manual.

## Patient ID Card

A temporary patient ID card is packaged with each device. A permanent ID card will be sent to the patient four to six weeks after the implant form is received by Guidant. The patient should be advised to carry the Patient ID card at all times.

# DIAGNOSTICS AND FOLLOW-UP

## CHAPTER 7

This chapter contains PULSAR MAX II information about the diagnostic screens available with the application. The Brady Parameters screen is discussed in detail in Chapter 6—Therapy.

The screen names appear in the toolbox button bar at the bottom of the PRM screen.

| System Summary | Quick Check | Brady Parameters | Temporary Parameters | Setup | Therapy History | Diagnostic Evaluation | EP Test |
|---|---|---|---|---|---|---|---|

The following is a brief description of each screen included in this chapter:

- **System Summary**—Provides a summary of basic device and lead system information as well as a list of clinical events recorded since the last follow-up.

- **Quick Check**—Provides a method of sequencing through a series of typical follow-up procedures controlled from a single screen.

- **Temporary Parameters**—Allows parameter settings to be tested in a temporary mode while maintaining the "permanent" parameters in the pacemaker's memory.

- **Setup**—Allows the parameter setup for various features including Magnet, Stored Arrhythmia, Trending, and Daily Measurement.

- **Therapy History**—Allows viewing of patient therapy including Arrhythmia Logbook, Counters, and Histograms.

- **Diagnostic Evaluation**—Displays data and/or allows testing of Battery Status, Intrinsic Tests, Impedance Tests, Threshold Tests, Daily Measurement, Trending, and Snapshot Viewer.

- **EP Test**—Provides the ability to induce and/or terminate arrhythmias noninvasively.

## SYSTEM SUMMARY

The System Summary (Figure 57) screen provides a summary of the data retrieved from the device. These data are available in greater detail on other screens. To view those screens, select the shortcut button ( ) next to the feature.  Programmable parameters cannot be changed on this screen.

The test values on the System Summary screen will not be updated during a patient session. To view updated test results on the System Summary screen, select New Patient from the Utilities menu and re-interrogate the pacemaker.



**Figure 57. A typical System Summary Screen**

Ex. 13.032

The clinical events are considered either informational or important. The important messages will be preceded by a stop sign icon (⬤). The display will show "No Events" if there are none to report. View detail of the clinical events by selecting the message or the stop sign button next to the event. Clinical events that will be displayed include the following:

- Ventricular Tachycardia

- Atrial Tachycardia

- Patient Triggered Event Stored

- Lead Configuration Switched

- Battery at ERT

- Battery at EOL

- PMT Episode Stored

- SBR Episode Stored

- Patient Activated EGMs ON

## QUICK CHECK SCREEN

| System Summary | Quick Check | Brady Parameters | Temporary Parameters | Setup | Therapy History | Diagnostic Evaluation | EP Test |
|---|---|---|---|---|---|---|---|

The Quick Check screen (Figure 58) provides a method of sequencing through a series of follow-up procedures. The selected tests will be performed in the order they appear on the screen, beginning with the left column when the Start button is depressed. The clinician will be prompted with a dialogue window before each of the following tests:  Intrinsic Amplitude Measurements, Lead Impedance Measurements, and Amplitude Threshold Tests. After the Amplitude Threshold Tests, no messages are displayed other than "Telemetry in Progress."

Beside each function on the Quick Start screen is a Go  button. Individual functions can be activated by selecting the Go button. This allows the user to repeat individual Quick Check functions or perform the tests in any sequence desired. As each test is completed, the results are displayed on the  screen. If a test was unable to complete (eg, the patient was 100% paced during Intrinsic Amplitude Measurement), the results will be reported as NR (no results).

Ex. 13 033



**Figure 58. The Quick Check screen.**



When the "Go" button is selected, only the test next to the button will be started (whether the test box has a check displayed or not).

When this box displays a check mark, the respective test will be started when the Start button is selected. The boxes can be selected at anytime to make the check visible or not.

When this Start button is selected, all tests that have a checked box will be started.

## Intrinsic Amplitude Measurement

Intrinsic Amplitude Measurements are performed when this function is activated. In dual-chamber modes, both P- and R-waves are measured. In single-chamber modes, only the active chamber is tested. The Mode, Lower Rate Limit, and AV Delay can be changed for this test by selecting the magnifying glass icon to access the popup screen.

The Last Measurement (from the previous session) and the current Inrinsic Amplitude Measurement are both displayed. If multiple measurements are taken, the current measurement data will be updated while the Last Measurement will remain the same.

## Lead Impedance Measurement

Lead impedance measurements are performed when this function is activated. In dual-chamber modes, both the atrial and ventricular leads are measured. In single-chamber modes, only the active chamber is tested. If a chamber is not being paced due to the patient's intrinsic rhythm when this

Ex. 13.034

test is conducted, the pacemaker will momentarily switch to a triggered mode and pace into the sensed event to ensure a measurement in that chamber. If the mode is DDD(R) and the pacemaker has mode switched in response to an atrial arrhythmia, lead tests will not be conducted in the atrium.

*NOTE:* *To help ensure successful atrial lead impedance measurements, the programmer temporarily increases the Maximum Tracking Rate to 185 ppm until the atrial lead impedance test is completed. The effective Maximum Tracking Rate will still be limited by the total atrial refractory period.*

The Last Measurement (from the previous session) and the current Lead Impedance Measurement are both displayed. If multiple measurements are taken, the current measurement data will be updated while the Last Measurement will remain the same.

## Atrial and Ventricular Amplitude Thresholds

The Amplitude Threshold Test uses the Smart Start amplitude value, which is three Voltage steps above the previously measured threshold. If there has not been a previous threshold, the test will start at the programmed Voltage. The Lower Rate Limit, AV Delay, and starting Voltage amplitude can be changed for this test by accessing the popup screen with the magnifying glass icon. The surface ECG is automatically set to 2X for the duration of the Atrial Amplitude Threshold Test to help the user distinguish the P-wave. The clinician is prompted to remove the telemetry wand or select Stop at loss of capture. Only the threshold tests require intervention. When threshold has been lost, as indicated by the user stopping the test or breaking telemetry, the Snapshot feature will automatically be activated and the 10 seconds before loss of capture will be recorded. This information can be viewed and printed from the Snapshot Viewer.

The Last Measurement (from the previous session) and the current measurement are both displayed. If multiple measurements are taken, the current measurement data will be updated while the Last Measurement will remain the same. The threshold measurement displayed is the Voltage step value that is one higher than when the threshold test was terminated.

*NOTE:* *The Ventricular Amplitude Threshold Test begins immediately after the completion of the Atrial Amplitude Threshold Test.*

## Print Quick Notes

Quick Notes provides a summary of the Quick Check test results. One to five copies can be printed.

## Full Report

A full report, which includes Brady Parameters, Battery Status, Histograms and Counters, Daily Measurement, and Arrhythmia Logbook may be printed using the Full Report function.

## Save All to Disk

Patient and device data can be saved to a data disk. Only the data from one patient's device can be stored on a disk; information from multiple devices cannot be stored on the same data disk.

## BRADY PARAMETERS SCREEN

The Brady Parameters screen and the submenus accessible through it are discussed in Chapter Six—Therapy.

## TEMPORARY PARAMETERS SCREEN

| System Summary | Quick Check | Brady Parameters | Temporary Parameters | Setup | Therapy History | Diagnostic Evaluation | EP Test |
|---|---|---|---|---|---|---|---|

The pacemaker can be programmed with temporary parameter values that differ from the programmed "permanent" values. This allows the clinician to examine alternate pacing therapies while maintaining the previously programmed "permanent" parameters in the pacemaker memory. Once initiated, temporary programming remains in effect as long as telemetry is maintained between the programmer and the pacemaker. The temporary parameters are deactivated and the permanent parameters are restored when the telemetry link is broken or when the Cancel button is selected on the "Temporary Parameters now in use" dialogue window.

*NOTES:*

- *When the pacemaker is transmitting real-time electrograms or is in Temporary mode, some diagnostic functions are suspended. This includes Trending, Event Counters, and Histograms. When the pacemaker is in Magnet Mode, sensor and rate trending are suspended.*

- *If the MV sensor is programmed ON in permanent mode, the Lower Rate Limit cannot be programmed < 50 ppm. To program rates lower than 50 ppm in temporary mode, temporarily program the MV sensor to OFF at the same time. Once the temporary mode is deactivated, the MV sensor response will resume.*

Parameters and range values that are available during permanent programming are also available during Temporary programming with the exception of the following features:

- Magnet

Ex. 13.036

Ex. 13 037

- Automatic Response Factor
- Auto Sense
- Lead Safety Switch
- 4—On MV Initialization

In addition, temporary programming offers nonpacing modes and values that are not available in permanent programming (see Appendix E—Reference Tables for listing). Unlike the permanent parameters, temporary programming permits Amplitude to be turned OFF. This allows examination of underlying cardiac rhythms.

**CAUTION:** If the Amplitude is OFF during temporary programming, the pacemaker will not pace. Pacing with the permanently programmed parameters can be restored by breaking the telemetry link or by selecting the Cancel button on the "Temporary Parameters now in use" dialogue window.

## Implementing Temporary Values

Use the following procedure to program the pacemaker for temporary pacing:

1. Select the Temporary Parameters button on the tool bar.

**NOTE:** If a report is desired listing Temporary Parameters, select the Printer icon and make sure that Print after Modification is set to Enable. The report will print after the Temporary programming session has ended.

2. Select the parameter to change by selecting the Change box next to the parameter.

3. Select new parameter values by increasing or decreasing values in the Temporary column. If additional parameters require modification, repeat to achieve the desired values. **Multiple parameter changes can be made at one time.**

   After entering the change(s), make sure that the Parameter Interaction button is not displayed. If it is, select that button to determine how the current changes violate interactive limits. Any interactive limit errors ( ⬛STOP ) must be corrected before temporary programming can occur. Interactive limit warnings ( ⚠ ) should be taken into careful consideration before continuing, but will not prohibit programming.

4. Select the Start button to send the changes to the pacemaker via telemetry. The programmer will display a dialogue window indicating that temporary programming is in effect. As long as the telemetry link is maintained, the pacemaker will function according to the temporary values. No

changes can be made to permanent parameters while in a temporary programming mode.

5. To end temporary programming, select the Cancel button on the Temporary Programming dialogue window or break the telemetry link. The pacemaker will then return to using the permanent pacing parameters.

After a temporary programming session, you can perform any of the following actions:

- Make additional changes to the temporary parameters for further examination.

- Copy the temporary parameter values to the Change column on the Brady Parameters screen.

- Choose Cancel Changes. This will clear the temporary values from the Temporary column.

## SETUP



The Setup screen allows access to the setup and/or reset parameters for the following features:

- Magnet

- Arrhythmia Logbook

- Trending

- Daily Measurement

## Magnet

Select the Magnet button on the Setup screen to access this screen. The Magnet setup screen allows the magnet response to be changed. The programmable values are OFF, ASYNC, and EGM.

*NOTE:* *After changing the Magnet Response value, the Initiate Magnet button must be selected to enable the change.*

## Arrhythmia Logbook

Select the Arrhythmia Logbook button on the Setup screen to access the Arrhythmia Logbook setup screen. This screen allows the clinician to enable EGM storage and to choose which events will trigger the EGMs.

Ex. 13.038

Recording of arrhythmias can be triggered by up to seven selectable events:

- **Atrial Tachy Detection**—This event is recorded when the pacemaker is operating in an atrial sensing mode and the atrial rate meets or exceeds a programmable Atrial Detection Rate maintained for a programmable Atrial Detection Duration. The Atrial Tachy Detection algorithm does not use any data from the ventricular channel.

  Sensed events falling both outside and inside the atrial refractory period are used to determine the atrial rate.

- **Ventricular Tachy Detection**—This event is recorded when the pacemaker is operating in a ventricular sensing mode and the ventricular rate meets or exceeds a programmable Ventricular Detection Rate maintained for a programmable Ventricular Detection Duration. The ventricular tachy detection algorithm does not use any data from the atrial channel.

  Sensed events falling both outside and inside the ventricular refractory period are used to determine the ventricular rate.

- **Magnet (Patient Triggered)**—When the pacemaker detects the presence of a magnet, one recording will be triggered. The pacemaker must not have a magnet present for at least one full cardiac cycle following the EGM recording cycle before another magnet-triggered EGM can be recorded. The Magnet Response parameter on the Brady Parameters screen (Magnet submenu) must be programmed to EGM for magnet detection to trigger EGM storage. This trigger will not be activated if an EGM is being recorded when the magnet is detected.

*NOTE:* *If patient magnet activation is selected, you may wish to have the patient initiate a stored EGM at the time of feature programming. This may assist with patient education and feature validation.*

- **NSVT (Multiple PVCs)**—This event is recorded when a device is operating in a dual-chamber mode and a run of three or more pacemaker-defined PVCs is detected. The pacemaker definition for a PVC is a sensed or paced ventricular event that is followed by another sensed ventricular event without an intervening atrial event. Atrial senses within PVARP are used.

- **A-Tachy Response**—This event is recorded when Atrial Tachy Response (ATR) mode switching fallback is triggered. The ATR Mode Switching feature on the Brady Parameters screen (A-Tachy Response submenu) must be programmed ON for ATR detection to trigger EGM storage.

- **Sudden Brady Response**—This event is recorded when Sudden Bradycardia Response is triggered. The SBR feature on the Brady Parameters screen (Rate Enhancements submenu) must be programmed ON for SBR detection to trigger EGM storage.

- **Pacemaker Mediated Tachycardia (PMT)**—This event is recorded when the PMT Termination feature is triggered. The PMT Termination feature on the Brady Parameters screen (A-Tachy Response submenu) must be enabled for this trigger to activate.

When EGM storage is enabled, the clinician must specify the EGM storage method. This will determine how many events can be stored in the pacemaker memory.

To select the trigger sources, change the selection to ON. For the Atrial and Ventricular Detection Rates, enter the rate and duration to the right of the parameter name.

For the ventricular and atrial trigger sources, sensed events falling both outside and inside the refractory period will be used to determine the rate.

Changes made to the settings on this screen will not be stored automatically. You must select the Initiate Arrhythmia Logbook button before the changes will take effect. If the EGM Storage Method has been changed, selecting the Initiate Arrhythmia Logbook button will initiate the changes and erase existing EGMs and trending data. Navigating to other screens without selecting the Initiate Arrhythmia Logbook button will not delete the changes. If changes to the Setup have not been confirmed via the Initiate Arrhythmia Logbook button, they are not used and the pacemaker continues operation using the previous Setup information.

### EGM Selections

All EGM selections include Event Markers and an Onset portion that occurs before the EGM trigger is satisfied. Using the EGM feature with its Onset EGM increases device current drain by less than 0.5%.

The EGM selections with their Event Markers are as follows:

- OFF
- 10 Episodes (2 seconds Pre-Trigger & 2 seconds Post-Trigger) Continuous with 6 Event Markers before the trigger and 6 Event Markers after the trigger
- 5 Episodes (4 seconds Pre-Trigger & 4 seconds Post-Trigger) Continuous with 13 Event Markers before the trigger and 13 Event Markers after the trigger
- 2 Episodes (4 seconds Pre-Trigger & 10 seconds Post-Trigger) Continuous with 13 Event Markers before the trigger and 39 Event Markers after the trigger
- 1 Episode (7 seconds Pre-Trigger & 27 seconds Post-Trigger) Continuous with 27 Event Markers before the trigger and 110 Event Markers after the trigger

Ex. 13.040

- 1 Episode (27 seconds Pre-Trigger & 13 seconds Post-Trigger) One Shot with 110 Event Markers before the trigger and 55 Event Markers after the trigger

With each electrogram selection, a specific number of Event Markers can be recorded. The Event Markers are "centered" around the trigger. For example, if there are six Event Markers pre-trigger and six Event Markers post-trigger, there will be a marker for each of the six events before the trigger and each of the six events immediately after the trigger. Depending on the actual rhythm that is recorded during the EGM storage, the beginning and the end of the EGM may not have Event Markers, but the portion of the EGM around the trigger will always have them.

To provide an Onset portion for EGMs, part of the 40-second memory is continuously recording Atrial and/or Ventricular EGMs with markers. The fact that some of the device memory is typically recording an Onset portion of an EGM means that not all 40 seconds of the device memory is available for EGM retrieval. Newer EGMs will write over (replace) older EGMs in the device memory, except when the clinician selects One Shot (1 Episode with 27 seconds Pre-Trigger and 13 seconds Post-Trigger). In this case, all 40 seconds of device memory is utilized. With this selection, as soon as an EGM is recorded, no further EGMs can be recorded until the Arrhythmia Logbook is reinitiated.

### Clearing Stored EGMs

The following EGMs are cleared by changing EGM Storage or by activating Trending:

- 10 Episodes (2 seconds Pre-Trigger & 2 seconds Post-Trigger) Continuous
- 5 Episodes (4 seconds Pre-Trigger & 4 seconds Post-Trigger) Continuous
- 2 Episodes (4 seconds Pre-Trigger & 10 seconds Post-Trigger) Continuous
- 1 Episode (7 seconds Pre-Trigger & 27 seconds Post-Trigger) Continuous

The following EGM is cleared by changing EGM Storage, by activating Trending, or by initiating the Arrhythmia Logbook:

- 1 Episode (27 seconds Pre-Trigger & 13 seconds Post-Trigger) One Shot

The Arrhythmia Logbook is continuously updated based on the triggers that have been selected and have detected arrhythmias, but the Arrhythmia Logbook cannot be cleared. Activating Trending does not affect the Arrhythmia Logbook.

## Trending

This function allows the clinician to specify which types of data will be collected by the pacemaker and the resolution at which to store the acquired data.

Use the following procedure to set up the Trending Data storage:

1. Select the Trending tool button on the Setup screen.

2. Choose the Trending Source to be used.

    **Rate**—Rate and sensor data will be recorded

    **Sensitivity**—Signal amplitude and Auto Sense sensitivity data will be recorded. Auto Sense must be ON in at least one chamber to allow Sensitivity to be trended

3. Choose the Trending Method to be used.

    **High Resolution method**—The pacemaker averages and records the actual rate and sensor values of the permanently programmed sensors over 16 seconds. Using the high resolution method in dual-chamber mode, rate, MV, and accelerometer data will be recorded for 18.2 hours.

    **Long Duration method**—The pacemaker averages and records the actual rate and sensor values of the permanently programmed sensors over 60 seconds. Using the long duration method in dual-chamber mode, rate, MV, and accelerometer data will be recorded for 68.3 hours.

    **Beat to Beat method**—The pacemaker records intervals and event markers or sensitivity on a cycle-to-cycle basis. No sensor information will be stored using this recording method. Using beat to beat in dual-chamber mode at 60 ppm, data will be recorded for 1.1 hours.

    **5–Minute method**—This method is available only with sensitivity trending. Samples are taken at 5-minute intervals and provide more than 1 week of data. No sensor information will be stored using this recording method.

4. Choose how the data should be stored. There are three ways to save the data:

    **Fixed** storage starts when the setup is confirmed and continues until the memory buffer is filled, allowing the clinician to view data from initial setup for a specific amount of time.

    **Continuous** storage has the most recent data available. It starts upon confirmation of the setup and continuously overwrites the oldest data until the information is retrieved. It allows the clinician to view the data for the recording duration immediately previous to the current time.

    **Timer (fixed)** storage allows the clinician to specify the time and date when the pacemaker should begin storing data. The data will then be stored for the recording duration until the memory buffer is filled.

Ex. 13.042

5. When all of the parameters on the Setup screen are as desired, select the Initiate Trend button. The pacemaker will immediately begin storing the data as specified. Initiating trending will erase any stored EGM data.

The Selected Duration depends on the number of programmed sensors and is displayed on the Setup window.

### Daily Measurement

The Daily Measurement Setup screen allows the erasure of all daily measurement data stored in the pacemaker, up to 1 year of data.

## THERAPY HISTORY

| System Summary | Quick Check | Brady Parameters | Temporary Parameters | Setup | Therapy History | Diagnostic Evaluation | EP Test |
|---|---|---|---|---|---|---|---|

### Arrhythmia Logbook

Recording of arrhythmias can be triggered by up to seven selectable events:

- Atrial Tachy Detection
- Ventricular Tachy Detection
- Magnet Activation
- Non-sustained ventricular tachycardia (NSVT)
- A-Tachy Response
- Sudden Bradycardia Response
- Pacemaker Mediated Tachycardia (PMT)

The Arrhythmia Logbook can store up to 25 separate events. As new events are recorded, the oldest events are written over (ie, replaced). If EGM storage has been initiated, the most recent events also will have EGMs.

For example, if the EGM storage method was 5 Episodes (4 seconds Pre-Trigger and 4 seconds Post-Trigger), the five most recent Arrhythmia Logbook episodes would have EGMs while older episodes would not.

*NOTE: With the One Shot EGM selection (27 seconds Pre-Trigger and 13 seconds Post-Trigger ), once an event has been recorded, no further events will be recorded until the Initiate Arrhythmia Logbook button is activated.*

The Arrhythmia Logbook is continuously updated based on the triggers that have been selected and have detected arrhythmias, but the Arrhythmia Logbook cannot be cleared.

Enabling the Trending functions will erase Stored EGMs data. Choosing the Initiate Trend button on the Setup—Trending screen will instruct the programmer to establish telemetry with the pacemaker and clear the data storage.

The Arrhythmia Logbook stores the information about detected arrhythmias, as described in the table below. All detected arrhythmias also will include date and time.

**Table 15. Summary of Information Stored in the Arrhythmia Logbook**

| Trigger | Onset (ppm) | Max (ppm) | Duration |
|---|---|---|---|
| Atrial Tachy Detection | Last measured interval when the detection criteria are first met | Fastest measured interval during the arrhythmia, after criteria are met | Not applicable |
| Ventricular Tachy Detection | Last measured interval when the detection criteria are first met | Fastest measured interval during the arrhythmia, after criteria are met | Not applicable |
| Magnet | Not applicable | Not applicable | Duration is equal to the length of EGM stored |
| NSVT | Last measured interval when the detection criteria are first met | Fastest measured interval during the arrhythmia, after criteria are met | N/A |
| A-Tachy Response | Last measured interval when the detection and duration criteria are first met prior to mode switch | Fastest measured interval during fallback | Duration of mode switch [a] |
| Sudden Brady Response | Average atrial rate measured before the rate decrease to the LRL or Sensor-Indicated Rate | Not applicable | Duration of therapy [a] |
| Pacemaker Mediated Tachycardia | Not applicable | Not applicable | Not applicable |

a.   Minimum duration value is equal to the length of the EGM stored.

When you access the Arrhythmia Logbook screen (Figure 59), the arrhythmia data interrogated from the pacemaker at initial interrogation are displayed.

Ex. 13.044



**Figure 59. The Arrhythmia Logbook screen.**

Use the following procedure to retrieve the Arrhythmia Logbook data that have been stored since initial interrogation:

1.  The data will be displayed in chronological order. To view data farther up on the table, choose the Newer Episodes button. To view data farther down on the table, choose the Older Episodes button. If no further data are available in the desired direction, the button will appear gray and cannot be selected.

2.  To print out the Arrhythmia Logbook, select the Print Log button.

### Stored Electrograms

Stored electrograms (EGMs) must be enabled by the clinician and can be disabled if desired. When enabled, each triggering event will cause an electrogram to be stored in the pacemaker. An electrogram is stored for each chamber for which sensing is enabled. The post-trigger portion of the EGM will be stored once the triggering event has occurred. The Onset portion of the EGM, which occurred before the event, will also be stored. If all the available storage has been used, the new event will overwrite the oldest event in the pacemaker storage.

The features on the  window (Figure 60) allow the clinician to zoom in and out, to scroll the traceStored EGMs left or right, and to drop electronic calipers to make measurements on the screen. The calipers provide the interval in milliseconds between the calipers, and the voltage difference between caliper positions for both the atrial and the ventricular electrograms (if applicable).



**Figure 60. The Stored EGMs screen.**

Use the following procedure to view a stored electrogram:

1. Select the magnifying glass icon on the logbook window next to the entry to be viewed. If the stored arrhythmia does not include a stored electrogram, there will be no button next to that event.

2. Select the sweep speed using the buttons in the middle of the screen.

3. Use the arrow buttons on the screen to scroll the currently displayed view left or right along the trace. Below the trace is a full view bar. The current view is represented by the portion of the full view between the brackets. To select a different section of the recorded trace, touch the desired section with the stylus.

4. To use the electronic calipers, drag the calipers to the desired new positions, then lift the stylus. The interval and the amplitude difference between the two calipers will be displayed.

5. To print a displayed EGM trace, select the Print EGM button on the screen. The EGM with annotated event markers will be printed at the selected sweep speed (nominal sweep speed is 25 mm/s).

**NOTE:** *The Stored electrogram amplitudes are similar to the real-time electrograms. Changing the programmed Sensitivity will affect the appearance of future stored electrograms, but will not affect electrograms stored previously.*

## Counters

Event counters record the number of intrinsic and pacemaker-mediated events that occur during an event recording period. This period begins with

Ex. 13.046

the last time the counters were reset by the clinician and ends when the data are retrieved from the pacemaker via telemetry. Neither data retrieval nor changing the programmed parameters resets the counters.

The following events are counted and recorded when relevant to the currently programmed permanent pacing mode:

- Paced and Sensed Events
- Atrial Tachy Response Mode Switch Data
  - Total ATR Mode Switches
  - Total ATR Mode Switch Time
  - Maximum Mode Switch Time
  - Average Mode Switch Time
- Ectopic Beats
  - PACs
  - Single or Double PVCs
  - Three or More Successive PVCs
  - Atrial Tachy Detections
  - Ventricular Tachy Detections
- V-V Variation
  - V-V Variation 0% $\leq$ 10%
  - V-V Variation 11% $\leq$ 20%
  - V-V Variation 21% $\leq$ 30%
  - V-V Variation > 30%
- Rate Hysteresis Searches—total number and number of successful searches
- AV Hysteresis Searches—total number and number of successful searches
- Rate Smoothing Up—atrial and ventricular
- Rate Smoothing Down—atrial and ventricular
- Wenckebach Events (PMT Termination algorithm must be active for this counter)
- Minute Ventilation Baseline Values—hourly for the last 24 hours (MV must be active for this data)

The event counters can be reset via telemetry by selecting the Reset button on the Counters screen (Figure 61). Use caution when performing this operation. Once telemetry is established, some or all of the data will be cleared even if you choose the Cancel button during the operation. Pacing mode changes do not reset the event counters.

**NOTE:** *When the pacemaker is transmitting real-time electrograms or is in Temporary mode, some diagnostic functions are suspended. This includes Trending, Event Counters, and Histograms. When the pacemaker is in Magnet Mode, sensor and rate trending are suspended.*



**Figure 61. The Counters screen.**

## Histograms

Rate histograms allow the clinician to graphically display atrial and ventricular paced and sensed events collected during the recording period (Figure 62). This period begins with the last time that histograms were reset by the clinician and ends when the data are retrieved from the pacemaker via telemetry. Select the Retrieve button to retrieve the data.

Two histogram selections are possible: AV and Pace/Sense. The AV histograms show A-sensed events followed by V-sensed and V-paced events, and A-paced events followed by V-sensed and V-paced events. These events are sorted into rate bins. The Pace/Sense histograms show atrial paced and sensed events and ventricular paced and sensed events, also sorted into bins. The histogram bins are large enough to count events for more than 10 years at 60 ppm without reaching their maximum capacity.

Ex. 13.048



**Figure 62. The Histograms screen.**

The rate distributions are sorted into 10-ppm wide bins for rates between 30 ppm and 180 ppm, and into a single bin for rates aboved 180 ppm.

Rate histograms must be reset using the Reset button on the Histograms or Counters window. Parameter changes and mode changes do not reset them. All rate bins and counters are reset simultaneously.

*NOTE:* *When the pacemaker is transmitting real-time electrograms or is in Temporary mode, some diagnostic functions are suspended. This includes Trending, Event Counters, and Histograms. When the pacemaker is in Magnet Mode, sensor and rate trending are suspended.*

## DIAGNOSTIC EVALUATION

| System Summary | Quick Check | Brady Parameters | Temporary Parameters | Setup | Therapy History | Diagnostic Evaluation | EP Test |
|---|---|---|---|---|---|---|---|

### Battery Status

The Battery Status screen (Figure 63) displays the date of the last battery test, the previous and present battery status indicators, the current and previous effective magnet rates of the pacemaker, and the estimated longevity remaining. Battery measurements are performed by the pacemaker every 11 hours and cannot be initiated using the PRM. The screen also provides a graphical representation of battery status.



**Figure 63. The Battery Status screen.**

On initial interrogation, the programmer retrieves the most recent battery status data and the previous session's stored data from the pacemaker. Table 16 shows the battery status indicators and their respective magnet rates.

The Longevity Remaining estimate is based on measurements indicating the remaining charge in the battery. Mathematically, the estimate calculates the time remaining assuming 100% pacing at the programmed LRL in all programmed chambers at programmed outputs using measured lead impedances. If pacing is less than 100%, the time remaining may be greater than the number displayed . Time remaining is displayed from > 5.0 years to < 0.5 years in 0.5-year increments.

**NOTE:** *Before implant, the battery status may display an artificially low value due to the device being subjected to cold temperatures. Upon interrogation, if the battery status reads less than BOL, warm the device to room temperature. Once the pacemaker has warmed to room temperature, future battery status readings should be normal.*

**Table 16. Battery Status Indicators and the Respective Magnet Rates**

| Battery Status Indicator | Magnet Rate |
|---|---|
| GOOD | 100 ppm |
| ERT (Elective Replacement Time) | 85 ppm |
| EOL (End of Life) | $\leq$ 85 ppm |

## Intrinsic Tests

The Intrinsic test will measure and display the intrinsic amplitude for the atrium and/or ventricle. Intrinsic measurement will be available for a given

Ex. 13.050

cardiac chamber only if sensing is enabled for that chamber in the current pacing mode.

For intrinsic measurements in single-chamber modes, the clinician can temporarily program a lower LRL value to bring out the patient's underlying rhythm. This parameter change is in effect only during the test.

If an Intrinsic test is desired for both chambers, the atrial and the ventricular measurements must be conducted individually. In this case, the clinician can program the pacemaker to temporarily change the LRL and AV Delay for the duration of the test. The Intrinsic for each chamber will be gathered in separate but adjacent search periods.



**Figure 64. The Intrinsic Tests screen.**

The Intrinsic test is based on the measurement of one complex per chamber. The test is complete and all effects of the parameters programmed for the test are terminated within 10 seconds for each chamber measured, or when either of the following occur:

- The test is terminated via a command from the programmer (eg, selecting Cancel or pressing the STAT PACE key)
- The pacemaker exits the temporary state when the telemetry link is broken

The pacemaker stores the results of the last Intrinsic test so that the data from the previous session and the results of the current test can be viewed simultaneously.

Follow these steps to perform an Intrinsic test:

1. Select the Intrinsic Tests button on the Diagnostic Evaluation screen.

2. Select the LRL and AV Delay values that will allow the intrinsic rhythms to be seen.

3. Place the wand over the pacemaker, then select the Start button on the screen. The measurement requires a maximum of 10 seconds of telemetry time per chamber, depending on the presence of intrinsic activity. When the test is completed, the Intrinsic data will be displayed in the Present column.

4. If the test was unsuccessful because the programmed LRL and/or AV Delay did not allow intrinsic rhythms to be seen (ie, the Measured Amplitude field reports Paced), repeat steps 2 and 3. If the test is unsuccessful, a message on a popup window will indicate that the measurement could not be completed.

*NOTE:* *Parameters changed on the Intrinsic Tests screen also will be in effect during Quick Check.*

A report of the displayed test results can be printed as directed in Chapter 8—Electrograms/Event Markers/Reports.

## Impedance Tests

The Impedance test will report the Lead Impedance, pacing Amplitude and Pulse Width, current, and energy at permanently programmed output settings for the leads in the pacemaker system. These energy calculations reflect energy used at programmed settings. To facilitate the measurement, the Amplitude and Pulse Width parameters are temporarily changed to predetermined values based on permanently programmed settings. Once the measurement is completed or the measurement period has expired, the permanently programmed pacing parameters are restored.

If the currently programmed pacing Amplitude is 3.5 V or less for the duration of the test, the amplitude will be set at 3.5 V. If the Amplitude is 4.0, 4.5, or 5.0 V, the amplitude will be set at 5.0 V. If the Amplitude is 7.0, the amplitude will be set at 7.0 V.

If the currently programmed Pulse Width is less than 0.4 ms, the pulse width will be set to 0.4 ms; otherwise, the pulse width for the test will be set to the currently programmed Pulse Width.

The impedances for the test are based on the measurement of one event and will be reported as <100 Ω, 100 Ω to 2500 Ω in increments of 10 Ω, and >2500 Ω.

*NOTE:* *To help ensure successful atrial lead impedance measurements, the programmer temporarily increases the Maximum Tracking Rate to 185 ppm until the atrial lead impedance test is completed. The effective Maximum Tracking Rate will still be limited by the total atrial refractory period.*

Ex. 13.052

When the measurement is conducted in AAI or VVI mode, the clinician can temporarily change the LRL for the duration of the test in order to overdrive the intrinsic rhythm. If an interactive Lead Impedance measurement is conducted in DDD mode, the lead impedance for each chamber will be measured separately but in adjacent search periods. In this case, the clinician can program the pacemaker to temporarily change the LRL and AV Delay for the duration of the test. These parameters are in effect only during the test.

The Impedance test is complete and the original parameters are restored within 10 seconds for each chamber measured, or sooner if the test is terminated via the Cancel button, or by breaking the telemetry link.

The pacemaker stores the results of the previous Impedance test so that the data from the previous session and the results of the current test can be viewed simultaneously. The value may differ from a pacing system analyzer (PSA) measurement due to the method of calculation. The pacing impedance test can be used as a relative measure of lead integrity over time. In addition, lead integrity can be ascertained with pacing measurements.

Energy is calculated using programmed outputs and measured lead impedances.



**Figure 65. A typical Impedance Test screen.**

Follow these steps to perform an Impedance test:

1.  Select the Impedance Tests button on the Diagnostic Evaluation screen.

2.  Place the wand over the pacemaker, then select the Start button on the screen. When the test is completed, the Lead Impedance will be displayed in the Present column.

A report of the displayed test results can be printed as directed in Chapter 8—Electrograms/Event Markers/Reports.

## Threshold Tests

Automatic threshold testing enables the clinician to determine the minimum energy needed for capture. Identifying and then programming a narrow pulse width or lower pulse amplitude will increase battery longevity.



Figure 66. A typical Threshold Test scree

The Amplitude Threshold Test uses the Smart Start amplitude value, which is three voltage steps above the previously measured threshold. If there has not been a previous threshold, the test will start at the programmed voltage and incrementally step that value down as the test progresses. The starting value for Pulse Width or Amplitude and the number of cardiac cycles between step changes is programmable by the clinician. The Mode, LRL, AV Delay, and Lead Configuration to be used during the threshold test are also programmable. These parameters are in effect only during the test. Testing for a chamber is allowed only when pacing is active for that chamber in the mode specified at the top of the Start column.

Once the test is started, the pacemaker enters a temporary state using the parameters specified in the Start column. The pacemaker then decrements the selected parameter (Pulse Width or Amplitude) until the test is complete. Real-time electrograms and annotated event markers continue to be available during threshold testing.

During the threshold test, the programmer displays the test parameters in a dialogue window (Figure 67) while the test is in progress. To momentarily pause the test, select the Hold button on the dialogue window. To continue the test, select the Continue button.

When the threshold has been lost, as indicated by the user stopping the test or breaking telemetry, the Snapshot feature will automatically be activated and the 10 seconds before loss of capture will be recorded. This information can be viewed and printed from the Snapshot Viewer.



**Figure 67. The Threshold Test in Progress dialogue window.**

After the test, the permanently programmed Amplitude and Pulse Width settings are automatically restored and the test results are displayed in the Threshold Tests table. Up to six tests can be displayed for each chamber; if more than six tests are performed, the six most recent tests are displayed.

The threshold test is complete and all effects of the parameters programmed for the test are terminated when any of the following occur:

- The lowest available setting for Pulse Width or Amplitude is reached
- The test is terminated via a command from the programmer (eg, selecting the Stop button or pressing the STAT PACE key)
- The pacemaker exits the temporary state when the wand is removed

## Using the Automatic Threshold Testing Functions

Follow these steps to perform a threshold test:

1. Select the Threshold Tests button on the Diagnostic Evaluation screen.

2. Select the type of test to be performed. Two options are available:

   - Choose Amplitude to decrement the pulse amplitude during the test or
   - Choose Pulse Width to decrement the pulse width during the test

3. For dual-chamber modes, select Atrium to test the atrial thresholds or Ventricle to test the ventricular thresholds.

4. Enter the starting values for each applicable parameter in the Start column. Parameter applicability is dependent on the mode selected.

5. Select the Start button on the screen to begin the threshold test. After the programmed number of cycles, the pacemaker automatically decrements the Amplitude or Pulse Width. This will continue until the telemetry link is broken, the Stop button is selected, or the STAT PACE key is pressed, or until the lowest value has been tested.

6. Watch the ECG monitor and break telemetry by removing the wand or selecting the Stop button when loss of capture is observed. **The measurement displayed is one step higher than the step at which the test was terminated.**

   At the end of the test, the previously programmed permanent values are immediately restored.

7. To perform another threshold test, make changes to the test parameter values in the Change column if desired, then begin again with step 5. Results of the tests will be displayed on the screen table. If more than six tests are performed, the last six tests are displayed by chamber tested, with the most recent test at the top.

*NOTE: Parameters changed on the Threshold Tests screen also will be in effect during Quick Check.*

A report of the displayed test results can be printed as directed in Chapter 8—Electrograms/Event Markers/Reports.

## Daily Measurements

### Intrinsic Amplitude Measurements

Once each day, the pacemaker will automatically attempt to measure intrinsic P- and R-wave amplitudes for each cardiac chamber in which sensing is enabled. This measurement will not affect normal pacemaker therapy. The measurement will be taken during a 256-cardiac cycle period at approximately the same time each day. When the pacemaker is operating in a dual-chamber mode, the atrial and the ventricular measurements will be conducted individually. The intrinsic amplitude for each chamber will be gathered in separate but adjacent search periods.

Daily amplitude measurements will be stored for 7 days. After 7 days, the pacemaker calculates and stores a weekly minimum measurement. These measurements are stored for 52 weeks. So, at a given time, you can access the daily measurements for the last 7 days, and the weekly measurements for the last 52 weeks.

Ex. 13.056

The daily amplitude measurement cannot be taken if events during the test period were all paced. If the measurement is unsuccessful and the measurement period has not expired, the pacemaker will attempt the measurement again. If the test period expires before the measurement can be completed, no data will be stored for that day. Data for other days are not affected.

## Lead Impedance Measurement

Once each day, the pacemaker will automatically attempt to measure the pacemaker system Lead Impedance for each cardiac chamber in which pacing is enabled. To facilitate the measurement, the Amplitude and Pulse Width parameters are temporarily changed to predetermined values. Once the measurement is completed, the permanently programmed pacing parameters are restored.

If the currently programmed Pulse Width is less than 0.4 ms, the pulse width will be set to 0.4 ms; otherwise, the pulse width for the test will be set to the currently programmed Pulse Width.

If the currently programmed pacing Amplitude is 3.5 V or less, the amplitude will be set at 3.5 V. If the pacing Amplitude is 4.0, 4.5, or 5.0 V, the amplitude is set to 5.0 V. If the Amplitude is set to 7.0 V, it remains at 7.0 V.

The measurement will be taken at approximately the same time each day. Once the measurement is initiated, the pacemaker will allow the system to reach the voltage described above. Once this voltage is reached, the measurement will be taken. If the chamber being tested is having sensed events, the pacing output will be delivered by triggered mode. Triggered pacing will not be delivered during a PVC or refractory event.  When the pacemaker is operating in a dual-chamber mode, the atrial and the ventricular measurements will be conducted individually. The lead impedance for each chamber will be gathered in separate but adjacent search periods.

Daily impedance measurements will be stored for 7 days. After 7 days, the pacemaker calculates and stores a weekly average measurement. These measurements are stored for 52 weeks. So, at a given time, you can access the daily measurements for the last 7 days, and the weekly average measurements for the last 52 weeks.

If the pacemaker is in a dual-chamber mode and an Atrial Tachy Response mode switch is active when lead impedances are measured, atrial lead impedances will not be measured.

## Displaying Daily Measurement Data

The Daily Measurement screens allow the clinician to display the daily measurement data stored in the pacemaker in a tabular or a graphical format.

The graphical screen (Figure 68) displays the stored data in two views: a point-plot graph showing the minimum weekly measurements and a point-plot graph showing the daily measurements for the last 7 days.



Figure 68. The Daily Measurement—Graphical screen.

To view the data in a tabular format, select the Table button. The tabular screen (Figure 69) displays up to 16 measurements at a time. The measurements are displayed in reverse chronological order. The seven daily measurements appear first, and then the lowest weekly value is listed. To view data farther down on the table, choose the Older Data button. To view data farther up on the table, choose the Newer Data button. If no further data are available in the desired direction, the button will appear gray and cannot be selected. To switch back to the graphical view, select the Graph button.

To clear all Daily Measurement data from the pacemaker, go to Setup →Daily Measurement and select Reset. This will instruct the programmer to establish telemetry with the pacemaker and clear the data storage. Use caution when performing this operation. Once telemetry is established, some or all of the data will be cleared even if you choose the Cancel button during the operation.



**Figure 69. The Daily Measurement—Tabular screen.**

## Trending

The Trending Sensitivity screen (Figure 70) allows the clinician to graphically display measured intrinsic events and sensitivity levels stored in the pacemaker when the Auto Sense feature is used.



**Figure 70. A typical Trending Sensitivity screen.**

*NOTES:*

- *The pacemaker cannot store trending data and Arrhythmia Log EGM data at the same time. When changing from one feature to another, all data in the original feature will be erased.*

- *When the pacemaker is transmitting real-time electrograms or is in Temporary mode, some diagnostic functions are suspended. This includes Trending, Event Counters, and Histograms. When the pacemaker is in Magnet Mode, sensor and rate trending are suspended.*

## Retrieving Trending and Beat to Beat Data

The Retrieve function allows the clinician to retrieve stored trending and Beat to Beat data from the pacemaker. The data are not automatically retrieved from the pacemaker at initial interrogation due to the possibly large volume of data and consequent long transfer time; however, the storage setup information is retrieved.

After establishing telemetry, use the following procedure to retrieve trending and Beat to Beat data from the pacemaker:

1. Select the Retrieve button on the screen.

2. While retrieving the data, the programmer will display the Telemetry in Progress dialogue window. This window will indicate how much information has been retrieved thus far. The programmer will retrieve the most recent information first. If the interrogation is interrupted, the information already retrieved will be available for analysis.

## Working with Rate/Sensor Trending Data

The PRM displays a graphical representation of the retrieved data. Replay allows the clinician to see how changes in the pacing parameters will affect the sensor response. Replay parameters cannot be modified until the trending data have been retrieved from the pacemaker. Parameter availability is dependent on the mode and the permanently programmed sensor.

Follow these steps to use the Replay function:

1. Retrieve the trending data from the pacemaker using the procedure above. The programmer displays a graphical representation of the patient's rate (black) and sensor response (orange) during the recording.

2. Select the magnifying glass icon next to the Accelerometer button, then make changes to the Trending Replay Parameters to optimize the sensor response.

   As the Trending Replay parameters are modified, the application will modify the sensor graph to illustrate the effects that would result from the changes.

3. If the replayed parameters result in the optimal response, copy the changes to the Brady Parameters screen by selecting the Copy to Brady button.

*NOTE:* *The Trending function records actual MV and/or Accelerometer out-*
*puts during the sampling period. However, as these samples occur less fre-*
*quently than in the actual device, some differences may be observed*
*between the actual rate and the sensor replay.*

### Working with Beat to Beat Data

Retrieve the Beat to Beat data from the pacemaker using the procedure
above.

Upon retrieval, the PRM will display the rate trend for the duration of the Beat
to Beat recording. By zooming into the level of greatest resolution, you can
position the caliper on an individual cycle by selecting the arrow buttons or
dragging the caliper with the stylus. The following information is then dis-
played for that cycle:

- V–V interval
- A–V interval
- V–A interval

Event annotations will also be displayed on the screen.

### Working with Sensitivity Trending Data

Retrieve the trending data from the pacemaker using the procedure above.

Upon retrieval, the PRM will display a graphical representation of the pa-
tient's atrial and ventricular intrinsic amplitudes and sensitivity thresholds. By
zooming to the level of greatest resolution, you can position the caliper in an
individual cycle by dragging it with the stylus or selecting the arrow buttons.
The following information is then displayed for that cycle:

- V–V interval
- A–V interval
- V–A interval
- Rate

Event annotations will also be displayed on the screen.

## Snapshot Viewer

The Snapshot Viewer screen allows the clinician to display and analyze pre-
viously recorded traces. A snapshot of the trace screen can be made from
any screen when the Snapshot button is selected. Surface ECG, A and V
EGMs (if applicable), and annotated markers will be captured for the 10 sec-

onds before the button was selected and the 10 seconds following the button press. This information is captured by the PRM and does not require any programming or interrogation. If a snapshot was automatically acquired during a pacing threshold test, the snapshot will be 10 seconds long, ending with the termination of the test.



Figure 71. The Snapshot Viewer screen.

After the snapshots have been captured, they can be viewed on the Snapshot Viewer screen. Up to four time-stamped snapshots will be retained in the PRM's memory for the current session only; once the session has been terminated by exiting the Model 2891 application software or by interrogating a new patient, the data will be lost.

The features on the screen allow the clinician to zoom in and out, to scroll the trace left or right, and to make interval and amplitude measurements on the screen using electronic calipers. The interval and the amplitude difference between the two calipers will be displayed.

*NOTE:* At the 10-mm/sec speed, the markers will not be displayed.

Use the following procedure to view and analyze a previously recorded snapshot:

1. Select the Snapshot Viewer toolbox button on the screen.

2. Select one of the four time-stamped buttons in the lower left of the Snapshot Viewer screen that identifies the snapshot you want to view.

3. Select the sweep speed using the buttons to the right of the snapshot selection buttons to change the view of the snapshot display.

Ex. 13.062

4. Use the arrow buttons on the screen to scroll the currently displayed view left or right. Below the trace is a full view window of the 20-second snapshot. The brackets on the full-view window indicate which portion of the snapshot is shown in detail. To select a different section of the detailed recorded trace, touch and hold the desired section with the stylus.

5. To use the electronic calipers, drag the caliper to its new position then lift the stylus. The interval and the amplitude difference for the Atrial and Ventricular EGMs between the two calipers will be displayed.

To print a displayed snapshot, select the Print button on the screen. The currently viewed snapshot and measurements will be printed.

## EP TEST



The EP test enables the clinician to induce and/or terminate tachyarrhythmias noninvasively. These tests can be performed while running the real-time intracardiac ECG traces and markers.

The following features allow noninvasive EP testing of arrhythmias:

- Programmed Electrical Stimulation (PES) allows the pacemaker to deliver a series of timed pacing pulses (S1) that are followed by premature pulses (S2–S5). The pulses can be delivered either to the atrium or the ventricle. The PRM allows flexible setup and control of each PES attempt.

- Manual Burst pacing can be delivered for as long as desired to either the atrium or the ventricle.



Figure 72. The EP Test screen.

Ex. 13 063

## Atrial Stimulation and Backup VVI Pacing During EP Testing

During EP testing, atrial stimulation is available for PES and Manual Burst testing. Two buttons are available on the EP Test screen for selecting the cardiac chamber to be stimulated; selecting the Atrium button will allow atrial stimulation.

**WARNING:** For dual-chamber devices, the cardiac chamber selection is nominally set to Atrium. Life-threatening ventricular arrhythmias can be induced when the selection is set to Ventricle. Ensure that an external cardiac defibrillator is easily accessible.

During atrial stimulation, backup pacing is available in VVI mode if ventricular pacing is enabled in the permanently programmed normal brady mode. The Backup VVI pacing parameters are independently programmable from the permanent pacing parameters. Backup VVI pacing can be programmed off by selecting OFF in the Backup VVI parameter box.

Pacing pulses during induction are delivered at the programmed EP Test Pulse Width and EP Test Amplitude.

## Programmed Electrical Stimulation

PES induction allows the pacemaker to deliver up to 30 equally timed pacing pulses (S1) followed by up to four premature stimuli (S2–S5) to induce or terminate arrhythmias. Drive pulses, or S1 pulses, are intended to capture and drive the heart at a rate faster than the intrinsic rate. This ensures that the timing of the premature extra stimuli will be accurately coupled with the cardiac cycle. The initial S1 pulse is coupled to the last sensed or paced beat at the S1–S1 interval. All pulses are delivered in VOO or AOO mode (depending on the chamber selected) at the programmed PES Pulse Width and PES Amplitude. Figure 73 illustrates a PES induction drive train.



**Figure 73. PES induction drive train.**

Ex. 13 064

### Performing PES Induction

1. Choose the cardiac chamber to be paced; select either Atrium or Ventricle.

   **WARNING:** For dual-chamber devices, the cardiac chamber selection is nominally set to Atrium. Life-threatening ventricular arrhythmias can be induced when the selection is set to Ventricle. Ensure that an external cardiac defibrillator is easily accessible.

2. To change the number of S1 pulses, select the box next to the words S1 Pulses, and select the desired value.

   Two methods are available to change the cycle length of each pulse (programmed in a range from 120–750 ms or OFF):

   a. Select a value box to the left of an S button to display a value slider, and select the desired value.

   b. Select an S button to shift the arrow to that location, then select either the (+) or (–) buttons to increase or decrease the cycle length in 10-ms steps in the value box.

3. Select (do **not** hold) the Induce button to begin delivery of the drive train. The pointer will automatically move to the (–) button so the value can be decreased quickly, if desired, after the test is completed. When the programmed number of S1 pulses is delivered, the pacemaker will then deliver the programmed S2–S5 pulses. The pulses are delivered in sequence until a pulse is encountered that is set to OFF (eg, if S4 is OFF and S5 is set to 200 ms, the S5 pulse will not be delivered).

   Once induction is initiated, breaking the telemetry link will stop the PES delivery. If the Induce button is selected again while the S1 pulses are still being delivered, the count of S1 pulses is restarted at the original number and the drive train is effectively extended.

4. PES induction is complete when the drive train and premature stimuli are delivered.

   *NOTE:* *Intracardiac electrograms and markers will continue to be displayed during the entire test sequence.*

## Manual Burst Pacing

Manual Burst pacing pulses are delivered in VOO or AOO mode at the programmed EP Test Pulse Width and EP Test Amplitude.

### Performing Manual Burst Pacing

1. Choose the cardiac chamber to be paced; select either Atrium or Ventricle.

   **WARNING:** For dual-chamber devices, the cardiac chamber selection is nominally set to Atrium. Life-threatening ventricular arrhythmias can be

induced when the selection is set to Ventricle. Ensure that an external cardiac defibrillator is easily accessible.

2. Select the desired value for the Burst Interval; this indicates the cycle length of the intervals in the drive train and is programmable from 100–1000 ms.

3. Select the Enable button. The text on the Hold for Burst button will become selectable.

4. To deliver the burst, hold the stylus on the Hold for Burst button. The Manual Burst will be delivered as long as the stylus is held on the button. Pulses will be at a constant rate.

*NOTE:* Intracardiac electrograms and markers will continue to be displayed during the entire Manual Burst pacing.

5. To stop the burst delivery, lift the stylus. The text on the Hold for Burst button will become deselectable (gray) again.

6. To deliver additional Manual Burst pacing, repeat steps 3–5.

Ex. 13.066

# ELECTROGRAMS/EVENT MARKERS/REPORTS

## CHAPTER 8

This chapter includes information about obtaining intracardiac electrograms and real-time annotated event markers, as well as printing reports of parameter settings, session activity, and diagnostics. The following procedures are described in this chapter:

- Displaying surface ECGs and electrograms on the PRM screen or an external recorder.

- Displaying annotated event markers on the PRM screen.

- Printing surface ECGs and electrograms from the PRM.

- Printing surface ECGs and electrograms to an external recorder.

- Obtaining printed reports of selected data from the programming session, either on the PRM's internal printer or on an external printer.

Refer to Appendix C—External Cable Connections for instructions on connecting the PRM and patient cables to an external recorder and connecting the PRM to an external printer.

## VIEWING AND PRINTING TRACES AND MARKERS

In addition to displaying surface ECGs, the PULSAR MAX II system can provide intracardiac electrograms (EGMs) and real-time annotated event markers that identify key intrinsic and pacemaker-related events. The annotated event markers can help you verify the effectiveness of selected parameter settings or simplify diagnosis of complex ECG rhythms.

- High-fidelity real-time atrial and ventricular EGMs can be transmitted from the pacemaker to evaluate intracardiac signal morphology and rhythm and conduction disorders; they also facilitate the diagnosis of possible lead system issues such as lead fractures, insulation breaks, or dislodgments.

- Event markers can identify intrinsic cardiac and device-related events as interpreted by the pacemaker, and provide information such as sensed/paced events and therapy delivery. The event markers appear as abbreviated annotations on the PRM screen, and as full-disclosure annotations on the PRM printer.

- If Intervals are selected on the ECG menu, the key timing intervals will be displayed on the PRM printer, but not on the PRM screen.

The following intervals will be printed on the strip:

- AS      (A—A Interval)
- AP      (A—A Interval)
- VS      (V—V Interval)
- VP      (V—V Interval)
- VA      (V—A Interval)
- AV      (A—V Interval)
- REFR      (PVARP)

*NOTES:*

- *The full set of annotated event markers are not available when EGMs are selected, but intervals or a subset of the markers are available. See Figure 77 for a list of the event markers.*

- *The Intracardiac EGMs and annotated event markers or intervals will be transmitted as long as telemetry communication is maintained. If telemetry communication is interrupted, reestablish the telemetry link to automatically resume transmission.*

## Displaying Surface ECGs, Electrograms, and Event Markers

Use the following options to choose the display (Figure 74):

- To view EGMs and markers on the PRM screen, select the A, V, or M button to the right of the ECG/EGM display area to activate atrial or ventricular EGMs or event markers.

- To view surface ECG traces, refer to Appendix C for instructions on proper patient cable connections. The surface ECG will be displayed on the screen as soon as the cables are connected. The PRM can display one of up to six limb leads or one chest lead. The displayed lead will be annotated with the pacing spike marker if that feature is selected. To display the pacing spike markers correctly, the Lead II electrodes must be connected to the patient, regardless of which lead is displayed.



**Figure 74. The ECG display shows surface ECG traces.**

The following screen features can be used to change the values and appearance of the traces:

- **Trace Selection Buttons—**Select whether Atrial EGMs, Ventricular EGMs, and/or event markers should be displayed. These options may also be selected on the ECG display.

- **Lead Selection Button—**Select the lead trace to be displayed.

- **Trace Speed Buttons—**Select the desired speed button on the ECG display to freeze the speed of the traces (0) or to change them.

Access the ECG/Trace Selections window (Figure 75) by selecting the ECG button at the top of the screen.



**Figure 75. The ECG/Trace Selections window.**

The following values may be changed in that window:

- **Select ECG—**Select the lead trace to be displayed.

- **Surface or Telemetered Gains—**Adjust the gain of the tracings by select-ing the appropriate Surface Gain value (0.5x, 1x, or 2x) for the surface ECGs, and the Telemetered Gains (0.5x, 1x, or 2x) for the intracardiac EGMs

- **Filter—**Select the Filter ON setting to minimize noise on the surface ECG. The Filter OFF setting allows viewing surface ECGs with diagnostic filter settings.

- **Pacing Spike Display—**Program this feature ON to show detected pacing spikes, annotated by a marker on the top waveform.

- **PG Telemetered—**Select whether Atrial EGMs, Ventricular EGMs, and/or event markers should be displayed. These options may also be selected on the ECG display.

- **Printed Event Marker Annotation—**Select Annotations to show the marker annotations (Figure 77) on the printout. Select Intervals to show the intervals and a limited set of annotations.

To display a calibration pulse on the PRM (Figure 76), press the key labeled ⊓. Press the key labeled ⎓ to force the surface trace back to baseline. To print the surface ECG on the PRM printer/recorder, select the desired speed key (10, 25, 50, or 100 mm/sec) on the printer/recorder. To stop the printer/recorder, press the speed key labeled 0 (zero).



↑ ⊓ key pressed

**Figure 76. A 1-mV calibration pulse for surface ECGs appears on the PRM's strip when the ⊓ key is pressed. If event markers are active when the ⊓ key is pressed, a marker legend also will be printed on the PRM printer strip.**

## Printing to the Internal PRM Printer/Recorder

To print electrograms, the full set of annotated event markers, intervals, and the surface ECG on the PRM printer/recorder, select the desired speed key (10, 25, 50, or 100 mm/sec) on the printer/recorder while the traces are being displayed on the PRM screen.

*NOTE: Event marker annotation definitions (Figure 77) can also be printed by selecting the Marker Legend option on the Print window.*

Press the ⊓ key (calibrate) to print a list of the event marker annotations, if they are active (Figure 76).

To stop the printer/recorder, press the speed key labeled 0 (zero) on the printer/recorder.

| | | | |
|---|---|---|---|
| **AS** | **Atrial Sensed** | FB | During A-Tachy Response |
| **AP** | **Atrial Paced** | MT | Atrial Tracked at MTR |
| **VS** | **Ventricular Sensed** | PVP→ | PVARP after PVC/PAC |
| **VP** | **Ventricular Paced** | PMT–B | PMT Detection and PVARP |
| **S** | **Sensed (Single chamber)** | **Output↓** | **Threshold New Parameters Active** |
| **P** | **Paced (Single Chamber)** | ATR↑ | A-Tachy Sense Count Up |
| Hy | Hysteresis Rate | ATR↓ | A-Tachy Sense Count Down |
| PVC | PVC after Refractory | ATR–FB | Fallback Started |
| **( )** | **During Refractory** | ATR–Dur | Onset Started |
| Sr | Sensor | ATR–End | Fallback Ended |
| Fl | Atrial Flutter Response | TN | Noise Indication |
| ↑ | Rate Smoothing Up | REFR | Refractory Interval |
| ↓ | Rate Smoothing Down | PP | Atrial Pacing Preference |
| → | Inserted after AFR | VR | Ventricular Rate Regulation |
| Tr | Trigger Mode | SBR | Sudden Brady Response |
| Ns | Sense Amp Noise | Caliper | Screen Caliper Location |

**Figure 77. Definitions of event marker annotations. The markers in bold are included in the subset  available when EGMs are selected.**

*NOTE: The Atrial Pacing Preference feature is not available in the United States.*

## Printing to an External Recorder

To view intracardiac electrograms and the surface ECG on an external recorder, press the desired speed key on the external recorder while the traces are displayed on the PRM screen. See Appendix C for instructions on connecting the PRM to the external recorder. Refer to the manual for the external recorder for instructions specific to its operation.

## Printing to an External Printer

To view intracardiac electrograms and the surface ECG on an external recorder, press the desired speed key on the external printer/recorder while the traces are displayed on the PRM screen. See Appendix C for instructions on connecting the PRM to the external recorder. Refer to the manual for the external recorder for instructions specific to its operation.

The Model 2920 PRM with the Model 2891 CONSULT Software Application also supports printing reports on an external printer using 8.5 x 11–inch/A4 paper. Real–time ECGs and telemetered EGMs are not available on the external printer.

At the end of the initial device interrogation, the printer selection will default to External if the external printer is connected and powered up. If the external printer was not connected or powered up at initial device interrogation but the clinician now wishes to use the external printer, perform the following steps:

1. Connect the external printer as shown in Appendix C, External Cable Connections.

2. Power up the printer.

3. Select the External printer on the Choose Reports to Print window. Select the printer icon to open this window. The clinician may use the external printer to print reports while simultaneously using the internal printer to print real–time ECGs and EGMs.

## OBTAINING A PRINTED REPORT

The print function can be initiated at any time during a follow-up session. Use the following procedure to print reports on the PRM:

1. Select the printer button at the top of the screen to display the Print Menu window showing available report options (Figure 78).



**Figure 78. The Print Menu window.**

2. Select the desired reports. Choose Select All to print all reports listed.

3. Select Print. All selected reports will print.

Other buttons available on the Choose Reports to Print screen:

- Select Close to close the print window without printing.

- Select Cancel Printing to stop reports that are in the process of printing.

- Select the Enable button under Print after Modification to trigger the printing of permanent and/or temporary parameter changes as soon as they are programmed.

- Select the desired printer (External or Internal).

*NOTE: Be sure to print desired reports prior to selecting Quit or New Patient, since data are erased from programmer memory when these actions are performed.*

Printed reports, which are designed to be filed as part of the patient's medical record, also identify the manufacturer (Guidant), the institution name, the programming device, and the pacemaker name, model number, and serial number.

# EXHIBIT 14

# DECLARATION OF SANTIAGO SALINAS, JR.

1. My name is Santiago Salinas. I am a retired attorney. Before my retirement, I was licensed to practice law in Texas. Along with Richard Alley, I was court-appointed counsel for Tilon Carter in his 2006 capital murder trial in Tarrant County.

2. In Mr. Carter's case, the cause of death of the victim, James Tomlin, was the key issue at trial. Mr. Alley and I tried to show at trial that Mr. Tomlin had been struggling after Mr. Carter and his co-defendant left the house. The State presented Dr. Peerwani's testimony that someone had intentionally smothered Mr. Tomlin. The State relied heavily on this testimony to prove that Mr. Tomlin died as a result of an intentional act of smothering. The State then argued that Mr. Carter had put his hands over Mr. Tomlin's mouth and smothered him.

3. When Mr. Tomlin was discovered by first responders, he was lying face down on the floor of his home with his hands and feet bound with duct tape and with a strip of duct tape affixed to one cheek. Mr. Carter and his co-defendant gave custodial statements stating that they bound Mr. Tomlin's hands and feet with duct tape, placed a strip of tape over his mouth, and then left him alive on the floor of his house.

4. At trial, Mr. Alley and I tried to show that after Mr. Carter and his co-defendant left Mr. Tomlin bound but alive on the floor of his home, Mr. Tomlin struggled against the duct tape restraints to free himself and summon help

1

Ex. 14 001

5. The fact that the duct tape had apparently been placed over Mr. Tomlin's mouth yet was found affixed to one cheek when he was discovered by first responders was, in my mind, consistent with Mr. Tomlin struggling to free himself after Mr. Carter and his co-defendant left Mr. Tomlin alone on the floor of the house. The State's smothering theory, though, supported by Dr. Peerwani's testimony, conveyed that the duct tape shifted during this smothering. Dr. Peerwani insisted that intentional smothering had occurred. I believe this testimony was the reason Mr. Carter was convicted and ultimately given the death penalty.

6. Because cause of death was the central issue at trial, the defense retained Dr. Charles Harvey to review materials from the State's autopsy. Dr. Peerwani had conducted the autopsy for the State. The defense team sent Dr. Harvey all the materials related to the autopsy that we had received from the State. We had no reason to withhold information about the autopsy from Dr. Harvey because we needed the fullest picture of Mr. Tomlin's cause of death and what arguments we might make at trial.

7. I spoke on the phone with Dr. Peerwani before he testified in Mr. Carter's case. I do not recall Dr. Peerwani mentioning that Mr. Tomlin had a pacemaker at the time of autopsy. Had Dr. Peerwani mentioned that information, I would have recorded it in the notes that I made during that telephone call. A copy of my notes is attached to this declaration. There is no mention of a pacemaker in these notes. Instead, my notes reflect that, during the call, Dr. Peerwani and

I discussed Mr. Tomlin's health conditions. But Dr. Peerwani did not mention that Mr. Tomlin had a pacemaker at autopsy.

8. Had Dr. Peerwani mentioned the presence of a pacemaker at Mr. Tomlin's autopsy, I would have shared it with the rest of the defense team and Dr. Harvey. I would also have questioned Dr. Peerwani about this fact and used the information in defending Mr. Carter to show that Mr. Tomlin did not die of an intentional act.

9. The defense team did not have knowledge that Mr. Tomlin had a pacemaker at the time of his death. The autopsy report made no reference to an implanted pacemaker at the time of autopsy and none of the photos taken at the time of the autopsy showed a pacemaker. I was chiefly responsible for working on the autopsy-related issues and had no knowledge that Mr. Tomlin had a pacemaker. The autopsy report and materials we received from the prosecution disclosed only that Mr. Tomlin had a past history of a pacemaker. Any brief reference to a pacemaker at trial by the defense team was in reference to this past history.

10. I have now learned that Dr. Peerwani in fact observed during the autopsy that Mr. Tomlin had an implanted pacemaker at the time of his death. This information would have been important to the defense theory of the case. The pacemaker furthers the defense theory that Mr. Tomlin was alive when Mr. Carter and his co-defendant left, but then something else happened. This

would have gone to the defense's argument at trial that Mr. Carter did not intentionally cause Mr. Tomlin's death.

11. Evidence of a pacemaker suggests that Mr. Tomlin's heart could have stopped, causing his death. If we'd had information that Mr. Tomlin had a pacemaker at the time of his death, we certainly would have presented this information at trial and sought to consult with a cardiac expert. We would have also cross-examined Dr. Peerwani with the pacemaker evidence and challenged his trial testimony that, other than an enlarged heart and hardening of the arteries, there were no pathologies or internal abnormalities found at autopsy.

My name is Santiago Salinas, Jr., my date of birth is _____, and my address is _____.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Tarrant County, Texas, USA on _Dec. 3, 2025_ (date).

Santiago Salinas, Jr.
Declarant

4

Ex. 14 004

TL Dr Pelam

Grand | Cannot Answer – ?

Causing Atherosclerosis

"Naturally susceptible to the anoxia
By virtue of natural disease

232

# EXHIBIT 15

# Charles M. Harvey, M.D.
**Anatomic, Clinical, and Forensic Pathology**

73 Hollylaurel Circle
The Woodlands, Texas
77382

Telephone: 936-271-9849
Mobile: 409-771-2075
e-mail: charveymd@houston.rr.com

# Forensic Pathology Consultation Report

**To:**     Richard Alley, Attorney-at-Law

**In Re:**     Texas v. Carter, Case # 0949973

**Date:**     27 November 2006

The following materials have been received and reviewed in the preparation of this report. All opinions expressed are to the standard of reasonable medical certainty, unless otherwise noted.

Materials:
1) 128 photographs
2) Letter from Richard Alley, Attorney-at-Law, 27 Oct 2006
3) Autopsy report, case # 0403742, on James Eldon Tomlin, including:
   a) Two body diagrams
   b) Trace Evidence Analysis Report, 29 Apr 2004
   c) Two page Forensic Investigator's Report, 28 Apr 2004
   d) Three page Forensic Investigator's Narrative Report, (mis-dated 14 Jul 2003)
4) Police Statements:
   a) Tilon Lashon Carter, 27 Sep 2004
   b) Tilon Lashon Carter, 22 Sep 2004
   c) Total of four Fort Worth Police Department computer reports
   d) Fort Worth Police Department Homicide Investigation Narrative Report Log from 28 Apr 2004 to 23 Sep 2004
   e) Total of three Fort Worth Police Department Interview transcripts, subject Lakeetha Allen:
      i) 4 Sep 2004
      ii) 20 Sep 2004
      iii) 23 Sep 2004
   f) Fort Worth Police Department Evidence Transmittal Log
5) Grand Jury Review Sheet, 9 Dec 2004

The decedent is an elderly Caucasian male who is found deceased at his residence in a prone position (face and chest against the floor), with his arms and legs bound together with duct tape. The autopsy and photographs reveal a pattern of multiple superficial skin injuries, and a pattern of bruising to the lower inner lip. There is a small hemorrhage into the membrane covering the lower right eye, and the face and neck show swelling and a marked purple discoloration to the skin that is associated with pooling of the blood by the force of gravity after the heartbeat stops and there is no further circulation of the blood in the vascular system. These findings are consistent with the stated cause of death by smothering. The wording of the cause of death statement is "smothering with positional asphyxia." Positional asphyxia is here used to describe the condition of the body face down, impairing the ability to breathe and exchange waste carbon dioxide in the body for oxygen to nourish the body tissues. This ability to respire (that is, to dispose of carbon dioxide from normal metabolism, and supply oxygen to the tissues) is further compromised by degenerative changes

**EXHIBIT** _5_

Ex. 15 001

that have occurred from normal ageing, and include damage to the lungs, apparently from tobacco use, and enlargement of the heart, with accompanying severe narrowing of the arteries that supply blood to the heart from atherosclerosis, a process of fatty deposits accumulating in the blood vessels in general. There is also evidence that the decedent has high blood pressure, with degenerative changes to the kidneys. These vascular degenerative changes put the decedent in a delicate and precarious situation, such that his heart is susceptible to stress changes, and could develop a process called arrhythmia and suffer an acute heart attack (that would not leave any specific changes at autopsy). The possibility of a cardiac arrhythmia is further enhanced by the history of pacemaker implantation (further suggested by a linear scar in the left upper chest, supportive of pacemaker placement), but I am unable to discover in the autopsy report that a pacemaker was recovered. Therefore, it is possible that he could have died from so-called "natural" causes, but in the setting of an ongoing felony, the medical examiner would be obliged to rule the manner of death as a homicide. With the findings consistent with smothering, there exists a greater probability that the death is due to asphyxial causes. The manner in which he arrived at a face down position on the floor (the "positional asphyxia" aspect of the cause of death statement) does not appear to be established from the investigation, and therefore, it is possible that he was left in an uncompromised position, but in struggles to free himself, he rolled over onto his stomach and face, and was further unable to extricate himself from this position. The photography of the autopsy indicates that the prosector performed a layered neck dissection, which showed hemorrhages into the muscles of the right side of the neck, a finding that is suggestive of manual strangulation, but not further supported by fractures to the bony structures of the neck and larynx (voice box). Further, the narrative aspect of the autopsy report does not describe these hemorrhages, suggestive of an oversight by the prosector, since they are clearly visible in the photographs. One is left to conclude that there has been some trauma to the right side of the neck, but the nature of that trauma cannot be firmly established.

This concludes my opinions in regard to this autopsy report, but should further information become available at some future time, there also exists the possibility that some of these opinions may require modification.

Certification Signature _____

# EXHIBIT 16

**Carol A. Lawson**

From: Carol A. Lawson
Sent: Tuesday, May 09, 2017 11:57 AM
To: Nizam Peerwani (NPeerwani@TarrantCounty.com)
Subject: FW: Follow-up on Yesterday's Meeting with Dr. Peerwani
Attachments: Tilon Carter - First Subsequent Application for Post-Conviction Writ of Habeas Corpus (filed in the 371st Dist Ct and the CCA on May 8, 1017).pdf; declaration of Thea Posel.pdf

Hi Dr. Peerwani,

I replied to them stating that I would forward this to you but that you're out of the office until Friday, and may have limited access to your county email.

From: Schonemann, Raoul D [mailto:rschonemann@law.utexas.edu]
Sent: Tuesday, May 09, 2017 11:28 AM
To: Carol A. Lawson
Cc: Posel, Thea J
Subject: RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

Dear Ms. Lawson,

Can you please forward the attached documents to Dr. Peerwani, along with this message (and can you please also confirm your receipt of this email; the attachments are so large that there's a possibility the email will be screened out by your email program):

Dear Dr. Peerwani,

I am writing to forward the habeas corpus application that we filed yesterday in the Tilon Carter case, about which Thea Posel and I met with you last week. I am also forwarding, as a separate attachment, a copy of a declaration that we had Thea execute to reflect those aspects of our conversation with you that we felt supported our application. (It is also attached to the application as Exhibit 8.) I want to again reiterate how much we appreciated your willingness to meet with us and to review the case with us.

We were required to file the application yesterday to meet the Court of Criminal Appeals' 7-day filing deadline prior to an execution date. I regret that we were compelled to do so without a declaration from you reflecting what you discussed with me and Thea last week. We had hoped to obtain a declaration from you before the filing deadline; without it, we felt we had no choice but to proceed by supporting the application with a declaration by Thea documenting the conversation we had with you.

We fully understand that you have an extraordinarily busy schedule, and we greatly appreciate the time you have already given us last week. We are hopeful, however, that you will still consider providing us with a declaration, particularly if you feel that any aspect of Thea's declaration is inaccurate or does not fairly reflect your views.

Please feel free to contact me at your convenience this week if you are available to discuss this further.

Again, thank you for time and your willingness to discuss the case with us.

Respectfully,

ME000706
Ex. 16 001

Ex. 16 002

THE UNIVERSITY OF TEXAS AT AUSTIN

CAPITAL PUNISHMENT CLINIC · SCHOOL OF LAW
727 E. Dean Keeton Street · Austin, Texas 78705

AUSTIN
TX 787
27 APR 2017
PM 5 L

USA
FOREVER
A84670326 673848

Tarrant County Medical Examiner's Office
200 Feliks Gwozdz Place
Ft. Worth, Texas 76104-4919

76104-491960

ME000707

Raoul Schonemann
Capital Punishment Clinic
University of Texas School of Law
727 East Dean Keeton Street
Austin, TX  78705
(512) 232-9391 office
(512) 471-3489 fax
rschonemann@law.utexas.edu

**From:** Carol A. Lawson [mailto:CALawson@TarrantCounty.com]
**Sent:** Friday, May 5, 2017 12:32 PM
**To:** Posel, Thea J <tposel@law.utexas.edu>
**Cc:** Schonemann, Raoul D <rschonemann@law.utexas.edu>
**Subject:** RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

I will forward this to Dr. Peerwani.

Dr. Peerwani is not available today.  He will be out of the office most of next week, but I can see if there is any possible time; he is very booked.

**From:** Posel, Thea J [mailto:tposel@law.utexas.edu]
**Sent:** Friday, May 05, 2017 11:30 AM
**To:** Carol A. Lawson
**Cc:** Schonemann, Raoul D
**Subject:** RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

Hi Carol,

I am attaching the closing arguments from the case for Dr. Peerwani's reference, as well as a particular page we believe he may be interested in.

I realize it is Friday and Dr. Peerwani may be leaving the office early…we are hoping to speak with him this afternoon at his earliest convenience, perhaps 1 or 2 pm, to follow up on our letter of yesterday. Would that be possible?

Thank you so much,

Thea Posel
Capital Punishment Clinic
University of Texas School of Law
727 East Dean Keeton Street
Austin, TX  78705
(512) 232-1598
tposel@law.utexas.edu

**From:** Carol A. Lawson [mailto:CALawso
**Sent:** Thursday, May 4, 2017 4:02 PM

0403742

Met May 3, 2017

[handwritten notes, illegible]

ME000708
Ex. 16 003

**To:** Posel, Thea J <tposel@law.utexas.edu>
**Subject:** RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

Hi Thea,

You're quite welcome. I will be sure Dr. Peerwani gets this.

Good luck with everything.

**From:** Posel, Thea J [mailto:tposel@law.utexas.edu]
**Sent:** Thursday, May 04, 2017 3:57 PM
**To:** Carol A. Lawson
**Subject:** Follow-up on Yesterday's Meeting with Dr. Peerwani

Carol,

Thank you so much for arranging yesterday's meeting, and for delivering the attached letter to Dr. Peerwani!

Best,

Thea Posel
Capital Punishment Clinic
University of Texas School of Law
727 East Dean Keeton Street
Austin, TX 78705
(512) 232-1598
tposel@law.utexas.edu

ME000709
Ex. 16 004

## Carol A. Lawson

| | |
|---|---|
| **From:** | Carol A. Lawson |
| **Sent:** | Thursday, May 04, 2017 4:03 PM |
| **To:** | Nizam Peerwani |
| **Subject:** | FW: Follow-up on Yesterday's Meeting with Dr. Peerwani |
| **Attachments:** | 2017-5-4 UT Law Follow-up Letter to Dr. Peerwani.pdf |

Hi Dr. Peerwani,

Please see enclosed letter. I have also printed it and will scan into Digital Media and send to the file.


**From:** Posel, Thea J [mailto:tposel@law.utexas.edu]
**Sent:** Thursday, May 04, 2017 3:57 PM
**To:** Carol A. Lawson
**Subject:** Follow-up on Yesterday's Meeting with Dr. Peerwani

Carol,

Thank you so much for arranging yesterday's meeting, and for delivering the attached letter to Dr. Peerwani!

Best,

Thea Posel
Capital Punishment Clinic
University of Texas School of Law
727 East Dean Keeton Street
Austin, TX 78705
(512) 232-1598
tposel@law.utexas.edu

ME000710
Ex. 16 005

# Carol A. Lawson

| | |
|---|---|
| **From:** | Carol A. Lawson |
| **Sent:** | Friday, May 05, 2017 12:33 PM |
| **To:** | Nizam Peerwani |
| **Subject:** | FW: Follow-up on Yesterday's Meeting with Dr. Peerwani |
| **Attachments:** | States Closing Argument Excerpt.pdf; Merits Phase Arguments.pdf |

**From:** Posel, Thea J [mailto:tposel@law.utexas.edu]
**Sent:** Friday, May 05, 2017 11:30 AM
**To:** Carol A. Lawson
**Cc:** Schonemann, Raoul D
**Subject:** RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

Hi Carol,

I am attaching the closing arguments from the case for Dr. Peerwani's reference, as well as a particular page we believe he may be interested in.

I realize it is Friday and Dr. Peerwani may be leaving the office early…we are hoping to speak with him this afternoon at his earliest convenience, perhaps 1 or 2 pm, to follow up on our letter of yesterday. Would that be possible?

Thank you so much,

Thea Posel
Capital Punishment Clinic
University of Texas School of Law
727 East Dean Keeton Street
Austin, TX 78705
(512) 232-1598
tposel@law.utexas.edu

**From:** Carol A. Lawson [mailto:CALawson@TarrantCounty.com]
**Sent:** Thursday, May 4, 2017 4:02 PM
**To:** Posel, Thea J <tposel@law.utexas.edu>
**Subject:** RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

Hi Thea,

You're quite welcome.  I will be sure Dr. Peerwani gets this.

Good luck with everything.

**From:** Posel, Thea J [mailto:tposel@law.utexas.edu]
**Sent:** Thursday, May 04, 2017 3:57 PM
**To:** Carol A. Lawson
**Subject:** Follow-up on Yesterday's Meeting with Dr. Peerwani

Carol,

ME000711
Ex. 16 006

Thank you so much for arranging yesterday's meeting, and for delivering the attached letter to Dr. Peerwani!

Best,

Thea Posel
Capital Punishment Clinic
University of Texas School of Law
727 East Dean Keeton Street
Austin, TX 78705
(512) 232-1598
tposel@law.utexas.edu

ME000712
Ex. 16 007

| | |
|---|---|
| **From:** | Carol A. Lawson |
| **Sent:** | Tuesday, May 09, 2017 11:56 AM |
| **To:** | Schonemann, Raoul D |
| **Cc:** | Posel, Thea J |
| **Subject:** | RE: Follow-up on Yesterday's Meeting with Dr. Peerwani |

Hello,

I will forward this information to Dr. Peerwani. He is out of the office until Friday and may have limited access to his county email. Thank you.

**From:** Schonemann, Raoul D [mailto:rschonemann@law.utexas.edu]
**Sent:** Tuesday, May 09, 2017 11:28 AM
**To:** Carol A. Lawson
**Cc:** Posel, Thea J
**Subject:** RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

Dear Ms. Lawson,

Can you please forward the attached documents to Dr. Peerwani, along with this message (and can you please also confirm your receipt of this email; the attachments are so large that there's a possibility the email will be screened out by your email program):

Dear Dr. Peerwani,

I am writing to forward the habeas corpus application that we filed yesterday in the Tilon Carter case, about which Thea Posel and I met with you last week. I am also forwarding, as a separate attachment, a copy of a declaration that we had Thea execute to reflect those aspects of our conversation with you that we felt supported our application. (It is also attached to the application as Exhibit 8.) I want to again reiterate how much we appreciated your willingness to meet with us and to review the case with us.

We were required to file the application yesterday to meet the Court of Criminal Appeals' 7-day filing deadline prior to an execution date. I regret that we were compelled to do so without a declaration from you reflecting what you discussed with me and Thea last week. We had hoped to obtain a declaration from you before the filing deadline; without it, we felt we had no choice but to proceed by supporting the application with a declaration by Thea documenting the conversation we had with you.

We fully understand that you have an extraordinarily busy schedule, and we greatly appreciate the time you have already given us last week. We are hopeful, however, that you will still consider providing us with a declaration, particularly if you feel that any aspect of Thea's declaration is inaccurate or does not fairly reflect your views.

Please feel free to contact me at your convenience this week if you are available to discuss this further.

Again, thank you for time and your willingness to discuss the case with us.

Respectfully,


Raoul Schonemann
Capital Punishment Clinic

ME000713
Ex. 16 008

University of Texas School of Law
727 East Dean Keeton Street
Austin, TX 78705
(512) 232-9391 office
(512) 471-3489 fax
rschonemann@law.utexas.edu

**From:** Carol A. Lawson [mailto:CALawson@TarrantCounty.com]
**Sent:** Friday, May 5, 2017 12:32 PM
**To:** Posel, Thea J <tposel@law.utexas.edu>
**Cc:** Schonemann, Raoul D <rschonemann@law.utexas.edu>
**Subject:** RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

I will forward this to Dr. Peerwani.

Dr. Peerwani is not available today. He will be out of the office most of next week, but I can see if there is any possible time; he is very booked.

**From:** Posel, Thea J [mailto:tposel@law.utexas.edu]
**Sent:** Friday, May 05, 2017 11:30 AM
**To:** Carol A. Lawson
**Cc:** Schonemann, Raoul D
**Subject:** RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

Hi Carol,

I am attaching the closing arguments from the case for Dr. Peerwani's reference, as well as a particular page we believe he may be interested in.

I realize it is Friday and Dr. Peerwani may be leaving the office early...we are hoping to speak with him this afternoon at his earliest convenience, perhaps 1 or 2 pm, to follow up on our letter of yesterday. Would that be possible?

Thank you so much,

Thea Posel
Capital Punishment Clinic
University of Texas School of Law
727 East Dean Keeton Street
Austin, TX 78705
(512) 232-1598
tposel@law.utexas.edu

**From:** Carol A. Lawson [mailto:CALawson@TarrantCounty.com]
**Sent:** Thursday, May 4, 2017 4:02 PM
**To:** Posel, Thea J <tposel@law.utexas.edu>
**Subject:** RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

ME000714
Ex. 16 009

Hi Thea,

You're quite welcome.  I will be sure Dr. Peerwani gets this.

Good luck with everything.

**From:** Posel, Thea J [mailto:tposel@law.utexas.edu]
**Sent:** Thursday, May 04, 2017 3:57 PM
**To:** Carol A. Lawson
**Subject:** Follow-up on Yesterday's Meeting with Dr. Peerwani

Carol,

Thank you so much for arranging yesterday's meeting, and for delivering the attached letter to Dr. Peerwani!

Best,

Thea Posel
Capital Punishment Clinic
University of Texas School of Law
727 East Dean Keeton Street
Austin, TX  78705
(512) 232-1598
tposel@law.utexas.edu

ME000715
Ex. 16 010

University of Texas School of Law
727 East Dean Keeton Street
Austin, TX 78705
(512) 232-9391 office
(512) 471-3489 fax
rschonemann@law.utexas.edu


**From:** Carol A. Lawson [mailto:CALawson@TarrantCounty.com]
**Sent:** Friday, May 5, 2017 12:32 PM
**To:** Posel, Thea J <tposel@law.utexas.edu>
**Cc:** Schonemann, Raoul D <rschonemann@law.utexas.edu>
**Subject:** RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

I will forward this to Dr. Peerwani.

Dr. Peerwani is not available today. He will be out of the office most of next week, but I can see if there is any possible time; he is very booked.


**From:** Posel, Thea J [mailto:tposel@law.utexas.edu]
**Sent:** Friday, May 05, 2017 11:30 AM
**To:** Carol A. Lawson
**Cc:** Schonemann, Raoul D
**Subject:** RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

Hi Carol,

I am attaching the closing arguments from the case for Dr. Peerwani's reference, as well as a particular page we believe he may be interested in.

I realize it is Friday and Dr. Peerwani may be leaving the office early...we are hoping to speak with him this afternoon at his earliest convenience, perhaps 1 or 2 pm, to follow up on our letter of yesterday. Would that be possible?

Thank you so much,

Thea Posel
Capital Punishment Clinic
University of Texas School of Law
727 East Dean Keeton Street
Austin, TX 78705
(512) 232-1598
tposel@law.utexas.edu


**From:** Carol A. Lawson [mailto:CALawson@TarrantCounty.com]
**Sent:** Thursday, May 4, 2017 4:02 PM
**To:** Posel, Thea J <tposel@law.utexas.edu>
**Subject:** RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

ME000716
Ex. 16 011

**Carol A. Lawson**

| | |
|---|---|
| **From:** | Carol A. Lawson |
| **Sent:** | Tuesday, May 09, 2017 1:05 PM |
| **To:** | Schonemann, Raoul D |
| **Cc:** | Posel, Thea J |
| **Subject:** | RE: Follow-up on Yesterday's Meeting with Dr. Peerwani |

Of note, the attachment has a name Carol "Swanson." I believe it is intended to list my name; it should be Lawson. Thanks.

**From:** Schonemann, Raoul D [mailto:rschonemann@law.utexas.edu]
**Sent:** Tuesday, May 09, 2017 11:28 AM
**To:** Carol A. Lawson
**Cc:** Posel, Thea J
**Subject:** RE: Follow-up on Yesterday's Meeting with Dr. Peerwani

Dear Ms. Lawson,

Can you please forward the attached documents to Dr. Peerwani, along with this message (and can you please also confirm your receipt of this email; the attachments are so large that there's a possibility the email will be screened out by your email program):

Dear Dr. Peerwani,

I am writing to forward the habeas corpus application that we filed yesterday in the Tilon Carter case, about which Thea Posel and I met with you last week. I am also forwarding, as a separate attachment, a copy of a declaration that we had Thea execute to reflect those aspects of our conversation with you that we felt supported our application. (It is also attached to the application as Exhibit 8.) I want to again reiterate how much we appreciated your willingness to meet with us and to review the case with us.

We were required to file the application yesterday to meet the Court of Criminal Appeals' 7-day filing deadline prior to an execution date. I regret that we were compelled to do so without a declaration from you reflecting what you discussed with me and Thea last week. We had hoped to obtain a declaration from you before the filing deadline; without it, we felt we had no choice but to proceed by supporting the application with a declaration by Thea documenting the conversation we had with you.

We fully understand that you have an extraordinarily busy schedule, and we greatly appreciate the time you have already given us last week. We are hopeful, however, that you will still consider providing us with a declaration, particularly if you feel that any aspect of Thea's declaration is inaccurate or does not fairly reflect your views.

Please feel free to contact me at your convenience this week if you are available to discuss this further.

Again, thank you for time and your willingness to discuss the case with us.

Respectfully,

Raoul Schonemann
Capital Punishment Clinic

ME000717

Ex. 16 012

Hi Thea,

You're quite welcome. I will be sure Dr. Peerwani gets this.

Good luck with everything.

**From:** Posel, Thea J [mailto:tposel@law.utexas.edu]
**Sent:** Thursday, May 04, 2017 3:57 PM
**To:** Carol A. Lawson
**Subject:** Follow-up on Yesterday's Meeting with Dr. Peerwani

Carol,

Thank you so much for arranging yesterday's meeting, and for delivering the attached letter to Dr. Peerwani!

Best,

Thea Posel
Capital Punishment Clinic
University of Texas School of Law
727 East Dean Keeton Street
Austin, TX 78705
(512) 232-1598
tposel@law.utexas.edu

ME000718
Ex. 16 013

## Carol A. Lawson

**From:** Posel, Thea J <tposel@law.utexas.edu>
**Sent:** Thursday, May 04, 2017 3:57 PM
**To:** Carol A. Lawson
**Subject:** Follow-up on Yesterday's Meeting with Dr. Peerwani
**Attachments:** 2017-5-4 UT Law Follow-up Letter to Dr. Peerwani.pdf

Carol,

Thank you so much for arranging yesterday's meeting, and for delivering the attached letter to Dr. Peerwani!

Best,

Thea Posel
Capital Punishment Clinic
University of Texas School of Law
727 East Dean Keeton Street
Austin, TX 78705
(512) 232-1598
tposel@law.utexas.edu

ME000719
Ex. 16 014

# EXHIBIT 17

**STATE OF TEXAS**     **CERTIFICATE OF DEATH**     STATE FILE NUMBER     04037421

Texas Department of Health — Bureau of Vital Statistics

| 1. NAME OF DECEASED | (a) FIRST | (b) MIDDLE | (c) LAST | (d) MAIDEN | 2. SEX | 3. DATE OF DEATH |
|---|---|---|---|---|---|---|
| | JAMES | ELDON | TOMLIN | | | 4-28-2004 |

| 4. DATE OF BIRTH | 5. AGE (IN YEARS) | IF UNDER 1 YR. MO / DAYS | IF UNDER 1 DAY HOURS / MIN | 6. BIRTH PLACE (CITY & STATE OR FOREIGN COUNTRY) | 7. SOCIAL SECURITY NO. |
|---|---|---|---|---|---|
| | | | | | |

| 8. RACE | 9a. WAS THE DECEDENT OF HISPANIC ORIGIN? ☐ YES ☐ NO | 9b. IF YES, SPECIFY (MEXICAN, CUBAN, PUERTO RICAN, ETC.) | 10. WAS DECEDENT EVER IN U.S. ARMED FORCES? ☐ YES ☐ NO | 11. EDUCATION (SPECIFY HIGHEST GRADE COMPLETED, ELEM. OR SECONDARY (0-12) COLLEGE (13-16, 17+) |
|---|---|---|---|---|

| 12. MARITAL STATUS ☐ MARRIED ☐ NEVER MARRIED ☐ WIDOWED ☐ DIVORCED | 13. SURVIVING SPOUSE (IF WIFE, GIVE MAIDEN NAME) | 14a. DECEDENT'S USUAL OCCUPATION | 14b. KIND OF BUSINESS OR INDUSTRY |
|---|---|---|---|

| 15a. RESIDENCE STREET ADDRESS | | 15b. CITY OR TOWN |
|---|---|---|

| 15c. COUNTY | 15d. STATE | 15e. ZIP CODE | 15f. INSIDE CITY LIMITS ☐ YES ☐ NO |
|---|---|---|---|

| 16. FATHER'S NAME | 17. MOTHER'S MAIDEN NAME |
|---|---|

18. PLACE OF DEATH (CHECK ONLY ONE)

HOSPITAL: ☐ INPATIENT ☐ ER/OUTPATIENT ☐ DOA    OTHER: ☐ NURSING HOME ☐ RESIDENCE ☐ OTHER (SPECIFY)

| 19. COUNTY OF DEATH | 20. CITY OR TOWN (IF OUTSIDE CITY LIMITS, GIVE PRECINCT NO.) | 21. NAME OF HOSPITAL OR INSTITUTION (If not in institution, show street address) |
|---|---|---|

| 22. INFORMANT — SIGNATURE & RELATIONSHIP | 23. MAILING ADDRESS OF INFORMANT |
|---|---|

| 24. METHOD OF DISPOSITION ☐ BURIAL ☐ CREMATION ☐ REMOVAL FROM STATE ☐ DONATION ☐ OTHER (SPECIFY) | 25a. PLACE OF DISPOSITION (NAME OF CEMETERY, CREMATORY OR OTHER PLACE) 26. LOCATION (CITY, STATE) 27. SIGNATURE OF FUNERAL DIRECTOR OR PERSON ACTING AS SUCH | 25b. Section ___ Block ___ Lot ___ Space ___ Unknown ☐ 28. DATE OF DISPOSITION | 29. NAME & ADDRESS OF FUNERAL HOME |
|---|---|---|---|

30. CERTIFIER

☐ CERTIFYING PHYSICIAN    TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE TIME, DATE, AND PLACE, AND DUE TO THE CAUSE(S) AND MANNER AS STATED.

☒ MEDICAL EXAMINER
☐ JUSTICE OF THE PEACE    ON THE BASIS OF EXAMINATION AND/OR INVESTIGATION, IN MY OPINION, DEATH OCCURRED AT THE TIME, DATE, PLACE, AND DUE TO THE CAUSE(S) AND MANNER AS STATED.

| 31. SIGNATURE & TITLE OF CERTIFIER _[signature]_ NIZAM PEERWANI, M.D. Chief Medical Examiner, Tarrant County | 32. DATE SIGNED MO 4 DAY 29 YEAR 2004 | 33. TIME OF DEATH 2:11 p. |
|---|---|---|

34. PRINTED NAME & ADDRESS OF CERTIFIER

TARRANT COUNTY MEDICAL EXAMINER, 200 FELIKS GWOZDZ PLACE, FT. WORTH, TEXAS 76104-491

35. PART 1    ENTER THE DISEASES, INJURIES OR COMPLICATIONS THAT CAUSED THE DEATH. DO NOT ENTER THE MODE OF DYING SUCH AS CARDIAC OR RESPIRATORY ARREST, SHOCK, OR HEART FAILURE. LIST ONLY ONE CAUSE ON EACH LINE.

Approximate Interval Between Onset and Dea    UNKNOWN

IMMEDIATE CAUSE (Final disease or condition resulting in death) → a. _____ PENDING _____
DUE TO (OR AS A LIKELY CONSEQUENCE OF):

Sequentially list conditions, if any, leading to immediate cause. Enter UNDERLYING CAUSE (disease or injury that initiated events resulting in death) LAST
b. _____
DUE TO (OR AS A LIKELY CONSEQUENCE OF):
c. _____
DUE TO (OR AS A LIKELY CONSEQUENCE OF):
d. _____

PART 2    OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART 1 (i.e., substance abuse, diabetes, smoking, etc.)

| 36a. AUTOPSY? ☒ YES ☐ NO | 36b. AUTOPSY FINDINGS AVAILAB PRIOR TO COMPLETION OF CAUS DEATH? ☐ YES ☒ N |
|---|---|

| 37. DID TOBACCO USE CONTRIBUTE TO DEATH ☐ YES ☐ PROBABLY ☐ NO ☒ UNKNOWN | 38. DID ALCOHOL USE CONTRIBUTE TO DEATH ☐ YES ☐ PROBABLY ☐ NO ☒ UNKNOWN | 39. WAS DECEDENT PREGNANT AT TIME OF DEATH ☐ YES ☐ NO ☐ UNK WITHIN LAST 12 MO ☐ YES ☐ NO ☐ UNK |
|---|---|---|

| 40. MANNER OF DEATH ☐ NATURAL ☐ ACCIDENT ☐ SUICIDE ☐ HOMICIDE ☒ PENDING INVESTIGATION ☐ COULD NOT BE DETERMINED | 41a. DATE OF INJURY | 41b. TIME OF INJURY M. | 41c. INJURY AT WORK ☐ YES ☐ NO | 41d. PLACE OF INJURY — AT HOME, FARM, STREET, FACTORY, ETC. (SPECIFY) |
|---|---|---|---|---|

41e. LOCATION (STREET AND NUMBER, CITY OR TOWN, STATE)

41f. DESCRIBE HOW INJURY OCCURRED

| 42a. REGISTRAR FILE NO. | 42b. DATE RECEIVED BY LOCAL REGISTRAR | 42c. SIGNATURE OF LOCAL REGISTRAR |
|---|---|---|

WARNING The penalty for knowingly making a false statement in this form can be 2-10 years in prison and a fine of up to $10,000. (Health and Safety Code, Sec. 195, 1989)

112 REV. 9/95

Ex. 17 001

# EXHIBIT 18

# UNIVERSITY OF TEXAS SCHOOL OF LAW
## CAPITAL PUNISHMENT CLINIC
### 727 EAST DEAN KEETON ST.
### AUSTIN, TX  78705

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: *Tarrant County Medical Examiner's Office* | FROM: *Raoul Schonemann* |
| COMPANY: | DATE: *April 25, 2017* |
| FAX NUMBER: *(817) 920-5713* | TOTAL NO. OF PAGES INCLUDING COVER: *3* |
| PHONE NUMBER: | SENDER'S PHONE NUMBER: *(512) 232-9391* |
| RE: *PIA request* | SENDER'S FAX NUMBER: *(512) 471-3489* |

☑ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☑ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS:

0403742
H



SCHOOL OF LAW

THE UNIVERSITY OF TEXAS AT AUSTIN

*Capital Punishment Clinic · 727 E. Dean Keeton Street · Austin, Texas 78705-3299*
*(512) 232-9391· FAX (512) 471-3489*

April 25, 2017

Tarrant County Medical Examiner's Office
200 Feliks Gwozdz Place
Ft. Worth, Texas 76104-4919
Via mail and by fax to (817) 920-5713

    **Re: Autopsy of James Eldon Tomlin, Case No. 0403742**

To Whom It May Concern:

    I write to request all records connected with the post-mortem examination of James Eldon Tomlin, performed by Nizam Peerwani, M.D., Chief Medical Examiner, on April 29, 2004, at the Tarrant County Medical Examiner's District Morgue in Fort Worth, Texas.

    I am requesting copies of any and all records you hold related to the autopsy, toxicological examination, and any other examinations that were performed, including the examiners' notes. For the purpose of this request, the terms "records" and "documents" are intended to include, without limitation, all written, typed, printed, recorded, graphic computer-generated, or other matter of any kind from which the information can be derived, whether produced, reproduced, or stored on paper, cards, tape, film, electronic facsimile, computer storage devices, or any other medium. They include without limitation, letters, memoranda (including internal memoranda), calendars, schedules, books, indices, notes, printed forms, publications, press releases, notices, minutes, summaries or abstracts, reports, files, transcripts, computer tapes, printouts, drawings, photographs, records (including both videotapes and audiotapes), telegrams, and telex messages, as well as any reproductions thereof that differ in any way from any other reproduction, such as copies containing marginal notations.

    Please note that the University of Texas School of Law is a state institution, and to the extent that you do not charge state agencies for copies, we respectfully request that the records be provided at no charge. If, however, you anticipate there will be a fee charged for copies of these records, please let me know what that will be as soon as possible and I will send payment forthwith.

Please do not hesitate to contact me at (512) 232-9391 or via email at rschonemann@law.utexas.edu if you require any additional information in order to process this request.

Please send the requested information to:

Raoul Schonemann
Capital Punishment Clinic
University of Texas School of Law
727 East Dean Keeton Street
Austin, TX 78705

Thank you in advance for your assistance with this matter.

Sincerely,

Raoul Schonemann
Clinical Professor

# EXHIBIT 19

TC



# Tarrant County Medical Examiner
### District Medical Examiner's Office
Serving Tarrant, Denton, Parker and Johnson Counties

**PROVISIONAL AUTOPSY FORM**   Pathologist: __HP__   Autopsy Tech: __RR__

NAME: James Eldon Tomlin   CASE NO: 04-03742
Approximate Age: 89 years   Sex (Male)/Female  W/M
Height: 69 inches (____cms)   Weight: 154 L pounds (____kg) (APPROX)
Exam Date: 4/29/2004   Time: Start 1000 hours   End 1300 hours
am   pm

PRELIMINARY CAUSE OF DEATH: __pending__

MANNER OF DEATH:  ( ) Natural  ( ) Accident  ( ) Suicide  ( ) Homicide  (✓) Pending

PROCEDURE:  (✓) Complete Autopsy  ( ) Partial _____

TEST(S) ORDERED:  ( ) None  (✓) Toxicology  ( ) Histology  ( ) Chemistry
( ) Vitreous Chemistry  ( ) Metabolic Screen  ( ) GSR by EM
( ) Firearm  ( ) Trace  (✓) Latent  ( ) Other_____

BODY PRESENTED:  (✓) Wrapped in Sheet  WS  ( ) Body Bag _____
Hands bagged ( ) Yes  ( ) No   Feet bagged ( ) Yes ( ) No

| I. | CLOTHING  ( ) No ( ) Yes |
|---|---|
| 1. | Jacket/Jean jacket/Sweater/Pullover/Wind breaker |
| 2. | Pants/Jeans/Overalls/Short/Skirt/Dress  Navy blue |
| 3. | Shirt/Blouse  L/S gray-green stripped (button-up) |
| 4. | T-shirt/Undershirt/Brassiere/Slip  white |
| 5. | Brief/Boxers/ Long Johns/Panties |
| 6. | Belt/Suspenders  Blk w/ plain YM buckle |
| 7. | Pajama top/Pajama bottom/Nightie/Night gown/Bathrobe _____ |
| 8. | Cap/Hat/Bandana _____ |
| 9. | Socks/Full panty hose/Knee high panty hose  blue pair |
| 10. | Shoes/Sneakers/Tennis shoes/Short boots/Boots _____ |
| 11. | _____ 12. |

[B = Blood  C = Cut  D = Defect  F = Feces  R = Removed  T = Torn  U = Urine  V = Vomitus]

| II. | PERSONAL EFFECTS: ⌀ | | |
|---|---|---|---|
| 1. | Ear-ring _____ | 2. | Bracelet  Trace Team  4/29 |
| 3. | Chain _____ | 4. | Pendant  Activated |
| 5. | Wedding band _____ | 6 | Ring _____ |
| 7. | Watch _____ | 8. | Key ✓ Ron Dingee |
| 9. | Lighter _____ | 10. | Pocket Knife ✓ Kelly Belcher |
| 11. | Wallet_____ | 12. | ✓ Pat Eddings |
| 13. | _____ | 14. | ✓ Bill Bailey |
| 15. | _____ | 16. | |

※ Recovered by Trace Team
Trace collected.

Page | 1

Ex 19,001

| II. | **THERAPEUTIC INTERVENTION:** ( ✓ ) No ( ) Yes |

II.     **THERAPEUTIC INTERVENTION:** ( ✓ ) No     ( ) Yes
1.      **Endotracheal tube:**   ( ) Oral      ( ) Nasal     ( ) Tracheotomy
2.      **Foley Catheter:**      ( ) No        ( ) Yes _____ mL urine
3.      **Nasogastric tube:**    ( ) No        ( ) Yes: Left/Right (Circle)
4.      **Intravenous lines:**   ( ) LTJug     ( ) RTJug     ( ) LSCV      ( ) RSCV
        ( ) LACF     ( ) RACF     ( ) LT Arm   ( ) RT Arm    ( ) LT Wrist  ( ) RT Wrist
        ( ) LT dorsal hand   ( ) RT dorsal hand   ( ) LTFem   ( ) RTFem
        ( ) Other: _____
        _____
5.      **Arterial Lines(s):** _____
6.      **Drains:** ( ) LT-chest        ( ) RT-chest
                    ( ) LUQ             ( ) RUQ            ( ) LLQ        ( ) RLQ
        ( ) Other: _____
7.      **Incision:**    ( ) Craniotomy _____
        ( )   Thoracotomy _____
        ( )   Abdominal Laparatomy _____
8.      **Splint:** _____    9.  **Cast:** _____
10.     **EKG Pads:** _____ 11. **Pacer Pads** _____    12. **C-Collars** ( )
13.     **Others:** _____
        _____
        _____

III.    **EXTERNAL BODY DESCRIPTION:**
1.      ( ) Infant      ( ) Child    ( ) Adolescent   ( ) Adult   ( ✓ ) Elderly (over 65 years)
2.      ( ✓ ) White ( )  Black    ( ) Hispanic    ( ) Native    ( ) Asian
3.      ( ✓ ) Male     ( ) Female
4.      **Age:** _89_ years   5. **Length:** _69_ inches      6. **Weight:** _154.6_ pounds
7.      **Build:** ( ) Small     ( ✓ ) Medium    ( ) Large    ( ) Heavy
8.      **Nutrition:**   ( ) Emaciation ( ✓ ) Average   ( ) Obese _____
9.      **Hydration:**   ( ✓ ) Normal   ( ) Dehydration    Mild/Moderate/Severe
10.     **Preservation:** ( ✓ ) Good    ( ) Decomposition ⌀ _____
        ( )   Putrefaction
                a.  Bloating:        ( ) No ( ) Yes _____
                b.  Purging:         ( ) No ( ) Yes _____
                c.  Discolor:        ( ) No ( ) Yes _____
                d.  Marbling:        ( ) No ( ) Yes _____
                e.  Slippage:        ( ) No ( ) Yes _____
                f.  Skeletal:        ( ) No ( ) Yes _____
        ( )   Adipocere _____
        ( )   Mummification ⌀ _____
11.     **Maggot Infestation:** _____
12.     **Insect bite marks:** _____
13.     **Rigor:** ( ) None      ( ) Early     ( ) Moderate   ( ) Complete  ( ✓ ) Fading
14.     **Livor:** ( ) None      ( ) Mild      ( ) Developed ( ) Well developed
        ( ) Back          ( ✓ ) Front     ( ) Upper Body     ( ) Lower Body
        ( ) Left sided       ( ) Right sided
        ( ) Blanchable       ( ) Slightly blanchable          ( ✓ ) Fixed
        ( ✓ ) Normal Color    ( ) Abnormal Color _____
        Contact Pallor _____

Ex. 19 002

Sup Laceration x 2 ⌐ 5/15
⌐ 1/4
L parietal scalp
w/ abr. = 2 x 1½ ——→ ⌐ L scalp
Lacerations
(diagram)

**15.** **Scalp:** Length: (✓) Short ( ) Medium ( ) Long _____
Texture: ( ) Str (✓) Wavy ( ) Curly ( ) Kinky ( ) Braided
Color: ( ) Blk ( ) Brwn ( ) Red ( ) Blnd ( ) Sandy (✓) Gray
Loss: ( ) Non Receded (✓) Receded _____ inches front/back (✓) Bald  ∅

**16.** **Face Hair:** (✓) Shaven ( ) Unshaven ( ) Not Applicable
Mustache: ( ) No ( ) Yes: Full Lower Lip Handlebar Color: _____
Beard: ( ) No ( ) Yes: Full Trim Full Untrim Goatee Color: _____

**17.** **Body Hair:** ( ) None (✓) Slight ( ) Average ( ) Plentiful
(✓) Male ( ) Female ( ) Preadolescent

**18.** **Face:** Injuries Face facial abr: ① R malar and ② ant chin = 2 x ¾ and  ② ¾ x ½

**19.** **Eyes:** Position (✓) Closed ( ) Slightly Open ( ) Open _____
Bulbar Conjunctivae: ( ) Tache ( ) Clear (✓) Cloudy ( ) Opaque
Hemorrhage: No (Yes) ( ) Bulbar _____ ( ) Palpebral _____ ] conj cdema + L bulbar sub-conj. hemorrhage
Irides: _____ Green Sclerae: White Cataracts: ( ) No ( ) Yes
Arcus: (✓) No ( ) Yes: Pupils: RT 3 mm LT 3 mm
∅ fx **Orbits:** (✓) Normal ( ) Ecchymosis: LT/RT/Both ( ) Edema: LT/RT/Both

**20.** **Nose:** (✓) Normal ( ) Blood LT/RT/Both ( ) Froth: LT/RT/Both
Septum: (✓) Intact ( ) Torn _____ wht congested beige

**21.** **Mouth:** Hygiene: ( ) Good ( ) Poor ( ) Very Poor
**Lips:** upper lip: Prominent edema — x 3 mucosal patterned cont w/ 3/8 x ¼ each
Tongue: _____
Buccal: _____
Teeth: (✓) Natural: U/L/Both ( ) Edentulous: U/L/Both
( ) Partial Dentures: U/L/Both _____
( ) Full Dentures: U/L/Both _____
( ) Other: _____

**22.** **Ears:** (✓) Normal ( ) Pierced LT x ___ RT x ___ ( ) Blood: LT/RT/Both  ∅ blood
Others: _____

**23.** **Neck:** ( ) Supple ( ) Rigid ( ) Masses: _____
Others: _____

**24.** **Chest:** ( ) Symmetric ( ) Barrel ( ) Other _____
Non-Symmetric: ( ) Pectus Carinatum ( ) Pectus Excavatum
Breasts: ( ) Male normal ( ) Gynecomastia: _____
( ) Female Size: Small/Medium/ Large/Pendulous/Atrophy
( ) Implants: LT/RT/Both
( ) Mastectomy: Simple/Radical LT/RT/Both

**25.** **Abdomen:** ( ) Scaphoid ( ) Protuberant: Mild/Moderate/Severe ( ) Striae
( ) Hernia Umbilical/LT Inguinal/RT Inguinal: _____
( ) Other: _____
_____

**26.** **Upper Extremities:**
Equal: (✓) Yes ( ) No _____       R forearm : (SG) = 4 x 1½"
Symmetric: (✓) Yes ( ) No _____
Fingernails (✓) Cyanotic ( ) Pale ( ) Clubbing ( ) Edema
Fractures: (✓) No ( ) Yes _____ ✱ (Healing Inj)
Injuries: ( ) No (✓) Yes _____       Abr w/ scab: dorsal
Deformity: (✓) No ( ) Yes _____       L FA = 1½ x ¼"   Page | 3

Acute Inj : Post R arm forearm = 2 x 1½

27. **Lower Extremities:**
Equal: (✓) Yes ( ) No _____
Symmetric: (✓) Yes ( ) No _____
Fingernails: (✓) Cyanotic ( ) Pale ( ) Clubbing ( ) Edema
Fractures: (✓) No ( ) Yes _____
Injuries: ( ) No (✓) Yes _____ * (Healing Inj)
Deformity: ( ) No ( ) Yes _____

28. **Male Genitalia:**
Circumcised: ( ) Yes (✓) No   Descended Testicles: ( ) Yes ( ) No
Other: _____

29. **Female Genitalia:**
Vulva: _____   Vagina: _____
Introitus: _____   Other: _____

30. **Back:** _____ N/A
31. **Buttocks:** _____
32. **Anus:** _____
33. **Integument:** Color (✓) Normal ( ) Abnormal
32. **Scars (S) and/or Tattoos (T):** ( ) No (✓) Yes

① Soft tissue indentation L/R knees
② Duct tape glue w/ freg blue fabric — ant ⓇΒ leg post Ⓡ leg

① Faint yellow cont w/ abr: Ⓡ distal post lg = 3/8" x 1/4
② Faint yellow comb w/ abr Ⓛ lat. ankle = 1/2 x 3/8

| # | S or T | Location | Description |
|---|--------|----------|-------------|
| 1 | S | Ⓛ upper chest | Pacemaker scar = |
| 2 | | | 1 3/4 0/ sg |
| 3 | | | Palpable Pacemaker |
| 4 | S | Ⓡ Ant-lat | 2 1/2" |
| 5 | | arm | |
| 6 | S | Ⓡ forearm | Irreg = 7" x 2" |
| 7 | | | |
| 8 | S | Ⓛ Ant arm | 3" |
| 9 | | | |
| 10 | T = ∅ | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |

Others: _____
_____
_____
_____
_____

Page | 4

Ex. 19 004

## V. INTERNAL EXAMINATION

**1. Serous Cavities:** (✓) Normal ( ) Abnormal   Ø fx

| Chest wall: | (FX Codes: | A=Acute | | | R=Recent | | | O=Old | B=Blood) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| LT Rib FX: | Anterior | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | Lateral | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | Posterior | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| RT Rib FX: | Anterior | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | Lateral | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | Posterior | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| Spine FX | Cervical | 1 | 2 | 3 | 4 | 5 | 6 | 7 | | | | | |
| | Thoracic | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| | Lumbar | 1 | 2 | 3 | 4 | 5 | | | | | | | |

Sternum FX: _____
Clavicular FX: Left: _____ Right: _____   } Ø fx
Sacrum, Coccyx, Pelvic FX: _____

Adhesions: (✓) No ( ) Yes: LT/RT/Both
Fluid: LT: _Ø_ mL (Blood/Transudate/Exudate/Empyema)
RT: _Ø_ mL (Blood/Transudate/Exudate/Empyema)
Scoliosis: (✓) No ( ) Yes _____ (LT or RT) Mild/Moderate/Severe
Kyphosis: (✓) No ( ) Yes Mild/Moderate/Severe
Other: _____

**Abdominal wall:** Adhesions: (✓) No ( ) Yes: LT/RT/Both
Fluid: _Ø_ mL (Blood/Transudate/Exudate/Empyema/Feces)
Lordosis: (✓) No ( ) Yes Mild/Moderate/Severe
**Pericardium:** Adhesions ✓ No ( ) Yes ___ Normal serous fluid.
Fluid: _____ mL (Blood/Transudate/Exudate/Empyema)

**2. Cardiovascular System**
Weight: 455.8 gms   LV 2.1 cm   RV 0.5 cm   Septum _____ cm
**Epicardium** ( ) Normal ( ) Abnormal : _____
**Arteries:** Origin: ( ) Normal ( ) Abnormal: _____
Stenosis: Ostia: ( ) Patent ( ) Other: _____
LT Main ____% Stable Plaque/Hemorrhage/Thrombus/Calcification
LAD ____% Stable Plaque/Hemorrhage/Thrombus/Calcification
LC
RCA ____% Stable Plaque/Hemorrhage/Thrombus/Calcification
Dominance: ( )RT ( ) LT CABG: ( ) No ( ) Yes: _____   Multi-focal CAD w 70-80% Stenosis
**Myocardium:** Infarct: (✓) No ( ) Yes: Acute/Recent/Healed   Ø Infarcts
Size: _____ Location: _____
Description: _____
**Valves:** AV: 7 1/2 cms Normal/Other: _____
MV: 13 cms Normal/Other: _____
PV: 8 cms Normal/Other: _____
TV: 13 cms Normal/Other: _____
**Cong Anomaly:** ( ) No ( ) Yes:
**Vessel:** _____ Mod – Severe AS (generalized)
* #1 PM w lead in RV
(w/ ⊕ upper chest scar — sq battery)

Ex. 19 005

**3. Pulmonary System**

**Neck:** Hyoid Bone: (✓) Normal ( ) Other: _____ ⌐∅ fx
Thyroid Cartilage: (✓) Normal ( ) Other: _____
Cricoid Cartilage: (✓) Normal ( ) Other: _____
Larynx: (✓) Normal ( ) Other: _____
Epiglottis: (✓) Normal ( ) Edema ( ) Trauma ( ) Other: _____
Musculature (✓) Normal ( ) Other: _____
Arteries: (✓) Normal ( ) Other: _____
Veins: ( ) Normal ( ) Other: _____
Trachea:(✓) Normal ( ) Other: _____ ∅ aspiration

**Lungs:** Weight: Both _____ gms    LT _____ gms    RT _____ gms    ⌐ 1451
LT Lung: S (✓) Congestion (✓) Edema ( ) Pneumonia ( ) Other _____
RT Lung: S (✓) Congestion (✓) Edema ( ) Pneumonia ( ) Other _____    Mod CLE
T-Bronchial: ( ) Inflammation (✓ Fluid) ( ) Blood ( ) Other    emphysema
Vessels: ( ) Normal ( ) Emboli ( ) Other: _____
Pleura: (✓) Normal ( ) Other: _____ mod – large
∅ PE                                       frothy fluid

**4. Gastrointestinal System**

**Esophagus** (✓) Normal ( ) Other: _____
**GE Junction** (✓) Normal ( ) Erosion ( ) Varices ( ) Other: _____
**Stomach:** (✓) Normal ( ) Gastritis ( ) Ulcer ( ) Other: _____
(✓ Empty) (✓) No Contents: ∅ (gms)_____
**Duodenum:** ( ) Normal ( ) Ulcer (✓) Other: _____
**SM Bowel:** ( ) Normal ( ) Other: _____
**Colon:** ( ) Normal ( ) Other: _____
**Liver:** 1356 gms (✓) Normal ( ) Fatty _____
(✓) Congested ( ) Cirrhosis _____
( ) Other: _____
**Gallbladder** Bile 20 mL ( ) Cholesterolosis ( ) Cholecystitis ( ) Lithiasis_____
**Pancreas:** 215 gms (✓) Normal ( ) Pancreatitis: Acute/Chronic ( ) Other
**Surgery:** (✓) No ( ) Yes    Appendectomy/Cholecystectomy/Other_____

**5. Genitourinary System**

**LT Kidney:** 137.6 gms    ⌐ Arteriolo nep
**RT Kidney:** 132.7 gms    cortex = 2-3 mm
**Hilum:** _____
**Bladder:** _____    Urine: 5 mL
**Male:** Prostate: Neg    Testes: descends → neg
**Female:** Cx: N/A    Uterus: _____   (age atrophy)
Tubes: N/A    Ovaries: _____
**Surgery:** ( ) Nephrectomy LT/RT/Both ( ) Hysterectomy ( ) Salpingectomy
( ) Tubal Ligation ( ) Oophorectomy LT/RT/Both

**6. Hematopoietic System**

**Spleen:** 189 gms (✓) Normal ( ) Congested ( ) Other: _____
**Lymph Node:** (✓) Normal ( ) Adenopathy: _____
**Thymus:** ∅ gms ( ) Normal ( ) Congested ( ) Other: _____
**Bone Marrow:** Neg

Ex. 19.006

**7. Endocrine System**
Adrenal: _____
Thyroid: _____
Pituitary: _____

**8. Central Nervous System**
Scalp: ( ) Normal ( ✓ ) Other: _(L) parietal scalp_
_Laceration w/ abrasion x 2_
Cranium: ( ) Normal ( ) Other: _w/ subgaleal_
_hemorrhages_
∅ Fx

Brain: _1254_ gms
Leptomeninges ( ✓ ) Congested ( ) Pale ( ) Inflamed ( ) Subarachnoid hemorrhage
Dura: ( ✓ ) Normal ( ) Epidural ____ gms ( ) Subdural ____ gms
Gyrii: ( ✓ ) Normal ( ) Flattened ( ) Atrophy: _____
LT Hemisphere: ( ) Normal ( ) Other: _____

RT Hemisphere: ( ) Normal ( ) Other: _____

Corpus: ( ✓ ) Normal ( ) Other: _____
Edema: ( ) None ( ) Mild ( ) Moderate ( ✓ ) Severe ⎤ global edema
Herniation: ( ) No ( ✓ ) Yes Uncal: LT/RT/Both ⎦ moderate
 Tonsillar: LT/RT/Both Cingulate: ∅ LT/RT _____
Ventricles: ( ✓ ) Normal ( ) Abnormal CSF: ( ✓ ) Clear ( ) Cloudy ( ) Blood
 ( ) Hydrocephalus: Mild/Moderate/Severe Comm/NonComm/Ex-Vacuo
Arteries: ( ✓ ) Normal ( ) Berry - Location: _____
 Atherosclerosis: ( Mild ) ( ) Moderate ( ) Severe _min plaques_
Spinal Cord: ( ✓ ) Not Examined ( ) Examined: _____

**9. Tissue/Organ Harvesting** ∅
Tissue: Cornea: LT/RT/Both Eyes: LT/RT/Both Heart Valves
 Skin: _____
 Bones: _____
 Other: _____
Organs: Kidney: LT/RT/Both Lung: LT/RT/Both
 Heart Liver Pancreas Spleen

NOTES: (1) Medical Hx: (1) HTN
 (2) Pacemaker Insertion
 (Scene) prone on living room floor
 (inside doorway)
 Body — ✓ silver colored duct tape — (legs)
 ✓ silver colored duct tape — wrist
 (behind back)
 ✓ duct tape — (L) face

Rx: 1) Clonidine (catapres) (HTN) 6 Chlordiazepoxide
 antihtn [2] Amitriptyline (Elavil)
 [3] Rofecoxib (Vioxx) — NSAID
 4 Hydroxypropyl — ophtalmic
 5 Bacitracin — Antibiotic

Page | 7
Ex. 19 007

## V. SPECIMENS/EVIDENCE COLLECTED

### 1. Biological:

Blood  1. **30** mL   Fluoride /Non-Fluoride   (AORTA)   FV   SCV   HEART   CHEST: LT/RT   SUBD
      2. **30** mL   Fluoride /Non-Fluoride   AORTA   (FV)   SCV   HEART   CHEST: LT/RT   SUBD
      3. _____ mL   Fluoride /Non-Fluoride   AORTA   FV   SCV   HEART   CHEST: LT/RT   SUBD

Urine   ( ) No   (✓) Yes **5** mL
    Urine Dipstick   (a) Glucose: Negative/Positive _____mg%   (b) Ketones: Negative/Positive _____mg%

Other Fluids:   (a) Vitreous **5** mL   (b) Gastric _____ mL   (c) Bile _____ mL
    (d) Other _____

Tissue:   (✓) Formalin   ( ) Cassettes _____   ( )   ( ) Whole Eyes LT/RT in formalin
    ( ) Brain in Formalin   ( ) Other Organs in Formalin _____   ( ) Frozen _____

Biology: (✓) DNA swabs on FTA-paper x **1**   (✓) Red top tube   (✓) Purple top tube

Hair:   (✓) Scalp   ( ) Facial   (✓) Pubic   ( ) Other _____

Nails:   (✓) Left hand   (✓) Right hand (Cuttings/scrapings)

Sexual: Swabs   ( ) Vaginal _____   ( ) Oral _____   ( ) Anal _____   ( ) Perianal _____
    Smears ( ) Vaginal _____   ( ) Oral _____   ( ) Anal _____   ( ) Perianal _____
    Hair   ( ) Pubic hair combed   ( ) Pubic hair pulled

Cultures   ( ) Blood _____ Aerobic/Anaerobic   ( ) CSF _____ Aerobic/Anaerobic
    ( ) Tissue _____   ( ) Other _____

Other: _____
_____

### 2. Physical:

Photos: **27** digital frames

X-Ray   ( ) Yes x _____   1. _____   2. _____   3. _____
    4. _____   5. _____   6. _____

Clothing ( ) None   (') Released   (✓) Preserved   All/Partial _____

Prints   (✓) Fingerprints x **2**   (✓) Palmprints x **1**

SEM Stubs   ( ) Left palm   ( ) Left dorsal   ( ) Right palm   ( ) Right dorsal
    ( ) Other _____

Bullet   ( ) No   ( ) Yes x _____
    1. _____   2. _____
    3. _____   4. _____
    5. _____   6. _____

Shotgun   ( ) No   ( ) Yes   ( ) Birdshot   ( ) Buckshot x_____   ( ) Wad x _____

Ligature   ( ) No   ( ) Yes   ( ) Neck   ( ) Wrist bind x _____   ( ) Ankle bind x _____

Paint   ( ) No   ( ) Yes _____

Glass   ( ) No   ( ) Yes _____

Other: _____
_____
_____
_____
_____

Ex. 19 008

# EXHIBIT 20

# DECLARATION OF PATRICK GARNER

1. My name is Patrick Garner. I am an attorney licensed to practice in Texas. I obtained my J.D. from Southern Methodist University Dedman School of Law in 2007.

2. At the time of Tilon Carter's trial in 2006, I was a legal intern for Richard Alley. Mr. Carter was represented by Mr. Alley and Santiago Salinas. I interned for Mr. Alley for around 2 to 3 years. I was a legal intern in the months leading up to and for the duration of trial. I attended both phases of the trial.

3. As a legal intern, I attended defense team meetings and meetings between trial counsel and the State. The lead prosecutor was Tarrant County Assistant District Attorney Lisa Callaghan. After one meeting between trial counsel and ADA Callaghan in her office that I attended, ADA Callaghan accused me of stealing records off of her desk. I had of course not taken anything and nothing ever came of her accusation.

4. As a legal intern, I helped trial counsel leading up to and during trial. Cause of death was the focus of the defense theory at trial. Mr. Carter's statements to police were that the victim, James Tomlin, had been alive when Mr. Carter and his co-defendant left the home. The defense team retained Dr. Charley Harvey as an expert forensic pathologist to challenge cause of death. The defense team, to my knowledge, P.G. did not hold any materials about the autopsy or death investigation back from Dr. Harvey because it was important that he have all the information relating to cause of death within the defense's possession.

5. During the guilt phase, while Alley and Salinas were conducting hearings, P.G. I returned a missed call from Dr. Harvey. He informed me that he did not believe he would be helpful as far as challenging cause of death. I then relayed this information to trial counsel. Had Dr. Harvey been able to provide helpful testimony to challenge cause of death, we would have called him to testify at the guilt phase of trial.

1

P.G.

6. I do not recall the defense team ever discussing that James Tomlin had a pacemaker at the time of death. Had this information been known to the defense team, it would have been communicated to Dr. Harvey.

7. As a legal intern, I was also assigned to go to the Tarrant County District Attorney's Office and copy the discovery provided by the State. I was required to copy the materials under the supervision of a DA's Office employee. The State did not have an open file policy, and I was permitted to copy only the materials provided. Those materials were then made part of trial counsel's files. If a particular document is not in trial counsel's files, it is because it was not provided by the State. and I was therefore not permitted to copy it.

8. During trial, I was struck by Mr. Carter's low intellectual functioning. It was something that was discussed a lot leading up to and during the punishment phase of trial.

My name is Patrick Garner, my date of birth is ████ ███ , and my address is _____

██████████████████████████████ .

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Tarrant County, Texas on  11-6-2025  (date).

_Patrick Garner_
PATRICK GARNER
Declarant

2

Ex. 20 002

# EXHIBIT 21

**Ayman Itani**

| | |
|---|---|
| **From:** | Carol A. Lawson |
| **Sent:** | Thursday, April 27, 2017 12:54 PM |
| **To:** | Mark C. Kratovil; Polly S. Maxwell |
| **Cc:** | Tarr J. Wilson; Ayman Itani |
| **Subject:** | 0403742 - Homicide |
| **Attachments:** | 0403742-Homicide-Request for Records-From School of Law.pdf |

Received faxed request for records; please see enclosed. This is a homicide case, therefore submitting to your office.

Tarr J or Ayman will have the file and access to the reports, to send to you.

The requestor is asking for basically "everything in the file." I do not see a subpoena for these, so therefore, would not send everything as they have requested.

Thank you.

*Carol Ann Lawson*
Executive Assistant/PIO
**Tarrant County Medical Examiners Office**
**and Forensic Laboratories**
**200 Feliks Gwozdz Place**
**Fort Worth, TX 76104-4919**
Office hours: M-F 8:00 a.m. to 4:30 p.m.(CST)
☎ **817-920-5700 Ext. 8340** *(If urgent matter outside office hours, please dial "5" for immediate assistance)*
(*After-hours/weekends/holidays* —PIO requests - I will assist you as time permits; if urgent matter, please call the office so that I may be reached)
**FAX 817-920-5713**
✆ CALawson@TarrantCounty.com
**RECORDS requests:** tcmerecords@tarrantcounty.com
**VITAL STATISTICS requests** (DCs, Cremation Permits): funeralhomesinfo@tarrantcounty.com
**CPS Notifications:** CPS_Notifications@tarrantcounty.com

**TCME Case Data/Info Public Web Site:** https://mepublic.tarrantcounty.com/MEPublic/
**TCME General Information:** http://www.tarrantcounty.com/en/medical-examiner.html?linklocation=Departments&linkname=Medical Examiner

Note: This e-mail (including any attachments) is confidential and may be legally privileged. If you are not an intended recipient or an authorized representative of an intended recipient, you are prohibited from using, copying or distributing the information in this e-mail or its attachments. If you have received this e-mail in error, please notify the sender immediately by return e-mail and delete all copies of this message and any attachments. Thank you.

Ex. 21 001

| | |
|---|---|
| **From:** | Tarr J. Wilson |
| **Sent:** | Friday, April 28, 2017 2:13 PM |
| **To:** | Polly S. Maxwell |
| **Cc:** | Mark C. Kratovil; Ayman Itani; Carol A. Lawson |
| **Subject:** | RE: Response to Schonemann, Raoul - OR, 17-04-0376 |

Ayman,
Print this off and match to file. Confirm receipt of this email.

**From:** Polly S. Maxwell
**Sent:** Friday, April 28, 2017 10:56 AM
**To:** rschonemann@law.utexas.edu
**Cc:** Mark C. Kratovil; Tarr J. Wilson; Ayman Itani; Carol A. Lawson
**Subject:** Response to Schonemann, Raoul - OR, 17-04-0376

Dear Mr. Schonemann:

ACDA Mark Kratovil is in receipt of your request for a copy of the autopsy report of James Eldon Tomlin directed to the Tarrant County Medical Examiner's Office. In response to same, please see the attached autopsy and toxicology reports. Thank you.

*Polly S. Maxwell*
*Legal Assistant*
*Tarrant County Criminal District Attorney's Office – Civil Division*
*Tim Curry Criminal Justice Center*
*401 West Belknap, 9th Floor*
*Fort Worth, Texas 76196-0201*
*(817) 884-1495; (817) 884-1675 fax*
*E-mail psmaxwell@tarrantcountytx.gov*

———————————

**Sharen Wilson**
**Criminal District Attorney**
**Tarrant County, Texas**



CONFIDENTIALITY NOTICE: This electronic transmission and any documents or other writings sent with it may contain information that is confidential, proprietary and/or privileged. It is intended for the sole use of the intended recipient. If you have received this communication in error, please promptly notify the sender at the Tarrant County Criminal District Attorney's Office by reply email and destroy the original message. Any inadvertent disclosure does not constitute a waiver of

Ex. 21 002

**Tarr J. Wilson**

Dear Mr. Schonemann:

We are in receipt of your inquiry regarding the complete file in possession of the Tarrant County Medical Examiner's Office. Please be advised that in order to obtain copies of photographs, we would need to have either a subpoena or a signed, notarized letter from the legal next-of-kin authorizing release of the photographs. As you can imagine, our highest priority is to protect the privacy of all parties. Therefore, this procedure is necessary to make sure that we are releasing this sensitive material only to the legal next-of-kin. Since 27 exam photographs were taken, the cost of reproducing same is $155.00 for a CD or $7.00 per photograph.

If you are still interested in obtaining said photographs, you will also need to enclose a ***cashier's check or money order*** in the amount of $155.00 made payable to the **"Tarrant County Medical Examiner's Office."** All information, including the next-of-kin letter needs to be mailed to the following individual for proper processing:

Tarr J. Wilson, Records Custodian
Tarrant County Medical Examiner's Office
200 Feliks Gwozdz Place
Fort Worth, Texas 76104

Upon receipt, the Tarrant County Medical Examiner's Office will mail the photos to the address you have selected in your request. Finally, a subpoena is required in order to obtain histology/micro slides prepared by the TCME. We would need you to provide us with the name of an expert or laboratory where the slides should be sent along with a federal express or other account number as the TCME does not pay shipping costs.

It is the policy of the TCME to release information only when they have received the proper documentation for their file. This is especially true in homicide cases. Thank you and if you have any questions, please do not hesitate to call.

*Polly S. Maxwell*
*Legal Assistant*
*Tarrant County Criminal District Attorney's Office – Civil Division*
*Tim Curry Criminal Justice Center*
*401 West Belknap, 9th Floor*
*Fort Worth, Texas 76196-0201*
*(817) 884-1495; (817) 884-1675 fax*
*E-mail psmaxwell@tarrantcountytx.gov*

**Sharen Wilson**

Ex. 21 003

***Criminal District Attorney***
***Tarrant County, Texas***



CONFIDENTIALITY NOTICE: This electronic transmission and any documents or other writings sent with it may contain information that is confidential, proprietary and/or privileged. It is intended for the sole use of the intended recipient. If you have received this communication in error, please promptly notify the sender at the Tarrant County Criminal District Attorney's Office by reply email and destroy the original message. Any inadvertent disclosure does not constitute a waiver of the attorney-client privilege or any other privilege. Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication or any attachment(s) by anyone other than the intended recipient is strictly prohibited.

---

**From:** Schonemann, Raoul D [mailto:rschonemann@law.utexas.edu]
**Sent:** Saturday, April 29, 2017 4:52 PM
**To:** Polly S. Maxwell
**Cc:** Mark C. Kratovil; Tarr J. Wilson; Ayman Itani; Carol A. Lawson
**Subject:** RE: Response to Schonemann, Raoul - OR, 17-04-0376

Dear Ms. Maxwell and Mr. Kratovil,

Thank you for your prompt response to my PIA request directed to the Tarrant County Medical Examiner's Office dated April 25, 2017.

I appreciate you providing me with copies of the autopsy and toxicology reports in response to my request. I am writing to clarify that my PIA request was for the entire Medical Examiner's case file related to this case, and to specifically request the following documents and materials:

(1) Electronic images or color photocopies of all photographs taken by Tarrant County Medical Examiner (TCME) personnel or anyone working at the TCME's direction in connection with this death investigation;

(2) Electronic images or color photocopies of all histology slides or micro slides prepared by the Tarrant County Medical Examiner or anyone working at the TCME's direction in connection with this death investigation;

(3) Any and all histology documents and records, including any and all notations made in connection with the examination or analysis of any tissue samples or histology slides or micro slides by Tarrant County Medical Examiner personnel or anyone working at the TCME's direction (e.g., an external clinical histology laboratory) in connection with this death investigation.

My office will pay reasonable fees or costs associated with preparation of these materials. Please let me know if there will be any such fees or costs and I will make arrangements to submit payment to your office immediately.

Please feel free to contact me if you need any other information from me in connection with this request. I can be reached at the phone number or email address indicated below.

Thank you very much for your assistance.

Sincerely,

Raoul Schonemann
Capital Punishment Clinic

Ex. 21 004

University of Texas School of Law
727 East Dean Keeton Street
Austin, TX 78705
(512) 232-9391 office
(512) 471-3489 fax
rschonemann@law.utexas.edu

---

**From:** Polly S. Maxwell [mailto:PSMaxwell@tarrantcountytx.gov]
**Sent:** Friday, April 28, 2017 10:56 AM
**To:** Schonemann, Raoul D <rschonemann@law.utexas.edu>
**Cc:** Mark C. Kratovil <mckratovil@tarrantcountytx.gov>; Tarr J. Wilson <tjwilson@TarrantCounty.com>; Ayman Itani <AItani@TarrantCounty.com>; Carol A. Lawson <CALawson@TarrantCounty.com>
**Subject:** Response to Schonemann, Raoul - OR, 17-04-0376

Dear Mr. Schonemann:

ACDA Mark Kratovil is in receipt of your request for a copy of the autopsy report of James Eldon Tomlin directed to the Tarrant County Medical Examiner's Office. In response to same, please see the attached autopsy and toxicology reports. Thank you.

*Polly S. Maxwell*
*Legal Assistant*
*Tarrant County Criminal District Attorney's Office – Civil Division*
*Tim Curry Criminal Justice Center*
*401 West Belknap, 9th Floor*
*Fort Worth, Texas 76196-0201*
*(817) 884-1495; (817) 884-1675 fax*
*E-mail psmaxwell@tarrantcountytx.gov*

---

**Sharen Wilson**
**Criminal District Attorney**
**Tarrant County, Texas**



CONFIDENTIALITY NOTICE: This electronic transmission and any documents or other writings sent with it may contain information that is confidential, proprietary and/or privileged. It is intended for the sole use of the intended recipient. If you have received this communication in error, please promptly notify the sender at the Tarrant County Criminal District Attorney's Office by reply email and destroy the original message. Any inadvertent disclosure does not constitute a waiver of

Ex. 21 005

# EXHIBIT 22



Office of Chief Medical Examiner
Tarrant County Medical Examiner's District
Tarrant County, Texas
200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919
(817) 920-5700  FAX (817) 920-5713

# AUTOPSY REPORT

**Name:** James Eldon Tomlin
**Approximate Age: 89 years**
**Height: 69 inches**

**CASE NO: 0403742**
**Sex: Male**
**Weight: 154.6 pounds**

I hereby certify that on the twenty ninth day of April 2004, beginning at 1000 hours, I, Nizam Peerwani, M.D., pursuant to Statute 49.25 of Texas Criminal Code, performed a complete autopsy on the body of JAMES ELDON TOMLIN at the Tarrant County Medical Examiner's District Morgue in Fort Worth, Texas and upon investigation of the essential facts concerning the circumstances of the death and history of the case as known to me, I am of the opinion that the findings, cause and manner of death are as follows:

**FINDINGS:**

I.  Decedent discovered lying prone on living room floor of a private residence with:
   A. Body clad in navy blue Jeans, long-sleeved stripped shirt, black belt and pair of blue socks
   B. Hands bound behind back with gray duct tape
   C. Feet bound with gray duct tape wrapped over socks
   D. Evidence of smothering with:
      1. Patterned mucosal contusions of upper lip with edema
      2. Orbital edema, upper eyelids
      3. Marked leptomeningeal congestion, with cerebral edema
      4. Generalized visceral congestion
   E. Multiple cutaneous injuries including:
      1. Two superficial lacerations of left parietal scalp with surrounding contusion and subgaleal hemorrhage
      2. Abrasions of right malar surface and anterior chin
      3. Focal abrasion with faint contusion of right anterior shoulder
      4. Contusion of posterior right arm
II.  Hypertensive atherosclerotic cardiovascular disease with:
   A. Cardiomegaly (weight = 455.5 gms)
   B. Left ventricular hypertrophy
   C. Multi-focal occlusive coronary atherosclerosis with 70-80% stenosis
   D. Arteriolonephrosclerosis, bilateral, severe
   E. Generalized atherosclerosis, moderate-to-severe

_0203742_
James Eldon Tomlin

<u>FINDINGS</u> (Continued)

| | |
|---|---|
| III. | Centrilobular pulmonary emphysema, bilateral, moderate, with prominent pulmonary anthracosis |
| IV. | Chronic cholecystitis with lithiases |
| V. | Nodular hyperplasia of the prostate, moderate-to-severe |
| VI. | Senile cerebral atrophy, moderate, with hydrocephalus ex-vacuo |

**CAUSE OF DEATH:** SMOTHERING WITH POSITIONAL ASPHYXIA

**MANNER OF DEATH:** HOMICIDE

Signature

Nizam Peerwani, M.D.
*Chief Medical Examiner*

## GROSS ANATOMIC DESCRIPTION

I.   **CLOTHING AND PERSONAL EFFECTS:** The body is presented to the Morgue wrapped in a white sheet and clad in:
1.   Navy blue Jeans
2.   Long sleeved  gray-green stripped button-up shirt
3.   Black belt with plain yellow metal buckle
4.   Pair of blue socks
5.   White briefs

Submitted with the body in a brown paper bag is a pair of black shoes (slip-on loafers) and a large blue disposable sheet. The hands are bound behind back with gray duct tape multiple times in a figure-of-eight, whereas the feet are bound with gray duct tape wrapped over socks multiple times with legs placed evenly. In addition, there is a small strip of gray duct tape adherent to the left cheek. In addition, there are assorted personal items in the clothing as well as a watch.

This Examiner enlisted the assistance of Mr. Ron Singer, Ms. Kelly Belcher, Ms. Patricia Eddings as well as Mr. Bill Bailey to recover and preserve trace evidence, personal items and binding material.

II.   **THERAPEUTIC INTERVENTION:**   None.

III.   **EXTERNAL BODY DESCRIPTION:** The body is that of a normally developed elderly white male appearing the stated age of 89 years with a body length of 69 inches and body weight of 154.6 pounds.  Body presents medium build with average nutrition, normal hydration and good preservation.  There is fading rigor with developed anterior fixed lividity of normal color.  Body is cold to touch post refrigeration.  Head is covered by short, wavy, sandy gray hair with receding anterior hairline and without balding. Left parietal scalp lacerations with contusion is noted. Face is shaven with focal facial abrasions.  There is slight body hair of male pattern distribution.  Eyes are closed with cloudy bulbar and palpebral conjunctivae and without tache noire. There is prominent conjunctival edema as well as left bulbar sub-conjunctival hemorrhage.  Irides are green with white sclerae.  Cataracts are not identified. Arcus senilis are absent.  Pupils are equal at 3 mm.  Orbits appear normal.  Nasal cavities are unremarkable with intact septum. Oral cavity presents upper and lower dentures with prominent

_____0403742
James Eldon Tomlin

edema of the upper lip as well as three mucosal patterned contusions each measuring 3/8 inch by 1/4 inch. Good oral hygiene characterized by absence of gingival disease. Ears are unremarkable with no hemorrhage in the external auditory canal. Neck is supple and there are no palpable masses. Chest is symmetrical with mild barrel configuration. Abdomen is scaphoid and palpation non-revealing. Upper and lower extremities are equal and symmetrical presenting cyanotic nailbeds without clubbing. Edema is absent. There are no fractures, injuries, deformities or amputations present except those described. A focal area of senile ecchymosis of posterior right is present measuring 4 inches by 1-1/2 inches. External genitalia present descended testicles with uncircumcised penis. The back reveals dependent lividity with contact pallor.

In addition, following observations are made:
1.  Soft tissue indentations of left and right knees
2.  Presence of duct tape glue with fragments of blue fabric material coating the anterior right distal leg as well as the posterior right leg
3.  Healing contusions including:
    a.  Small abrasions with scab along the dorsal left forearm measuring 3/8 inch in diameter
    b.  Faint yellow contusion with healing abrasion of right distal anterior leg, measuring 1-1/2 inches by ¼ inch
    c.  Faint focal yellow contusion with abrasion of right distal posterior leg measuring 3/8 inch by ¼ inch
    d.  Faint focal yellow contusion with abrasion of left lateral ankle measuring ½ inch by 3/8 inch

SCARS:
1.  Left upper chest measuring 1-3/4 inches
2.  Right antero-lateral arm measuring 2-1/2 inches
3.  Irregular scar of dorsal right forearm covering a surface 7 inches by 2 inches
4.  Left anterior arm measuring 3 inches

TATTOOS: None

CUTANEOUS INJURIES:
1.  Two superficial lacerations of left parietal scalp measuring 5/15 inch and ¼ inch with abrasions and surrounding contusion covering a surface 2 inches by 1-1/2 inches. There is underlying subgaleal hemorrhage with cranial fractures, intra-cerebral hemorrhage or cerebral contusions.
2.  Abrasions of right malar surface and anterior chin measuring 2 inches by

 0403742
James Eldon Tomlin

· 1-3/4 inches, and ¾ inch by ½ inch respectively
3. Focal abrasion with faint contusion of right anterior shoulder measuring ¼ inch
4. Contusion of posterior right arm measuring 2 inches by 1-1/2 inches

## IV. INTERNAL EXAMINATION

**1. INTEGUMENTS**: A Y-shaped thoraco-abdominal incision is made and the organs are examined in situ and eviscerated in the usual fashion. The subcutaneous fat is normally distributed, moist and bright yellow. The musculature of the chest and abdominal area is of normal color and texture.

**2. SEROUS CAVITIES:** The chest wall is intact without rib, sternal or clavicular fractures. The pleura and peritoneum are congested, smooth glistening and essentially dry, devoid of adhesions or effusion. There is no scoliosis, kyphosis or lordosis present. The left and right diaphragms are in their normal location and appear grossly unremarkable. Pericardial sac is intact smooth glistening and contains normal amounts of serous fluid.

**3. CARDIOVASCULAR SYSTEM:** The heart is enlarged and weighs 455.5 gms and there is concentric left-sided chamber hypertrophy without dilatation. Left ventricular wall is 2.1 cms and the right 0.5 cms. Cardiac valves are unremarkable with the aortic, mitral, pulmonary and tricuspid valves having a circumference of 7.5, 13, 8 and 13 cms respectively. The coronary ostia are in the normal anatomical location leading into moderate-to-severely narrowed coronary arteries due to atherosclerosis with multi-focal 70-80% stenosis. Right dominant circulation is present. The endocardial surface is smooth without thrombi or inflammation. Sectioning of the myocardium presents no gross evidence of ischemic changes either of recent or remote origin. The aortic arch along with the great vessels present moderate-to-severe generalized atherosclerosis. Congenital cardiac anomalies are absent.

**4. PULMONARY SYSTEM:** The neck presents an intact hyoid bone as well as thyroid and cricoid cartilages. Larynx is comprised of unremarkable vocal cords and folds, appearing widely patent without foreign material, and is lined by smooth, glistening membrane. Epiglottis is a characteristic plate-like structure without edema, trauma or pathological lesions. Both the musculature and the vasculature of the anterior neck are unremarkable. Trachea and spine are in the midline presenting no traumatic injuries or pathological lesions.

0403742
James Eldon Tomlin

Lungs are hyper inflated and together weigh 1451 gms. Both the lungs appear severely congested and edematous and on sectioning frothy edema fluid can be easily expressed. There are no gross pneumonic lesions or abnormal masses identified. Moderate centrilobular emphysema is present The tracheobronchial tree contains large amounts inspissated frothy edema fluid and pulmonary arterial system is unremarkable without thrombo-emboli. Pleural surface black and fibrotic due to anthracosis.

**5.    GASTROINTESTINAL SYSTEM:**    Esophagus is intact with normal gastro-esophageal junction and without erosions or varices. Stomach is also normal without gastritis or ulcers. Stomach is devoid of food particles. Loops of small and large bowel appear grossly unremarkable. The appendix is unremarkable.

Liver is of normal size and weighs 1356 gms presenting a brown smooth glistening surface.    On sectioning the hepatic parenchyma is brown, homogeneous and congested. Gallbladder is presents chronic cholecystitis with lithiases consisting of multiple black stones along with 20 mL of thick green bile. Biliary tree is patent. Pancreas weighs 213 gms and presents a lobulated yellow cut surface without acute or chronic pancreatitis.

**6.    GENITOURINARY SYSTEM:** Left and right kidneys weigh 137.6 gms and 132.7 gms respectively. The capsules strip with difficulty and the cortical surfaces are granular, brown, glistening and congested.    On sectioning the cortex presents a reduced thickness of 0.2-0.3 cms above the medulla. The renal columns of Bertin extend between the well demarcated pyramids and appear unremarkable. The medulla presents normal renal pyramids with unremarkable papillae. The pelvis is of normal size and lined by gray glistening mucosa. There are no calculi. Renal arteries and veins are normal.

The ureters are of normal caliber lying in their course within the retro peritoneum and draining into an unremarkable urinary bladder containing 5 mL of urine. External genitalia present a uncircumcised penis without hypospadia, epispadias or phimosis. There are no infectious lesions or tumors noted. The descended testicles are of normal size encased within an intact and unremarkable scrotal sac and on palpation abnormal masses or hernias are not present. The prostate is of normal size and shape and sectioning presents normal two lateral lobes with thin median lobe forming the floor of the unremarkable urethra. There are no gross pathological lesions.



7.   **HEMATOPOIETIC SYSTEM:**  Spleen weighs 189 gms presenting a grey smooth capsule and on sectioning reveals a reddish-brown soft splenic pulp. There is hilar lymphadenopathy with reactive black nodes measuring 1-2 cms in diameter.  Bone marrow is red and firm and thymus gland is involuted.

8.   **ENDOCRINE SYSTEM:**  Thyroid gland is of normal size and shape presenting two well-defined lobes with connecting isthmus and a beefy brown cut-surface. There are no goitrous changes or adenomas present. Adrenal glands are of normal size and shape and sectioning present no gross pathological lesions. Pituitary gland is encased within and intact sella turcica and presents no gross pathological lesions.

9.   **CENTRAL NERVOUS SYSTEM:**  A scalp incision, craniotomy and evacuation of the brain is carried out in the usual fashion. Scalp is intact without contusions or lacerations.  Calvarium is likewise intact without bony abnormalities or fractures.

Brain weighs 1254.6 gms presenting severe congestion of the leptomeninges. Overlying dura is intact and unremarkable.  Cerebral hemispheres reveal a normal gyral pattern with prominent global edema.  Brainstem and cerebelli show similar changes with bilateral moderate uncal and cerebellar tonsillar notching. Circle of Willis is patent presenting no evidence of thrombosis or berry aneurysm. On coronal sectioning of the brain the ventricular system is symmetrical and contains clear cerebrospinal fluid.  There are no space occupying lesions present.  Spinal cord is not examined.

Ex. 22 007

 0403742
James Eldon Tomlin

## SPECIMENS AND EVIDENCE COLLECTED

1.  30 mL of aortic blood, 30 mL of femoral vein blood, 5 mL of vitreous and 5 mL of urine for toxicology
2.  Representative tissue sections in formalin
3.  Twenty seven digital exam photos
4.  Blood in red top and purple top tubes and blood card
5.  Pulled scalp and pubic hair
6.  Fingernail cutting from left and right hands
7.  Fingerprints and palmprints
8.  Clothing
9.  Assorted personal items including miscellaneous papers, wallet as well as watch recovered by the Trace Lab
10. Trace material as well as DNA swabs collected by Trace Lab

EDC             June 29, 2004
Dictated/Typed: June 4, 2004
Completed:      June 4, 2004
NSP:np

ME-54   GPC-1744   REV. 10/97

Case No: 0403742

Examiner: Peerwani



Bulbar subconj hemorrhag

Edema eyclids

Abr = 2 x )3/4"

focal mucosal cont = 3/8 x 1/4 x 3

5 1/16

1/4"

abr = 3/4 x 1/2

Cont = 2 x 1 1/2

Abr = 3/4 x 3/8

6 G ← 2"

4 - 29 - 04

Ex. 22 009

# Office of Chief Medical Examiner
## Tarrant, Denton and Parker Counties, Texas
200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919 ◆ (817) 920-5700

ME-18 GPC-1953 Rev. 8/00

Examiner: _Breens and_    Autopsy No. _04-03742_



abr = 1/4" w/ faint cont.

S = 1 3/4"

Scar = 3'

S = 2 1/2

abr = scab = 3/8"

Cont = 2 x 1 1/2

SE = 4 x 1 1/2

Irreg Scars = 7"

Soft tissue indentation

Q 1/2

Soft tissue indentation

Yellow abr = 1 1/2 x 1/4

duct tape glue w/ blue fabric

Yellow abr = 1/2 x 3/8

Yellow abr = 3/8 x 1"

duct tape glue w/ fragments of blue fabric

Yellow abr = 4 1/2" x 3/8"

4-29-04

# C E R T I F I C A T E   O F   A N A L Y S E S

OFFICE OF THE CHIEF MEDICAL EXAMINER
CRIMINALISTICS LABORATORIES
200 FELIKS GWOZDZ PLACE
FORT WORTH, TEXAS 76104

NIZAM PEERWANI, M.D., DABFP
CHIEF MEDICAL EXAMINER
RONALD L. SINGER, M.S.
CRIME LABORATORY DIRECTOR

## T R A C E   A N A L Y S E S   L A B O R A T O R Y

NAME: James Tomlin                    PRIORITY: 1
TCME NUMBER: 0403742
DATE OF ANALYSIS: 29 April 2004
REQUESTED BY: Nizam Peerwani, M.D.

COMPLETED BY: Patricia C. Eddings, Kelly L. Belcher, M.S.
        And Ronald L. Singer

### Examination of body for trace evidence:

A white male with grey hair was observed face down with the
hands bound behind the back on a gurney in the major case morgue.
A brown paper bag containing a large blue sheet and a pair of
black slip-on loafers accompanied the body.  The decedent was
wearing a long-sleeved green striped button-up shirt, dark blue
pants, a black belt with a yellow metal buckle, dark blue socks,
and a pair of white briefs.  The hands were bagged.  Grey duct
tape was observed wrapped "loop" style around both ankles and
"figure-8" style around the wrists.  An additional strip of tape
was observed adhering to the left cheek of the decedent.  A
white/yellow metal "Benrus" elastic band wristwatch was observed
partially covered by tape on the left wrist.

The left rear pocket of the pants contained a blue comb and
a black tri-fold wallet with ID, checks, and at least one $100
bill (contents not inventoried due to potential fingerprint
analysis).  The left side pants pocket contained one ink pen, two
sets of key rings with keys, and one pair of nail clippers.  The
right rear pocket of the pants contained two folded paper towels.
The right side pocket of the pants contained a key ring with
keys, a pocket knife, a broken piece of black plastic, and $3.82
in change (12 quarters, 5 dimes, 3 nickels, and 17 pennies).  The
left front shirt pocket contained a small prescription bottle
with numerous assorted pills, two packaged bandaids, and numerous
business cards and assorted papers secured by a rubberband.

The left ring finger of the decedent was absent.  Apparent
blunt force trauma was observed to the upper right cheek, mouth,
and head of the decedent.

The following items were recovered and maintained by the trace evidence laboratory.

| | |
|---|---|
| Item 3: | Trace material from posterior pants |
| Item 4: | Trace material from posterior shirt |
| Item 5: | Trace material from socks |
| Item 6: | Trace material from face |
| Item 7: | Trace material from anterior pants |
| Item 8: | Trace material from hands |
| Item 9: | Fingernail Cuttings - Right Hand |
| Item 10: | Fingernail Cuttings - Left Hand |
| Item 11: | Possible carpet fibers from left side pocket of pants |
| Item 12: | Swabs from right palm for DNA |
| Item 13: | Swabs from left palm for DNA |
| Item 14: | Swabs from neck for DNA |
| Item 15: | Known Scalp Hair |
| Item 16: | Known Pubic Hair |

The custody of all other items was maintained by Nizam Peerwani, M.D.

ANALYST:

Patricia C. Eddings
Senior Trace Analyst

Kelly L. Belcher, M.S.
Trace Analyst

APPROVED BY:

Ronald L. Singer, M.S.
Crime Laboratory Director

# CERTIFICATE OF ANALYSES

OFFICE OF THE CHIEF MEDICAL EXAMINER
CRIMINALISTIC LABORATORIES
200 FELIKS GWOZDZ PLACE
FORT WORTH, TEXAS 76104
(817) 212-7028

NIZAM PEERWANI, M.D., DABFP
CHIEF MEDICAL EXAMINER
RONALD L. SINGER, M.S.
CRIME LABORATORY DIRECTOR

## LATENT PRINT LABORATORY

**NAME:** Tomplin, James
**CASE #** 0403742

**PRIORITY:** (1)

**DATE OF REQUEST:** 29 April 2004
**REQUESTED BY:** Nizam Peerwani, M. D.

**AGENCY #:** 04049162

**DATE OF COMPLETION:** 29 April 2004
**COMPLETED BY:** Bill Bailey

**REQUEST FOR ASSISTANCE:** This examiner received a request to attempt to recover latent prints from the body (skin) of the deceased. The body is viewed, in the morgue, at the Tarrant County Medical Examiner's Office as that of an adult Caucasian male.

**PROCESS PROCEDURE:** The arms and neck area is processed using fluorescent powder

**EXAMINATION:** ALS

**RESULTS:** The arms and neck area are each processed for latent prints using fluorescent powder and then examined using a fluorescent excitation light source with negative results.

**ANALYST:** Bill Bailey
Latent Fingerprint Examiner

**APPROVED BY:** Ronald L. Singer, M.S.
Crime Laboratory Director

Ex. 22 013

T?S

## Investigator's Report

CASE #: 0403742          TYPE: Jurisdiction          IDENTITY: Identified

NIZAM PEERWANI, M.D.                          DARRELL THOMPSON
CHIEF MEDICAL EXAMINER          CHIEF FORENSIC DEATH INVESTIGATOR

---

DECEASED: James Eldon Tomlin
ADDRESS: 3008 Mims , Fort Worth, TX 76112

| | | |
|---|---|---|
| AGE: 89 | BIRTH DATE: 08/25/1914 | MARITAL STATUS: Widowed |
| PHONE: | RACE OR COLOR: White | SEX: M |
| HEIGHT: | WEIGHT: | |
| SSN: | MANNER OF DRESS: striped long sleeved shirt, black pants, black socks, black shoes | |

OCCUPATION:
PLACE OF EMPLOYEMENT:

DATE OF DEATH: 04/28/2004   TIME OF DEATH: 14:11
PLACE OF DEATH DESCRIPTION: living room floor
ADDRESS OF DEATH: 3008 Mims , Fort Worth, TX 76112

HOSPITALIZED: No          ENVIRONMENT CONDITION: indoors, not controlled, 78 deg.
CHARACTERISTIC OF PREMISES: private residence

---

DATE/TIME M.E. NOTIFIED: 04/28/2004 16:08
ARRIVED: 04/28/2004 16:46
REPORTING PERSON: Det. S. Johnson
REPORTING AGENCY: Fort Worth PD
ADDRESS:
PHONE:
PRONOUNCED DEAD BY: Medstar
PRONOUNCING AGENCY: Medstar
LAST TREATED BY:

---

DATE/TIME OF OCCURENCE: 4-27-2004  1500
INJURY AT WORK: No
PLACE OF OCCURENCE: private residence
UNINCORPARATED PRECINT: no
LOCATION: 3008 Mims , Fort Worth, TX 76112
TRAUMA RELATED: yes

---

IDENTIFIED BY: John Briggs
IDENTIFICATION TYPE: By Person
DATE/TIME OF IDENTIFICATION: 04/28/2004 14:11
COMMENTS: found by next of kin
ADDRESS:
PHONE: (817)578-8135

---

NEXT OF KIN NOTIFICATION DATE/TIME: 04/28/2004 14:11
NOTIFIED BY: Medstar
NOTIFYING AGENCY: Medstar
NEXT OF KIN NAME: Pat Wilson
RELATIONSHIP: Daughter
COMMENTS:
ADDRESS: 4001 Paluxy Hwy, Granbury, TX 76048
PHONE: 8175788135

Ex. 22 014

MEDICATIONS:

Clonidine prescribed by Dr. Beverly Greer-Simpson of the VA
Amitriptyline prescribed by Dr. Virgil Cox of the VA
Rotecoxib prescribed by Dr. Martin Henry of the VA
Hydroxypropyl prescribed by Dr. M. Trevino of the VA
Bacitracin prescribed by Dr. John Smith of the VA
Chlordiazepoxide HCL prescribed by Dr. Virgil Cox of the VA
None of the prescriptions were seized as evidence by this investigator.

DETAILS OF INCIDENT:

SCENE ACTIVITY / OBSERVATIONS:

Photographs are taken of the decedent and of the scene by this investigator. The
hands are bagged at the scene by this investigator and the body was placed on a clean
white sheet to preserve trace evidence.

To the right of the decedent was a claw hammer with a wooden handle. There was
blood on the handle. Lying on top of the hammer was a pair of glasses with blood on
them. A roll of silver colored duct tape was found near the doorway.

INTERVIEWS:

An interview is conducted with Detective S. Johnson of Fort Worth PD who stated
that Deborah Wilson, daughter, last spoke with the decedent yesterday at about 1500
hours. The other daughter, Pat Wilson, came by today at 1411 hours to check on the
decedent. She found the side door open and the decedent as described. EMS and
police were called to the scene. Medstar pronounced the decedent upon arrival.

Detective Johnson said the decedent had been robbed and burglarized several times
in the past. The doors to the residence had multiple padlocks or hasps on them. It is
unknown if anything was missing from the residence at this time. When officers
arrived on scene they found two stove burners turned on and the house very warm.
Crime scene officers were still processing the scene and the case was still under
investigation.

ADDITIONAL INFORMATION:

Tarrant County Medical Examiner protocol is explained to Pat Wilson and an
information pamphlet is provided.

PROPERTY:

No property is removed from the decedent due to a trace evidence collection request.

DETAILS OF INSTRUMENT CAUSING INJURY:

Claw hammer with wooden handle
Disposition: seized as evidence by officers

ORGAN/TISSUE DONOR STATUS:

A request has not been made to harvest organs/tissue at the time of the report.

FOLLOW UP INVESTIGATION REQUIRED:

Obtain a copy of the police report.

COMMENTS:

Detective Hardy requests that trace evidence collection be completed.

The decedent was placed in the major case examination room pending trace evidence
collection. The body was left in the prone position to preserve the bindings on the
wrists. Dr. Peerwani was advised of the case and approved leaving the body in the
prone position. Pat Eddings and Bill Bailey were notified of the trace evidence
request.

John P. Briggs, D-ABMDI
Forensic Death Investigator

## TARRANT COUNTY MEDICAL EXAMINER'S DISTRICT
## SERVING TARRANT, PARKER, & DENTON COUNTIES

### INVESTIGATOR'S REPORT

| | |
|---|---|
| NIZAM PEERWANI, M.D. | DARRELL THOMPSON |
| CHIEF MEDICAL EXAMINER | CHIEF FORENSIC DEATH INVESTIGATOR |
| Case Number: 0403742 | Case Type: Jurisdiction |

DECEDENTS NAME: JamesEldonTomlin        AGE: 89
ADDRESS: 3008 Mims
BIRTH DATE: 08/25/1914 00:00      MARITAL STATUS: Widowed      PHONE: ()-

CASE NO. 0403742                Tarrant County

The decedent is an 89-year old White male with a known medical history of a pacemaker and high blood pressure. He was found deceased in his residence with trauma to the head. A claw hammer with blood on it was found near the body. His hands and feet were bound with duct tape and there was duct tape on his face. Fort Worth PD is investigating this incident.

### DESCRIPTION OF BODY:

This medical investigator observed the decedent lying prone on a living room floor just inside a doorway entrance. There was no evidence of medical intervention. Visible trauma to the body is observed to the head. The body is cool to the touch. Rigor is present, well developed and not easily movable. Lividity is present with contact pallor on the anterior side. Lividity was gravity dependent, not blanchable, and consistent with the position seen. There is a white colored substance or purge in the mouth and nostrils.

There is silver colored duct tape wrapped around the lower legs. The arms are pulled behind the back and the wrists are bound together in silver colored duct tape. There is a piece of silver colored duct tape on the decedent's left side facial area.

There is blood on the posterior right arm sleeve of the decedent.

### MEDICAL HISTORY:

The daughter, Pat Wilson, said the decedent had a past history of a pacemaker placement and high blood pressure. The decedent was a VA patient that frequented the Fort Worth clinic and the Dallas VA Hospital. The decedent had been in a car wreck about two months ago and the airbag deployment injured his arms slightly. He had been to a Dr. Henry in Arlington due to this injury.

## Investigator's Report

CASE #: 0403742          TYPE: Jurisdiction          IDENTITY: Identified

NIZAM PEERWANI, M.D.                                    DARRELL THOMPSON
CHIEF MEDICAL EXAMINER          CHIEF FORENSIC DEATH INVESTIGATOR

BODY TO: Morgue Services                    CONVEYANCE:
FUNERAL HOME:

NAME OF RELEASING AUTHORITY:          RELATIONSHIP:

DISPOSITION OF PROPERTY:

MEDICAL INVESTIGATOR: John Briggs

Ex. 22 018

# EXHIBIT 23

IN THE 371ST DISTRICT COURT
TARRANT COUNTY, TEXAS

CAPITAL CASE

|  |  |  |
|---|---|---|
| TILON LASHON CARTER, | § | Trial Cause No. 0949973D |
|  | § |  |
|  | § | Tarrant County Writ No. W011057 |
| Applicant. | § |  |
|  | § | CCA Writ No. WR-77,722-03 |
|  | § |  |

**DECLARATION OF DR. MICHAEL BADEN**

1.      I, Michael M. Baden, M.D., submit this Declaration in support of Applicant's request to have the Tarrant County Medical Examiner prepare microscopic slides from tissues removed at the autopsy of James Eldon Tomlin to be able to more scientifically evaluate the cause of his death.

2.      I am a physician, Board-certified in Anatomic Pathology, Clinical Pathology and Forensic Pathology.  I have served as the Chief Medical Examiner of New York City and as the Chief Forensic Pathologist for the New York State Police.  I have held professorial appointments to teach pathology and forensic pathology at New York University School of Medicine, Albert Einstein Medical School, Albany Medical College, John Jay School of Criminal Justice and New York Law School. Attached is a copy of my *curriculum vitae*.

3.      I have reviewed the autopsy and toxicology reports, scene and autopsy photographs, death certificates, Dallas and North Texas Veteran's Hospital medical

records, laboratory reports, Statements of Tilon Carter, Affidavit and statements of Leketha Allen, the report of Dr. Charles Harvey and TLC reporter records, relative to the death of James Eldon Tomlin.

4.     Mr. Tomlin, 89 years old, had a history of severe heart disease with intermittent complete third degree heart block that required the insertion of a permanent double-barreled cardiac pacemaker in his left upper chest in 2002.

5.     This pacemaker had been routinely interrogated (examined electronically) on April 5, 2004 at the Dallas Veteran's Affairs Hospital and it was found to be intact and fully functional; it was properly controlling Mr. Tomlin's cardiac rhythm.

6.     The presence of the pacemaker and the wires extending from it into the chambers of the heart were missed at the autopsy.  Pacemakers can be interrogated after removal from the body, as they are interrogated during life, and the memory information collected, which would include the heart rhythm while he was dying. This information, if obtained from Mr. Tomlin's pacemaker, would have been of value in determining if he had died of a cardiac event or of suffocation or positional asphyxia.

7.     The autopsy report documents that Mr. Tomlin's coronary arteries were 80% narrowed by occlusive atherosclerotic plaques.  Such severe coronary artery narrowing is the major cause of death in the United States.  However, although, according to the autopsy report, "Representative tissue sections in

Ex. 23 002

formalin" were collected as part of the autopsy, specifically to be made into histologic slides, they have not yet been made. They can still be prepared from the formalin fixed tissues. The examination of such slides under the microscope is a necessary and important part of a complete autopsy (*see* Bibliography 1, 2, 3 and 4).

8.     The microscopic examination is needed to assist in determining if Mr. Tomlin had suffered a myocardial infarction – a heart attack – in the past or during the robbery, important information in determining cause of death.

9.     It is my opinion, beyond a reasonable degree of medical certainty, based on the above materials that I have reviewed and on my education, training and experience as a forensic pathologist, that a microscopic examination of the tissues removed at Mr. Tomlin's autopsy would be of great value in more accurately determine the cause of Mr. Tomlin's death and whether Mr. Tomlin's death was intentional or due to an unanticipated fatal cardiac event.

_____
Michael M. Baden, M.D.

Dated:   10 July 2018

Ex. 23 003

<u>BIBLIOGRAPHY</u>

Statements from four (4) lead forensic pathology textbooks:

1. Jason Payne-James, *et al.*, <u>Encyclopedia of Forensic and Legal Medicine</u> (2005, pgs. 485-493):

"Histology is essential:

1. to confirm the nature of lesions found by the naked eye, and to assess their extent and severity accurately.

2. to identify those lesions not visible to the naked eye.

3. to date injuries."

"Moreover, histologic slides and paraffin blocks preserve the evidence, because they are stored permanently."

"Thorough examination of the heart, both grossly and histologically, is essential in forensic practice."

2. Bernard Knight, <u>Forensic Pathology</u> (1991, pg. 29):

"In most autopsies and inevitably in all criminal or litigious cases, the pathologist will need to carry out a histological examination on a range of tissues, even if only to exclude the possibility of some occult natural disease." (Disease that cannot be seen with the naked eye.)

3. Lester Adelson, <u>The Pathology of Homicide</u> (1974, pg. 23):

"Pertinent lesions and vital organs should be examined histologically."

"From the forensic standpoint, a slide which contributes positive or negative data for establishing cause, manner, circumstances and other pertinent facets of death investigation primarily for medicolegal purposes should be regarded as a permanent, objective anatomic record, available for whatever studies and consultation the examiner requires."

-4-

4.    David Dolinak, <u>Forensic Pathology, Principles and Practice</u> (2005, pg. 69):

"The autopsy report usually contains the following separate sections:

External examination
Evidence of therapy
Evidence of injury
Internal examination
Microscopic examination
Toxicology
Summary of findings
Cause and Manner of Death"

Ex. 23 005

# Michael M. Baden, M.D.

Dr. Michael Baden is the former Chief Medical Examiner of New York City and past Co-Director of the New York State Police Medico-Legal Investigations Unit. He received a B.S. Degree from the City College of New York and an M.D. Degree from New York University School of Medicine. He trained in internal medicine and pathology at Bellevue Hospital Medical Center where he was intern, resident and Chief Resident. He has been a medical examiner for forty-five years and has performed more than 20,000 autopsies. He has held professorial teaching appointments at Albert Einstein Medical School, Albany Medical College, New York University School of Medicine, New York Law School and John Jay College of Criminal Justice. He has been a consultant to the Federal Bureau of Investigation, Veteran's Administration, Bureau of Alcohol, Tobacco and Firearm's, Drug Enforcement Agency and the United States Department of Justice.

He was Chairman of the Forensic Pathology Panel of the U.S. Congress Select Committee on Assassinations that re-investigated the deaths of President John F. Kennedy and Dr. Martin Luther King, Jr. in the 1970s. He was the forensic pathologist member of a team of U.S. forensic scientists asked by the Russian government to examine the newly found remains of Tsar Nicholas II, Alexandra and the Romanov family in Siberia in the 1990s. He has been an expert in multiple Iraq-related court martials in the United States and Camp Liberty, Baghdad. He has also been an expert in the investigations concerning Medgar Evers, John Belushi, Yankee Manager Billy Martin, Marlon Brando's son Christian Brando, O.J. Simpson, Jayson Williams, Kobe Bryant, Robert Blake, and Las Vegas hotel owner Ted Binion. He has investigated deaths in Poland, Croatia, Serbia, Israel, the Gaza Strip and the West Bank, Monaco, Panama, England, Canada, Zimbabwe and other countries for human rights groups and private attorneys. He has taught homicide courses for police, judges, attorneys and physicians in most of the 50 states as well as in China, Taiwan, Kuwait, Australia, France, Italy, Ecuador, Puerto Rico, Columbia and other countries. He has been a member of the board of directors of a number of drug abuse and alcohol abuse treatment programs where he attempts to apply what he has learned from the dead at the autopsy table to the betterment of the living.

Dr. Baden has also served as President of the Society of Medical Jurisprudence and Vice President of the American Academy of Forensic Science. He was the host of the HBO "Autopsy" series for thirteen years, which demonstrated how the various forensic sciences assist in solving crimes and was a consultant for the "Crossing Jordan" television series. He has been author or co-author of more than 80 professional articles and books on aspects of forensic medicine and two popular non-fiction books "Unnatural Death, Confessions of a Medical Examiner" and "Dead Reckoning, the New Science of Catching Killers." He is also the author, with his wife, attorney Linda Kenney Baden, of two recent forensic thrillers, "Remains Silent" and "Skeleton Justice." He is the Forensic Science Contributor for FOX News Channel and is a reviewer for the New England Journal of Medicine.

# MICHAEL M. BADEN, M.D.

15 West 53ʳᵈ Street, Suite 18
New York, New York 10019

Telephone: (212) 397-2732              Facsimile: (212) 397-2754

E-mail: MBaden@mac.com

## CURRICULUM VITAE

### EDUCATION

- The City College of New York             (1955)  B.S. Degree
- New York University School of Medicine    (1959)  M.D. Degree

### POST-GRADUATE TRAINING

1959-1960          Intern, First (Columbia) Medical Division, Bellevue Hospital

1960-1961          Resident, First (Columbia) Medical Division, Bellevue Hospital

1961-1963          Resident, Pathology, Bellevue Hospital

1963-1964          Chief Resident, Pathology, Bellevue Hospital

### LICENSURE

- New York State Medical License             (1960)
- Diplomate, National Board of Medical Examiner's    (1960)
- Diplomate, American Board of Pathology:
  - Anatomic Pathology                  (1965)
  - Clinical Pathology                  (1966)
  - Forensic Pathology                  (1966)

### PROFESSIONAL POSITIONS

1985-2011          Director, Medicolegal Investigations Unit, New York State Police

1961-1985          Office of Chief Medical Examiner, New York City; Chief Medical Examiner (1978-1979)

1981-1983          Deputy Chief Medical Examiner, Suffolk County, New York; Director of Laboratories, Suffolk County, New York

## TEACHING APPOINTMENTS

| | |
|---|---|
| 1961-1989 | New York University School of Medicine, Associate Professor, Forensic Medicine |
| 1975-2001 | Visiting Professor of Pathology, Albert Einstein School of Medicine |
| 1975-1988 | Adjunct Professor of Law, New York Law School |
| 1975-1978 | Lecturer in Pathology, College of Physicians and Surgeons of Columbia University |
| 1986, 1989 | Visiting Professor, John Jay College of Criminal Justice |
| 1965-1978 | Assist Visiting Pathologist, Bellevue Hospital, New York |
| 2002 | Adjunct Lecturer, The Cyril H. Wecht Institute of Forensic Science and Law, Duquesne University School of Law |
| 2002 | Distinguished Professor/Adjunct Lecturer, Henry C. Lee Institute, University of New Haven (Connecticut) |

## GOVERNMENTAL APPOINTMENTS

| | |
|---|---|
| 1977-1979 | Chairman, Forensic Pathology Panel, United States Congress, Select Committee on Assassinations, Investigations into the deaths of President John F. Kennedy and Dr. Martin Luther King |
| 1973-Present | Member, New York State Correction Medical Review Board |
| 2015-Present | Member, New York State Justice Center for the Protection of People with Special Needs |
| 1976-2014 | Member, New York State Mental Hygiene Medical Review Board (*renamed* Justice Center for the Protection of People with Special Needs in 2015) |
| 1983-1986 | Member, National Crime Information Center, Committee on Missing Children, United States Department of Justice (F.B.I.) |
| 1971-1975 | Special Forensic Pathology Consultant, New York State Organized Crime Task Force (investigation of deaths at Attica Prison) |
| 1974-2006 | Director and/or Moderator, Annual Northeastern Seminar in Forensic Medicine, Colby College, Maine |
| 1973-1987 | Lecturer, Drug Enforcement Administration, Drug Law Enforcement Training School, United States Department of Justice |

## PROFESSIONAL ORGANIZATIONS

| | |
|---|---|
| 1966-Present | American Academy of Forensic Sciences; Fellow Vice President and Program Chairman (1982-1983) |
| 1965-Present | The Society of Medical Jurisprudence; Fellow, President (1981-1985) |
| 1966-Present | College of American Pathologist; Fellow, Chairman, Toxicology Subcommittee (1972-1974) |
| 1971-1975 | College of American Pathologists Foundation; Forensic Pathology Seminar Faculty |
| 1973-1976 | American Board of Pathology; Forensic Pathology Board Test Committee (1973-1976) |
| 1966-1986 | American Society of Clinical Pathologist; Fellow Member, Drug Abuse Task Force (1973-1977) |
| 1965-1978 | New York State Medical Society; Chairman, Section of Medicolegal and Workers' Compensation Matters (1972) |
| 1965-Present | Medical Society of the County of New York |
| 1969-1978 | National Association of Medical Examiner's |
| 1965-Present | American Medical Association |

## HONORS

- The City College of New York: Senior Class President; Editor-in-Chief of The Campus (newspaper); Phi Beta Kappa

- Honor Legion, New York City Police Department, 1969

- College of American Pathologists, Certificate of Appreciation (Chairman, Toxicology Resource Committee, 1972-1975)

- American Academy of Forensic Sciences, Award of Merit, 1974 and 1983

- Drug Enforcement Administration, United States Department of Justice, Certificate of Appreciation, 1982

-• New Jersey Narcotic Enforcement Officers Association, Certificate of Appreciation, 1977

- Fire Department of the City of New York, Certificate of Appreciation, 1978

- New York State Bar Association, Certificate of Appreciation, 1980

- New York City Health and Hospitals Corporation, Certificate of Appreciation for participation in development of emergency facilities for Emergency Medical Services for the City of New York, 1980

- New York University, Great Teacher, 1980

- First Fellow in Forensic Science of the University of New Haven, Henry C. Lee Institute, (Connecticut), 2002


## PROFESSIONAL PUBLICATIONS AND PRESENTATIONS

1.  M. Helpern and M. Baden; Editors:  Atlas of Legal Medicine by Tomio Watanabe, Lippincott, 1968

2.  D. Louria, M. Baden, et al.:  The Dangerous Drug Problem.  New York Medicine, 22:3, May 1966

3.  D. Gold, P. Henkind, W. Sturner and M. Baden:  Occulodermal Melanocytosis and Retinitis Pigmentosa.  Am. J. of Ophthalmology, 63:271, 1967

4.  B. Van Duuren, L. Lanseth, L. Orris, M. Baden and M. Kuschner:  Carcinogenicity of Expoxides Lactones and Peroxy Compounds v. Subcutaneous Injection of Rats.  J. Nat. Cancer Institute, 39:1213, 1967

5.  M. Helpern and M. Baden:  Patterns of Suicides and Homicides in New York City, Proceedings of the Seventh International Meeting of Legal Medicine (Budapest); October 1967

6.  M. Baden:  Pathology of Narcotic Addiction, Proceedings of the Sixth Latin American Congress of Pathology (San Juan, Puerto Rico); December 1967

7.  M. Baden:  The Diagnosis of Narcotism at Autopsy, Proceedings of the American Academy of Forensic Sciences (Chicago); February 1968

8   M. Baden:  Medical Aspects of Drug Abuse, New York Medicine, 24:464, 1968

9.  C. Cherubin, M. Baden, et al.: Infective Endocarditis in Narcotic Addicts.  Ann. Int. Med., 69:1091, 1968.

10. M. Baden:  Pathologic Aspects of Drug Abuse, Proceedings of the Committee on Problems of Drug Dependence, National Academy of Sciences, National Research Council, 1969.

11. W. Matusiak, L. Dal Cortivo and M. Baden:  Analytical Problems on a Narcotic Addiction Laboratory, Proceedings of the American Academy of Forensic Sciences (Chicago), February 1969

Ex. 23 010

12. M. Baden, P. Hushins and M. Helpern: The Laboratory for Addictive Drugs of the Office of Chief Medical Examiner of New York City, Proceedings of the International Conference on Poison Control (New York City), June 1969

13. M. Baden, S. Hofstetter and T. Smith: Patterns of Suicide in New York City, Proceedings of the Fifth International Meeting of Forensic Sciences (Toronto), June 1969

14. R.W. Richter and M. Baden: Neurological Aspects of Heroin Addiction, Proceedings of the Ninth International Congress of Neurology (New York City), September 1969

15. R.W. Richter and M. Baden: Neurological Complications of Heroin Addiction. Transactions of the American Neurological Association

16. M. Baden: Of Drugs and Urine, Editorial, Medical Tribune

17. M. Baden: Methadone-Related Deaths in New York City, Proceedings of the Second National Conference on Methadone Treatment (New York City), October 1969. Int. J. Addictions.

18. M. Baden: Chairman, Workshop on Techniques for Detecting Drugs of Abuse, Proceedings of the Statewide Conference on Prevention Aspects of Treatment and Research in Drug Abuse. New York City Narcotics Addiction Control Commission, 1969.

19. M. Baden: Investigation of Deaths of Persons Using Methadone, Proceedings of the Committee on Problems on Drug Dependence. National Academy of Sciences National Research Council, 1970.

20. M. Baden: The Changing Role of the Medical Examiner, Proceedings of the American Academy of Forensic Sciences (Chicago), February 1970, Med. Op. 7:64-68, 1971

21. N. Valanju, M. Baden, S.K. Verma and C.J. Umberger: Analytical Toxicological Determination of Drugs in Biological Material. I. Acidic Drugs. Acta Pharmaceutica Jugoslavica 20:11, 1970

22. M. Baden: Deaths from Heroin Addiction Among Teenagers in New York City, Proceedings of the Second World Meeting on Medical Law (Washington, D.C.), August 1970

23. M. Baden: Bullous Skin Lesions in Barbiturate Overdosage and Carbon Monoxide Poisoning (letter) JAMA 213:2271, 1970

24. M. Baden and J. Foley: Heroin Deaths in New York City during the 1960's. Int. M.J. of Legal Medicine, 5:1970

25. N. Valanju, M. Baden, S. Valanju and S. Verma: Rapid Isolation and Detection of Free and Bound Morphine from Human Urine. Int. M. J. of Legal Medicine, 5:1970

26. M. Baden: Angitis in Drug Abusers (letter), NEJM 264:11, 1971

27. M. Baden, et al.: Methadone Maintenance – Pro and Con. Contemporary Drug Problems, 1:17-152, 1971

28. M. Baden: Changing Patterns of Drug Abuse. Proceedings of Committee On Problems of Drug Dependence. NAS-NRC, 1971

29. M. Baden: Narcotic Abuse: A Medical Examiner's View. In: Wecht, C., Editor, Legal Medicine Annual, 1971 (Appleton-Century-Crofts, New York State) Reprinted New York State J. Med. 72:834-40, 1972

30. Y. Challenor, R. Richter, B. Bruun, M. Baden and M. Pearson: Neuromuscular Complications of Heroin Addiction. Proc. Am. Coll. Phys., 1971

31. C. Cherubin, M. Baden, et al.: Studies of Chronic Liver Disease in Narcotic Addicts. Proc. Am. Coll. Phys., 1971

32. M. Baden: Fatalities Due to Alcoholism. In: Keup, W., edit., Drug Abuse – Current Concepts and Research. Charles C. Thomas, Springfield, Illinois, 1972

33. L. Roizin, M. Helpern, M. Baden, M. Kaufman and K. Skai: Toxo-synpathys (a multifactor pathogenic concept) In: Keup, W., edit.,: Drug Abuse – Current Concepts and Research. Charles C. Thomas, Springfield, Illinois, 1972

34. M. Baden, N. Valanju, S. Verma and S. Valanju: Confirmed Identification Biotransformed Drugs of Abuse in Urine. Am. J. Clin. Path. 57:43-51, 1972. Reprinted: Yearbook of Path. And Clin. Path., 1973, 357-361 (Yearbook Medical Publishers)

35. M. Baden: Homicide, Suicide and Accidental Death Among Narcotic Addicts. Human pathology 3:91-96, 1972

36. J. Pearson, R. Richter, M. Baden, Y. Challenor and B. Bruun: Transverse Myelopathy as an Illustration of the Neurologic and Neuropathologic Features of Heroin Addiction. Human Pathology, 3:107-112, 1972

37. B. Bruun, M. Baden, Y. Challenor, J. Pearson and R. Richter: De-neurologic Kimplikationer Ved Heroinmisbrug Ureakuift. F. Leeger, 134:89-93

38. C. Cherubin, W. Rosenthal, R. Stenger, A. Prince, M. Baden, R. Strauss and T. McGinn: Chronic Liver Disease in Asymptomatic Narcotic Addicts. Ann. Int. Med., 76:391-395, 1972

39. M. Baden, N. Valanju, S. Verma and S. Valanju: Identification and Excretion Patterns of Propoxyphene and Its Metabolites in Urine. Proc. Comm. Prob. Drug Depend., National Academy of Sciences – National Research Council, 1972

40. R. Richter, J. Pearson, B. Bruun, Y. Challenor, J. Brust and M. Baden: Neurological Complications of Heroin Addiction. Proc. Comm. Prob. Drug Depend., National Academy of Sciences – National Research Council, 1972

41. M. Baden and B. Lutz: Preliminary Analysis of 128 Methadone-Related Deaths in New York City. Proc. Com. Prob. Drug Depend., National Academy of Sciences – National Research Council, 1972

42. L. Roizin, M. Helpern, M. Baden, M. Kaufman, S. Hashimoti, J. C. Liu and B. Eisenberg: Neuropathology of Drugs of Dependence, In: Drugs of Dependence (Mule, J.C. and Brill, H., edit.) Uniscience Series, CRC (Chemical Rubber Co.), Cleveland, Ohio 1972

43. C. Cherubin, J. McCusker, M. Baden, F. Kavaler and Z. Amzel: The Epidemiology of Death in Narcotic Addicts. Am. J. Epid., 96:11-22

44. M. Baden: Narcotic Antagonists (letter) Science 177:1152, 1972

45. M. Baden: Investigation of Deaths From Drug Abuse. Chapter in: Spitz, W.U. and Fisher, R.W., edit.: Medicolegal Investigation of Death, 1972, (Charles C. Thomas, Springfield, Illinois)

46. L. Roizin, M. Helpern, M. Baden, et al.: Methadone Fatalities in Heroin Addicts. Psych. Quarterly, 46:393-410, 1972

47. M. Baden: Suicide in Prison, Proceedings of the American Academy of Forensic Sciences, March 1973

48. L. R. Reichman, C. S. Shim, M. Baden and R. Richter: Development of Tolerance to Street Heroin in Addicted and Non-Addicted Primates. Am. J. Public Health, 63:81-803, 1973

49. M. Baden and R. S. Turoff: Deaths of Persons Using Methadone in New York City, 1971, Proceedings of the Comm. On Problems of Drug Depend., Nat. Acad. Of Sci. Nat. Res. Council, 1973

50. J. C. Huang and M. Baden: Rapid Methods of Screening Micro-Quantities of Abused Drugs from Urine Samples for Micro-Crystal Tests. Clinical Toxicology, 6:325-350, 1973

51. P. Haberman and M. Baden: Alcoholism and Violent Death. Quarterly Journal of Studies on Alcohol, 35:221-231, 1974

52. P. Haberman and M. Baden: Drinking, Drugs and Death. International Journal of the Addictions, 9:761-773, 1974

53. D. C. Wise, M. Baden and L. Stein: Postmortem Measurement of Enzymes in Human Brain: Evidence of a Central Noradrenergic Deficit in Schizophrenia (submitted for publication)

54. R. Richter, J. Pearson, M. Baden, et al.: Neurological Complications of Addiction to Heroin. Bulletin of the New York Academy of Medicine, 49:3-21, 1973

55. M. Baden and D. Ottenberg: Alcohol – The All-American Drug of Choice. Contemporary Drug Problems, 3:101-126, 1974

56. M. Baden: Pathology of the Addictive States. Chapter in: Medical Aspects of Drug Abuse, Richter, R., edit. 1975 (Harper & Row)

57. M. Baden, N. Valanju, S. Verma and S. Valanju: Detection of Drugs of Abuse in Urine. Chapter in: Medical Aspects of Drug Abuse, Richter, R., edit., 1975 (Harper & Row)

58.  D. Sohn and M. Baden:  The First Year of the College of American Pathologists Toxicology Survey Program, Amer. J. of Clin. Path., 1975

59.  M. Baden:  Narcotics and Drug Dependence by J. B. Williams, Book Review, Journal of Forensic Sciences, 1975

60.  M. Baden:  Drug Abuse, author and narrator, audio-visual presentation produced by the College of American Pathologists, 1974

61.  J. Pearson, R. Richter, M. Baden, E. Simon, et al.:  Studies on Sites of Binding and Effects of Narcotics in the Human Brain.  International Congress of Neuropathology Proceedings, Budapest, Hungary.  Excerpta Medica, 1975

62.  M. Baden and J. Devlin:  Child Abuse Deaths in New York City, Proceedings of the American Academy of Forensic Sciences (Chicago) 1975

63.  M. Baden:  Mortality from Alcoholism and Drug Abuse, Proceedings of the Second National Drug Abuse Conference, (New Orleans) 1975

64.  R. W. Richter, M. Baden, P. H. Shively, N. M. Valanju and J. Pearson:  Neuromedical Aspects of Methadone Abuse (abstract).  Neurology 4:373-379, 1975 (presented at the Annual Meeting of the American Academy of Neurology, May 3, 1975)

65.  R. W. Richter, M. Baden and J. Pearson:  Neuromedical Aspects of Narcotic Addiction.  Audio-visual presentation produced and distributed by Columbia University College of Physicians and Surgeons, 1975

66.  M. Baden:  Basic Pathology for Criminal Lawyers, Proceedings of the Virginia Trial Lawyers Association, 16:22-41, 1975

67.  M. Baden:  Contributor, Forensic Pathology, A Handbook for Pathologists; R. Fisher and C. Petty, Editors.  College of American Pathologists and National Institute of Law Enforcement and Criminal Justice, United States Government Printing Office, 1977

68.  M. Baden:  Alcohol and Violence.  Chapter in:  The Professional and Community Role of the Pathologist in Alcohol Abuse, G. Lundberg, Edit., United States Department of Transportation, National Highway Traffic Safety Administration, 1976

69.  M. Baden:  Treating the Patient in Suicide Attempts and Abused Drug Overdoses.  Physicians Assistant, 1:18-20, 1976

70.  P. Haberman and M. Baden:  Alcohol, Other Drugs and Violent Death.  Oxford University Press, 1978

71.  M. Baden:  Medical Aspects of Child Maltreatment; the Abused and Neglected Child:  Multi-Disciplinary Court Practice.  The Practicing Law Institute, 1978

72.  M. Baden:  Evaluation of Deaths in Methadone Users.  Legal Medicine Annual 1978 (Appleton-Century-Crofts)

73.  O. Bubschmann, M. Baden, et al.:  Craniocerebral Gunshot Injuries in Civilian Practice – Prognostic Criteria and Surgical Management:  Experience with 82 cases.  Journal of Trauma, 19:6-12, 1979

74.  M. Fellner, M. Baden, et al.:  Patterns of Autofluorescence in Skin and Hair.  International Journal of Dermatology, 1980

75.  S. Mackauf, M. Baden, et al.:  Anatomy for Lawyers.  New York State Bar Association Committee on Continuing Legal Education, 1981

76.  M. Baden:  The Lindbergh Kidnapping Revisited:  Forensic Sciences, Then and Now.  Journal of Forensic Sciences, 28:1035-1037, 1983

77.  M. Baden:  The Lindbergh Kidnapping:  Review of the Autopsy Evidence.  Journal of Forensic Sciences, 28:1071-1075, 1983

78.  M. Baden:  Investigation of Deaths in Custody, Proceedings of the American Academy of Forensic Sciences (New Orleans), 1985

79.  M. Baden:  Embalmed and Exhumed Bodies, in Handbook for Postmortem Examination of Unidentified Remains, M. Fierro, M.D., Ed. College of American Pathologists (in press)

80.  M. Baden, J. A. Hennessee:  Unnatural Death, Confessions of a Medical Examiner, Random House, New York 1989

81.  M. Baden, M. Roach:  Dead Reckoning, The New Science of Catching Killers, Simon & Schuster, New York 2001

82.  M. Baden:  The Role of the Medical Examiner and Coroner in the Investigation of Terrorism in Forensic Aspects of Chemical and Biological Terrorism, Lawyers & Judges Publishing Company, Inc., Tuscon, Arizona 2004.

83.  M. Baden, L. Kenney Baden:  "Remains Silent," Alfred A. Knopf, August 2005.

84.  M. Baden:  Preface in Forensic Nursing by Virginia A. Lynch.  Elsevier/Mosby, St. Louis, Missouri  2006.

85.  M. Baden:  Exhumation in Spitz and Fisher's Medicolegal Investigation of Death, 4th Edition, Charles C. Thomas, Springfield, Illinois 2006.

86.  M. Baden:  Encyclopedia of Legal Medicine, Book Review, New England Journal of Medicine, 2006.

87.  M. Baden, L. Kenney Baden:  Scientific Evidence in Civil and Criminal Cases, 5th Edition, Contributor, Foundation Press, 2007.

88.  M. Baden, L. Kenney Baden:  "Skeleton Justice," Alfred A. Knopf, June 2009.

89. R. Williams (with M. Baden, H. Lee and C. Wecht): Sherlock Holmes and the Autumn of Terror, Rukia Publishing, 2016.

## **LECTURES**

- Co-Chairman, Bring Your Own Slides, American Academy of Forensic Sciences, February, 2018

- Speaker and Panelist, Pioneers of Forensic Science, The Cyril H. Wecht Institute of Forensic Science and Law, Pittsburgh, Pennsylvania, June 1-2, 2017

- Speaker, "Drug Related Death" and "Death Harvester," Medicolegal Investigation of Death, Wayne State University, Dearborn, Michigan, May 4, 2017

- Keynote Speaker, On the Front Line: New Frontiers in Forensics, Crime and Security, New York City, April 4, 2017

- Speaker, National Medical Services speaker series, "Forensic Pathology for Toxicologists," March 2, 2017

- Speaker, New York State Bar Association, "Forensic Pathology Perspectives on Questioned Diagnoses," February 28, 2017

- Co-Chairman, Bring Your Own Slides, American Academy of Forensic Sciences, February 15, 2017

- Lecturer, Henry F. Williams Seminar, "Medgar Evers Case," Albany, New York, September 20, 2016

- Kentucky Funeral Director's Annual Meeting, "Determining Cause of Death," Louisville, Kentucky, June 30, 2016

- Mississippi Coroner's Conference, "Death Investigation," Biloxi, Mississippi, June 23, 2016

- Medicolegal Investigation of Death, Wayne State University, "Controversies in Medicolegal Cases," Dearborn, Michigan, April 28, 2016

- Keynote Speaker, Forensic Nursing Conference, Drexel University, Philadelphia, PA, April 16, 2016

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, February 26, 2016

- American Academy of Forensic Sciences, "Good Cop, Bad Cop," February 25, 2016

- Speaker, New York State Bar Association Fall Program on Forensics, "Time of Death," November 14, 2015

- Lecturer, Henry F. Williams Seminar, "Medgar Evers Case," Albany, New York, October 5, 2015

- Speaker, Markel Symposium, "Medical Examiner's Perspective in Police Shooting Incidents," West Haven, Connecticut, October 20, 2015

- NACDL/National Forensic College, "Special Problems in Forensic Pathology: Discovery, Time of Death Determinations and Cognitive Bias," Benjamin N Cardozo School of Law Cordozo Law School, New York, New York, June 8, 2015

- Medicolegal Investigation of Death, Wayne State University, "Asphyxial Deaths: Chokeholds, Sleeperholds and Back Pressure," Dearborn, Michigan, May 20, 2015

- "Confessions of a Medical Examiner," The Lotus Club, New York, New York, May 11, 2015

- Medicolegal Investigation of Death, "Asphyxial Deaths:  Chokeholds, Sleeperholds and Back Pressure," Wayne State University, Dearborn, Michigan, April 30, 2015

- American Academy of Forensic Science, "Prosecution Expert for Death in a Bathtub - Drew Peterson case," February 17, 2015

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, February 17-21, 2014

- American Academy of Forensic Sciences, "Plausible Deniability The Ethics of Inconsistent Consistency," February 17-21, 2014

- Keynote Speaker, Baruch Biomedical Society, New York, New York, October 17, 2013

- Speaker, Markle Symposium, "Medical Examiner Perspective on the Death of JFK," October 15, 2013

- Speaker, NAMFCU Annual Training, "Use of a Medical Examiner in a Nursing Home," Mobile, Alabama, October 7, 2013

- Speaker, Northeastern Association of Forensic Scientists, Cromwell, "Medical Evidence in the JFK Assassination," Connecticut, September 27, 2013

- Lecturer, Henry F. Williams Seminar, "Cold Cases with Dr. Baden," New York State Police, September 24, 2013

- "Use of a Medical Examiner in a Nursing Home Death Investigation," Resident Abuse Training Program, Virginia Beach, Virginia, June 6, 2013

- "Medicolegal Investigation of Death, "Investigating the Scene of Mass Disasters: What to Look for with Fire, Explosion or Terrorist Attack," Wayne State University, Dearborn, Michigan, May 1-3, 2012

- Children's Law Topical Conference, "When 'Abuse' is Not Abuse," Albany, New York, April 19, 2013

- "Determining Cause of Death," Making Sense of Science VI: Forensic Science and the Law, NACDL & CACJ's 6th Annual Conference, Las Vegas, Nevada April 5-6, 2013

- American Academy of Forensic Science, Panelist, "150 Years — Does Time Bring Agreement? The H.L. Hunley, the R.M.S. Titanic, and the Assassination of John F. Kennedy," Washington, D.C., February 17-24, 2013

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, February 17-24, 2013

- Speaker, Corrections and Youth Services Association Annual Meeting, Saratoga Springs, New York, October 31, 2012
- Lecturer, 21st Annual Arnold Markle Symposium, "Sexually Related Homicides," October 9, 2012

- Lecturer, Henry F. Williams Seminar, New York State Police, "Forensic Pathology," September 18-19, 2012

- Society of Professional Investigators, "Current Status of the Forensic Sciences," New York, New York, September 12, 2012

- Speaker, New York State Police Sexual Abuse Seminar, Albany, New York, May 21, 2012

- "Medicolegal Investigation of Death, "Problems in Forensic Pathology," Wayne State University, Dearborn, Michigan, May 1-3, 2012

- 2012 NASDEA Spring Conference, "Drug Deaths: Homicide v. Overdose," The Roosevelt Hotel, New York City, NY, April 24, 2012

- Concord Seminars for the Dental and Medical Professions, "Forensic Odontology," Manchester, New Hampshire and Bangor, Maine, April 20-21, 2011

- Emory School of Medicine, Grand Rounds, "Forensic Pathology: The Good, The Bad, The Ugly," Atlanta, Georgia, March 3, 2012

- Major Case Squad of Greater St. Louis Annual Retraining Conference, "Forensic Pathology," St. Louis, Missouri, March 4-5, 2012

- American Academy of Forensic Sciences, "Conflicting and Misleading Testimony in the Forensic Pathology Community," February 19-25, 2012

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, February 19-25, 2012

- Lecturer, 20th Annual Arnold Markle Symposium, "Investigation of Sex Crime: Forensic Investigation of Sexual Assault, Serial Offenders, and Sexual Abuse," October 10, 2011

- Lecturer, Henry F. Williams Seminar, New York State Police, "Forensic Pathology," September 18-21, 2011

- Speaker, Annual Investigation for Identification, New Orleans, Louisiana, August 25-26, 2011

- Lenox Hill Hospital, Medical Grand Rounds, "Controversies in Forensic Medicine," New York City, March 11, 2011

- Valley Forge Dental Conference, Keynote Speaker, "Justice Through Science," Valley Forge, Pennsylvania, March 4, 2011

- American Academy of Forensic Sciences, Communications in Forensics, "In My Experience …" February 21, 2011

- American Academy of Forensic Sciences, A Multidisciplinary Look into Forensic Science: Perspectives, Views and Experiences, "Forensic Pathology Perspectives," February 22, 2011

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, February 23, 2011

- Lecturer, "CSI: Dartmouth," University of Massachusetts/Dartmouth Law School, Dartmouth, Massachusetts, November 18, 2010

- Guest Forensic Lecturer (4 lectures), Transatlantic Crossing of the Queen Elizabeth II, November 1-8, 2010

- Lecturer, Henry F. Williams Seminar, New York State Police, "Forensic Pathology," September 27-30, 2010

- Speaker, 13th Annual Investigation for Identification, New Orleans, Louisiana, "A History of Forensic Science from Cain and Abel Through Katrina," August 27-28, 2010

- Speaker, Brigham & Women's 2010 Master Clinician Section, August 1, 2010

- Speaker, "Post-Mortem with Dr. Michael Baden," Kentucky Funeral Director's Association, Louisville, Kentucky, June 30, 2010

- Speaker, Northeast College and Universities Security Association, 57th Annual Conference, Skidmore College, Saratoga Springs, New York, June 28, 2010

- Speaker, 13th Annual Investigation for Identification, New Orleans, Louisiana, "A History of Forensic Science from Cain and Abel Through Katrina," August 27-28, 2010

- Speaker, Brigham & Women's 2010 Master Clinician Section, August 1, 2010

- Speaker, "Post-Mortem with Dr. Michael Baden," Kentucky Funeral Director's Association, Louisville, Kentucky, June 30, 2010

- Speaker, Northeast College and Universities Security Association, 57th Annual Conference, Skidmore College, Saratoga Springs, New York, June 28, 2010
*
- Lecturer, New York Prosecutor's Training Institute, Westchester, New York, June 8, 2010

- SELETS 14th Annual Law Enforcement Training Seminar, Lawrenceberg, Tennessee, June 1, 2010

- New York State Police Sex Offense Seminar, "The Forensic Sciences," Albany, New York, May 24-28-2010

- Society of Professional Investigator's Meeting, New York City, May 20, 2010

- Wayne State University, Medicolegal Investigation of Death, "Exhumation and Time of Death," and "Fire, Explosion and Mass Casualty," April 21-22, 2010

- Oswego University, "History of Forensic Science," March 25, 2010

- American Academy of Forensic Sciences, "Bring Your Own Slides," Seattle, Washington, February 22-26, 2010

- 2010 Forensic Seminar for Capital Defense Attorneys, DePaul University College of Law, February 18-19, 2010

- CSI Symposium, Norwich University, "Forensic Pathology," January 29, 2010

- NYSP Child Physical Abuse and Neglect Seminar, November 18, 2009

- New York Council of Defense Lawyers, Rye, New York, November 7, 2009

- FBI/IT Exchange Conference, Keynote Speaker, Seattle, Washington, September 20-21, 2009

- Henry F. Williams Seminar, New York State Police, "Forensic Pathology and Child Deaths," Albany, New York, September 14-17, 2009

- New York State Funeral Director's Association, Saratoga, New York, September 1, 2009

- Cabell Sheriff's Department, West Virginia (Marshall University in Huntingdon, West Virginia), August 25, 2009

- NCSTL Conference, Tampa, Florida, May 20-21, 2009

- Wayne State University, Medicolegal Investigation of Death, "Exhumation and Time of Death," and "Forensic Questions: The Experts Answer," with Werner Spitz, M.D., Dearborn, Michigan, April 22-24, 2009

- Bronx High School of Science, March 11, 2009

- American Academy of Forensic Sciences, "Bring Your Own Slides," Denver, Colorado, February 16-21, 2009

- American Academy of Forensic Sciences, "New Investigative Techniques and Scientific Advancement for Forensic Scientists in the Future," Denver, Colorado, February 16-21, 2009

- South Carolina Funeral Director's Association, "Post Mortem with Dr. Michael Baden," Columbia, South Carolina, February 4, 2009

- CSI Symposium, "Forensic Pathology," Norwich, Connecticut, January 29-30, 2009

- New York State CASA DNA Initiative Conference, Albany, New York, January 28, 2009

- Medicolegal Investigation of Death Conference, "Exhumation and Time of Death," Las Vegas, Nevada, January 5-6, 2009

- Mattapoisett (Massachusetts) Police Department, Forensic lecture, November 25, 2008

- George Mason University, "Sexually Violent Crime: the Body as Evidence," November 10-11, 2008

- Hofstra University, "An Evening of Crime and Wine," October 29, 2008

- New Jersey State Funeral Director's Association, "Post Mortem with Dr. Michael Baden," September 17, 2008

- SPIAA 57th Annual Retraining Conference, July 23, 2008

- NY Cops Foundation Annual Dinner Gala, Keynote Speaker, June 2, 2008

- New York State Police Sex Offense Seminar "The Forensic Sciences," May 2008

- Keynote Speaker, National Council of Investigation & Security Services annual meeting, May 2, 2008

- Medicolegal Investigation of Death Conference, Wayne State University, "Terrorism," April 23, 2008

- Medicolegal Investigation of Death Conference, Wayne State University, "Exhumation and Time of Death," April 23, 2008

- 17th Annual Arnold Markle Symposium, Connecticut State Police, March 23-24, 2008

- "Forensic Pathology and Living/Injured Victims," Academy for BCI Basic School (NYSP), March 11, 2008

- Lecturer, New Jersey Chapter of Int'l Assn of Arson Investigators, March 5, 2008

- American Academy of Forensic Sciences, Young Forensic Scientists Forum "Death is My Teacher," February 19, 2008

- American Academy of Forensic Sciences, "Healthcare Serial Killer Workshop," February 19, 2008

- American Academy of Forensic Sciences, "Significant Achievements and Contributions by Forensic Scientists to the International Community," February 19, 2008

- Medicolegal Investigation of Death Conference, "Postmortem Changes & Time of Death," and "Forensic Questions:  The Experts Answer," Las Vegas, Nevada, December 4-6, 2007

- 33rd Annual Arson Seminar, NYS Fire Academy, "The Role of the Forensic Pathologist in Fire Investigation," November 7, 2007

- 12th Annual Investigation for Identification Educational Conference, Pensacola, Florida, October 19-20, 2007

- Penn State University, Forensic Sciences Seminar, September 24, 2007

- Col. Henry F. Williams Homicide Seminar, "Forensic Pathology,"  September 17-20, 2007

- Harvard Medical School, Intensive Review of Internal Medicine Course, "CSI Meets IRIM – The New Science of Catching Killers," Boston, Massachusetts, July 2007

- Arizona Judicial Conference:  Forensic Pathology, 2007

- New York State Police Sex Offense Seminar "The Forensic Sciences," May 2007

- Smithsonian Associates, "Murder Investigation with Forensics:  The Good, the Bad, and the Ugly," May 2007

- Medicolegal Investigation of Death Conference, "Death Investigation" and "Fire, Explosions and Terrorism," April 24-26, 2007

- Louisiana Judicial College, "CSI Effect," April 19-20, 2007

- 16th Annual Arnold Markle Symposium 2007, "Parents who Kill:  Muchausen's by Proxy," April 9, 2007

- Harvard Medical School "Brigham Master Clinician:  Update in Medicine," "The Forensic Sciences:  From Cain and Abel to JFK to OJ Simpson," March 29, 2007

- American Academy of Forensic Sciences, "Bring Your Own Slides," February 21, 2007

- American Academy of Forensic Sciences, "Police Use of Force:  Where is the Line and When is it Crossed" February 22, 2007

- Medicolegal Investigation of Death Homicide Conference, "Asphyxias, Serial Murders and Sexual Assaults," "Death Investigations: Fire, Explosions and Terrorism," Las Vegas, Nevada, November 29-30, 2006

- American College of Trust and Estate Counsel, Westin Providence, Rhode Island, October 12, 2006

- Col. Henry F. Williams Homicide Seminar, "Forensic Pathology," September 19-21, 2006

- 57th Annual Harvard Associates in Police Science Conference, Vermont Criminal Justice Training Council, Burlington, Vermont, June 27, 2006

- SEAK National Expert Witness, "The Role of the Expert Witness: from the Expert's Perspective," Cape Cod, Massachusetts, June 23, 2006

- Mississippi Coroner's Association, Vicksburg, Mississippi, June 15, 2006

- Monmouth University, "Time of Death Determination" and "Electrocution, Explosives, and Fire-Related Deaths," Oceanport, New Jersey, June 13, 2006

- SELETS Homicide Conference, Lawrenceberg, Tennessee, June 7-8, 2006

- NYSP Sex Crimes Seminar "The Forensic Sciences," May 22, 2006

- Fermilab National Accelerator Laboratory, Colloquium, "How Long Has Grandpa Been Dead and Other Forensic Mysteries," Chicago, Illinois, May 17, 2006

- AtlantiCare Regional Medical Center, New Jersey, Keynote Speaker, 8th Annual Trauma Symposium, "Forensic Sciences, Trauma & Mass Disasters," May 2, 2006

- Medicolegal Investigation of Death Homicide Conference: "The Asphyxias, Serial Murders and Sexual Assaults," Detroit, Michigan, April 26-28, 2006

- Albany, New York, Area Association of Certified Fraud Examiners, keynote speaker, March 30, 2006

- American Academy of Forensic Sciences, "Victims & Defendants: Clinical Aspects of Their Death," February 21, 2006

- American Academy of Forensic Sciences, "The Role of the Forensic Scientist in the Investigation of Police-Related Deaths - A Current Dilemma," February 22, 2006

- American Academy of Forensic Sciences, ""Shaken Baby Syndrome: Medical Myth or Medical Fact?" February 24, 2006

- Clinical Forensic Nursing, Veterans Administration, Phoenix, Arizona, Impacting Patient Care Delivery, Quality Management and Investigations in Healthcare Settings, January 23, 2006

- Advanced Practical Homicide Seminar, "Modes of Death Involving Firearms, Knives, Blunt Force and Child Abuse," November 8-9, 2005

- Monmouth University, Oceanport, New Jersey, "Determining Time of Death" and "Fire-related Death and Electrocution and Explosions," June, 2005

- New York State Police, Sex Offense Seminar, "The Forensic Sciences," May 23, 2005

- New York State Association of County Coroners & Medical Examiners, "Violence Among Children," April 30-May 1, 2005

- Medicolegal Investigation of Death Conference, "Serial Killers, Autoerotic Asphyxias, Sexual Assault or Accident," and "Death by Fire and Explosion," Wayne State University, School of Medicine, April 20-22, 2005

- College of Mt. Saint Vincent, Department of Nursing, "Unraveling the Mystery of the Nurse Investigator," April 14, 2005.

- The National Clearinghouse for Science, Technology and the Law at Stetson University College of Law, "Forensic Pathology on Both Sides of the Pond," April 4, 2005

- Markle Symposium, Connecticut State Police Homicide Conference, Foxwoods Lodge, Connecticut, March 27-28, 2005

- The Learning Annex, "Revealing the Mysteries of Forensic Science," March 10, 2005

- American Academy of Forensic Sciences, "Complex Forensic Science Issues on Highly Controversial Cases," February 21-26, 2005

- Quinnipiac University, Law and Forensic Sciences, Hamden, Connecticut, February 5, 2005

- Duquesne University, The Cyril H. Wecht Institute of Forensic Science and Law, "Tracking Terrorism in the 21st Century," October 21-23, 2004

- Greater Cincinnati Regional Arson and Fire Investigators Seminar, "The Death Detective," October 14, 2004

- Col. Henry F. Williams Homicide Seminar, "Forensic Pathology," October 5, 2004

- Associated Licensed Detectives of New York State, Keynote speaker, October 1, 2004

- Nebraska Institute of Forensic Sciences, "Crime & Death Scene Reconstruction: Utilizing Bloodstain Pattern Analysis," September 15-17, 2004

- Southeast Law Enforcement Seminar, "Fascinating Cases of Death," June 9, 2004

- Florida Coastal School of Law, "Role of Forensic Pathology in Criminal and Civil Litigation," Jacksonville, Florida, May 7, 2004

- Wayne State University, "Medicolegal Investigation of Death," Dearborn, Michigan, April 21-23, 2004

- The Three Sleuths (with Drs. Cyril Wecht and Henry Lee), The Rio Suite, Hotel & Casino, Las Vegas, Nevada, April 17, 2004

- Annual SleuthFest Meeting, Exhumation Session, "Famous Cases," March 20, 2004

- 44th Annual American College of Legal Medicine, "The Role of the Forensic Pathologist in Medical Malpractice Cases," Las Vegas, Nevada, March 5-7, 2004

- Stetson University College of Law, "The Complete History of Murder and Science in One Hour," Gulfport, Florida, January 29, 2004

- Quinnipiac Law School, Law and Forensic Science, January 24, 2004

- The City University of New York, Graduate School and University Center, "Forensic Series," December 2, 2003

- Testified before the United States Senate Committee on the Judiciary Department of Justice Oversight: "Funding Forensic Sciences, DNA and Beyond" 2003

- Duquesne University, National Symposium on the 40th Anniversary of the JFK Assassination, "Solving the Great American Murder Mystery," November 20-23, 2003

- Smithsonian Associates, Educational and Cultural Programs, "Murder, Mystery and the New Forensics," November 1, 2003

- Association of Inspectors General, John Jay College of Criminal Justice, "Non-Traditional OIG Investigations," October 17, 2003

- Colorado Association of Sex Crimes Investigator's Annual Conference, Snowmass, Colorado, August 20-22, 2003

- 31st Annual Florida Medical Examiner Educational Conference, F.A.M.E. 2003, "The History of Forensic Science from Cain & Abel to O.J. Simpson," Ponte Vedra Beach, Florida, August 6-8, 2003

- Washington County Prosecutors Office, "Dead Man Talking: Forensic Science and Homicide Investigation," May 5 and 6, 2003

- Medicolegal Investigation of Death, Wayne State University, "Adult Sexual Assault & The Asphyxias" and "Child Sexual Assault/Abuse Myths Dearborn, Michigan, April 2-4, 2003

- New York State Trial Lawyer's Association, Wrongful Death Seminar, "Using Medical Science to Prove the Cause of Death and Conscious Pain and Suffering," March 25, 2003

- DNA Symposium, The State College of Pennsylvania, "The Role of the Forensic Pathologist regarding DNA Evidence: From Autopsy to Courtroom," March 2003

- American Academy of Forensic Sciences, "Overview of the Legal Issues Concerning the Discovery and Investigation and Prosecution of the Abuse of Elderly Patients in Healthcare Facilities and the Homicide of All Patients in Various Medical Treatment Facilities," Chicago, Illinois, February 17-22, 2003

- American Academy of Forensic Sciences, "Presentation of Specific Cases through the Initial Contact by Prosecutors Concerning Suspected Criminal Deaths through the Exhumation and the Trial" Chicago, Illinois, February 17-22, 2003

- 1st Eastern Analytical Symposium & Exposition, Somerset, New Jersey, November 18-21, 2002

- Utah County Police Officer's Workshop, November 2002

- 10th Annual Investigation for Identification Educational Conference, "New Concepts in Forensic Pathology," Pensacola, Florida, September 20-21, 2002

- Singapore Government Ministry of Health Services Administration, Centre for Forensic Medicine, August 17-31, 2002

- State of New York, Office of the Attorney General, Medicaid Fraud Control Unit, 2002 Training Conference, June 10-13, 2002, Lake Placid, New York

- Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, International Postblast Investigation Class, May 8, 2002, Brunswick, Georgia

- American Academy of Forensic Sciences, Addressing Social and Legal Issues Associated with Police Involved Shooting Incidents Through Forensic Investigation & Shooting Scene Reconstruction, February 11-15, 2002, Atlanta, Georgia

- American Academy of Forensic Sciences, Bring Your Own Slides, February 11-15, 2002, Atlanta, Georgia

- The UMKC School of Law, The History of Murder Investigation and Forensic Science, University of Missouri, Kansas City, January 24, 2002

- DNA and the Law:  Reining in the Revolution, "The Role of the Forensic Pathologist in DNA Use: From Autopsy to Courtroom," Duquesne University, November 30, 2001, Pittsburgh, Pennsylvania

- New Technologies and the Proof of Guilt & Innocence, Court TV, October 25, 2001

- 2001 Ohio Attorney General's Conference on Law Enforcement, Plenary Speaker, October 11, 2001

- The Second European-American Intensive Course in Clinical and Forensic Genetics, September 3-14, 2001, Dubrovik, Croatia

- Forensic Nursing Clinical Update, "Death Investigation, Adverse Patient Events and Evidence Collection in the Hospital Setting," August 27 and 28, 2001, Phoenix, Arizona

- Harvard Associates In Police Science, Keynote Speaker, August 20-23, 2001, 52nd Annual Conference, Annapolis, Maryland

- The Boston Strangler Case: A High Tech Hearing on the Murder of Mary Sullivan, August 4, 2001, American Bar Association Annual Meeting, Chicago, Illinois

- Emerging Technologies in Forensic Investigation, June 1-3, 2001, Nova Southeastern University, Fort Lauderdale, Florida

- The Forensic Investigation of Child Abuse and Neglect, May 30, 2001, The Family Partnership Center

- Making Communities Safer, May 21-22, 2001, New York State Alliance of Sex Offender Service Providers, Sixth Annual Training Conference, Albany, New York

- Practical Homicide and Medicolegal Death Investigation, April 9-11, 2001, Beaumont, Texas

- Police Liability in New York, May 2, 2001, Albany, New York

- Symposium on Forensic Medicine, Kuwait Institute for Medical Specialization, January 27-29, 2001, Kuwait

- Forensic Science and the Law, October 27-28, 2000, Duquesne University, Pittsburgh, Pennsylvania

- 8th Annual Investigation for Identification Educational Conference, Speaker, September 22-23, 2000, Pensacola Beach, Florida

- Advanced Practical Homicide Investigation, September 11-15,2000, <u>Southern Law Enforcement Foundation</u>, Irving, Texas

- Vision 2000: Together We Can, Funeral Service Conference of the Northwest, August 27-29, 2000, Coeur d'Alene Resort, Idaho

- Mississippi Attorney General Prosecutor's Annual Training Conference, April 26-28, 2000, Gulfport, Mississippi

- Forensic Crime Scene Analysis Training, April 28, 2000, Union County Police Chief's Association, Cranford, New Jersey

- At the Heart of the Matter: The Medicolegal Aspects of Organ and Tissue Donation, May 4, 2000, New York Organ Donor Network, Poughkeepsie, New York

- NYSBA Criminal Justice Section Spring Meeting, May 19-21, 2000, The Ethics of Scientific Evidence, Chautauqua, New York

- 2000 Dodge Seminar, March 20-23, 2000, Clearwater Beach, Florida

- Medicolegal Investigation of Death, March 16 and 17, 2000, Wayne State University School of Medicine and Michigan State Police

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| **TILON CARTER**<br>　　*Petitioner*,<br><br>v.<br><br>**ERIC GUERRERO**, Director,<br>Texas Department of Criminal<br>Justice,<br>Correctional Institutions Division.<br>　　*Respondent.* | Case No. _____ |

---

## SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

JASON D. HAWKINS
Federal Public Defender

Jeremy Schepers
Supervisor, Capital Habeas Unit

Rachel Schafer
Naomi Fenwick
Assistant Federal Public Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
rachel_schaefer@fd.org
naomi_fenwick@fd.org

## SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

Petitioner Tilon Carter, through counsel, pursuant to all rights available under the Constitution, laws or treaties of the United States, respectfully petitions this Court for a writ of habeas corpus declaring unconstitutional and invalid his conviction for capital murder as well as the resulting death sentence.

## TABLE OF CONTENTS

SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254 ............................................... i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES .................................................................. iv

PARTIES ........................................................................................... vii

STATEMENT OF FACTS ..................................................................... 1

    A. Dr. Peerwani unequivocally testified at trial that Tomlin died of smothering. ................................................................................. 3

    B. Dr. Peerwani admits that, contrary to his trial testimony, his autopsy findings do not establish that Tomlin died of smothering. .. 9

    C. The State reveals that Tomlin had a pacemaker, which would have provided evidence of time and cause of death. ......................... 11

    D. Dr. Peerwani concedes that smothering may have never occurred. .................................................................................... 13

    E. The previously suppressed evidence of the pacemaker at autopsy alters the evidentiary picture of Tomlin's health and Dr. Peerwani's conclusions about the cause of death ............................................... 16

PROCEDURAL HISTORY ................................................................... 22

CARTER MEETS THE REQUIREMENTS OF 28 U.S.C. § 2244 TO RECEIVE AUTHORIZATION TO PROCEED IN DISTRICT COURT. 24

    I. Carter can make a prima facie showing that he meets 28 U.S.C. § 2244 to receive authorization to proceed in district court on the claim that the State suppressed exculpatory information in violation of *Brady v. Maryland*. ........................................................... 25

        A. The *Brady* claim has potential merit. ......................................... 25

        B. Carter was diligent in discovering the suppressed evidence. ..... 31

        C. Carter can make a showing of innocence. ................................... 36

    II. Carter can make a prima facie showing that he meets 28 U.S.C. § 2244 to receive authorization to proceed in district court on the

claim that the State relied on false testimony by the Chief ME to obtain a conviction. .................................................................. 38

    A.  The false testimony claim has potential merit. ......................... 38

    B.  Carter was diligent in discovering the falsity of Dr. Peerwani's testimony. ...................................................................... 44

    C.  Carter can make a showing of innocence. ................................. 46

III.    Carter can make a prima facie showing that he meets 28 U.S.C. § 2244 to receive authorization to proceed in district court on the claim that the State destroyed evidence and violated *Youngblood*. ... 48

    A.  The *Youngblood* claim has potential merit. ............................... 48

    B.  Carter was diligent in pursuing evidence the State destroyed. . 56

    C.  Carter can make a showing of innocence. ................................. 60

IV. Carter can make a prima facie showing that the statute of limitations is met.................................................................... 61

PRAYER FOR RELIEF ......................................................... 63

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Arizona v. Youngblood*,
    488 U.S. 51 (1988) ...................................................... 48, 52, 56, 59, 61

*Banks v. Dretke*,
    540 U.S. 668 (2004) ...................................................................... 29, 32

*Bennett v. United States*,
    119 F.3d 468 (7th Cir. 1997) .............................................................. 25

*Brady v. Maryland*,
    373 U.S. 83 (1963) .................... 11, 23, 25, 26, 27, 28, 29, 32, 33, 54, 57

*In re Campbell*,
    750 F.3d 523 (5th Cir. 2014) .............................................................. 62

*Carter v. Stephens*,
    805 F.3d 552 (5th Cir. 2015) ...................................................... 22, 30

*Carter v. Stephens*,
    No. 4:10-cv-969-Y, 2015 WL 918677 (N.D. Tex. Mar. 4, 2015) .... 22, 29

*Giglio v. United States*,
    405 U.S. 150 (1972) ...................................................................... 38, 43

*House v. Bell*,
    547 U.S. 518 (2006) ............................................................................ 36

*Johnson v. Dretke*,
    442 F.3d 901 (5th Cir. 2006) .............................................................. 31

*McQuiggin v. Perkins*,
    569 U.S. 383 (2013) ............................................................................ 62

*In re Morris*,
    328 F.3d 739 (5th Cir. 2003) .............................................................. 25

*Napue v. Illinois*,
    360 U.S. 264 (1959) ............................................................. 38

*Schlup v. Delo*,
    513 U.S. 298 (1995) ............................................................. 62

*Strickler v. Greene*,
    527 U.S. 263 (1999) ...................................................... 26, 29

*United States v. Bagley*,
    473 U.S. 667 (1985) ............................................................. 26

*In re Will*,
    970 F.3d 536 (5th Cir. 2020) .................. 24, 31, 32, 36, 46, 60

**State Cases**

*Carter v. Texas*,
    No. AP-75,603, 2009 WL 81328 (Tex. Crim. App. Jan. 14,
    2009) ............................................................ 7, 9, 14, 22, 37

*Ex parte Carter*,
    2017 WL 4276860 (Tex. Crim. App. Sept. 27, 2017) .......... 22

*Ex parte Carter*,
    721 S.W.3d 341 (Tex. Crim. App. 2025) ...................... 23, 24

*Ex parte Carter*,
    No. WR-70,722-01, 2010 WL 5232998 (Tex. Crim. App. Dec.
    15, 2010) ............................................................................ 22

*Ex parte Carter*,
    No. WR-70,722-04, 2021 WL 1014638 (Tex. Crim. App. March
    17, 2021) ............................................................................ 23

*Louis v. Texas*,
    393 S.W.3d 246 (Tex. Crim. App. 2012) ............................. 38

**Federal Statutes**

28 U.S.C. § 2244 ...................... 24, 25, 36, 38, 44, 46, 48, 56, 59, 60, 61, 62

**State Statutes**

Tex. Code Crim. Proc. art. 11.071 ...................................................... 10, 44

Tex. Penal Code section 19.03 ................................................. 1, 2, 9, 37

**Constitutional Provisions**

U.S. Const. amend. XIV ..................................................... 38, 48

## PARTIES

Petitioner Tilon Carter is a death-sentenced prisoner in the Texas Department of Criminal Justice (TDCJ). Carter's TDCJ number is 999517 and he is incarcerated at the Polunsky Unit, Livingston, Texas.

Respondent Eric Guerrero is the Director of TDCJ's Correctional Institutions Division and agent of the State that has custody of Carter. He has custody pursuant to the judgment and sentenced of death entered against Carter on November 16, 2006, in the 371st Judicial District Court, Tarrant County, Texas.

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a). Venue is proper in the United States District Court for the Northern District of Texas under 28 U.S.C. §2241(d) because it is the court for the district within which Carter was convicted and sentenced.

## STATEMENT OF FACTS

Tilon Carter, though guilty of lesser offenses, is innocent of capital murder. Carter admits that he robbed eighty-nine-year-old James Tomlin but has always maintained that Tomlin was alive when he left Tomlin's home. 40 RR 144;[1] Ex. 9 at 2. The State's theory, however, was that Carter along with his codefendant, Laketha Allen, robbed Tomlin and that Carter then intentionally killed him, thereby committing capital murder. 42 RR 44, 70, 72. Thus to obtain Carter's capital murder conviction, the State was required to prove beyond a reasonable doubt that he intentionally caused Tomlin's death. *See* Tex. Penal Code § 19.03(a)(2).

At trial, the State's only evidence that Carter intentionally caused Tomlin's death was Chief Medical Examiner Dr. Nizam Peerwani's unequivocal testimony that "[t]he cause of death was smothering with positional asphyxia." 41 RR 195. The State hinged its capital murder case

---

[1] Carter cites to the state court record as [volume] record type [page] and uses the following record type convention: (1) RR for Reporter's Record, *Texas v. Carter*, No. 0949973D; (2) CR for Clerk's Record, *Texas v. Carter*, No. 0949973D; (3) SHRR for Reporter's Record, *Ex parte Carter*, No. WR-70,722-01; (4) SHCR for Clerk's Record, *Ex parte Carter*, No. WR-70,722-03; (5) SH2RR for Reporter's Record, *Ex parte Carter*, No. WR-70,722-03; (6) SH2CR for Clerk's Record, *Ex parte Carter*, No. WR-70,722-03.

on Dr. Peerwani's testimony: "[T]he bottom line from Dr. Peerwani . . . is that [Carter] intentionally tried to smother [Tomlin], and he died of smothering." 42 RR 77. As summarized by the State in closing: "the smothering is an intentional act, the causation is there, and [Carter] is guilty of capital murder, no matter which way it pans out." *Id.*

But Dr. Peerwani's testimony was false. As Dr. Peerwani now admits, smothering may have never occurred: "Could [smothering] have never happened? The answer is yes, it could have never happened." 6 SH2RR 115. And contrary to his trial testimony, Dr. Peerwani now concedes that his findings at autopsy do not establish that Tomlin died of an intentional act, let alone smothering. In fact, Dr. Peerwani cannot provide cause of death.

Moreover, following a trial court order for Dr. Peerwani's deposition in 2018, the State for the first time turned over Dr. Peerwani's notes from autopsy showing that Tomlin had a pacemaker at the time of his death. Neither Dr. Peerwani's autopsy report, his extensive trial testimony, nor any prior State disclosures ever mentioned that Tomlin had an implanted pacemaker at the time of death. This pacemaker recorded and stored data related to his cardiac activity in the hours preceding his death, which

would have provided valuable evidence to the jury on the critical question at trial: whether Tomlin died as a result of an intentional act of smothering, as the State alleged, or whether he died as a result of an unintentional act as the defense maintained. Yet, Dr. Peerwani released Tomlin's remains to the funeral home to be buried with the pacemaker still implanted, thus destroying it, and the State concealed the pacemaker's very existence until twelve years after trial.

> ### A.    Dr. Peerwani unequivocally testified at trial that Tomlin died of smothering.

On April 28, 2004, Carter and Allen robbed eighty-nine-year-old Tomlin in his home at 3008 Mims Street in Fort Worth, Texas. 40 RR 24-25; 41 RR 151. With duct tape, they bound Tomlin's feet together and his hands behind his back. 40 RR 40, 68-69. Hours later, Tomlin's daughter found him deceased and face down inside the front door. *Id.* at 38-39.

Law enforcement attention eventually focused on Carter and Allen. Upon his arrest, Carter admitted that he and Allen had robbed Tomlin. 40 RR 140, 143; Exs. 8, 9. Carter plainly admitted that he sat Tomlin down on the floor and duct taped his hands and feet to keep Tomlin from moving. 40 RR 141, 143-44; Exs. 8 at 1; 9 at 1. But Carter told police that Tomlin was alive when he left the house: after binding Tomlin's hands

and feet, Carter "watched him for a minute to make sure he was okay. When I left out of the house, [Tomlin] was still talking. . . . I looked back through the screen, and he was sitting up with his legs out on the ground and his hands behind him." 40 RR 144; Ex. 9 at 2.

Allen corroborated that Tomlin "was definitely alive . . . he was moving" when she left the house. 1 SHCR 110. According to Allen, Carter came of the house "within [] ten seconds." Ex. 5 at 6; *see also* Ex. 4 at 4 (Carter came "right out"); 1 SHCR 110 (Carter came out "approximately 15 seconds" after she did). Carter was therefore not alone with Tomlin for the "several minutes, maybe as much as five to ten minutes" that Dr. Peerwani testified it would have taken to intentionally smother Tomlin. *See* 41 RR 183.

Carter and Allen took two jars of coins and a long gun, and left before Tomlin could free himself or call for help. *See* 40 RR 45-48. They left behind the more than $20,000 in cash Tomlin had stashed in containers around the home and $100 in Tomlin's front pocket. *Id*. at 34-35, 54, 69. Tomlin's history suggested Carter and Allen could commit a robbery for such a paltry sum with impunity. Allen's mother, Donna Lacy, occasionally had sex with Tomlin in exchange for money. Ex. 12

at 1. She had also previously robbed Tomlin, taking both guns and money from him, before later selling the guns back to Tomlin for cash. *Id.*; Ex. 11 ¶¶3, 5. A month before his death, Lacy took "forty or fifty dollars" from Tomlin. Ex. 5 at 3. When Allen and Lacy again needed money a few weeks later, Lacy suggested stealing it from Tomlin. Exs. 5 at 4-5; 8 at 1. Tomlin never reported these thefts.

The State's trial theory, by contrast, was that Carter had killed Tomlin by intentionally smothering him after Allen left. *See* 42 RR 72-74, 76-77. The State's case hinged on Dr. Peerwani's testimony that his autopsy established that Tomlin had died of "smothering with positional asphyxia," which Dr. Peerwani characterized as "an intentional and very purposeful act." 41 RR 183, 195.

Dr. Peerwani, the Chief ME of the Tarrant County Medical Examiner's Office (TCME), performed Tomlin's autopsy on April 29, 2004. The autopsy was also attended by Fort Worth Police Department Detective Cheryl Johnson who led the investigation into Tomlin's death. 40 RR 78, 196-97; 6 SH2RR 56. The provisional autopsy form, which contains Dr. Peerwani's contemporaneous-to-autopsy handwritten notes reflect that he observed a "palpable pacemaker" in Tomlin's chest cavity,

albeit with a single lead attached to the heart. Ex. 19 at 4-5. He also noted a "pacemaker scar." *Id.* at 4. At that time, Dr. Peerwani issued a preliminary death certificate listing the "immediate cause" of death as "pending." Ex. 17. The very next day, on April 30, Dr. Peerwani released Tomlin's body for burial. Ex. 10.

Five weeks later, after requesting and reviewing law enforcement's investigation, Dr. Peerwani issued an amended death certificate changing the cause of death to "smothering with positional asphyxia."[2] Ex. 6. Around the same time, on June 4, 2004, he completed and signed an 8-page typed autopsy report. Ex. 22 at 1-8. The report listed various cardiac conditions based on Dr. Peerwani's observations of Tomlin's heart but noted only a scar on his chest. *Id.* at 4. The typed report omitted any mention that Dr. Peerwani had seen a pacemaker during autopsy. *Id.* at 1-8.

At trial, Dr. Peerwani testified that the cause of Tomlin's death was "smothering with positional asphyxia." 41 RR 195. Dr. Peerwani based

---

[2] Toxicology, the sole outstanding testing Dr. Peerwani sought following autopsy, remained outstanding at the time Dr. Peerwani ruled on a definitive cause of death determination. Ex. 2. This suggests the only additional information Dr. Peerwani obtained before issuing the amended death certificate was from law enforcement's investigation.

this conclusion on four findings, which he characterized as definitively establishing that Carter smothered Tomlin: (1) "teeth markings left along the inner surface of [Tomlin's] right upper lip," 41 RR 170; (2) orbital edema, (3) leptomeningeal (brain covering) congestion, with cerebral edema, and (4) generalized visceral (organ) congestion, *id.* at 162, 174-76. In particular, he described the teeth markings as "a very classical and typical injury . . . where a person has been smothered." *Id.* at 172; *see also id.* ("[Y]ou are seeing the inner markings of the mucosa lacerations that are very much consistent with the smothering[.]"). Dr. Peerwani also described that Tomlin had contusions or bruises from "blunt force traumatic injury" on his cheek and chin, which he distinguished from "abrasions" (scraping injuries) to other areas. *Id.* at 156-58, 160-61, 165, 173. As to Tomlin's heart, Dr. Peerwani testified, "[Tomlin] had a enlarged heart. He had hardening of his arteries . . . . Otherwise, there was no other pathology or abnormalities present internally." *Id.* at 174.

Based on these findings, Dr. Peerwani testified that Tomlin had died from "smothering with positional asphyxia." 41 RR 195, 212. He described smothering as "an intentional and very purposeful act requiring pressure to be continuously applied for several minutes." *Id.* at

183; *see also Carter v. Texas*, No. AP-75,603, 2009 WL 81328, *2 (Tex. Crim. App. Jan. 14, 2009) (describing Dr. Peerwani's testimony including evidence there was "profound and sustained pressure against Tomlin's mouth"). He elaborated that Tomlin died from someone "applying pressure to intentionally cut off [Tomlin's] air." 41 RR 181-82, 216.

In closing, the State pointed to Dr. Peerwani's testimony to establish that Carter had the specific intent to commit capital murder: "[T]he bottom line from Dr. Peerwani . . . is that [Carter] intentionally tried to smother him, and he died of smothering." 42 RR 77. The State held a full minute of silence during Dr. Peerwani's testimony, 41 RR 184-85, and harkened to it in closing argument as evidence that smothering, which required more than a minute of pressure, was a "highly intentional act," 42 RR 73-74. In particular, the State highlighted Dr. Peerwani's characterization of teeth markings inside Tomlin's lip as "classical for a case of intentional smothering." *Id.* at 41, 73-74. The State acknowledged that Dr. Peerwani had contemplated various scenarios but emphasized that "[e]ither way, the smothering is an intentional act, the causation is there, and [Carter] is guilty of capital murder, no matter which way it pans out." *Id.*

The jury found Carter guilty of capital murder for intentionally causing the death of Tomlin in the course of a robbery. 11 CR 2607; *see also Carter*, 2009 WL 81328, at *1, *3; Tex. Penal Code § 19.03 (a)(2). During the punishment phase, the State re-urged the jury to consider this smothering evidence. 50 RR 10, 13, 15-16, 42. The jury answered the special issues such that Carter was sentenced to death. 11 CR 2617-19.

> **B.  Dr. Peerwani admits that, contrary to his trial testimony, his autopsy findings do not establish that Tomlin died of smothering.**

On February 9, 2017, the State sought and obtained an Order setting Carter's execution for May 16, 2017. 1 SH2CR 149-51. That May, Dr. Peerwani admitted to Carter's then-state habeas counsel that, contrary to his unequivocal trial testimony, his autopsy findings did not establish that cause of death was an intentional act of smothering. Instead, Dr. Peerwani stated that his autopsy findings showed that: (1) positional asphyxia, not smothering, was the cause of death; (2) Tomlin experienced a prolonged death; and (3) circumstances of the offense were not consistent with Tomlin's death having been caused by an intentional act. *See* 1 SH2CR 141-47. Then-state habeas counsel Thea Posel made repeated efforts to follow up with Dr. Peerwani and obtain a

signed declaration from him recounting what he had told her, but from then on Dr. Peerwani ceased responding to counsel's communications. Ex. 16 at 1-11; 1 SH2CR 144, 172-73.

With Carter's execution looming, Carter's counsel filed a copy of her attempts to communicate with Dr. Peerwani as well as a sworn declaration recounting his statements, in support of a Subsequent Application for Post-Conviction Writ of Habeas Corpus (Application) and motion for stay of execution.[3] 1 SH2CR 9-140, 141-47. Posel then provided Dr. Peerwani with a copy of this declaration and asked him to respond with any inaccuracies. 6 SH2RR 108-09; 8 SH2RR 168. Dr. Peerwani remained unresponsive. 6 SH2RR 108. The Texas Court of Criminal Appeal (CCA) stayed Carter's execution on May 12, 2017, and authorized proceedings on, *inter alia*, Carter's claim that the State had presented false and misleading evidence through Dr. Peerwani to obtain his capital murder conviction. 1 SH2CR 177-79.

---

[3] Because Dr. Peerwani failed to respond to Posel's efforts to obtain a declaration from him and Article 11.071 of the Texas Code of Criminal Procedure does not permit pre-filing discovery, Posel provided a declaration recounting what Dr. Peerwani had said during their meeting and was thus forced to withdraw as counsel.

### C. The State reveals that Tomlin had a pacemaker, which would have provided evidence of time and cause of death.

Following remand, Carter's counsel sought and obtained court authorization to depose Dr. Peerwani on July 30, 2018. 1 SH2CR 303-04, 307. On July 29, 2018, the State turned over for the first time a copy of Dr. Peerwani's handwritten notes and provisional autopsy form from Tomlin's autopsy. *See* 1 SH2CR 417, 427-39; Ex. 19. Despite filing sixteen pre-trial *Brady* notices, *e.g.* 4 CR 775-78, 10 CR 2090-95, the State never previously turned over these materials. Nor did it turn them over in response to trial counsel's express request for "any report. . . and the underlying data, summaries, compilations . . . documents or other tangible items" by any expert witness. 1 CR 45. The State also never disclosed these documents to any other lawyer who represented Carter throughout his initial state and federal post-conviction proceedings.

These notes included previously suppressed information: Dr. Peerwani observed a pacemaker in Tomlin's chest at autopsy.



Ex. 19 at 4. Moreover, Dr. Peerwani noted only one lead attached to

Tomlin's heart, potentially indicating that the device had malfunctioned.



*Id.* at 5.

Contrary to his office's practice, Dr. Peerwani neither photographed nor sent the pacemaker to be interrogated for the data it recorded.[4] 6 SH2RR 73-75. Instead, he had left the pacemaker in place and released the body for burial. *Id.* at 75. The pacemaker, however, would have recorded time of death and provided evidence relevant to determining cause of death. Ex. 1 ¶¶25-27.

The typed report provided by the State to counsel pre-trial and in subsequent proceedings did not include Dr. Peerwani's observations of a "palpable pacemaker" and "pacemaker scar" that were recorded in his handwritten notes. Ex. 19 at 4. The typed report only mentioned a nondescript scar on the "[l]eft upper chest measuring 1-3/4"." *Compare*,

---

[4] The State took more than 130 photographs during the autopsy and investigation—including photographs of Tomlin's house keys, the contents of his wallet, the spare change in his pockets, and the soles of his shoes—but did not take a single photograph of the pacemaker.

*id.*, *with*, Ex. 22 at 4. Likewise, the ME investigator's report mentioned only a past history of a pacemaker. *Id.* at 18.

### D. Dr. Peerwani concedes that smothering may have never occurred.

At an evidentiary hearing held in state postconviction proceedings on December 3, 2019, and September 4 and 18, 2020, Dr. Peerwani testified his autopsy findings did not establish that Tomlin had died of smothering. Controverting his unequivocal trial testimony that Tomlin died as a result of an intentional act of smothering, Dr. Peerwani admits that Tomlin's death was not a "classic case of smothering." 6 SH2RR 115. Instead, he concedes that smothering "could have never happened." *Id.* He further agrees that "smothering with positional asphyxia" could not be the cause of death because the two are competing causes of death. 6 SH2RR 109, 163-64; *see also* 2 SH2CR 736-37.

He testified that none of the four signs he pointed to at trial as definitive-smothering evidence were specific to an asphyxial death at all, let alone smothering. First, the teeth indentations and injuries on the inside of Tomlin's lip do not establish smothering. At trial Dr. Peerwani testified that linear contusions and damage on the inside of Tomlin's upper lip were caused by "compression" and were "classic[]" evidence of

smothering. 41 RR 169-72. He also rejected that these injuries could have occurred from a fall or light pressure such as the weight of Tomlin's head as he lay on the floor. *Id.* at 172, 186, 201-02, 214-15; *see also Carter*, 2009 WL 81328, at *1-2 (medical examiner testimony included that inner lip injuries "would not have resulted from the impact of a fall or from the weight of Tomlin's head as he lay on the floor"). But Dr. Peerwani now testifies that these injuries on the inside of Tomlin's lip are not "specific for suffocation, or smothering" or any asphyxial cause of death. 6 SH2RR 201. Instead, he concedes that they have a variety of causes. *Id.* at 111, 201; *see also id.* at 122. And Dr. Peerwani agrees, contrary to his trial testimony, that these injuries could have been caused solely by compression from the weight of Tomlin's head laying on the ground. *Id.* at 217.

Second, Dr. Peerwani admits that orbital edema (eye swelling) is also "not diagnostic of smothering." 6 SH2RR 84. Contrary to his trial testimony, he concedes that this finding broadly indicates "respiratory or poly respiratory failure," and is "consistent with many" causes of death, including heart failure or even lying face down during the period shortly before death. *Id.* at 84-85, 201-02; *see also* 7 SH2RR 26. Far from

indicating smothering, orbital edema indicates a "prolonged" asphyxial death. By contrast, smothering "[i]s a short term event" and therefore inconsistent with orbital edema. 6 SH2RR 141; *see also id.* at 143-44, 202.

Third, leptomeningeal congestion and cerebral edema (swelling around the brain) similarly have numerous causes. 6 SH2RR 202; 7 SH2RR 28-30. They are little more than a nonspecific finding that "basically shows that there is some sort of reason for lack of oxygen to the brain." including where the heart or lungs are failing. 6 SH2RR 202. Moreover, as with orbital edema, this brain swelling indicates prolonged asphyxiation—not smothering. 6 SH2RR 110.

Fourth, visceral congestion (fluid build-up in organs) is a finding commonly seen at autopsy and is likewise not specific to smothering. 6 SH2RR 205; 7 SH2RR 30-31. As Dr. Peerwani concedes, "[p]eople dying of respiratory death by any cause could have [visceral congestion]." 6 SH2RR 95. In Tomlin, who already had heart and lung disease, Dr. Peerwani describes, "there is no specific event [visceral congestion] would associate with." *Id.* at 206.

Finally, contrary to his firm trial testimony that the injuries to Tomlin's cheek were "contusions," Dr. Peerwani agrees that they were

"obviously" abrasions. 6 SH2RR 62-64. As he acknowledges, this type of injury is commonly caused by a rub or scrape. *Id.* at 65. The nature and location of these abrasions are consistent with Tomlin being alive after the robbery and rubbing his face across the carpeted floor in an effort to free himself. *See* 40 RR 75-76; 7 SH2RR 39; 8 SH2RR. However, based on his mischaracterization of these injuries as contusions, Dr. Peerwani expressly rejected this scenario at trial. *See* 41 RR 161, 186.

In short, contrary to his trial testimony and the State's only reliable evidence of intent, Dr. Peerwani now concedes that none of the autopsy findings he emphasized as diagnostic of smothering are specific to smothering as cause of death.

**E. The previously suppressed evidence of the pacemaker at autopsy alters the evidentiary picture of Tomlin's health and Dr. Peerwani's conclusions about the cause of death.**

In his hearing testimony, Dr. Peerwani further conceded that presence of the pacemaker may well have been significant in determining Tomlin's cause of death. 6 SH2RR 81. This device indicates Tomlin likely had a "rhythm abnormality" sufficiently problematic to warrant continued pacemaker implantation. *Id.* at 72, Ex. 1 ¶11. As Peerwani acknowledges, this abnormality made Tomlin "at risk of dying of a

sudden cardiac event at any time." 6 SH2RR 71; *see also id.* at 106.

Arrythmia as a cause of death cannot be detected at autopsy; it is determined based on "prior medical information" (including heart disease history) and the circumstances surrounding the death. 6 SH2RR 88; 2 SH2CR 949 ¶11; Dr. Peerwani concedes Tomlin had various factors consistent with arrythmia: Tomlin had "a lot of other comorbidities that could have played a role at the very end." 6 SH2RR 91. Tomlin had emphysema, 70-80% narrowing of his arteries, thickening of his ventricular walls, "a bad heart, he had bad coronaries, he had bad lungs, he was in a prone position. . . . [and h]e was stressed." *Id.*, *see also id.* at 69, 88; 1 SH2CR 82, 322. In addition, Tomlin was taking the prescription drug Vioxx (generic Refecoxib) for inflammation. 6 SH2RR 92. This drug was withdrawn from the market just months after Tomlin's death because, as Dr. Peerwani acknowledges, it significantly increased heart attack risk among users and could lead to "sudden death" by arrythmia. *Id.* at 92-93. Tomlin was also taking Chlordiazepoxide, a sedating benzodiazepine that typically slows breathing. Ex. 22 at 15; *see also* 40 RR 28 (describing Tomlin's use of anti-anxiety medication). This drug was additive to Tomlin's bad lungs and "respiratory distress" from his

prone positioning. *See* 6 SH2RR 91.

"He could have had arrhythmia and died . . . I can't say he didn't do that." 6 SH2RR 90. Moreover, the pacemaker Dr. Peerwani describes "would not stop the arrhythmia" as it could not shock the heart back into rhythm. *Id.* at 72, 74. Dr. Peerwani's now-disclosed notations that he only saw a single lead from this pacemaker also suggest the device was "not hooked up correctly." *Id.* at 81. This information could have, Dr. Peerwani admits, been significant to determining Tomlin's cause of death. *Id.*

Augmenting these conditions, Dr. Peerwani admits that the prone position in which Tomlin was found, "would have impeded [Tomlin's] proper respiratory motions." 6 SH2RR 91. He agrees that it would have been "very hard" for Tomlin to right himself from this prone position. *Id.* at 105. This position along with the stress of the robbery, "plus [Tomlin's] severely diseased heart, plus his severely diseased lungs . . . would have all worked together" to restrict his breathing. *Id.* at 207. Together this made Tomlin susceptible to "fatally succumbing to the position in which he was found." *Id.* at 106.

Dr. Peerwani now also admits that "multiple findings in the autopsy supported a prolonged rather than quick death." 6 SH2RR 109-

10. Specifically, pulmonary edema (fluid in the lungs) establishes Tomlin lived for an extended period, at least 30 minutes or even an hour, after Carter left. 6 SH2RR 90-91; 1 SH2CR 129 ¶¶2, 6 (describing "a significant number of intervening minutes-to-hours between the incident and the actual death" inconsistent with smothering). This sign, along with Tomlin's orbital edema and leptomeningeal congestion, are also commonly seen with heart failure or a cardiac cause of death. 6 SH2RR 137, 168; 7 SH2RR 31-32, 67. Tomlin's lungs also contained almost a quart of excess frothy fluid, a finding "typical of congestive heart failure." *Id.* at 31; *accord* 6 SH2RR 68.

Dr. Peerwani's now-testimony widely differs from his trial testimony; it explains Tomlin's appearance and injuries and suggests Tomlin struggled to right himself while bound—after Carter left him bound and alive on the floor of his house. Tomlin's shoes had mostly fallen from his feet; only his toes remained shod. 40 RR 42. Glue from the duct tape, but no corresponding tape, appeared on his sock and pant leg, suggesting the tape pulled off in Tomlin's attempts to free himself. *Id.* at 77. The duct tape on his face had also come off and folded onto itself along Tomlin's left cheek. *Id.* at 75-76. On the other side of his face, where the

duct tape had been presumably affixed, Tomlin had abrasions to his cheek and chin:



Ex. 22 at 9. And he had three corresponding mucosal contusions on the same side—all on the right inside of Tomlin's upper lip. *Id.* This positioning and the duct tape placement, abrasions, inner-lip contusions and other physical evidence are all consistent with Tomlin attempting to loosen the duct tape from his ankles and face, resulting in abrasions on his cheek and chin from rubbing against the living room carpet. This is also consistent with the numerous fibers found on the duct tape's sticky

side. 8 SH2RR 128-29. Tomlin ultimately expired with his face turned to the left and his right cheek against the floor. *See* 40 RR 59, 67, 170; 8 SH2RR 15-16. He was lying in this position "for many hours [] after he died." 7 SH2RR 24. The weight of Tomlin's head alone, with this passage of time, was sufficient to cause the corresponding inner-lip injuries found only on the side of Tomlin's face resting against the floor. 6 SH2RR 217-18; 7 SH2RR 24; 8 SH2RR 21, 23-24, 37.

By contrast, had Tomlin been smothered, he would have had diffuse injuries across the inside of the lip rather than concentrated in one area. 8 SH2RR 26. Tomlin had a skin frailty making him more likely to bruise and exhibit such injuries. 41 RR 162-63. Had Tomlin been smothered, his teeth would have caused lacerations across his inner lip. *See* 7 SHRR 24-25. Smothering's prolonged pressure would also have dislodged Tomlin's dentures, but they were found in place at autopsy. 6 SH2RR 189, 221-23; *see also* 41 RR 184; 7 SH2RR 68.

The picture that emerges from behind Dr. Peerwani's false testimony and the State's suppressed evidence is one of an unintentional death, not the intentional capital murder of which Carter was convicted.

## PROCEDURAL HISTORY

Carter was convicted of capital murder and sentenced to death in the 371st Judicial District Court, Tarrant County, on November 15, 2006. The CCA affirmed Carter's conviction and sentence on January 14, 2009, *Carter*, 2009 WL 81328, and denied state habeas relief on December 15, 2010, *Ex parte Carter*, No. WR-70,722-01, 2010 WL 5232998 (Tex. Crim. App. Dec. 15, 2010). Carter then sought and was denied federal habeas relief, *Carter v. Stephens*, No. 4:10-cv-969-Y, 2015 WL 918677 (N.D. Tex. Mar. 4, 2015), and this Court denied a Certificate of Appealability on October 28, 2015, *Carter v. Stephens*, 805 F.3d 552 (5th Cir. 2015).

The trial court set an execution date for May 16, 2017. Carter filed a subsequent application for state habeas corpus relief on May 8, 2017. The CCA stayed the execution and later remanded two claims to the trial court for an adjudication on the merits, including that the State violated due process when it relied on false testimony by Dr. Peerwani to obtain Carter's conviction. *Ex parte Carter*, 2017 WL 4276860 (Tex. Crim. App. Sept. 27, 2017).

Upon remand, the trial court scheduled an evidentiary hearing on Carter's claims and ordered Dr. Peerwani to make himself available for deposition. On the eve of the deposition proceedings, the State disclosed

for the first time Dr. Peerwani's handwritten notes and a provisional autopsy form establishing that Tomlin had a pacemaker at the time of his death. 2 SH2CR 517; 6 SH2RR 75-76. Dr. Peerwani's deposition testimony also materially contradicted his trial testimony. Based on these new facts, Carter filed a second subsequent application for state habeas corpus relief raising, *inter alia*, claims under *Brady v. Maryland* and *Youngblood v. Arizona*, arising out of the State's suppression and destruction of Tomlin's pacemaker, and a false testimony claim arising out of Dr. Peerwani's deposition testimony contradicting his trial testimony.

The trial court held an evidentiary hearing. On March 15, 2021, the trial court concluded, *inter alia*, that Carter had shown that the State relied on false testimony by Dr. Peerwani in violation of due process and recommended that relief be granted. 3 SH2RR 1084-134.

The CCA dismissed Carter's second subsequent application on March 17, 2021. *Ex parte Carter*, No. WR-70,722-04, 2021 WL 1014638 (Tex. Crim. App. March 17, 2021). On July 30, 2025, the CCA rejected the trial court's findings and conclusions and denied relief in a 5-4 decision. *Ex parte Carter*, 721 S.W.3d 341, 346 (Tex. Crim. App. 2025).

The dissent would have adopted the trial court's findings and conclusions and granted relief. *Id.* at 363 (Walker, J., dissenting, joined by Richardson and Newell, JJ.).

Carter anticipates seeking certiorari from the CCA's July 30, 2025 decision. That application is currently due December 27, 2025.

## CARTER MEETS THE REQUIREMENTS OF 28 U.S.C. § 2244 TO RECEIVE AUTHORIZATION TO PROCEED IN DISTRICT COURT

When a petitioner seeks authorization to proceed on a second or successive habeas application, this Court performs an initial gatekeeping assessment. Under 28 U.S.C. § 2244(b)(3)(C), this Court "may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection." At this stage, the petitioner is not required to prove that he satisfies the criteria of § 2244(b), nor that he is entitled to relief on the merits of the proposed claim. Those are questions for the district court in the first instance if the petition is authorized to proceed. *In re Will*, 970 F.3d 536, 541 (5th Cir. 2020). Instead, the petitioner must make "'simply a sufficient showing of possible merit to warrant a fuller exploration by the district court'" and show that "'in light of the documents submitted with the application it appears reasonably

likely that the application satisfies the stringent requirement for the filing of a second or successive petition[.]'" *In re Morris*, 328 F.3d 739, 740 (5th Cir. 2003) (quoting *Bennett v. United States*, 119 F.3d 468, 469-70 (7th Cir. 1997)).

I.  **Carter can make a prima facie showing that he meets 28 U.S.C. § 2244 to receive authorization to proceed in district court on the claim that the State suppressed exculpatory information in violation of *Brady v. Maryland*.**

Carter has not previously raised a claim in federal habeas that the State suppressed material and exculpatory evidence concerning the Tomlin autopsy in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Section 2244(b)(1) therefore does not bar authorization.

A.  **The *Brady* claim has potential merit.**

The "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment[.]" *Brady*, 373 U.S. at 87. This violation occurs from State suppression "irrespective of the good faith or bad faith of the prosecution." *Id.* There are thus "three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and

25

prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

*Brady*'s disclosure obligations apply even where there has been no disclosure request by the defendant. *Strickler*, 527 U.S. at 280-81. And the State must learn of and disclose favorable material in its possession, as well as that of those acting on its behalf. *Id.* at 281. Evidence is material per *Brady* where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Here, despite their *Brady* obligation, the State failed to disclose that Tomlin had a pacemaker at the time of death and that one lead of this two-lead pacemaker was not visible at autopsy. Ex. 19 at 5. Dr. Peerwani recorded his observation that Tomlin had a pacemaker at the time of his death three times in the provisional autopsy form. *See id.* The autopsy report that the State turned over to Carter, however, does not mention the pacemaker in its description of Tomlin's cardiovascular system. Ex. 22 at 5. The pacemaker is similarly absent from the report's list of "clothing and personal effects" or "specimens and evidence

collected," though both list other items taken from the body at autopsy. *Id.* at 3, 8. The autopsy diagram notes only a 1-¾" scar on Tomlin's chest. *Id.* at 10.

The following facts underscore this suppression:

- Lead investigating officer, Detective Johnson, observed the autopsy. 40 RR 78, 196-97; 6 SH2RR 56. At trial, Johnson recounted numerous specific observations from Tomlin's body at autopsy but failed to mention the pacemaker. 40 RR 196-203.

- Pre-trial, the State provided Carter 18 pages purportedly containing all information from the autopsy. 9 CR 2053. The typed report omitted any information about the pacemaker. Ex. 22.

- Trial counsel requested: (1) discovery of "any report . . . and the underlying data, summaries . . . records . . . documents, or other tangible items" of State experts, 1 CR 102, 105; and (2) all *Brady* materials, including that "which would tend to be mitigating as to either the guilt-innocence or the punishment" or "tend to be exculpatory." 1 CR 92. The State represented it

had fulfilled these requests. 1 CR 95.

- Trial counsel spoke with Dr. Peerwani about the Tomlin autopsy. *See* 1 SHRR 145; Supp. SHCR 109. Dr. Peerwani and trial counsel "discussed Mr. Tomlin's health conditions. But Dr. Peerwani did not mention that Mr. Tomlin had a pacemaker at autopsy." Ex. 14 ¶7.

The State filed sixteen *Brady* disclosures before trial, including several items related to Dr. Peerwani's autopsy and findings:

- The State described the condition of Tomlin's heart in these disclosures but *never* disclosed that Tomlin had a pacemaker with only one visible lead at the time of death. Ex. 15 ¶¶9, 13; 3 CR 562; *see also* Supp. SHCR 52 (State asserting defense pathologist "review[ed] all documents, photographs, and other materials in the case"); Exs. 14 ¶7; 20 ¶4; 3 CR 629, 685; 10 CR 2100, 2114, 2121, 2139, 2182, 2216, 2245, 2305, 2322, 2351; 11 CR 2574, 2580, 2592.

- At trial, Dr. Peerwani testified that Tomlin had an enlarged heart, hardening of his arteries, and moderate emphysema of his lungs. 41 RR 174. "Otherwise, there was no other

pathology or abnormalities present internally." *Id.*

Carter reasonably relied on the State's false assertions that it had turned over all potentially exculpatory information about Tomlin's condition at autopsy. Carter was not required to "scavenge for hints of undisclosed *Brady* material" considering the State's actions and representations. *Banks v. Dretke*, 540 U.S. 668, 695 (2004). Simultaneously, the State's disclosure of *some Brady* information about Tomlin's health and his "past history" of a pacemaker suggested that there was nothing further to unearth and request. *Id.* at 693-94 (citing *Strickler v. Greene*, 527 U.S. 283-84 (1999)).

Information that Tomlin had a pacemaker and that this pacemaker had only one visible lead at the time of autopsy was material. "The manner of death was an important issue at trial because it related to the specific intent necessary to prove capital murder." *Carter*, 2015 WL 918677 at *7; *see also id.* at n.1 ("Most of every attorney's closing argument in the guilt/innocence stage focused on whether the evidence showed the specific intent to kill necessary to elevate murder to capital murder. (42 RR 34-77)"); Exs. 14 ¶2; 20 ¶4. Carter maintained, from his arrest, that he intended to "rob, but not kill, the victim." *Carter*, 2015 WL

918677 at *3. Thus at trial, the question of whether Tomlin died of smothering, "an intentional behavior," or "instead accidentally died of only positional asphyxia" was critical to the jury's determination that Carter had committed capital murder. *Carter*, 805 F.3d at 554.

Evidence that Tomlin had a pacemaker with only one visible lead would have supported the defense's case that Tomlin did not die of an intentional act. The fact that at the time of death Tomlin required a pacemaker showed that "his heart function had been sufficiently compromised." 7 SH2RR 45. The electrical signals had been "so damaged" that a pacemaker was required to provide proper blood flow. *Id.* at 11. Tomlin's heart was such that without a functioning pacemaker, "the [heart] rhythm would fail and he would die." *Id.* at 13; *see also* Ex. 1 ¶11 ("[T]he underlying rhythm of complete heart block and initial 100% pacing implies that Mr. Tomlin was effectively 100 percent ventricularly paced—his heartbeat entirely dependent on pacemaker output for ventricular activation."). The presence of only one lead on the pacemaker showed the device "somehow, [] became non-functioning . . . and made him more susceptible to dying from emotional [stressful] or physical problems." *Id.* at 45; *see also* Ex. 7 ¶¶11-12.

The fact that Dr. Peerwani observed but didn't interrogate Tomlin's pacemaker—where the decedent had several heart conditions and cause of death was the central disputed issue—was also material because it would have undermined Dr. Peerwani's credibility. The existence of the pacemaker and Dr. Peerwani's failure to remove or interrogate the device would have allowed Carter to effectively cross-examine and impeach Dr. Peerwani about: (1) the fact that neither the pacemaker nor its missing lead was recorded in the autopsy report or photographs; (2) Dr. Peerwani's emphatic assertions that Tomlin died of asphyxia and not a cardiac event, *see* 41 RR 176; (3) Dr. Peerwani's assertion that the time of death could not be determined in this case, *id.*at 207; and (4) his testimony that Tomlin had "no other pathology or abnormalities present internally" besides an enlarged heart and hardened arteries, *id.* at 174; *see also* Ex. 14 ¶¶8, 11. This would have raised significant questions for the jury as to the validity of Dr. Peerwani's conclusions.

## B.  Carter was diligent in discovering the suppressed evidence.

The diligence inquiry before this Court is whether "[t]he trial record contains [] evidence which would have put a reasonable attorney on notice." *Will*, 970 F.3d at 541. This standard is objective. *Johnson v.*

*Dretke*, 442 F.3d 901, 908 (5th Cir. 2006). But "[t]rial counsel need not assume the prosecution may be withholding information in order to exercise diligence." *Will*, 970 F.3d at 542-43; *accord Banks*, 540 U.S. at 695. Counsel "may rely, absent notice to the contrary, on representations by the prosecutor" that they have complied with *Brady*. *Will*, 970 F.3d at 542-43. To wit, petitioners need not "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Id.* at 542 (quoting *Banks*, 540 U.S. at 695).

Carter can demonstrate continued diligence both pre-trial and in postconviction proceedings. The State suppressed the fact that Tomlin had a pacemaker at the time of his death until Dr. Peerwani's 2018 deposition:

- As described above, despite filing sixteen pre-trial *Brady* notices, the State at trial failed to disclose the presence of this apparently defective pacemaker. To the contrary, through provided discovery and Dr. Peerwani's trial testimony, the State indicated there was nothing abnormal beyond that disclosed. *See* 2 SH2CR 951 ¶¶20-22. And as set out above, the State represented to the trial court and defense counsel

that it had complied with its *Brady* obligations.

- In its Reply to Carter's Application for Writ of Habeas Corpus, the State reaffirmed that Carter's counsel possessed "all documents, photographs, and other materials in the case" relating to the autopsy. Supp. SHCR 52.

- At the October 13, 2009 evidentiary hearing on Carter's initial state habeas application, defense pathologist, Dr. Charles Harvey, testified that "there was a linear scar that was present in a typical area where pacemakers are implanted, and [he had] a nagging recollection that somebody somewhere somehow said that [Tomlin] had a pacemaker at one time." SHRR 40. But Dr. Harvey testified there was no evidence in either the autopsy report or Dr. Peerwani's testimony that Tomlin had a pacemaker. *Id.* Dr. Harvey testified instead about the *lack of notation about a pacemaker* and circumstances that would lead to removal of a pacemaker, consistent with Tomlin no longer having a pacemaker. *Id.* at 40-42. The State failed to correct the false understanding that Tomlin did not have a pacemaker at the time of death.

- In federal habeas, the State re-entrenched Dr. Peerwani's falsehoods, pointing to Dr. Harvey's state evidentiary hearing testimony to show Dr. Harvey "did not dispute Dr. Peerwani's findings that Tomlin was smothered." *Carter v. Stephens*, Case No. 4:10-cv-00969, ECF No. 17 at 42 (N.D. Tex. March 27, 2012). But Dr. Harvey's findings were limited by the State's continued suppression of autopsy evidence.

- On April 25, 2017, less than a month before Carter's scheduled execution, counsel requested the medical examiner's complete file, including "the examiners' notes." Ex. 18. The State produced the autopsy report, but withheld Dr. Peerwani's notes. The TCME further instructed that the State should "not send everything as [counsel] have requested." Ex. 21.

- On May 3, 2017, Dr. Peerwani met with Carter's postconviction counsel. Counsel specifically asked about the cause of death and pre-existing health conditions. 8 SH2RR 162-63. Dr. Peerwani mentioned Tomlin's compromised health but did not disclose the existence of the pacemaker at

autopsy.

- After the CCA stayed the execution and ordered evidentiary proceedings, in October 2018, the State produced Dr. Peerwani's file but did not include the provisional autopsy form, which documented the pacemaker at autopsy. Ex. 21; 2 SH2CR 761. The State did not disclose this form until July 29, 2018, the eve of a court-ordered deposition of Dr. Peerwani. *Id.*; 5 SH2RR 10.

- On July 30, 2018, at that deposition, Dr. Peerwani admitted *for the first time* that he had observed the pacemaker at autopsy, failed to remove or interrogate the pacemaker, and instead sent it to the funeral home with Tomlin's body. 2 SH2CR 754-61.

Carter repeatedly and specifically requested all notes, test results, and exculpatory information and the entirety of the medical examiner's file. It was only after Carter was able to compel production of the entire file that the State disclosed Dr. Peerwani's handwritten notes from the autopsy. The State's responses obfuscated and falsely purported to

provide all responsive information. As such, Carter has demonstrated due diligence as required by § 2244(b)(2)(B)(ii).

## C. Carter can make a showing of innocence.

Carter can make "a prima facie showing, by clear and convincing evidence, that no reasonable factfinder would find him guilty" of the offense. *Will*, 970 F.3d at 543 (citing 28 U.S.C. § 2244(b)(2)(B)(ii)). This prima facie showing need only be "a sufficient showing of possible merit to warrant a fuller exploration." *Id.* The Court should authorize the petition where "it appears reasonably likely that" the application meets § 2244's requirements. *Id.* (internal citations omitted). In making this assessment, the Court should consider all new evidence and that adduced at trial to determine "whether it's reasonably likely that the withheld evidence would have changed the outcome." *Id.* at 543-44 & n.34 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)).

As described in the above statement of facts, the facts underlying this claim grossly alter the picture of Tomlin's health as presented at trial. Far from an elderly man whose health had sufficiently recovered such that pacemaker removal was warranted, Tomlin had a pacemaker at the time of his death. This information altered the severity of

testimony presented about Tomlin's enlarged heart, arterial narrowing, and emphysema. That the pacemaker remained implanted at a minimum underscored that Tomlin's life was dependent on its continued functioning, *see* Ex. 1 ¶11; but that Dr. Peerwani only visualized only one lead suggested that the device was no longer doing so. In other words, Tomlin was at heightened risk of dying of a cardiac event. Indeed, when confronted with the fact of the pacemaker, Dr. Peerwani now concedes he cannot exclude that Tomlin did not die of an intentional act. Moreover, Dr. Peerwani's failure to consider and document the device in determining cause of death underscored both the haphazard and biased nature of his conclusions.

Under these circumstances, the jury could not have found that Carter "intentionally cause[d] Tomlin's death." *Carter*, 2009 WL 81328, at *3; 11 CR 2601; *see also* Tex. Penal Code § 19.03(a)(2). The jury did not know about the nature or extent of Tomlin's frailties. A healthy individual would likely have survived being left in this position. 1 SH2CR 129 ¶ 3. Someone like Carter, "with no medical knowledge, could [not] have reasonably anticipated that their actions would have necessarily led to the death of Mr. Tomlin." *Id.* at ¶4; *see also* 41 RR 199. Absent evidence

that Carter's actions supported an inference that he intended to cause Tomlin's death, the jury could not that find Carter had the specific intent required to convict of capital murder. *See*, *e.g.*, *Louis v. Texas*, 393 S.W.3d 246, 251-52 (Tex. Crim. App. 2012). No reasonable factfinder would have found Carter guilty of capital murder. 28 U.S.C. § 2244(b)(2)(B)(ii).

## II. Carter can make a prima facie showing that he meets 28 U.S.C. § 2244 to receive authorization to proceed in district court on the claim that the State relied on false testimony by the Chief ME to obtain a conviction.

Carter has not previously raised a claim in federal habeas that the State relied on false testimony by Dr. Peerwani to obtain his conviction. Section 2244(b)(1) therefore does not bar authorization.

### A. The false testimony claim has potential merit.

The Fourteenth Amendment prohibits the State from eliciting testimony that it knows or should know to be false or from failing to correct misleading testimony. *Napue v. Illinois*, 360 U.S. 264, 268 (1959). To establish a due process violation, a petitioner must show that (1) the testimony was false; (2) the State knew or should have known that the testimony was false; and (3) the false testimony was material. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972). False testimony is material if

it could "in any reasonable likelihood have affected the judgment of the jury." *Id.* (internal quotation omitted).

The sole issue at guilt phase was cause of death. To prove that Carter acted with the specific intent to commit capital murder, the State relied on Dr. Peerwani's testimony. At trial, Dr. Peerwani offered three scenarios, all involving Carter smothering Tomlin: "What I can say, Counselor, is that [Tomlin] died of an asphyxial death, either is smothering, which by itself is fatal if it was carried on till -- on till he died, or it could have been attempted smothering which ended up in the death causing positional asphyxia . . . A third possibility is that he laid there in a state of positional asphyxia and was smothered at the very end." 41 RR 216. He concluded that "[t]he cause of death was smothering with positional asphyxia." *Id.* at 195. But Dr. Peerwani's trial testimony about the definitive nature of the autopsy findings supporting his proffered scenarios was false. As Dr. Peerwani testified in 2019 and contrary to his trial testimony, smothering "could have never happened." 6 SH2RR 115.

At trial, Dr. Peerwani testified that his conclusion that the cause of death involved smothering was based on five findings: (1) "teeth

markings left along the inner surface of [Tomlin's] right upper lip;" (2) orbital edema; (3) marked leptomeningeal congestion with cerebral edema; (4) generalized visceral congestion; and (5) "a contusion" on Tomlin's chin and right cheekbone, which he distinguished from "abrasions" to other areas. 41 RR 169-70, 156, 161; see Ex. 22 at 1. Dr. Peerwani firmly agreed that Tomlin died of "a respiratory event, not a cardio one" and with the State's case that Tomlin died of "an intentional act of smothering." *Id.* at 176, 216.

Dr. Peerwani now admits that none of the findings he identified to the jury as diagnostic of smothering are specific to an asphyxial death, let alone smothering: "None of these are specific to smothering." 6 SH2RR 145; *see also id.* at 84, 85. Moreover, Dr. Peerwani agrees that, to the extent these findings did result from asphyxia, they were consistent with "a finding of prolonged death" inconsistent with smothering. *Id.* at 110, 120. And with regards to his trial conclusion that Tomlin died of "smothering with positional asphyxia," Dr. Peerwani concedes that they are instead "competing causes of death." 6 SH2RR 109, 120; *see also* 2 SH2CR 737 ("They cannot be simultaneously present and cause of death.").

Additional false and misleading testimony abounds:

| Trial testimony | Testimony today |
|---|---|
| Four findings establish smothering. 41 RR 162, 174. | "[N]one" of these are specific to smothering. 6 SH2RR 145. |
| The lip markings are "a very classical and typical injury that you see . . . where a person has been smothered." 41 RR 172. | The lip markings "could be caused by many – several mechanisms," including by "an impact" or by Tomlin's head lying on the ground, and therefore do not establish smothering. 6 SH2RR 144, 120, 105, 169-70. They may be "a red herring". 6 SH2RR 143. |
| The absence of an exterior injury corresponding with the lip markings excludes the possibility of a blow to the mouth. 41 RR 173. | A blow may have left no exterior mark, 6 SH2RR 170. |
| The death was asphyxial and not a cardiac event. 41 RR 176. | Tomlin may have died of a cardiac event.6 SH2RR 88; *id.* at 91, 106. |
| The injuries to Tomlin's chin and cheekbone are "contusions." *See, e.g.,* 41 RR 156, 173. | Those injuries are "obviously" abrasions. 2 SH2CR 717. |
| "[T]here was no other pathology or abnormalities present internally." 41 RR 175. | Tomlin had a pacemaker at the time of his death. *See, e.g.*, 6 SH2RR 74-75; *see also* Ex. 19. |

| | |
|---|---|
| Tomlin died of "an intentional and very purposeful act." 41 RR 183; *id.* at 191, 216. | "I cannot judge intent from an autopsy[.]" 6 SH2RR 104. |
| "In this particular case, I can't be certain as to when he died, sir." 41 RR 207. | Tomlin's pacemaker would have recorded time of death. 6 SH2RR 73. |

By contrast with his firm trial testimony, Dr. Peerwani's testimony is now that this was "not" a classic case of smothering. *Id.* at 115. The State knew or should have known that this testimony was false. Dr. Peerwani testified as the Chief ME of the TCME Office. 6 SH2RR 49-50. Furthermore, Det. Johnson was also present during the autopsy. *Id.* at 56.

The materiality of this false testimony is evident from the State's closing argument: "[T]he bottom line from Dr. Peerwani . . . is that [Carter] intentionally tried to smother him, and he died of smothering." 42 RR 76-77. Every scenario Dr. Peerwani offered to the jury involved Carter smothering Tomlin, which he emphasized was "an intentional and very purposeful act." 41 RR 183, 216. Dr. Peerwani unequivocally excluded any other cause of death, including positional asphyxia alone or a cardiac event.

At trial and in subsequent proceedings, the State has centered Dr. Peerwani's testimony as the critical evidence of specific intent. *E.g.*, 42 RR 41, 45-46, 73, 77. Absent Dr. Peerwani's testimony, the State's case that Carter had the specific intent to commit capital murder was speculative at best. Carter did not deny his involvement in the robbery, and he admitted to binding Tomlin's hands and feet. 40 RR 140, 143; Exs. 8, 9. But he was—and remains—firm that Tomlin was alive when he left. *Id.* Moreover, Peerwani's false testimony that the injuries to Tomlin's cheeks were "contusions" enabled the State to rebut the defense's theory that Tomlin was alive after Carter left and sustained these injuries in attempting to remove the tape from his face. This defense theory, however, is consistent with what Dr. Peerwani now concedes are abrasions. Likewise, Dr. Peerwani's false testimony that there were no other "abnormalities" noted in his internal examination stripped the jury of critical information regarding Tomlin's health and relevant to cause of death. Dr. Peerwani's false testimony is material because it could "in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 153-54.

### B. Carter was diligent in discovering the falsity of Dr. Peerwani's testimony.

Carter can make a prima facie showing that he was diligent in discovering the falsity of Dr. Peerwani's testimony. 28 U.S.C. § 2244(b)(2)(B)(i). The State elicited false and misleading testimony at trial and has since failed to correct that false testimony despite opportunities to do so in subsequent proceedings. Notably, in 2008, the trial court held a hearing on Carter's claim of ineffective assistance of trial counsel at guilt phase which focused on Dr. Peerwani's trial testimony. *See* 2 SHRR. The State continued to rely on Dr. Peerwani's false testimony, including in support of its argument that Carter was not prejudiced because a pathologist would have agreed with Dr. Peerwani's conclusions—based on what is now known to be an incomplete record of Dr. Peerwani's autopsy findings. *See* Supp. SHCR 144.

The State's suppression of evidence establishing the falsity of Dr. Peerwani's trial testimony likewise continued in subsequent state habeas proceedings. *See* Claim I.B. When successor state habeas counsel requested the TCME's "complete file" in April 2017,[5] internal emails

---

[5] Texas Code of Criminal Procedure, Article 11.071 does not permit pre-authorization discovery and counsel therefore could not subpoena records.

reflect that it decided not to "not send everything as [counsel] have requested." Ex. 21 at 1. The State represented to counsel that it was withholding photographs and histology/microscopic slides but did not inform counsel that it was also holding back Dr. Peerwani's handwritten notes establishing the fact that Tomlin had a pacemaker. *Id.* Similarly, following a May 2017 meeting during which Dr. Peerwani told former counsel Posel that smothering was not the cause of death, Dr. Peerwani then refused any further communication. 8 SH2RR 162-63. The following day, Posel emailed Dr. Peerwani with a letter containing a summary of her conversation with Dr. Peerwani, asking him to clarify information regarding Tomlin's cause of death and provide a statement to that effect. *Id.* at 166. Peerwani did not respond. *Id.* at 168.

Without further communication from Dr. Peerwani, it was not until the day prior to Dr. Peerwani's July 2018 deposition that the State turned over Dr. Peerwani's handwritten notes and a provisional autopsy form revealing the existence of the pacemaker for the first time, and the day of his deposition that Dr. Peerwani provided sworn testimony

contradicting his trial testimony, beyond what had already been uncovered.[6]

## C.    Carter can make a showing of innocence.

Carter can make "a prima facie showing, by clear and convincing evidence, that no reasonable factfinder would find him guilty" of the offense. *Will*, 970 F.3d at 543 (citing 28 U.S.C. § 2244(b)(2)(B)(ii)). The State told the jury in closing argument that it was Dr. Peerwani's testimony that provided the evidence of specific intent necessary for the jury to reach a capital murder verdict. 42 RR 41, 45-46, 73, 77. But for Dr. Peerwani's false testimony, there is no evidence establishing beyond a reasonable doubt that Tomlin died of an intentional act, let alone intentional smothering.

Dr. Peerwani concedes that smothering "could have never happened." 6 SH2RR 115. He also admits that it is possible that Tomlin—

---

[6] Upon information and belief, Dr. Peerwani also provided false testimony during his deposition and hearing testimony. This includes false testimony that it was the TCME's practice to keep a pacemaker inside the body of a decedent. *Compare*, 6 SH2RR 73 (testifying that the TCME did not remove pacemakers) *with*, Ex. 14 ¶8 ("When someone had a pacemaker, the [TCME's] Office practice was to remove that device at autopsy."). It also includes Dr. Peerwani's 2019 testimony that his conclusions in this case were peer reviewed. 6 SH2RR 128, 179. Undersigned counsel have reviewed other autopsy reports produced by the TCME in homicide cases and which do reflect the signature of other TCME MEs. Dr. Peerwani's report in this case, however, reflects only his signature. *See* Ex. 22 at 2.

who, as he describes in his 2019 testimony, "has a lot of other comorbidities that could have played a role at the very end," *id.* at 91— may have died of a cardiac event, *id.* at 88. As Dr. Peerwani further explains: "[H]e was an elderly person, 89 years of age. He had an enlarged heart, he had bad coronaries, and he was stressed. And the terminal event, he could have had an arrythmia and suddenly died." *Id.*; *see also id.* at 91, 106. He further agrees that an individual presenting with these conditions was at greater risk of a fatal cardiac arrhythmia. *Id.* at 71. He also agrees that the absence of a second lead from the pacemaker to Tomlin's heart may be significant. *Id.* at 81. A jury today would hear from Dr. Peerwani that amongst all these factors, he "can't pinpoint one and say this is what killed him[.]" *Id.* at 92.

In short, Dr. Peerwani has entirely abandoned his trial testimony that the cause of death necessarily included an intentional act of smothering. Indeed, he cannot determine cause of death. 6 SH2RR 92. Absent Dr. Peerwani's false trial testimony that Tomlin died of an intentional act—smothering—there is no reliable evidence that Carter had the specific intent to commit capital murder. No reasonable

factfinder would have found Carter guilty of capital murder. 28 U.S.C. § 2244(b)(2)(B)(ii).

### III. Carter can make a prima facie showing that he meets 28 U.S.C. § 2244 to receive authorization to proceed in district court on the claim that the State destroyed evidence and violated *Youngblood*.

Carter has not previously raised a *Youngblood*[7] claim in federal habeas. Section 2244(b)(1) therefore does not bar authorization.

#### A. The *Youngblood* claim has potential merit.

The Fourteenth Amendment prohibits the State from destroying "potentially useful evidence" in bad faith. *Youngblood*, 488 U.S. at 58. To establish a *Youngblood* violation: (1) the evidence at issue must be "potentially useful," such that "it could have been subjected to tests, the results of which might have exonerated the defendant," *id.* at 57; and (2) the State must have destroyed the "potentially useful evidence" in bad faith, *id.* at 58. Importantly, to prevail on a *Youngblood* claim, a petitioner need not demonstrate that the evidence would have affected the outcome of a trial because the evidence is by definition unavailable. *Id.* at 57.

---

[7] *Arizona v. Youngblood*, 488 U.S. 51 (1988).

The State destroyed Tomlin's pacemaker, which would have provided time and cause of death, two critically disputed issues at trial. While the investigation was ongoing and Tomlin's cause of death was still pending, the State released Tomlin's body to a funeral home, thereby also burying the pacemaker. Ex 10. Carter was thus prevented from using the pacemaker and its data to undermine the only reliable evidence supporting capital murder liability: Dr. Peerwani's testimony that Tomlin died of "smothering with positional asphyxia." 41 RR 195.

Tomlin's pacemaker was "potentially useful evidence." The key disputed issue at trial was whether Carter had the specific intent required for the State to obtain a capital murder conviction. And cause of death was the State's only reliable evidence of such intent. The data recorded by the pacemaker was potentially useful evidence because it could have established both the time and cause of Tomlin's death. Ex. 1 ¶¶25-27; Ex. 23 ¶6 ("This information would have been of value in determining the exact time of Mr. Tomlin's death, whether it was during the home invasion or after everyone had left, and whether he died of spontaneous cardiac arrhythmia or of suffocation or positional asphyxia.").

Removal of the pacemaker and interrogation of the recorded data would have pinpointed the exact time of death. Ex. 1 ¶¶25, 27. Time of death was a contested issue at trial, and a fact which Dr. Peerwani testified he could not possibly establish. *See* 41 RR 206 ("[I]t's a very difficult thing to precisely say. There is no . . . laboratory test that you can run through a machine and say this is the time of death."); *id.* at 207 ("In this particularly case, I can't be certain as to when he died."). But, had the State preserved the pacemaker, "interrogation could demonstrate sustained ventricular arrhythmia (VT/VF), failure of ventricular capture, or a terminal decline in rate variability—findings that provide critical insight into both the mechanism and timing of death." Ex. 1 ¶27; *see also* Ex. 13.

A reading of the pacemaker data could have also provided evidence of cause of death, including that Tomlin died of a cardiac event. Pacemaker data would have shown the pattern of Tomlin's heartbeats leading up to his death, potentially demonstrating the occurrence of a fatal cardiac arrhythmia. Ex. 1 ¶27. Tomlin's pacemaker, like other models at the time, logged and time-stamped cardiac events, including arrhythmias.



Ex. 13 (excerpt from Pulsar Max II manual). Indeed, Dr. Peerwani

concedes that "the terminal event may have been a fatal cardiac

arrhythmia." 2 SH2CR 764. He did not include such a possibility in his

autopsy report or in his testimony at trial. This concession came only

after Dr. Peerwani was confronted with information that Carter's counsel

had become aware of the presence of a pacemaker.

The pacemaker would have further provided critical impeachment

evidence against Dr. Peerwani, on whose testimony the State hinged its

case. Had the defense known of the pacemaker, trial counsel would have

impeached and cross-examined Dr. Peerwani regarding his departure

from the TCME's practice of removing and interrogating the pacemaker,

as well as his omission of the pacemaker from his cause of death

determination. *See* Claim I.A. Furthermore, the model of Tomlin's pacemaker "was issued a Class I FDA recall/advisory in 2005 for a hermetic sealing defect that could lead to pacemaker malfunction and serious clinical consequences," including "serious adverse health consequences or death." Ex. 1 ¶12. The recall would have provided further impeachment material and bolstered the defense's case that Tomlin did not die of an intentional act. The pacemaker and its data are "potentially useful." *Youngblood*, 488 U.S. at 57.

The State's failure to preserve the pacemaker was in bad faith. In defining bad faith, *Youngblood* calls attention to "those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant," and envisages that "information [] concealed from [a defendant] at trial" may indicate bad faith. *Youngblood*, 488 U.S. at 58. The totality of the State's conduct establishes a prima facie showing of bad faith. Dr. Peerwani violated TCME practices and established forensic standards. His actions surpassed mere negligence and reflect a pattern of concealment.

First, by failing to preserve the pacemaker, Dr. Peerwani violated TCME and forensic pathology practice. Where a pacemaker was

observed, TCME "standard practice . . . included removal of the pacemaker, bagging it, and marking it as evidence." Ex. 7 ¶14. The pacemaker was then sent to the manufacturer "as a matter of course" to be interrogated. Ex. 3 ¶8; Ex. 7 ¶14 (standard TCME practice was that "[t]he pacemaker would then be sent to the manufacturer for auditing and examination").

Dr. Peerwani, however, failed to remove and request interrogation of Tomlin's pacemaker in accordance with TCME practice. Instead, Dr. Peerwani released the body for burial, thereby ensuring the pacemaker's destruction. Ex. 10. Moreover, Dr. Peerwani did so despite listing the cause of death as "pending," Ex. 17, which indicated the pendency of "further testing that was important to the cause of death determination," Ex. 3 ¶12. Instead, Dr. Peerwani immediately released Tomlin's body for burial—thereby ensuring the pacemaker was buried and its data destroyed.

Second, Dr. Peerwani also broke from the TCME's basic documentation procedures. Dr. Peerwani failed to follow "standard practice . . . at the [TCME] . . . to list the pacemaker in the description of the heart in the autopsy report." Ex. 7 ¶13. As established above, Claim

I, Dr. Peerwani included his observations of the pacemaker in the handwritten provisional autopsy form only; the State thereafter suppressed its existence until the day before Dr. Peerwani's 2018 deposition. Additionally, Dr. Peerwani flouted TCME's procedure of taking photographs of the "organs when they were unusual, particularly in homicide cases." Ex. 3 ¶7. In Dr. Peerwani's own words, "photographs are perhaps our most significant tool in documenting what we saw as pathologists at the time of autopsy." 41 RR 148. Yet, despite taking over 130 photographs during the autopsy and investigation, including photographs of Tomlin's keychain, wallet, and the soles of his shoes, the State did not take a single photograph of the pacemaker or of Tomlin's heart.[8] *See* 6 SH2RR 75. Dr. Peerwani's actions raise special concern because the cause of death was undetermined at the time the pacemaker was destroyed.

---

[8] According to 2021 State-initiated *Brady* disclosures, Dr. Peerwani disciplined and placed TCME Assistant Chief, Dr. Marc Krouse, on administrative leave after Dr. Krouse offended the same forensic practices Dr. Peerwani failed to follow in this case. For example, in a review of one of Dr. Krouse's cause-of-death determinations, Dr. Peerwani criticized Dr. Krause's failure to take "photograph[s] [of] the body . . . with appropriate overall, mid-range and close-up photographs" and Dr. Krause's release of a body with a leg monitor intact to the funeral home. Nizam Peerwani, Chief Medical Examiner, *Tarrant County Medical Examiner's Audit Report: Krouse Jurisdictional Homicide Cases: Jan. 01 2020 through Nov. 9, 2020* (Mar. 19, 2021).

The State's destruction of the pacemaker should be viewed in the larger context of a systematic effort to conceal its existence. Dr. Peerwani documented the presence of the pacemaker in three separate places in the handwritten provisional autopsy form—in the "Cardiovascular System" section (noting "PM w/ lead in RV"), in the "Scars" section (noting "palpable pacemaker"), and in describing the upper chest scar as a "pacemaker scar"—but he did not include any of these observations into the final autopsy report. *Compare* Ex. 19, *with,* Ex. 22. It was not until the day before his court-ordered 2018 deposition, more than twelve years after trial, that Dr. Peerwani's handwritten notes were disclosed.

Dr. Peerwani also shielded his work from the office's review process for cause of death determinations. "Pursuant to this process, a committee of medical examiners was assigned to review the autopsy findings and cause of death determination made by a fellow medical examiner in the office." Ex. 7 ¶7. This process was not only a matter of course, but "particularly important" in homicide cases. *Id.* at ¶8. There are, however, no signatures of other reviewers in Dr. Peerwani's final autopsy report, thus indicating that he evaded this critical process altogether. *See* Ex. 22.

Beyond this pattern of concealment, Dr. Peerwani's conduct has

also involved demonstrable misrepresentations about the pacemaker and his reasons for failing to preserve it. At trial, he testified that Tomlin had "no other [heart-related] pathologies or abnormalities present internally." 41 RR 174. This was plainly false; Dr. Peerwani repeatedly documented the pacemaker in his undisclosed notes. Ex. 19. Years later, when questioned about why he failed to preserve the pacemaker, Dr. Peerwani also claimed that the TCME did not remove pacemakers as a matter of routine. 6 SH2RR 73. But it was his office's practice to remove a pacemaker and have it interrogated "as a matter of course." Exs. 3 ¶8; 7 ¶13. This systematic concealment of the pacemaker's existence demonstrate bad faith.

## B. Carter was diligent in pursuing evidence the State destroyed.

Carter can make a prima facie showing that he was diligent in pursuing the factual predicate underpinning his *Youngblood* claim. 28 U.S.C. § 2244(b)(2)(B)(i). The factual predicate for Carter's claim that Dr. Peerwani destroyed the pacemaker in bad faith is based on evidence suppressed by the State: (1) Dr. Peerwani observed the pacemaker during the autopsy and made three specific, handwritten notations about it at the time; (2) Dr. Peerwani excluded these critical observations from his

final autopsy report; (3) contrary to well-established autopsy protocols, the TCME failed to take a single photograph of the pacemaker or of Tomlin's heart, even though the autopsy and investigation were otherwise thoroughly documented in more than 130 photographs; and (4) Dr. Peerwani released Tomlin's body, pacemaker intact, to the funeral home, thus burying and destroying the evidence. Carter could not establish these facts earlier because the State concealed Dr. Peerwani's handwritten notes and provisional autopsy form and falsely represented at trial and in subsequent proceedings that all autopsy materials had been disclosed.

As set out above, Claim I, the State falsely represented at trial that it had disclosed all *Brady* material and bolstered this assertion by failing to correct postconviction counsel's reliance on the false picture painted absent the withheld material. The State failed to disclose the pacemaker's presence through discovery or testimony pre-trial and in post-conviction proceedings. At each turn, the State stymied Carter's efforts:

- At trial, Dr. Peerwani falsely testified that Tomlin had "no other [heart-related] pathologies or abnormalities present

internally." 41 RR 174. Dr. Peerwani had documented the pacemaker in three separate places in his handwritten provisional autopsy form. The State did not correct his misrepresentation nor disclose the notes showing the pacemaker's existence.

- In its Reply to Carter's Application for Writ of Habeas Corpus, the State reaffirmed that Carter's counsel had "all documents, photographs, and other materials in the case" relating to the autopsy. Supp. SHCR 52.

- At the October 13, 2009, evidentiary hearing on Carter's initial state habeas petition, the State failed to correct Dr. Harvey's conclusion that Tomlin's pacemaker must have been removed prior to his death. SHRR 23.

- On April 25, 2017, counsel requested TCME's complete file, including "the examiners' notes." The State produced the autopsy report, but not Dr. Peerwani's notes documenting the pacemaker. Ex. 21 at 1.

- On May 3, 2017, Carter's state postconviction counsel met with Dr. Peerwani, who referenced Tomlin's poor health but did not disclose the pacemaker's existence at autopsy.

- After the state court stayed Carter's execution and ordered evidentiary proceedings in October 2018, the State produced the medical examiner's file, but did not include Dr. Peerwani's provisional autopsy form, which documented the pacemaker at autopsy. 2 SH2CR 761.

It was not until July 29, 2018—on the eve of a court-ordered deposition of Dr. Peerwani, twelve years after trial—that the State finally produced the provisional autopsy form, which indicated the presence of Tomlin's pacemaker. A day later, at his deposition, Dr. Peerwani for the first time admitted that he observed the pacemaker at autopsy, failed to remove or interrogate the pacemaker, and instead released Tomlin's body to the funeral home with the pacemaker inside all while Tomlin's cause of death determination remained "pending."

The factual predicate for the *Youngblood* claim therefore could not have been discovered previously through the exercise of due diligence. 28 U.S.C. § 2244(b)(2)(B)(i).

## C. Carter can make a showing of innocence.

Carter can make "a prima facie showing, by clear and convincing evidence, that no reasonable factfinder would find him guilty" of the offense. *Will*, 970 F.3d at 543 (citing 28 U.S.C. § 2244(b)(2)(B)(ii)). At this stage, it is sufficient that Carter makes a prima facie showing that it is "reasonably likely" the destroyed evidence "would have changed the outcome." *Id.* at 544.

By destroying the pacemaker, the State made its case at trial seem significantly stronger than it actually was. Had the State preserved and interrogated the pacemaker, Carter could have used the recorded data to undermine the only evidence supporting capital murder liability: Dr. Peerwani's testimony that Tomlin died of "smothering with positional asphyxia." 41 RR 195. The pacemaker could have revealed: (1) the precise time of death, corroborating Carter's statement that Tomlin was alive when he left the house; (2) a fatal cardiac arrhythmia as the terminal event—a possibility Dr. Peerwani concedes, but denied at trial when he testified the evidence was "very much consistent with the respiratory death rather than a sudden cardiac event," 41 RR 174, 176; and/or (3) that Tomlin's death occurred after the robbery from stress-induced

cardiac arrest and/or pacemaker dysfunction, a possibility raised by Dr. Peerwani's observation of only one of two leads in place on Tomlin's heart, *see* Ex. 19. at 5 With this evidence countermanding Dr. Peerwani's testimony, the evidence would have been insufficient to establish that Tomlin died of smothering and thus that Carter had the specific intent required to reach a capital murder conviction.

Ultimately, the State's destruction of the pacemaker has placed Carter in a "treacherous" position: he must not only "divin[e] the import of materials whose contents are unknown," *Youngblood*, 488 U.S. at 58, but also establish innocence despite the absence of the very evidence that could prove it. The State's bad-faith destruction of invaluable evidence should not foreclose this Court's authorization.

## IV. Carter can make a prima facie showing that the statute of limitations is met.

Carter can meet the statute of limitations pursuant to 28 U.S.C. § 2244(d)(1)(D). As set out above and here by incorporation, the fact that Dr. Peerwani observed a pacemaker at the time of autopsy was suppressed by the State until July 2018, twelve years after trial, when Carter was able to compel production of Dr. Peerwani's handwritten notes and deposition controverting his trial testimony. At that time,

Carter's application for state post-conviction review was pending, and the 1-year statute of limitations was therefore tolled until the CCA denied habeas relief on July 30, 2025. 28 U.S.C. 2244(d)(2). Carter's claims therefore fall within the 1-year statute of limitations. *Id.* at § 2244(d)(1).

In the alternative, the statute of limitations may be excused because Carter can show that he is actually innocent. *McQuiggin v. Perkins*, 569 U.S. 383, 392-93, 399 (2013) (holding that statute of limitations may be excused where petitioner can show that "'it is more likely than not that no reasonable juror would have convicted him in the light of new evidence.'" (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995))). Carter incorporates here by reference all facts and legal arguments made above in support of making a prima facie showing that he can meet 28 U.S.C. § 2244(b)(2)(B) as to his claims. Because Carter has alleged a "viable basis" for excusing the statute of limitations, this Court should permit him to proceed on his argument that the statute of limitations can be excused based on his actual innocence. *In re Campbell*, 750 F.3d 523, 533 (5th Cir. 2014).

## PRAYER FOR RELIEF

WHEREFORE, Tilon Carter requests that this Court consider his Petition for Writ of Habeas Corpus and grant the following remedies and such other relief as the Court deems appropriate:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and be relieved of his unconstitutional sentence of death;

2. Allow Petitioner leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his conviction and sentence;

3. Conduct an evidentiary hearing pursuant to Rule 8 of the Rules Governing 28 U.S.C. § 2254 Cases; and

4. That this Court grant such other relief as law and justice require.

Dated: December 22, 2025.

Respectfully Submitted,

JASON D. HAWKINS
Federal Public Defender

Jeremy Schepers
Supervisor, Capital Habeas Unit

*/s/ Naomi Fenwick*
Naomi Fenwick

*/s/ Rachel Schaefer*
Rachel Schaefer
Assistant Federal Public Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
(214) 767-2746
(214) 767-2886 (fax)
rachel_schaefer@fd.org
naomi_fenwick@fd.org